**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

OSCAR INSURANCE COMPANY
OF FLORIDA,

                                       CASE NO.:

                 Plaintiff,

vs.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., d/b/a Florida Blue; HEALTH
OPTIONS INC., d/b/a Florida Blue HMO; and
FLORIDA HEALTH CARE PLAN INC., d/b/a
Florida Health Care Plans,

                 Defendants.

_____/

## **COMPLAINT**

### **(INJUNCTIVE RELIEF SOUGHT)**

Plaintiff Oscar Insurance Company of Florida ("Oscar" or "Plaintiff") brings this civil action for injunctive relief and damages under the antitrust laws of the United States and the State of Florida and the common law of the State of Florida against Defendants Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue; Health Options Inc., d/b/a Florida Blue HMO; and Florida Health Care Plan Inc. (collectively, "Florida Blue" or "Defendants").  Plaintiff alleges based upon personal knowledge as to facts pertaining to itself, and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.     This action arises out of the improper, unlawful and anticompetitive conduct by Florida Blue to stifle competition in Florida for the sale of individual health insurance plans and products in compliance with the Patient Protection and Affordable Care Act of 2010 ("ACA"), a key cornerstone of extending health care to all Americans, regardless of health status.

2.     Florida Blue, the entrenched monopolist in Florida, holds approximately a 75 percent share of individual ACA insurance plans sold statewide and a significantly higher share in portions of the state, including the Orlando metro area, where prior to the current enrollment period Florida Blue faced only a single competitor serving the four counties that comprise the Orlando metro area.  In fact, since 2015, major insurers including Aetna, Humana, Cigna and UnitedHealthcare, have left the market, leaving Florida consumers little choice but to pay Florida Blue's steadily increasing rates.  Oscar is poised to change that.

3.     Oscar, one of the country's fastest growing health insurance companies, uses technology and a customer-first approach to make health care affordable and accessible to its roughly 230,000 members.  Oscar has had significant success bringing down health insurance prices and providing consumers with a superior experience in the health care system in the states outside Florida it has entered.

4.     Beginning with the annual enrollment period that started on November 1, 2018, Oscar is now selling ACA plans in the Orlando metro area and is offering innovative plans at lower prices than Florida Blue.  For example, in Orange County,

Oscar offers plans in the most popular plan categories with premiums that are $16-36 less expensive per month, or roughly $190-430 less per year, than the comparable Florida Blue plans.  Oscar's plans also offer richer features than its competitors, like free 24/7 telemedicine and dedicated concierge teams.  And Oscar's entry into the Orlando metro area is just the beginning—Oscar has in motion plans to begin selling insurance in other markets, including in the Jacksonville and Tampa metro areas as soon as next fall.

5.      Faced with a major threat to its monopoly profits, Florida Blue responded by implementing a blatant scheme targeted at Oscar to keep it out of the state, thereby causing Florida consumers to continue to pay more for health insurance coverage.  First and foremost, the scheme involves denying Oscar access to insurance brokers upon whom consumers rely to advise them of their insurance options.  Florida Blue has a company policy—brazenly displayed on its website—that no broker may sell Florida Blue's individual plans unless that broker agrees to sell *only* Florida Blue's individual plans.  Florida Blue wrongfully uses its monopoly power to compel brokers to sell only its plans when industry standards require independent brokers to find the best options for consumers' needs.  Second, during the very same week in October 2018 in which Florida Blue learned Oscar's plans are lower-priced than its own, Florida Blue moved to aggressively enforce this exclusivity policy against Oscar by systematically contacting brokers who have signed contracts with and been appointed as brokers by Oscar to threaten them with permanent termination.  In one email to brokers, Florida Blue said "**[you] will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

6.      Florida Blue's monopoly power in Florida makes its scheme devastating to a new entrant like Oscar, as well as deeply injurious to Florida consumers.  Brokers face losing the right to sell Florida Blue plans in all product lines throughout *the entire State of Florida* if they decide to sell Oscar plans in the *Orlando metro area*.  This anticompetitive leverage is greatest for the most successful brokers in the state, those with the largest client bases and those who operate in the regions, like Orlando, where Florida Blue has an especially dominant market position today.  Several brokers have explained they have no choice but to stay with Florida Blue:

- **"I just got word that any Florida Blue agents who will be contracting with Oscar will be terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here.  Losing our Blue Contract would be a financial disaster.**"

- **"Unfortunately I need to rescind my request, as Florida Blue has informed me that they will cancel my contract if they see new appointments for any products in any area of Florida.  This would be highly detrimental as they would be keeping most of my book of business.**"

- **"This is a request to terminate my Oscar contract as I am also appointed with FL blue and they can only allow captive agents to work with them."**

7.      Florida Blue's coercion of brokers not to deal with new entrants like Oscar stymies those entrants' ability to compete.  Brokers are a critical sales channel in health insurance markets for new entrants in all states, and this is especially so in Florida where brokers are more popular with consumers than in many other regions of the country.  Given Florida Blue's dominant market share in Florida (and even larger share in Orlando), brokers with the largest existing client bases have an overwhelming incentive to sell Florida Blue's plans and cannot afford *not* to sell Florida Blue's plans.  Consequently, Florida Blue's insistence that brokers sell *only* Florida Blue plans

necessarily forecloses Oscar from access to brokers responsible for selling the vast majority of ACA plans in the Orlando metro area.  Oscar will suffer the same fate in other Florida metro areas it intends to enter, where Florida Blue holds similar exclusionary power as a result of its high share of plan sales.

8.      Beyond the harm to competition derived from seeking to exclude a new, innovative competitor with lower-priced products from the marketplace, Florida Blue's scheme undermines a key function of the ACA health insurance marketplace.  One of the principal purposes of the ACA is to provide consumers with more choices.  Independent brokers serve a valuable public purpose in explaining options and helping consumers navigate health insurance exchanges so that they make informed, educated choices about which plan is best for them and their families.  But Florida Blue is attempting to force all independent brokers in Florida to become captive brokers beholden to Florida Blue.  If successful, Florida Blue will eliminate the independence of the largest brokers (and the valuable services they provide) in the Orlando metro market, such that consumers no longer will have access to objective advice about the full range of their insurance options.  Brokers will not review the options of insurers with consumers, but instead will merely help them renew their Florida Blue plans each year.

9.      The consequences for Oscar already have been severe.  Under pressure from Florida Blue, more than 190 brokers (and counting) backed out of agreements to sell Oscar's plans once they were threatened with termination by Florida Blue.  Because this coercive pressure was applied only one week before the beginning of the open enrollment period—the only six weeks during which health insurers selling individual

ACA plans can sign up customers for the entire following year—Oscar had limited opportunity to respond to this blatantly anticompetitive tactic. Even before the recent round of cancellations, other major brokers, including many of the largest and most successful brokers servicing the Orlando area, refused even to discuss dealing with Oscar out of fear of losing Florida Blue's business. In total, only about a quarter of the local brokers in the Orlando metro area, and very few of the brokers with the type of large client bases necessary for success, have been appointed by Oscar, which is far fewer appointed than in other markets Oscar has entered. Based on the success it has experienced with the limited number of brokers it has appointed in Orlando, Oscar has every reason to believe that Florida Blue's exclusivity policy is depriving it of the means to compete for a substantial majority of the ACA business in Orlando. In fact, Oscar has sold only a fraction of the plans to date in Orlando that it expected to sell based on its experience in other markets, even as its performance with the limited universe of brokers who have agreed to offer Oscar has been quite positive.

10.     While Florida Blue's scheme is causing harm in the Orlando market right now, its ramifications extend throughout Florida. Oscar plans to enter other Florida markets next year, including the Jacksonville and Tampa metro areas. Entering new insurance markets requires substantial advance work—beginning over a year before the open enrollment period—that includes contracting with hospitals, physicians and specialists to build provider networks, as well as attracting local brokers, and filing rate, plan, and network information for approval by state regulators. Oscar's ability to negotiate favorable rates with providers and attract brokers are both directly impacted by

how many insureds it has in Florida, as is its ability to recover the significant fixed costs of building new provider networks and marketing itself to consumers. At the moment, all major providers and brokers in Florida are dependent on Florida Blue. Florida Blue's scheme is designed to maintain its monopoly by ensuring Oscar and other potential new entrants cannot obtain the volume of business necessary to achieve a minimum efficient scale that will allow them to become viable competitors.

11. The effects of Florida Blue's scheme are designed to and will have the effect of keeping Oscar out of the Orlando metro area and other major metro areas, and preserving the high prices and monopoly profits that Florida Blue now reaps. The lack of scale will prevent Oscar from negotiating reasonable provider contracts in the Orlando metro area and other markets for 2020 and beyond that are necessary to provide low-cost alternatives to consumers.

12. Another component of Florida Blue's scheme is to ensure that new entrants like Oscar cannot make up for the lack of access to local brokers by turning to out-of-state brokers to sell their insurance plans in Florida. Specifically, Florida Blue has announced to brokers that it does "not appoint agents who reside out of state to sell individual products." In other words, to soften the blow of strong-arming local brokers out of selling insurance plans offered by Florida Blue's competitors, Florida Blue has taken measures to protect those same brokers from their out-of-state competitors. Significantly, the inability to work with Florida Blue, the largest insurer in the state, heavily deters out-of-state brokers from operating in Florida at all. The effect is to deny

the services of out-of-state brokers to new entrants such as Oscar and preserve Florida Blue's monopoly from disruption.

13.     Florida Blue's actions are those of a monopolist that believes it can get away with this type of anticompetitive conduct because it is too powerful to be told no. As a result of Florida Blue's anticompetitive conduct, Oscar's sales are substantially lower than they would have been but for Florida Blue's misconduct.  Moreover, unless Florida Blue's anticompetitive conduct is enjoined, Oscar will suffer irreparable harm for which it has no adequate remedy at law, including lost goodwill, lost opportunities and potentially its very viability in Florida, not only in the Orlando metro area, but in additional metro areas and counties in Florida it plans to enter in the future.

14.     In turn, Florida Blue's actions have harmed the entire insurance marketplace in Florida by deterring and preventing new insurers, like Oscar, from entering Florida markets.  Florida Blue's anticompetitive conduct offends the public interest because it deprives consumers of the benefits of a free and competitive market, which would otherwise include new and innovative insurance plans, more choices, lower premiums and better services.

## THE PARTIES

### I.     Plaintiff

15.     Plaintiff Oscar Insurance Company of Florida is a Florida corporation with its principal place of business at 295 Lafayette Street, New York, NY 10012.  Oscar's affiliates are currently accepting health insurance customers for the 2019 plan year in New York, New Jersey, California, Texas, Ohio, Tennessee, Arizona, and Michigan.

Oscar also now offers for the first time health insurance plans in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area, with a starting coverage date of January 1, 2019.

## II.   **Defendants**

16.     Blue Cross Blue Shield of Florida, Inc. is a Florida corporation with its principal place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246. Blue Cross Blue Shield of Florida, Inc. is an independent licensee of the Blue Cross and Blue Shield Association.  Blue Cross Blue Shield of Florida, Inc. sells health insurance plans across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

17.     Health Options Inc. is a Florida corporation with its principal place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  Health Options Inc. is an independent licensee of the Blue Cross and Blue Shield Association.  Health Options Inc. sells health insurance plans, specifically Health Maintenance Organization ("HMO") plans, across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

18.     Florida Health Care Plan Inc. is a Florida corporation with its principal place of business at 1340 Ridgewood Avenue, Holly Hill, FL 32117.  Florida Health Care Plan Inc. is an independent licensee of the Blue Cross and Blue Shield Association. Florida Health Care Plan Inc. sells health insurance plans across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

19.     Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered and/or done by Defendants' various officers, agents, employees or other representatives while actively engaged in the management of Defendants' affairs, within the course and scope of their duties and employment, and/or with the actual, apparent and/or ostensible authority of each Defendant.

## JURISDICTION AND VENUE

20.     This court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 for the claims in this action filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for damages and to secure injunctive relief against Florida Blue for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), as alleged herein.

21.     This court has supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claims as those claims arise out of the same matters and transactions that give rise to the federal law claims over which this Court has federal question jurisdiction.

22.     Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391.   Defendants' principal places of business are within this district, and Defendants have engaged in anticompetitive behavior in this district, as alleged herein.

23.     Defendants' actions described in this Complaint are within the flow of and substantially affect interstate commerce.   Defendants' activities foreseeably restrained

interstate commerce by foreclosing out-of-state health insurance plan providers and brokers from competing in Florida.

## FACTUAL ALLEGATIONS

### I.   Individual ACA Insurance Plans in Florida

24.     Health care is a significant concern for many Americans.  A recent Kaiser Family Foundation survey found that a majority of Floridians view health care as "very important" and 26 percent of Floridians rank it as the "most important issue," a higher percentage than any other issue.   In particular, health care costs continue to be an important issue for Floridians.  The same Kaiser Family Foundation survey found that, when asked to explain why health care is the most important issue, consumers most frequently identified costs as the concern.

25.     Enacted on March 23, 2010, the central goal of the ACA is "to create a more transparent, competitive marketplace that gives consumers more information about their health insurance options and ensures better value for their premium dollars." *Health Plan Finder Data*, Centers for Medicare & Medicaid Services, The Center for Consumer Information & Insurance Oversight.  The ACA governs the sale of, and in some cases subsidizes consumers' purchase of, individual insurance plans, which are health insurance plans that a person buys on his or her own as opposed to through an employer or association.  As the U.S. Department of Health and Human Services ("HHS") has explained, the paramount goal of the federal exchange is "to foster issuer competition, facilitate consumers' comparison shopping, and ensure affordability through financial assistance," *Health Insurance Marketplace Premiums After Shopping, Switching, and*

*Premium Tax Credits, 2015-2016*, Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (April 12, 2016), and to "foster competitive environments in which consumers can choose from a number of affordable and high quality health plans." *Issue Brief*, Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (July 30, 2015). That is why HHS proposed to spend roughly $1.7 billion in 2018 to operate the federal exchange (covering 34 states, including Florida) to "allow individuals . . . to compare health plan options, see if financial assistance with premiums and cost sharing is available, and purchase coverage." *Justification of Estimates for Appropriations Committee*, Health and Human Services, Centers for Medicare & Medicaid Services, Fiscal Year 2018.

26.     Individuals and families who buy individual ACA insurance plans have no reasonable alternatives, because generally they cannot secure health insurance through other means, e.g., employer-sponsored coverage, Medicare or Medicaid. Consumers who already have health insurance through employers or a federal program do not purchase individual ACA insurance plans.

27.     In plan year 2018, roughly 1.75 million Floridians purchased individual ACA insurance plans, the highest number of any state in the country. Florida Blue's public filings indicate that it sold 1.3 million individual ACA plans in 2018, which corresponds to a statewide market share of 75 percent. Approximately 10-12 percent of all individual ACA insurance plan enrollees nationwide are Floridians. A similar number is expected to enroll for plan year 2019.

28.     Enrollees select a plan for 2019 coverage during the open enrollment period, which runs between November 1, 2018 and December 15, 2018.  Coverage for plans purchased during this open enrollment period starts on January 1, 2019.  In the lead up to and during the enrollment period, health insurance companies devote significant resources and money to attracting enrollees, including recruiting brokers, because their performance during this six-week period determines their total revenues for the entire following year.

## II.    The Role and Importance of Brokers

29.     Brokers play a crucial role in driving policy sales in Florida, more so than in other states, which typically have far fewer brokers.[1]  To date in the Orlando metro area, even with Florida Blue's exclusionary conduct, 73 percent of Oscar's policy sales have come through brokers compared to 40 percent nationally.

30.     Brokers must be licensed by the state to sell insurance.  To become licensed, brokers must complete 60 hours of insurance and ethics education coursework and pass a written examination.  *See* Fl. Stat. Ann. §§ 626.241, 626.221, 626.8311.  Brokers receive income either through customer fees or through commissions received from an insurance company.  Though the amount and structure of payments varies from insurer to insurer, compensation from insurance companies typically is tied to the number of plans brokers sell.

---

[1] In Florida, the terms "broker" and "agent" are used interchangeably in the health insurance context.

31.     According to the National Association of Health Underwriters, a trade association representing over 100,000 insurance brokers and agents nationwide, brokers "help millions of consumers by guiding them through the complexities of health insurance purchasing and enrollment, while ensuring they get the best policy at the most affordable price."  Brokers do so by "seek[ing] to understand each personal situation to create recommendations that complement a client's financial and medical security needs."  Because consumers rely on brokers as expert personal insurance advisors, Florida law recognizes insurance brokers as fiduciaries of their customers and obligates brokers to provide their clients accurate advice about insurance plans and coverage.

32.     Thus, independent brokers offer consumers valuable services because they provide one-stop shopping and information about multiple insurers' competing plans, as well as expertise and advice as to which plan to select.  An important part of the strategy of any new entrant into a local health insurance market is to market its offerings to licensed brokers and to convince them to be "appointed"—meaning legally permitted to sell policies for a particular insurer in return for a commission—by the new entrant. This is especially true in Florida, where the broker sales channel is particularly large and an unusually high percentage of all individual insurance plans are sold through brokers.

33.     While individual ACA insurance plans are sold by different types of brokers, including brokers working at call centers and at online health businesses, local brokers, i.e., those with a physical presence in the relevant sales area, play a critical role in the marketplace because consumers' decisions are often relationship-driven.  Oscar's experience in Orlando demonstrates that local brokers have a far greater ability to guide

the decisions of local residents than out-of-state or out-of-area brokers.  In other words, many consumers strongly prefer the advice of local brokers whom they interact with in person, rather than brokers who communicate with them solely from a call center or through the Internet.  Insurance plan sales are also driven heavily by consumer referrals, and local brokers create more referrals.

34.     Brokers in general, and local brokers in particular, offer significant benefits to insurers selling individual ACA insurance plans, including by providing more marketplace exposure and sales representative coverage than insurers are able to generate on their own.  Local brokers spend significant resources marketing to residents in their community and building relationships of trust over many years.  To date in the Orlando metro area, of the individual ACA insurance policies sold by brokers for Oscar, nearly 80 percent have come from brokers with operations in that area.

35.     Certain large brokers, often called contracted general agents (i.e., large entities that provide administrative services and support to local brokers), play a particularly important role because they account for a large volume of the covered lives in the Orlando metro area either through their own policy sales or the sales of the brokers to which they provide services.  Oscar has been particularly unsuccessful in engaging these types of brokers because they cannot risk termination by Florida Blue across the entire state.

36.     Brokers are thus a vital source of customers for insurance companies that offer individual insurance plans under the ACA in Florida.  Without access to brokers, insurance companies cannot effectively compete.

### III.   Florida Blue's Dominance

37.     Competition in the sale of individual ACA insurance plans throughout Florida has diminished as the number of insurers selling those plans has declined.  Major insurers like Aetna, Humana, Cigna and UnitedHealthcare stopped selling individual ACA plans in Florida between 2015 and 2017, and Florida Blue absorbed the bulk of the consumers they left behind.

38.     Competition in the individual market is even more limited in certain metro area markets.  With the addition of Oscar in 2019, the number of insurance companies offering such plans in all four of the Orlando metro area counties will rise to three.

39.     As other insurance companies exited, Florida Blue steadily gained share, far eclipsing any other competitor.  Florida Blue held approximately 75 percent of the market for individual ACA plans statewide in 2018.  Its share is even higher in the Orlando metro area, where its faces almost no competition.

40.     As a result of its market power and stranglehold on brokers, Florida Blue is able to charge supracompetitive premiums for its individual ACA insurance plans in the Orlando metro area.  With less competition, consumers are left with fewer choices and higher prices.

### IV.    Oscar's Entry

41.     Oscar's founding mission has been to build a technology-driven health care experience that makes accessing health care and navigating the complex health care system easy, seamless and more affordable for consumers.  Oscar's decision to enter Orlando comes in its sixth year serving enrollees in states across the country and stems

from its goal of bringing Oscar's uniquely engaging member experience and superior technology to more consumers.

42.     To deliver a better health care experience, Oscar has developed tools and resources that simplify the bureaucracy around health insurance that is often associated with traditional insurers.   Oscar is one of the first health insurers to integrate telemedicine directly into its plans, offering 24/7 access to telemedicine to enrollees at no additional cost.  In 2017, 25 percent of Oscar enrollees used its telemedicine feature, eight times the national average for other large group, employer sponsored health insurers.  Oscar also pioneered a concierge team model in the health care industry, which gives each enrollee a dedicated team of care guides and nurses who holistically support enrollees to find conveniently located, high-quality doctors, book appointments, understand and process claims, and answer any general questions related to their care. In 2017, 70 percent of Oscar members contacted and engaged with their concierge team.

43.     Oscar's member experience is distinguished from traditional insurers because of its intuitively designed mobile and web application that allow enrollees to manage their health care seamlessly, including searching for in-network doctors, booking appointments (in certain states) and accessing their health records.  In fact, 43 percent of members' first visits to the doctor are routed through Oscar's technology and customer service teams.  The ability to route enrollees to the right care at the right time is made even more seamless because Oscar does not require referrals for enrollees to see specialist doctors.

44.     Because of its superior technology services and integrated benefits, Oscar has the most engaged health insurance plan members in the industry, with the highest number of online accounts and active online users (mobile and otherwise).   High member engagement translates to cost savings and member satisfaction, which is why Oscar's member satisfaction rate is three times the industry average.

45.     Altogether, these features make it easier and more efficient for enrollees to manage their health care, reducing the amount of time and stress consumers usually spend managing their care and leaving more time for work or family.   Since 2014, Oscar and its affiliates have successfully brought its innovative business model to ACA individual plan consumers in 14 metro areas in 9 states.

46.     As will be the case in Florida, the entry of Oscar and its affiliates has benefited consumers in those states by providing them more choices, lower premiums and services not offered by other insurers.   By focusing on technology and service, Oscar can keep plan members' costs low.   As a result, Oscar is usually less expensive than traditional insurers, including Florida Blue, while providing comparable coverage and a high quality of care.

47.     Nearly all of Oscar's individual ACA insurance plans in the Orlando metro area are less expensive than alternatives offered by the Florida Blue plans. Oscar's plans are often the lowest-priced plans available, while many of Florida Blue's plans are among the most expensive.

48.     For example, plans available to Florida residents on the federal ACA exchange are divided into "metal" tiers that correspond to a specific percentage level of

cost sharing between the insurer and the insured, with "Bronze," "Silver" and "Gold" plans being the most popular plan categories. Gold plans typically require higher monthly premiums than Bronze and Silver plans, but cover a higher percentage of the insured's medical bills. Both Oscar and Florida Blue offer all three types of plans in the Orlando metro area, and at each level, Oscar's monthly premiums are regularly significantly lower than comparable Florida Blue plan premiums. Thus, an individual purchasing an Oscar plan could save many hundreds of dollars a year.

49. These benefits already are available to consumers in the Orlando metro area with Oscar's entry this year. Absent Florida Blue's exclusionary conduct, they may be available to consumers in Jacksonville and Tampa as soon as 2020. Oscar intends to enter each of those markets and has taken significant affirmative steps to do so in 2020, including: (1) conducting market research; (2) negotiating with health care providers to build a competitive network of hospitals, physician groups and other ancillary care facilities; and (3) preparing financial analysis regarding the viability and profitability of entry. Oscar has invested, and continues to invest, significant money and resources on these efforts. Oscar's deadline for entering these markets next year is fast approaching. Oscar would need to execute agreements with health care providers, and file for approval of its insurance plan offerings and expansion proposal with federal and state agencies by May 2019, well before which all of the above efforts must be completed. Thus, time is short.

## FLORIDA BLUE'S UNLAWFUL SCHEME TO EXCLUDE OSCAR

50.     Florida Blue is well aware that Oscar is a threat to upend the traditional insurance model and undercut Florida Blue's dominance.  Upon learning that Oscar planned to enter the Orlando market, Florida Blue regarded Oscar to be a major threat to its monopoly, and turned its focus on how best to respond to Oscar's entry into Florida. In response to this threat, Florida Blue launched a targeted campaign to prevent Oscar's successful entry in Orlando specifically and Florida more generally through unlawful exclusionary conduct.

### I.     Coercion of Brokers into Anticompetitive Exclusive Agreements

51.     Florida Blue makes no secret of its exclusivity policy with respect to brokers that sell individual insurance plans.  Its website states "**Our appointment to sell individual products is an exclusive contract . . . .**"  Thus, if a broker wants to sell individual plans for Florida Blue, it must agree to sell *only* Florida Blue's individual plans.

52.     Florida Blue obtained and enforced these exclusive dealing agreements through coercion and intimidation, including threatening to exclude brokers from a significant portion of the market for individual ACA insurance plans.  Because Florida Blue accounts for approximately 75 percent of these plans statewide and an even higher proportion in the Orlando metro area, brokers cannot afford to refuse Florida Blue.  In turn, Florida Blue now holds captive the vast majority of independent brokers in the Orlando metro area from which other competitors, including Oscar, are foreclosed. Without the ability to enter and attract consumers, Florida Blue's competitors cannot

achieve sufficient scale to negotiate favorable provider contracts and bring real, sustained competition to the state.

53.     In late October 2018, with the 2019 ACA open enrollment period approaching, Florida Blue initiated a concerted effort to intimidate brokers into refusing to work with Oscar.  In the very week that Oscar's competitive pricing for 2019 plans became public, Florida Blue systematically contacted brokers appointed by Oscar, using appointment information that is publicly available on the Florida Department of Financial Services website.  These communications threatened to permanently deny Oscar-appointed brokers business from Florida Blue, not only in the Orlando metro area, but throughout Florida, if they continued to do business with Oscar.  Florida Blue's behavior occurred only a week before the commencement of the Open Enrollment period on November 1, 2018 in which health insurance providers sign up all their business for the following year.

54.     For example, on October 24, 2018, Beau Shiflet, Area Manager Central Florida Region for Florida Blue, sent an email to brokers threatening, "**You . . . will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

55.     In an email received by Oscar that same day, October 24, 2018, one broker wrote to Oscar, "**This is a request to terminate my Oscar contract as I am also appointed with FL Blue and they can only allow captive agents to work with them.**"

56.     Similarly, on October 29, another broker explained to Oscar, "**I just got word that any Florida Blue agents who will be contracting with Oscar will be**

21

terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here.  Losing our Blue Contract would be a financial disaster."

57.    Previously, on or around October 10, Florida Blue terminated the appointment of another broker who participated in a radio advertisement promoting Oscar.  When that broker asked why his appointment with Florida Blue was terminated, Mr. Shiflet replied, "**We saw and heard your radio program with Oscar leadership promoting them in the Orlando market and the recruiting of agents.  This is not what we are looking for in our business partners**."

58.    Florida Blue's scheme is particularly effective because they have forced all of the contracted general agents in the Orlando metro area to work exclusively with Florida Blue.  These contracted general agents account for a high percentage of the consumers in the Orlando metro area either through their own policy sales or the sales of the brokers to which they provide services.  The contracted general agents refused even to consider Oscar and have rebuffed Oscar's initial outreach for fear of losing business from Florida Blue.  By forcing all of the contracted general agents in the Orlando metro area to serve as captive agents, Florida Blue has foreclosed access not just to their customers, but to all of the smaller brokers in the area that contract with them for services, including brokers that market themselves as independent brokers.

59.    While employing some captive agents is not unusual, what is highly unusual and anticompetitive is Florida Blue, a monopolist, using its market power to coerce all independent brokers, including the largest and most important brokers in the area, to become captive agents beholden to Florida Blue.  As a result of Florida Blue's

anticompetitive scheme, more than 190 brokers (so far) have backed out of agreements to sell Oscar's insurance plans. Of those, 133 terminated their appointments within the 48 hours immediately following Mr. Shiftlet's October 24, 2018 email. To put that number in perspective and highlight Florida Blue's market power, this year Oscar's affiliates have had only 14 broker terminations *nationally* outside of Florida. Oscar has thus been able to appoint only 27 percent of local brokers in the Orlando metro area, compared to nearly 60 percent in other markets where, as in Orlando, Oscar entered with competitive pricing.

60.     The sheer percentage of brokers from which Oscar is foreclosed is significant, but does not tell the full foreclosure story. The brokers from which Oscar is foreclosed, which include contracted general agents, account for an even higher percentage of the policies sold and consumers in the Orlando metro area. Thus, while Oscar has access to only about a quarter of the brokers in the Orlando metro area, it has access to, and therefore the ability to compete for, even fewer policies and consumers.

## II.     Refusal to Deal with Out-of-State Brokers

61.     Florida Blue's website also states that "**Florida Blue does not appoint agents who reside out of state to sell individual products.**"

62.     Through this policy, Florida Blue limits the number of brokers competing for individual plan sales in Florida, including the Orlando metro area. Without the ability to sell individual plans for Florida Blue, which dominates the market, out-of-state brokers—even large multistate, call-center-based brokers—have little incentive to enter Florida.

63.     By locking out these out-of-state brokers, Florida Blue reduces the number of brokers competing for sales of insurance plans and for which other insurance companies can turn to compete with Florida Blue.

64.     Moreover, this in-state-only broker policy entices local brokers to enter into exclusive agreements with Florida Blue.  Local brokers know that to amplify the competition-reducing effects of its exclusive agreements, Florida Blue will keep out-of-state brokers from competing with local brokers.

65.     Together with its exclusivity policy, Florida Blue's in-state-only broker policy helps it maintain its monopoly position.

## RELEVANT MARKETS

### I.     The Market for Individual ACA Insurance Plans

66.     There is a relevant product market for individual health insurance plans under the ACA ("Individual Plan Market").  The outer boundaries of the Individual Plan Market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between individual health insurance plans under the ACA and potential substitutes.

67.     From the perspective of insurance customers, there are no reasonable substitutes for individual health insurance plans under the ACA because, *inter alia*, those individuals and families generally cannot secure health insurance through other means, e.g., employer-sponsored coverage, Medicare and Medicaid.  Consumers who already have health insurance through employers or a federal program do not purchase, and often are not eligible to purchase, individual ACA insurance plans.

II.    **Geographic Markets**

68.    The relevant geographic markets (the "Relevant Geographic Markets") are:

    A.    The Orlando metro area, consisting of Orange, Osceola, Seminole and Lake counties, or alternatively, each individual county therein ("Orlando Markets");

    B.    The Jacksonville metro area, consisting of Duval, St. Johns, Clay, Nassau and Baker counties, or alternatively, each individual county therein ("Jacksonville Markets"); and

    C.    The Tampa metro area, consisting of Hillsborough, Pinellas, Pasco and Hernando counties, or alternatively, each individual county therein ("Tampa Markets").

69.    Insurers offer plans with networks of medical providers that are based on the metro area in which the plan is sold.  Because individual insurance consumers are offered health plans based on where they reside and that include provider networks based on the metro area in which they reside, individual insurance plans outside of the metro areas in which they live do not provide reasonable substitutes regardless of how those plans are priced.  Alternatively, each of the aforementioned counties is a relevant geographic market because individual ACA insurance plans are sold on a county-by-county basis.

III.   **Florida Blue's Monopoly Power**

70.    Florida Blue's monopoly power in the Individual Plan Market in the Relevant Geographic Markets is evidenced directly by its abilities to: (1) charge higher prices than its competitors without losing share; and (2) exclude competitors and, therefore, restrict output.

71.    Florida Blue's monopoly power also is evidenced directly by its ability to coerce brokers into exclusive dealing arrangements in the Individual Plan Market in the Relevant Geographic Markets.

72.    Florida Blue's monopoly power is evidenced indirectly by its market shares in the Individual Plan Market in the Relevant Geographic Markets. In 2018, Florida Blue's share of the Individual Plan Market in the State of Florida was 75 percent, and Florida Blue's share is even higher in the Orlando Markets. Florida Blue holds market leadership positions in the Jacksonville Markets and the Tampa Markets.

IV.   **Barriers to Entry and Expansion**

73.    There are high barriers to entry and expansion in the Individual Plan Market in the Relevant Geographic Markets.

74.    As an initial matter, Florida Blue's coercive exclusive dealing arrangements function as both a barrier to entry and expansion because they deter potential competitors from even attempting to enter the Individual Plan Market in the Relevant Geographic Markets and prevent new entrants from expanding to achieve sufficient scale to effectively compete with Florida Blue.

75.     Insurers must meet both federal (HHS) and Florida licensing requirements (Florida Office of Insurance Regulation) to offer individual ACA insurance plans in Florida.   Certain health insurance plan types also require the approval of the Florida Agency for Health Care Administration.   The process to obtain such approvals must generally begin more than ten months before plan open enrollment periods for the following year begin.

76.     An insurer seeking to enter the Individual Plan Market must plan for months or years in advance and make significant capital investment before entering. Insurers must reach agreements with providers—hospitals, physicians, specialists and others—sufficient to provide care for the insurer's enrollees.   Given that federal regulations require insurers to include a wide range of services in health insurance plans, and state regulations that require the availability of a wide range of health care providers, insurers must make arrangements with a large number of different providers. With an uncertain number of future enrollees, entrants have less negotiating leverage with doctors and hospitals, meaning they are likely to pay higher prices for care, while at the same time offering lower premiums to attract enrollees.   Insurers must also establish relationships with, *inter alia*, pharmacies, laboratories, testing facilities and numerous brokers.   Negotiating all of these arrangements can take months or years of protracted negotiation.

77.     A new insurer must attract a substantial number of new enrollees in order to have a sustainable business model.   The nature of insurance is that it is economical to spread risk across as large of a population as possible.   And health insurers face

substantial fixed costs in the form of IT, employees and office space, which can only be efficiently recouped with economies of scale.  Consequently, a new health insurer will only seek to enter a new market if it is confident of attracting a sufficiently large number of enrollees.  Medical service providers will only enter into contracts for provision of services at reasonable rates if the plan has a sufficiently large number of enrollees.  This fact is critical for Oscar's success not only in the Orlando Markets but also in the Tampa Markets, Jacksonville Markets and the rest of Florida.

78.     High barriers to entry have contributed to consolidation in health insurance markets, as companies have found it easier to simply buy another health insurer rather than enter a new geographic market on their own, and new entry is deterred.

79.     Recent trends establish that insurers are exiting the sale of individual ACA insurance plans in Florida because insurers find them unprofitable.  Oscar's entry is only possible because of its innovative approach to insurance, which other insurers do not share and could not quickly replicate.

## ANTICOMPETITIVE EFFECTS OF FLORIDA BLUE'S CONDUCT

### I.     Antitrust Injury to Oscar

80.     As a direct result of Florida Blue's exclusionary conduct, Oscar has suffered—and will continue to suffer—damage.  In order to offer health insurance products in a particular market, an entity must:  (1) obtain a certificate of authority from the state regulator; (2) negotiate contracts with health care provider systems to build a network of hospitals, physician groups and other ancillary care facilities; (3) submit

insurance products and rates for regulator review and approval; (4) fund the insurance entity with enough capital in reserves to meet regulatory requirements; and (5) educate the market of licensed insurance brokers on the company and its insurance products to enlist their support in helping their clients enroll in the products.  Oscar invested significant time and millions of dollars to complete these steps in preparation of its entry into Florida, which is now being inhibited and jeopardized by Florida Blue's anticompetitive actions.

81.     In the Orlando Markets, Oscar already has been substantially foreclosed from brokers, a crucial path to insurance consumers, with only 27 percent of local brokers willing to work with Oscar, far less than in most other states.  And given that the largest brokers are beholden to Florida Blue, those local brokers represent far less than 27 percent of consumers represented by brokers in the area.  More than 190 brokers cancelled their appointments to sell Oscar insurance, and many other brokers will not even negotiate with Oscar, all as a result of the Florida Blue's intimidation and coercive behavior.  The result is that Oscar lost and continues to lose sales during the current 2019 enrollment period, which started on November 1, 2018 and runs through December 15, 2018.  Oscar also stands to lose sales in 2020 and beyond and its very future in the Orlando Markets is jeopardized by Florida Blue's conduct.

82.     In the Jacksonville Markets and Tampa Markets, Oscar is likely to suffer the same harm if and when it enters in 2020, as intended.  Florida Blue holds a monopoly position in these markets as well, and undoubtedly will engage in the same exclusionary conduct rather than compete with Oscar on the merits.  In light of this risk,

unless Florida Blue is enjoined, Oscar may be forced to abandon its plans to enter additional markets in Florida, resulting in a loss of profits in those markets and a loss of the significant investment Oscar has expended as part of those entry plans to date.

## II.    Oscar Is Suffering Irreparable Harm

83.    Oscar is suffering irreparable harm because of Florida Blue's conduct. Specifically, Oscar's ability to compete in the Orlando Markets has been inhibited because brokers have terminated—and likely will continue to terminate—their relationships with Oscar.  As a result, Oscar has significantly underperformed its sales projections, selling a fraction of the total number of individual ACA insurance plans that it expected to sell at this point in the 2019 open enrollment period.

84.    While independent and experienced Florida actuaries informally advised Oscar that it would sell approximately 70,000 individual insurance plans in the Orlando Markets during the 2019 open enrollment period, current data indicates that it will sell only a fraction of the estimated projection.

85.    This harm is irreparable.  If Oscar continues to underperform its sales projections, it is likely that it will not achieve the minimum efficient scale necessary for it to become a viable long-term competitor in the Orlando Markets.  Oscar's performance this year likely will have major repercussions on its competitiveness in future years.  The fewer insureds it has this year, the less leverage it will have to negotiate favorable terms with providers, which will impact the premiums it can afford to charge.  And any negative impact on the quality or pricing of its insurance plans—or even the impression thereof—will impact its reputation and ability to attract brokers and

consumers. The cascading effects could ultimately impact Oscar's viability in the Orlando Markets.

86. In addition, if Oscar underperforms in the Orlando Markets, plans to enter other markets, including the Jacksonville Markets and Tampa Markets will be threatened. Underperformance will impact Oscar's ability to negotiate desirable provider networks in other areas, its ability to attract brokers in other areas, and ultimately its ability to attract consumers in other areas.

87. Finally, Oscar continues to expand its services to localities in other states across the country. Its underperformance in, or forced exit from, Florida could cause providers and brokers in other states to question whether they should do business with Oscar and will hinder Oscar's ability to successfully bring its innovative products and services to consumers in other states.

## III.   <u>Harm to Competition</u>

88. Florida Blue is acting with the purpose and effect of unreasonably restraining and injuring competition in the Insurance Plan Market in the Relevant Geographic Markets by attempting to thwart Oscar's entry. Florida Blue's scheme to foreclose Oscar from access to brokers, which are an indispensable path to insurance customers, prevents Oscar and other new insurers from offering innovative and lower-cost insurance plans to Floridians. Additionally, Florida Blue is reducing output and limiting consumer choice, while also reducing quality by impeding innovation, thereby harming competition and the public interest.

89.     As other major insurers have exited the sale of individual ACA insurance plans, Florida Blue has been shielded from the price competition that characterizes a robust health insurance market.  Studies have shown that there is an inverse correlation between the number of insurers in a market and premium growth in the market (i.e., the fewer the number of insurers the greater the premium growth), which is reflected in the fact that Florida Blue has steadily raised its prices without much, if any, competitive restraint in recent years.  Studies have also shown that, unsurprisingly, many consumers prefer less expensive plans.  On average, 65 percent of plans selected are one of the two lowest cost plans available in a tier.

90.     The primary anticompetitive effect of Florida Blue's scheme to foreclose Oscar from brokers is that consumers will pay more for health insurance.  In the Orlando Markets, Oscar is offering a number of plans that are less expensive than Florida Blue alternatives.  Consumers will suffer by not having access to the better service and innovative products that Oscar provides and that would be unlocked by real competition.

91.     In Orange County, for example, Oscar offers three plans in the Bronze metal tier, all of which are less expensive than all other competitors' offerings.  The lowest price Florida Blue plan for a 40-year-old individual in the Bronze metal tier costs approximately 10 percent, or \$36, more per month, and roughly \$430 more per year, in premiums alone.  In the Silver metal tier, which most Florida consumers purchasing plans on the federal exchange select, Oscar has two plans that are less expensive than all other competitors' offerings.  The most affordable Florida Blue plan in the Silver metal tier costs approximately \$16 more per month, or roughly \$192 more per year.  And in

the Gold metal tier, Oscar's plan is priced lower than all four Florida Blue plans. Some of Florida Blue's plans in Orange County cost several hundred dollars per month more than other competitors' plans.

92. Much is the same in Osceola, Seminole and Lake Counties, and Oscar would aim for the same in the Jacksonville Markets and Tampa Markets. Oscar plans are usually among the lowest priced plans in a particular local market and considerably less expensive than those of local incumbents like Florida Blue.

93. By forcing brokers to become captive agents, Florida Blue's exclusive dealing arrangements with brokers prevent consumers from learning about Oscar's lower premiums or the numerous innovations in Oscar's insurance plans. This undermines the very purposes of the ACA and the federal exchange created thereunder—transparency and reduction of cost. Many consumers, if they were to learn of Oscar's lower prices, would select an Oscar plan over a Florida Blue plan. Oscar has entered other markets in the United States with low-cost plans and achieved large enrollment numbers, despite being less established than traditional insurers, in large part due to its lower prices and innovation. Beyond Oscar and Orlando, Florida Blue's scheme will likely have the effect of deterring entry by other disruptive competitors in many markets across Florida.

94. But for the exclusionary conduct described above: (1) Florida Blue's market power in the Relevant Geographic Markets would be lessened; (2) Florida Blue would be unable to coerce brokers into the exclusive dealing arrangements described above; (3) there would be increased competition in the sale of individual insurance

plans; (4) consumers would have access to, and knowledge of, more choices when selecting an individual ACA insurance plan; and (5) prices would be lower and the quality of care would be higher for consumers.

## CAUSES OF ACTION

### COUNT I
### Sherman Act § 2 Claim for Monopolization

95.     Oscar incorporates by reference the allegations in Paragraphs 1 to 94 above as fully set forth herein.

96.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits the willful monopolization of any part of the trade and commerce among the States.

97.     Florida Blue possesses monopoly power in the Individual Plan Market in the Relevant Geographic Markets and is maintaining this power through exclusionary conduct designed to exclude Oscar from competition.  This conduct includes coercing brokers into exclusive agreements and limiting the supply of brokers through refusals to deal.

98.     Florida Blue's willful and wrongful maintenance and/or extension of its monopoly power is not the result of growth and development as a result of innovation, business acumen or by virtue of offering a superior product.  Rather, it is a direct consequence of Florida Blue's exclusionary conduct.

99.     There is no efficiency enhancing, procompetitive justification for Florida Blue's conduct.

100.    Florida Blue's conduct has substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant

Geographic Markets.   But for Florida Blue's conduct, Oscar would have more successfully entered the Orlando Markets and would enter the Jacksonville Markets and Tampa Markets, which it has taken affirmative steps toward and is prepared to do.  As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

101.    Florida Blue's unlawful monopolization of the Individual Plan Market in the Relevant Geographic Markets is and will continue to be the proximate cause of injury to Oscar, a direct competitor to Florida Blue in the Orlando Markets and a prospective competitor in the Jacksonville Markets and Tampa Markets.

102.    Florida Blue's activities as alleged herein do not constitute the business of insurance, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, Florida Blue secured its exclusive agreements with brokers through coercion and intimidation within the meaning of the McCarran-Ferguson Act.

**COUNT II**
**Sherman Act § 2 Claim for Attempted Monopolization**

103.    Oscar incorporates by reference the allegations in Paragraphs 1 to 102 above as fully set forth herein.

104.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits attempts to monopolize any part of the trade and commerce among the States.

105.    If for any reason, Florida Blue is deemed not to have monopoly power in the Individual Plan Market in the Relevant Geographic Markets, there is a dangerous probability that Florida Blue will acquire such power.  Further, it was Florida Blue's

conscious objective to acquire monopoly power in the Individual Plan Market in the Relevant Geographic Markets by and through its exclusionary conduct.

106.    Florida Blue's attempt to monopolize is not the result of growth and development as a result of innovation, business acumen or by virtue of offering a superior product.  Rather, it is a direct consequence of Florida Blue's exclusionary conduct.

107.    There is no efficiency enhancing, procompetitive justification for Florida Blue's conduct.

108.    Florida Blue's conduct has substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant Geographic Markets.   But for Florida Blue's conduct, Oscar would have more successfully entered the Orlando Markets and would enter the Jacksonville Markets and Tampa Markets, which it has taken affirmative steps toward and is prepared to do.  As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

109.    Florida Blue's attempted monopolization of the Individual Plan Market in the Relevant Geographic Markets is and will continue to be the proximate cause of injury to Oscar, a direct competitor to Florida Blue in the Orlando Markets and a prospective competitor in other areas within the State of Florida.

110.    Florida Blue's activities as alleged herein do not constitute the business of insurance, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and

insured. Moreover, Florida Blue secured its exclusive agreements with brokers through coercion and intimidation within the meaning of the McCarran-Ferguson Act.

## COUNT III
**Sherman Act § 1 Claim Based on Florida Blue's Exclusive Agreements with Brokers**

111.    Oscar incorporates by reference the allegations in Paragraphs 1 to 110 above as fully set forth herein.

112.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition; and (4) that harms the plaintiff as a result of the anticompetitive aspect of the practice under scrutiny.

113.    Florida Blue has entered into exclusive agreements, either in writing or *de facto*, with brokers, which have foreclosed Oscar from a substantial share of brokers.

114.    These agreements unreasonably restrain trade in the Individual Plan Market in the Relevant Geographic Markets.

115.    Florida Blue has market power in the Individual Plan Market in the Relevant Geographic Markets.

116.    There is no efficiency enhancing, procompetitive justification for the agreements between Florida Blue and brokers.

117.    These agreements have substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant

Geographic Markets.  But for these agreements, Oscar would have more successfully entered the Orlando Markets and would enter the Jacksonville Markets and Tampa Markets, which it has taken affirmative steps toward and is prepared to do.  As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

118.     These agreements are and will continue to be the proximate cause of injury to Oscar.

119.     Florida Blue's activities as alleged herein do not constitute the business of insurance, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, Florida Blue secured its exclusive agreements with brokers through coercion and intimidation within the meaning of the McCarran-Ferguson Act.

## COUNT IV
### Florida Antitrust Act Restraint of Trade § 542.19 Claim for Monopolization and Attempted Monopolization

120.     Oscar incorporates by reference the allegations in paragraphs 1 to 119 above as fully set forth herein.

121.     Florida Statute § 542.19 makes it unlawful to monopolize, or attempt to monopolize, any part of the trade or commerce in Florida.

122.     Florida Statute § 542.16 states that the purpose of the provisions of the Florida Antitrust Act law is to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.

123.    Accordingly, for the same reasons set forth in Paragraphs 95-110, Florida Blue is violating § 542.19 by maintaining or attempting to acquire monopoly power in the Individual Plan Market in the Relevant Geographic Markets.

124.    Unless enjoined, Florida Blue's conduct will continue to cause injury and damage to Oscar, and competition will continue to decrease in the Individual Plan Market in the Relevant Geographic Markets.

### COUNT V
### Florida Antitrust Act Restraint of Trade § 542.18 Claim Based on Florida Blue's Exclusive Agreements with Brokers

125.    Oscar incorporates by reference the allegations in paragraphs 1 to 124 above as fully set forth herein.

126.    Florida Statute § 542.18 states that every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful.

127.    Florida Statute § 542.16 states that the purpose of the provisions of the Florida Antitrust Act law is to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.

128.    Accordingly, for the same reasons set forth in Paragraphs 111-119, Florida Blue is violating § 542.18 by entering into exclusive agreements with insurance brokers to foreclose Oscar from those brokers and thereby restraining trade in the Individual Plan Market in the Relevant Geographic Markets.

129.    Unless enjoined, Florida Blue's conduct will continue to cause injury and damage to Oscar, and competition will continue to decrease in the Individual Plan Market in the Relevant Geographic Markets.

## COUNT VI
## Claim for Tortious Interference with a Business Relationship

130.     Oscar incorporates by reference the allegations in paragraphs 1 to 129 above as fully set forth herein.

131.     Florida common law prohibits tortious interference with a business relationship where:  (1) a business relationship exists between the plaintiff and a third party; (2) the defendant knows of the relationship; (3) the defendant intentionally and unjustifiably interferes with the relationship; and (4) damage was caused to the plaintiff as a result of the breach of the relationship.

132.     Oscar recruited brokers to market and sell Oscar's insurance plans in the Orlando Markets during the 2019 ACA open enrollment period.

133.     Florida Blue is well aware of Oscar's business relationships with these brokers, which is publicly available information.

134.     With the intent to sever Oscar from its business partners to avoid competition, Florida Blue has threatened and continues to threaten brokers with which Oscar does business if those brokers continue to sell Oscar insurance plans.

135.     Florida Blue's behavior has been and will continue to be the proximate cause of harm to Oscar in the form of lost investment and lost business opportunities.

## PRAYER FOR RELIEF

136.    WHEREFORE, Plaintiff respectfully demands a trial by jury on all matters so triable under law, and respectfully requests that, based on the verdict of the jury, that judgment be entered:

A.    Enjoining Defendants from taking, or threatening to take, any retaliatory or deterrent actions against a broker based on that broker's marketing of, or consideration of marketing, non-Florida Blue health insurance plans, including suspending or terminating their broker agreement;

B.    Enjoining Defendants from conditioning a broker's ability to market their health insurance plans on that broker refusing to market non-Florida Blue health insurance plans;

C.    Requiring Defendants to remove their exclusive policy from their website and to distribute to each broker that markets Florida Blue plans revised broker criteria;

D.    Requiring Defendants to inform brokers of any injunction or judgment in this matter, including that Defendants will not retaliate against brokers for selling non-Florida Blue health insurance plans;

E.    Enjoining Defendants from engaging in any other exclusionary practices that directly or indirectly foreclose Oscar from marketing its health insurance in Florida;

F.    Awarding Plaintiff treble damages (to the extent the Court finds that such damages may be ascertained), reasonable attorneys' fees, costs, expenses

and such further relief as the Court deems just and proper

Dated:  November 13, 2018                    Respectfully Submitted,


                                             /s/ Francis M. McDonald, Jr.
                                             FRANCIS M. MCDONALD, JR., ESQ.
                                             Florida Bar No. 0327093
                                             SARAH A. LONG, ESQ.
                                             Florida Bar No. 0080543
                                             **MCDONALD TOOLE WIGGINS, P.A.**
                                             111 N. Magnolia Avenue, Suite 1200
                                             Orlando, FL 32801
                                             Telephone: (407) 246-1800
                                             Facsimile:  (407) 246-1895
                                             fmcdonald@mtwlegal.com
                                             slong@mtwlegal.com
                                             OscarHealthCorpvBCBS@mtwlegal.com


                                             STEVEN C. SUNSHINE (*Pro Hac Vice
                                             Admission to be applied for*)
                                             TARA R. REINHART (*Pro Hac Vice
                                             Admission to be applied for*)
                                             **SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP**
                                             1440 New York Avenue, NW
                                             Washington, D.C. 20005
                                             Tel: (202) 371-7000
                                             Facsimile: (202) 393-5760
                                             steve.sunshine@skadden.com
                                             tara.reinhart@skadden.com


                                             PAUL M. ECKLES (*Pro Hac Vice Admission
                                             to be applied for*)
                                             MICHAEL H. MENITOVE (*Pro Hac Vice
                                             Admission to be applied for*)
                                             MATTHEW LISAGAR (*Pro Hac Vice
                                             Admission to be applied for*)
                                             **SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP**
                                             4 Times Square
                                             New York, NY 10036
                                             Tel: (212) 735-3000
                                             Fax: (212) 735-2000

paul.eckles@skadden.com
michael.menitove@skadden.com
matthew.lisagar@skadden.com