UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

OSCAR INSURANCE COMPANY
OF FLORIDA,

     Plaintiff,

vs.                                                          Case No.: 6:18-cv-01944-ORL-40-TBS

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., d/b/a Florida Blue; HEALTH
OPTIONS INC., d/b/a Florida Blue HMO; and          **ORAL ARGUMENT REQUESTED**
FLORIDA HEALTH CARE PLAN INC., d/b/a
Florida Health Care Plans,

     Defendants.

_____/

## DEFENDANTS' DISPOSITIVE MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

     Blue Cross and Blue Shield of Florida, Inc., Health Options Inc. and Florida Health Care Plan Inc. (collectively, "Florida Blue") respectfully move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint of Plaintiff Oscar Insurance Company of Florida ("Oscar") for failure to state a claim upon which relief can be granted. Florida Blue submits the below memorandum of law in support of its motion to dismiss.

## MEMORANDUM OF LAW

     Oscar seeks to prevent Florida Blue from using exclusive agents to sell individual health insurance in Florida. As a new entrant in Florida, Oscar should be expending its efforts competing in the marketplace. Instead, Oscar brings this lawsuit to disrupt the lawful business of its competitor. The Complaint should be dismissed.

*First*, Oscar's Sherman Act claims (Counts I–III) are barred by the McCarran-Ferguson Act.  The sale of health insurance through agents is part of the "business of insurance," and Oscar does not allege any boycott or coercion within the meaning of the Act.

*Second*, Oscar fails to state a claim for monopolization or attempted monopolization under either federal or state laws (Counts I, II and IV).  Oscar has not plausibly pled facts tending to show that Florida Blue's exclusive deals harm competition as a whole or substantially foreclose Oscar from competing in a properly defined relevant market in which Florida Blue holds monopoly power.

*Third*, Oscar fails to plausibly allege that Florida Blue's conduct unreasonably restrains trade under federal or state law (Counts III and V).  In particular, Oscar fails to plausibly plead market power or harm to competition.

*Fourth*, Oscar fails to state a claim for tortious interference under Florida law (Count VI) because Oscar has not plausibly alleged that Florida Blue's purported interference was unjustified, driven entirely by malice or achieved through improper means.

## STATEMENT OF FACTS[1]

Florida Blue is a long-time individual health insurer in Florida.  (Compl. ¶ 2.)  Even as several of its competitors exited the market following the implementation of the Affordable Care Act ("ACA"), Florida Blue remained.  (*Id.* ¶ 37.)  In fact, Florida Blue "absorbed the bulk of the consumers" whose insurers left Florida and now enjoys a large portion of the market for individual ACA plans in the Orlando area.  (*Id.*)

Florida Blue uses a network of exclusive agents—whom Oscar refers to as

---

[1] In this motion to dismiss, Florida Blue relies, as it must, on the facts as alleged in Oscar's Complaint.

"brokers"[2]—to sell its individual health insurance plans.  (*Id.* ¶ 52.)  Florida Blue publicly displays this policy on its website, alerting competitors and agents that Florida Blue's agents may not also sell individual insurance plans offered by other health insurers.  (*Id.* ¶¶ 5, 51.)

Oscar, a new entrant focusing on tech-savvy consumers, began offering individual health insurance in Florida during this past open enrollment period.  (*Id.* ¶¶ 3–4.)  Oscar's selling point is its "superior technology," including its "technology-driven health care experience" and "intuitively designed mobile and web application."  (*Id.* ¶¶ 41, 43.)

Despite its purportedly innovative business model, Oscar claims that it cannot effectively compete in Florida without access to Florida Blue's exclusive agents.  (*Id.* ¶ 36.)  According to Oscar, Florida Blue's enforcement of its exclusive contracts has stymied Oscar's entry into the Orlando market.  (*Id.* ¶¶ 5, 7.)  In particular, Oscar alleges that it has been foreclosed from "many of the largest and most successful brokers servicing the Orlando area," who have declined to work with Oscar for "fear of losing Florida Blue's business." (*Id.* ¶ 9.)  "More than 190 brokers" whom Oscar appointed to sell insurance in Orlando later "cancelled their appointments" after Florida Blue reminded them of their exclusivity obligations.  (*Id.* ¶ 81.)  Because many consumers purportedly prefer "the advice of local brokers whom they interact with in person" (*id.* ¶ 33), Oscar's inability to use Florida Blue's exclusive agents has allegedly hindered its ability to attract consumers in Orlando.  (*Id.* ¶ 85.)

A few weeks into the 2019 open enrollment period—long before any insurer

---

[2] Although Oscar alleges otherwise (Compl. ¶ 29 n.1), exclusive agents and brokers are not synonymous under Florida law.  *See, e.g.*, *Essex Ins. Co. v. Zota*, 985 So. 2d 1036, 1046 (Fla. 2008).  Because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), this motion refers to Florida Blue's exclusive agents by their proper legal title—"agents," not "brokers."

could know its success in the marketplace—Oscar brought this lawsuit claiming that Florida Blue's exclusive contracts violate the Sherman Act and related state laws.  In particular, Oscar alleges that Florida Blue uses its exclusivity arrangements to maintain, or attempt to maintain, monopoly power under Sherman Act § 2 and Florida Antitrust Act § 542.19 (*id.* ¶¶ 95–110, 120–24), and that its contracts are unlawful agreements in restraint of trade, in violation of Sherman Act § 1 and Florida Antitrust Act § 542.18 (*id.* ¶¶ 111–19, 125–29). Oscar further claims that Florida Blue tortiously interfered in Oscar's business relationships with the "brokers" that Oscar "recruited" and appointed to sell Oscar's insurance plans in Orlando during the 2019 open enrollment period.  (*Id.* ¶¶ 130–35.)  Oscar seeks various forms of relief, including damages and an order enjoining Florida Blue from enforcing its exclusive agreements.  (*Id.* ¶ 136.)  Oscar previously moved for a preliminary injunction, which was heard by the Court on January 23, 2019, and remains pending as of this filing.[3]

## LEGAL STANDARD

A complaint must be dismissed if it fails to "state a claim to relief that is plausible on its face" and fails to include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court must take all well-pleaded factual allegations in the Complaint as true, the same "assumption of truth" does not apply to allegations that "are no more than conclusions." *Id.* at 679.  In addition, "courts may infer from the factual allegations in the

---

[3] Although the Court conducted an evidentiary hearing in connection with Oscar's motion for a preliminary injunction, the Court need not rely on the evidence set forth in that hearing to dismiss Oscar's Complaint, which is deficient even if taken as true for all the reasons set forth herein.

complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

## ARGUMENT

**I.    The McCarran-Ferguson Act Bars Oscar's Sherman Act Claims (Counts I–III)**

The McCarran-Ferguson Act "exempts insurer activities from the reach of the Sherman Act when three elements are met:  (1) the challenged activity is part of the 'business of insurance'; (2) the challenged activity is regulated by state law; and (3) the challenged activity does not constitute a boycott of unrelated transactions." *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1330 (11th Cir. 2004).  Here, there is no dispute that Florida Blue's relationship with its agents is regulated by state law, *see, e.g.*, Fl. Stat. § 626.112, meeting the second element.  Because the first and third elements are also met, Oscar's Sherman Act claims must be dismissed.

### A.    Florida Blue's Use of Exclusive Agents Is Part of the "Business of Insurance"

With respect to the first element, "[a]n activity is part of the business of insurance if it has 'the effect of transferring or spreading a policyholder's risk,' is 'an integral part of the policy relationship between the insurer and the insured,' and is limited to entities within the insurance industry." *Gilchrist*, 390 F.3d at 1331 (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)).  Applying this standard, "most courts have held that routine dealings between insurers and brokers or agents do constitute the business of insurance." *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 744 (5th Cir. 2015); *see also Thompson v. New York Life Ins. Co.*, 644 F.2d 439, 443 (5th Cir. 1981) ("We find,

turning to decisions of sister courts, that exclusive agency clauses have been deemed exempt from anti-trust scrutiny as part of the business of insurance.").[4]

### i. Florida Blue's Use of Exclusive Agents Has the Effect of Transferring or Spreading Policyholder Risk

While "[t]he Supreme Court has 'identified three criteria relevant to determining whether a particular practice is part of the business of insurance,'" the first element—"whether the practice has the effect of transferring or spreading a policyholder's risk"—is "indispensable."  *Sanger*, 802 F.3d at 742 (quoting *Pireno*, 458 U.S. at 129); *see also Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 212 (1979); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 356 (3d Cir. 2010).  Several circuit courts have held that agreements between insurers and agents or brokers involve the spreading of risk because those agreements affect how insurers create and maintain their risk pools.  *See Sanger*, 802 F.3d at 744 ("[R]outine dealings between insurers and brokers or agents do constitute the business of insurance."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 355 (noting that "[a]uthorizing agents to solicit individual or group policies" qualifies as the "business of insurance"); *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 65 (1st Cir. 2005) (same); *see also Grp. Life & Health Ins. Co.*, 440 U.S. at 224 n.32 ("[T]he 'business of insurance' may have been intended to include dealings within the insurance industry between insurers and agents.").

Sanger* is particularly instructive here.  In *Sanger*, the Fifth Circuit considered

---

[4] *Thompson* was decided on May 4, 1981, prior to the former Fifth Circuit's split, and is therefore binding authority.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

whether an insurance broker's "alleged exclusive dealing arrangements with insurers constitute 'the business of insurance.'"  *Sanger*, 802 F.3d at 743.  In holding that they did, the court explained that exclusivity arrangements constitute the "business of insurance" because they ensure that other insurers cannot "siphon off" the broker's customers, which would "alter the composition of policyholders in the Program and thus would likely impact the Program's ability to spread risk."  *Id.* at 744.  Thus, the court held:  "The insurers' alleged agreements with [the defendant] not to insure other brokers' competing group plans are . . . fundamental to the risk spreading characteristics of insurance," and the defendant had "therefore established the first criterion in assessing whether the challenged activity constitutes the business of insurance."  *Id.* at 745.

The reasoning of *Sanger* applies equally here.  Absent Florida Blue's exclusive arrangements with its agents, Florida Blue's competitors would be able to "siphon off" its customers and "alter the composition of policyholders" in its insurance pool.  *See id.* at 744.  Indeed, that is precisely the outcome Oscar seeks.  (*See* Compl. ¶ 13 (alleging that, but for Florida Blue's exclusive arrangements, Oscar would have made "substantially" more sales by converting Florida Blue's customers)).  Therefore, because Florida Blue's exclusive relationships directly affect Florida Blue's ability to attract customers and "spread risk," these arrangements constitute the "business of insurance" under McCarran-Ferguson. *See Sanger*, 802 F.3d at 744.[5]

---

[5] Oscar may point to *In re Insurance Brokerage Antitrust Litigation,* 618 F.3d 300 (3d Cir. 2010), to claim that Florida Blue's exclusivity policy does not actually implicate the "spreading of risk."  There, the Third Circuit held that an alleged agreement among insurers not to compete for each other's incumbent business did not implicate the "spreading of risk" because, by dividing consumers amongst themselves, the insurers altered "which insurer" would bear the risk of insuring policy holders, but not "whether or to what extent a prospective insurance purchaser would transfer its risk to an insurer."  *Id.* at 357.  That is not the case here.  This is not a

ii.     **Florida Blue's Use of Exclusive Agents Is an Integral Part of the Policyholder Relationship**

With respect to the next aspect of the "business of insurance" test, binding precedent holds that exclusive contracts between insurers and their agents are an integral part of the policyholder relationship. *Thompson*, 644 F.2d at 443. As such, they are "exempt from anti-trust scrutiny." *Id.*

In *Thompson*, the Fifth Circuit (pre-split) was asked to decide whether a contract between an insurance company and its agent fell within the McCarran-Ferguson immunity. *See id.* at 442. Among other things, the contract at issue prohibited the agent from "represent[ing] any other insurance company []or plac[ing] any application for life or any other type of insurance or annuity with any other insurer . . . without the written consent of the [insurer]." *Id.* at 441. In concluding that this agency agreement "is within the business of insurance," the court focused on the "important factor" of whether "the participation of the agent in the [challenged policy] concerned the agent's insurance dealings as such." *Id.* at 444 (citation omitted). Because the insurer's "restrictions did not force [the agent] to engage in activities unrelated to insurance"—but rather "offered [the agent] various incentives . . . so that [the agent] would agree to focus all his entrepreneurial skills solely on selling insurance"—the McCarran-Ferguson immunity applied. *Id.* at 444.[6]

---

market allocation case, and Oscar does not and cannot allege that every sale Florida Blue's agents currently make for Florida Blue would translate into a sale for a competitor absent Florida Blue's exclusive dealing. Indeed, that would be impossible, given that Florida Blue has a more expansive footprint in Florida than Oscar—or any other competitor, for that matter. (*See* Compl. ¶ 6 (acknowledging that Florida Blue operates "throughout the entire State of Florida"); *id.* ¶ 4 (stating that Oscar currently serves only a single metropolitan area).) In short, Florida Blue's exclusivity arrangements do not affect "which insurer" bears the risk of insurance, but instead whether any insurer bears such risk. McCarran-Ferguson immunity therefore applies.

[6] The Court found this factor "dispositive" on the facts before it, noting that "[w]hether restrictive covenants is a good policy is not a decision for this Court to make. We are merely required to determine if the

So too here.  Florida Blue's exclusivity policy bears directly on its agents' "insurance dealings." *Id.*  The policy governs Florida Blue's agents' ability to market and sell non-Florida Blue plans; it does not force its agents to engage in activities unrelated to insurance.  (*See* Compl. ¶¶ 5, 51.)  As in *Thompson*, Florida Blue's policy also gives its agents incentives to focus on selling insurance:  according to Oscar's own allegations, the policy "entices local brokers to enter into exclusive agreements with Florida Blue" (Compl. ¶ 64), and gives these agents "an overwhelming incentive to sell Florida Blue's plans" (*id.* ¶ 7).  Thus, Florida Blue's exclusivity arrangements are an integral part of the policyholder relationship and are the "business of insurance."

### iii.   Florida Blue's Use of Exclusive Agents Is Limited to Entities Within the Insurance Industry

Finally, the challenged exclusivity policy is plainly "limited to entities within the insurance industry" and thus satisfies the third aspect of the "business of insurance" test. *See Gilchrist*, 390 F.3d at 1331.  As the Fifth Circuit recognized in *Sanger*, alleged exclusive dealing between an insurance agent and an insurer "undisputably" satisfies the "third criterion" of the *Gilchrist* test.  *Sanger*, 802 F.3d at 745.

### B.   Oscar's Complaint Does Not Allege Boycott, Coercion or Intimidation

Under a narrow exception to the McCarran-Ferguson Act's immunity from federal antitrust suits, plaintiffs may pursue Sherman Act claims alleging acts of "boycott, coercion, or intimidation."  15 U.S.C. § 1013(b).  This narrow exception does not apply here. Oscar plainly does not allege any boycott; indeed, the word "boycott" never appears in the

---

challenged activity is the business of insurance.  Congress has determined that the states are the proper regulators of this business activity and it is not for this Court to go beyond that decision."  *Thompson*, 644 F.2d at 444.

Complaint.  Nor does Florida Blue's conduct amount to coercion or intimidation within the meaning of those terms under the McCarran-Ferguson Act.  Oscar's bare assertion that Florida Blue's exclusive agreements were secured "through coercion and intimidation" (Compl. ¶¶ 102, 110, 119) does not suffice.  *See Iqbal*, 556 U.S. at 678.

Although few courts have considered the issue, the "leading" antitrust treatise concludes that "concerted action" is required to establish coercion or intimidation within the meaning of the McCarran-Ferguson Act.  *Sanger*, 802 F.3d at 732 n.12.  In other words, to fall within the exception, the alleged misconduct must involve "an agreement of at least two firms" to engage in coercive or intimidating behavior—not "independent conduct" by a single company "seeking to leverage its supposed monopoly position."  *Id.* at 746.

This concerted-action requirement derives from the genesis of the "boycott, coercion or intimidation" exception—the Supreme Court case of *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944).  The *South-Eastern Underwriters* case concerned an alleged *conspiracy to boycott*, leading courts to limit the exception to McCarran-Ferguson immunity to unlawful "agreement[s] and concert of action."  *Id.* at 535*; see also Sanger*, 802 F.3d at 744; *Feinstein v. Nettleship Co.*, 714 F.2d 928, 934 (9th Cir. 1983).  The legislative history of the McCarran-Ferguson Act likewise supports the "concerted action" requirement.  When debating the bill, the Senate distinguished between unilateral practices, which were understood to be immunized under the Act, and concerted refusals to deal, which were not.  *Feinstein*, 714 F.2d at 934 & n.1 (citing 91 Cong. Rec. 480–81 (1945)).  "Monopoly alone is therefore not within any exception to the McCarran-Ferguson Act."  *Feinstein*, 714 F.2d at 934.

Oscar's Complaint does not satisfy the McCarran-Ferguson Act's concerted-action requirement.  Oscar alleges that Florida Blue unilaterally "obtained and enforced [its] exclusive dealing arrangements through coercion and intimidation, including threatening to exclude brokers from a significant portion of the market for individual ACA insurance plans."  (Compl. ¶ 52.)   Oscar does not allege that anyone worked in concert with Florida Blue to foreclose Oscar from the market—not any other insurer, not any insurance agency, not even any individual agent.  This omission alone defeats Oscar's federal antitrust claims.[7]

Moreover, even taken as true, Oscar's allegations do not establish unilateral coercion or intimidation.  Beyond its own self-serving spin, Oscar offers no factual support to suggest that Florida Blue "coerced" or "intimidated" its exclusive agents.  Rather, the Complaint alleges only that Florida Blue took steps to enforce existing contracts with its agents and that at least some of those agents, preferring to work with Florida Blue, dropped their Oscar appointments.  (Compl. ¶ 6.)  It is not coercion to enforce the terms of a lawful contract.  Indeed, fulfilling obligations is the very purpose of contract law.  *MCC-Marble Ceramic Ctr., Inc., v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1387 n.9 (11th Cir. 1998) ("[P]arties who sign contracts will be bound by them.").

In sum, Florida Blue's exclusive relationships with agents fall squarely within

---

[7] To the extent Oscar now wishes to argue that Florida Blue's exclusive agents banded together to avoid dealing with Oscar, the argument necessarily fails.  Such an alleged refusal-to-deal—which Oscar did not allege in its Complaint, and which Oscar cannot raise for the first time in opposition to this motion to dismiss, *see Huls v. Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011)—does not constitute a "boycott" under the McCarran-Ferguson Act.  A refusal-to-deal amounts to a boycott under McCarran-Ferguson only if it "expand[s] 'beyond the targeted transaction' to 'unrelated transactions [that] are used as leverage to achieve the terms desired.'"  *Sanger*, 802 F.2d at 746 (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 802–03 (1993)).  "The actions of the [brokers] as a group—refusing to work with [Oscar]—do not involve any 'collateral transactions' (they directly implicate potential transactions between the [brokers] and [Oscar]) and therefore do not constitute a boycott."  *Sanger*, 802 F.2d at 747.  Thus, even if Oscar had alleged such a boycott (which, again, it did not), the claim would fail.

the immunity of the McCarran-Ferguson Act.  Oscar has failed to allege any conduct that

satisfies the limited "boycott, coercion or intimidation" exception.  Thus, Oscar's Sherman

Act claims (Counts I–III) must be dismissed.

## II.   Oscar Fails To State a Claim for Monopolization or Attempted Monopolization under Sherman Act § 2 or Florida Statute § 542.19 (Counts I, II, IV)

To state a claim for monopolization under the Sherman Act, Oscar must allege

that Florida Blue (i) has monopoly power in a relevant geographic and product market, and

(ii) has wilfully acquired or maintained that power "as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident."

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)

(quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Similarly, to state a

viable claim for attempted monopolization under the Sherman Act, Oscar must allege that

"(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific

intent to monopolize and (3) a dangerous probability of achieving monopoly power" within

the relevant market.  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376

F.3d 1065, 1074 (11th Cir. 2004) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447,

456 (1993)); *see also T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d

816, 823 (11th Cir. 1991).  In either case, a plaintiff must plausibly allege harm to the

competitive process—not merely harm to a competitor—to state a viable claim.  *Morris*

*Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).

Oscar's monopolization and attempted monopolization claims under Florida's

Antitrust Act § 542.19 require identical showings.  *See St. Petersburg Yacht Charters, Inc. v.*

*Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. Dist. Ct. App. 1984) ("The Florida

legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act."). Oscar's state-law claims thus share the fate of its federal claims.

Here, Oscar has failed to state any plausible monopolization or attempted monopolization claims. First, Oscar has failed to define a relevant geographic market—an essential step to establishing monopoly power. Second, Oscar has failed to allege monopoly power, relying instead almost entirely on Florida Blue's allegedly high market share. In this Circuit, Oscar's cursory allegations regarding barriers to entry and monopolistic conduct do not suffice. Third, Oscar has failed to allege substantial foreclosure of the relevant market; at most, Oscar's allegations prove that Florida Blue has made one means of distribution—sales through Florida Blue agents—more difficult. Even if true, such allegations do not come close to establishing foreclosure. Finally, Oscar's Complaint alleges harm to *Oscar*, rather than harm to *competition*. Such allegations do not make out viable antitrust claims.

### A.   Oscar Fails To Properly Define the Relevant Geographic Market

The first step to establishing monopoly power is to define a relevant geographic and product market—the physical area where a particular good or service, or its "reasonably interchangeable substitutes"—is purchased and sold. *Marquette*, 931 F.2d at 823. Oscar defines the relevant product market as "individual health insurance plans under the ACA," but offers no concrete guidance on the geographic bounds of this market.

In attempting to define the relevant geographic market, Oscar first alleges that the relevant markets are the Orlando, Jacksonville and Tampa metro areas because consumers access provider networks within a metro area. (Compl. ¶¶ 68–69.) But within the

very same paragraphs, Oscar states that the individual counties making up each metro area might actually be the relevant market because "ACA insurance plans are sold on a county-by-county basis." (*Id.*) The rest of Oscar's Complaint further confuses the market issue: Oscar alternates between discussing the market as the entire state (*id.* ¶ 6 (alleging "monopoly power in Florida")), the metropolitan area (*id.* ¶ 9 (describing Oscar's projections for the Orlando market)) and individual counties (*id.* ¶¶ 91–92 (listing plan prices by county)). To make matters worse, the Complaint offers no allegations to determine which of the many possible geographic alternatives align with the purchasing decisions of consumers. Such a chaotic attempt at market definition fails to satisfy even the "liberal notice pleading of Rule 8(a)," *Beem v. Ferguson*, 713 F. App'x 974, 979 (11th Cir. 2018) (citation omitted), let alone the more exacting standards of *Twombly* and *Iqbal*, *see Iqbal*, 556 U.S. at 678; *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) ("[A]ntitrust plaintiffs . . . must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets."); *Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*, No. 09-CV-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) ("Rule 12(b)(6) dismissal is appropriate where the plaintiff's description of the geographic market is legally inadequate. . . .").

### B.     Oscar Fails To Plausibly Allege Monopoly Power

To plead the element of monopoly power, Oscar must allege facts tending to show either that Florida Blue has "monopoly power"—i.e., "the ability 'to control prices or exclude competition'"—or a "dangerous probability of achieving it." *McWane v. F.T.C.*, 783 F.3d 814, 830 (11 Cir. 2015) (citations omitted). Oscar offers three allegations to support

monopoly power, each of which fails as a matter of law.

First, Oscar alleges that Florida Blue's purportedly high market share demonstrates monopoly power.  (Compl. ¶ 72.)  But in this Circuit, high market share alone "is not enough to establish a *prima facie* show of monopoly power."  *Fin-S Tech., LLC v. Surf Hardware Int'l-USA, Inc.*, No. 13-CV-80645, 2014 WL 12461350, at *3 (S.D. Fla. Sept. 3, 2014) (60–70% market share not enough to demonstrate monopoly power); *see also Tyntec Inc. v. Syniverse Techs., LLC*, No. 8:17-CV-591-T-26MAP, 2017 WL 2733763, at *1, 5 (M.D. Fla. June 26, 2017) (70% market share not enough to demonstrate monopoly power).  That is particularly true where, as here, Florida Blue's market share is due to "growth or development as a consequence of a superior product, business acumen, or historic accident."  *Grinnell Corp.*, 84 U.S. at 570–71.[8]

Second, Oscar claims that Florida Blue's "ability to coerce brokers into exclusive dealing arrangements" evidences monopoly power.  (Compl. ¶ 71.)  Stripped of its incendiary language, however, this allegation boils down to the claim that Florida Blue's exclusive relationships are *themselves* evidence of monopoly power—an insinuation that flies in the face of well-settled case law.  Exclusive dealing relationships are typically "legitimate business practices," *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1224 (11th Cir. 2002), and companies may compete amongst themselves for exclusive deals with the best brokers or agents, *see McWane*, 783 F.3d at 834.  Oscar's suggestion that the very existence of exclusive dealing is alone evidence of monopoly power is therefore unavailing.

---

[8] For example, Oscar recognizes and alleges that Florida Blue's market share increased when other competitors chose to leave the ACA space, but Florida Blue did not.  (*See* Compl. ¶¶ 37, 39.)

Third, Oscar alleges that "[t]here are high barriers to entry and expansion in the Individual Plan Market in the Relevant Geographic Markets." (Compl. ¶ 73.) Oscar principally alleges that high barriers to entry exist because new insurers must (1) satisfy both federal and state licensing requirements to offer ACA insurance plans in Florida, and (2) "plan for months or years in advance and make significant capital investment before entering." (Compl. ¶¶ 75–76). Courts have rejected similar claims before. In *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986), for instance, the Seventh Circuit noted, where "insurers need only a license and capital" to enter a market, "[t]here are no barriers to entry." *Id.* at 1335. As the Seventh Circuit explained, "[t]he insurance industry is not like the steel industry, in which a firm must take years to build a costly plant before having anything to sell." *Id.* Rather, "[t]he 'productive asset' of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary." *Id.* Oscar offers no factual support to suggest that the licensing and capital requirements needed to enter the individual health insurance market in Florida (or Orlando, or its constituent counties) is somehow more onerous than the minimal requirements discussed in *Ball*. Oscar's conclusory assertions, therefore, should be disregarded. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' . . . will not do." (citation omitted)).

Oscar's next alleged barrier to entry—that "a new health insurer will only seek to enter a new market if it is confident of attracting a sufficiently large number of enrollees" (Compl. ¶ 77)—is likewise too vague to withstand a motion to dismiss. Because Oscar does not define a "sufficiently large number of enrollees," there is no way to know

whether Oscar in fact satisfied its own standard during the 2019 open enrollment period. Allegations whose meaning only Oscar can divine "do not state a claim for relief under the antitrust laws." *Spanish Broad. Sys.*, 376 F.3d at 1079.

Oscar's final allegation on this point—that Florida Blue's exclusive deals are themselves a barrier to entry and expansion—also fails. (*See* Compl. ¶ 74.) Indeed, Oscar itself defies that allegation, having entered the Orlando individual health insurance market notwithstanding Florida Blue's exclusive deals. (Compl. ¶ 5.) A complaint cannot survive a motion to dismiss where it contains "contradictory allegations." *Jackson v. Conner Collins, Inc.*, No. CRIMA509CV63(HL), 2009 WL 500858, at *1 (M.D. Ga. Feb. 27, 2009). Moreover, a plaintiff cannot plausibly allege monopoly power without "describing barriers to expansion" and "explaining why [current] participants cannot increase their own output in response to a contraction by Defendants." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2017 WL 4310767, at *9 (N.D. Cal. Sept. 28, 2017). As Oscar has failed to offer any non-conclusory allegations on entry and expansion, Oscar's monopolization and attempted monopolization claims must be dismissed. *See id.*

## C. Oscar Fails To Plausibly Allege Substantial Foreclosure

Exclusive deals can be unlawful only if they substantially foreclose competitors from the relevant market. *McWane*, 783 F.3d at 837. Although Oscar alleges that it has been "substantially foreclosed from brokers, a crucial path to insurance consumers" (Compl. ¶ 81), it alleges no facts to support this claim. So long as Oscar can reach consumers through its own broker relationships or through alternative channels of distribution, the alleged fact that 190 agents have opted to work exclusively with Florida

Blue (*id.*), has no antitrust significance.  *See McWane*, 783 F.3d at 839.  Indeed, it is a matter of public record that over 146,000 brokers and agents are appointed to sell insurance in Florida.[9]  Even if true, Oscar's allegation means that it has been "foreclosed" from only a small fraction of brokers.  That is hardly sufficient.

Oscar also alleges that access to Florida Blue's agents is "indispensable" because Florida Blue holds captive "many of the largest and most successful brokers serving the Orlando area" (Compl. ¶ 9), and consumers "strongly prefer" to work with local brokers rather than "out-of-area brokers" working at call centers or online health businesses (Compl. ¶ 33).  Once again, these are conclusions, not allegations.  Oscar pleads no factual support regarding the "largest and most successful brokers," and it supports the assertion that consumers prefer local brokers with nothing more than the statistic that 80% of Oscar policies "sold by brokers" in Orlando were sold by "brokers with operations in the area." (Compl. ¶ 34.)  As Oscar does not reveal the proportion of its appointed brokers that operate inside and outside Orlando, this statistic is meaningless.  For example, if a large percentage of Oscar brokers were located in Orlando, the fact that a large percentage of Oscar plans were also sold through those brokers would reveal nothing about consumer preference.

Moreover, Oscar's Complaint noticeably omits any discussion of alternate distribution channels beyond "brokers."  Under federal law, individuals can purchase health insurance plans through a government-run "call center" or "Internet Web site," 45 C.F.R.

---

[9] Such data is available on the Florida Department of Financial Services ("DFS") website.  *Licensee Search*, Fl. Dep't of Fin. Servs., https://licenseesearch.fldfs.com/ (last visited Jan. 29, 2019).  Courts in this circuit regularly take judicial notice of information available to the public on government websites.  *See Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, No. 16-21296-CIV, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017) (collecting cases).

§ 155.205(a)–(b); 45 C.F.R. § 155.405(c), or through insurers' own websites, 45 C.F.R.

§ 156.265(b).  Oscar does not mention these other distribution channels, let alone allege that

such channels are foreclosed.  The failure to plead such "conspicuously omit[ted]" facts

alone warrants dismissal.  *See Kadel v. Flood*, 427 F. App'x 778, 780 (11th Cir. 2011)

(dismissing complaint where plaintiff "conspicuously omit[ted] any facts that would require

one to rule out an innocent explanation for the alleged behavior" (internal citation omitted));

*McElveen v. Westport Recovery Corp.*, 310 F. Supp. 3d 1374, 1379 (S.D. Fla. 2018)

(dismissing claim when allegations tending to support core assertions were "conspicuously

absent from Plaintiff's complaint"); *In re Terazosin Hydrochloride Antitrust Litig.*, 160

F. Supp. 2d 1365, 1377 (S.D. Fla. 2001) (same).

Notably, Oscar describes itself as being "technology-driven," touts its

"intuitively designed mobile and web application" and claims that it "uses technology . . . to

make health care affordable and accessible," yet it never even mentions its ability (or

inability) to reach consumers using technology.  (Compl. ¶¶ 3, 41, 43.)  Oscar instead claims

to be entirely dependent on Florida Blue's network of exclusive agents.  This Court need not

credit such self-serving and far-fetched allegations on a motion to dismiss.

**D.      Oscar Fails To Plausibly Allege Harm to Competition**

It is axiomatic that the antitrust laws exist to protect "competition, not

competitors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962); *see also Spanish

Broad. Sys.*, 376 F.3d at 1075; *Morgan Yacht*, 457 So. 2d at 1032 (holding that Florida's

Antitrust Act tracks federal law).  "Even an act of pure malice by one business competitor

against another does not, without more, state a claim under the federal antitrust laws."

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).  Even if Oscar has alleged harm to its business, "injury to a competitor need not always result in injury to competition."  *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir. 1982).

Here, Oscar's Complaint focuses on purported harm to *Oscar* arising out of Florida Blue's exclusivity arrangements.  Oscar alleges, for instance, that its "ability to compete in the Orlando Markets has been inhibited," and its "plans to enter other markets, including the Jacksonville Markets and Tampa Markets will be threatened."  (Compl. ¶¶ 83, 86.)[10]  Such allegations alone cannot sustain a claim for monopolization or attempted monopolization.  *See Spanish Broad. Sys.*, 376 F.3d at 1075.

To the extent Oscar alleges harm to competition at all, it insists that "[t]he primary anticompetitive effect of Florida Blue's scheme to foreclose Oscar from brokers is that consumers will pay more for health insurance."  (Compl. ¶ 90.)  As support, Oscar focuses on alleged differences between Florida Blue's and Oscar's premium rates.  (*Id.* ¶¶ 91–92.)  Oscar makes no effort to compare the *total* costs associated with Florida Blue's plans with Oscar's plans.  No factual allegations thus support Oscar's claim that "consumers will pay more for health insurance" absent Oscar's ability to access Florida Blue's exclusive agents.

Oscar also summarily asserts that "Florida Blue is reducing output and

---

[10] Since filing its Complaint, Oscar has announced that it has abandoned its plans to expand to Jacksonville.  (Gossen Supp. Decl. ¶ 17 n.3.)  Oscar's claims should be dismissed insofar as they relate to Jacksonville because Oscar cannot demonstrate that it has antitrust standing with respect to that market.  *See, e.g.*, *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) (holding that antitrust standing requires "(1) an intention to enter the business, and (2) a showing of preparedness to enter the business").

limiting consumer choice, while also reducing quality by impeding innovation." (Compl.

¶ 88.) But again, Oscar offers no facts supporting its claim that market output and consumer

choice would increase absent Florida Blue's exclusive arrangements—a claim that is

particularly implausible given that Oscar's proposed relief would indisputably affect Florida

Blue's sales "throughout the entire State of Florida," while Oscar only serves a single

metropolitan area. (Compl. ¶ 6.) Nor does Oscar attempt to compare objectively the quality

of Oscar's plans to the Florida Blue plans it seeks to offset. Once again, bald assertions are

not sufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

     Finally, Oscar's own allegations point to Florida Blue's "superior product,

business acumen, or historic accident" as the reason for its success in the market. *See Trinko*,

540 U.S. at 407 (quoting *Grinnell*, 384 U.S. at 570–71). As Oscar itself acknowledges,

"since 2015, major insurers including Aetna, Humana, Cigna and United Healthcare, have

left the [Florida] market" and "Florida Blue absorbed the bulk of the consumers they left

behind." (Compl. ¶¶ 2, 37.) Oscar does not allege (nor could it) that these competitors'

decision to exit Florida had anything to do with Florida Blue's exclusivity policy. There is

thus an "obvious alternative explanation[]" for Florida Blue's purported dominance in the

individual health insurance market, which this Court may readily credit. *Cigna Corp.*, 605

F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682).

     In sum, Oscar's monopolization and attempted monopolization claims should

be dismissed.

## III. Oscar Fails To Plausibly Allege Sherman Act Section 1 or Florida Antitrust Act Section 542.18 Claims (Counts III and V)

     Oscar claims that Florida Blue's exclusivity policy violates Sherman Act § 1

(Count III) and Florida Antitrust Act § 542.18 (Count V).  Both statutes bar agreements that

unreasonably restrain trade, and the legal analysis for both statutes is the same.  *See Levine v.*

*Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996); *Hill Dermaceuticals,*

*Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1300 (M.D. Fla. 2017).

        Where, as here, a plaintiff challenges a vertical agreement between a supplier

and its dealers, the plaintiff must establish that the agreement involves an entity with market

power and causes anticompetitive harm that exceeds any procompetitive benefits.  *See*

*Levine*, 72 F.3d at 1551; *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1566,

1571 (11th Cir. 1983).  For all the reasons set forth above, Oscar has failed to allege either

market power or anticompetitive harm, and its Sherman Act § 1 and Florida Antitrust Act

§ 542.18 claims must fall.

**IV.**     **Oscar Fails To Plausibly Allege Tortious Interference (Count VI)**

        To state a tortious-interference claim, a plaintiff must show "(1) the existence

of a business relationship"; "(2) knowledge of the relationship on the part of the defendant;

(3) an intentional and unjustified interference with the relationship by the defendant; and

(4) damage to the plaintiff as a result of the breach of the relationship."  *Ethan Allen, Inc. v.*

*Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quoting *Tamiami Trail Tours, Inc.*

*v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985)).  "[I]ntentional interference requires both the

intent to damage the business relationship and a lack of justification for doing so."  *Alphamed*

*Pharm. Corp. v. Arriva Pharm., Inc.*, 391 F. Supp. 2d 1148, 1165 (S.D. Fla. 2005).

        Oscar alleges that Florida Blue "has threatened and continues to threaten

brokers with which Oscar does business if those brokers continue to sell Oscar insurance

plans," with "the intent to sever Oscar from its business partners to avoid competition."

Compl. ¶ 134.  Oscar has not alleged, and cannot show, that Florida Blue's actions were

unjustified or that Florida Blue acted solely out of malice or used improper methods.  Oscar's

tortious interference claim must fail as a result.

A.      **Oscar Fails to Allege that Florida Blue's Actions Were Unjustified**

A company's interference in a business relationship is justified "when

undertaken to protect its own business interests, such as to reduce the risk of loss.  So long as

the company does not engage in improper conduct, it may take steps to protect its business

interests without liability for tortious interference."  *Romika-USA Inc., v. HSBC Bank USA,*

*N.A.*, 514 F. Supp. 2d  1334, 1339 (S.D. Fla. 2007).  Actions are unjustified, by contrast,

where the interfering defendant is a stranger to the business relationship.  *Id.*  "A defendant is

not a 'stranger' to a business relationship if the defendant 'has any beneficial or economic

interest in, or control over, that relationship.'"  *Mattocks v. Black Entm't Television LLC*, 43

F. Supp. 3d 1311, 1319 (S.D. Fla. 2014) (quoting *Palm Beach Cnty. Health Care Dist. v.*

*Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009)).

For example, in *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285

(11th Cir. 2001), a car dealership sued a manufacturer for tortious interference after the

manufacturer prevented the dealer from selling the dealership to a third party, who would

operate out of a new location.  *Id.* at 1288–89.  Under the dealership agreement between the

manufacturer and the dealer, the dealer was not allowed to move the dealership without the

prior consent of the manufacturer, and the sale of the dealership was conditioned on the

manufacturer's approval.  *Id.*  The Eleventh Circuit held that the manufacturer had enough of

an interest in the transaction between the dealer and the third-party purchaser such that it was not a "stranger" and thus could not be held liable for tortious interference.  *Id.* at 1294–95.

The logic of *Ernie Haire Ford* applies equally here.  Under Oscar's own allegations, Florida Blue and its agents had pre-existing "exclusive agreements, either in writing or *de facto*," which required a "broker want[ing] to sell individual plans for Florida Blue" to "agree to sell *only* Florida Blue's individual plans."  (Compl. ¶¶ 51, 113.)  Thus, just as the manufacturer in *Ernie Haire Ford* had an interest in enforcing its relocation-oversight rights, Florida Blue has an interest in enforcing its exclusivity agreements.  As a result, Florida Blue was no stranger to the business relationships between Oscar and Florida Blue's exclusive agents and is not liable for tortious interference under Florida law.[11]

> **B.  Oscar Fails to Allege that Florida Blue Acted Solely Out of Malice or Used Improper Methods**

Even where a party has an interest in a business relationship, its "privilege to interfere" is not absolute.  In particular, an interested party may not interfere "where malice is the *sole* basis for the interference"—i.e., where the defendant is "interfering *solely* out of spite, to do harm, or for some other bad motive."  *Ernie Haire Ford*, 260 F.3d at 1294 n.9.  And "even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used."  *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004).  Actionable "improper" methods under Florida law include physical violence, misrepresentations, illegal conduct and threats of illegal conduct. *Alticor Inc. v. UMG Recordings, Inc.*, No. 6:14–CV–542–ORL–37, 2015 WL 736346, at *2

---

[11] Indeed, if anyone is liable for tortious interference, it is Oscar—who, by its own admission, sought to contract with agents already bound by exclusive agreements with Florida Blue.  (*See* Compl. ¶¶ 9, 81.)

(M.D. Fla. Feb. 20, 2015).  Interference does not involve "improper methods" where it entails nothing more than "regular business practice."  *See Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, No. 6:14-CV-533-ORL-31, 2014 WL 3747667, at *3 (M.D. Fla. July 29, 2014).

Here, Oscar has not alleged that malice was the sole basis for Florida Blue's enforcement of its exclusivity provisions with its agents, nor could it.  Rather, Oscar's Complaint reveals the legal and legitimate reasons for Florida Blue's enforcement of its exclusive contracts.  Oscar acknowledges brokers "play a crucial role in driving policy sales in Florida" and "consumers' decisions are often relationship-driven."  (Compl. ¶¶ 29, 33.) The "obvious alternative explanation[]" for Florida Blue's conduct, then, is that Florida Blue sought to protect its business relationships with its customers, as cultivated through its agents—not to drive Oscar from the market.  *Cigna Corp.*, 605 F.3d at 1290.

Nor has Oscar alleged interference through "improper methods."  *See KMS*, 361 F.3d at 1327.  Although Oscar claims that Florida Blue engaged in "coercion and intimidation," (Compl. ¶ 102), Oscar's actual allegations describe nothing more than standard enforcement of an exclusivity clause.  As exclusive dealing is typically a "legitimate business practice[]," *Maris Distrib.*, 302 F.3d at 1224, and as resort to a "regular business practice" is not "improper," *Advantor*, 2014 WL 374766, at *3, Oscar has not plausibly alleged improper interference.  Oscar's tortious interference claim (Count IV) therefore must be dismissed.

## CONCLUSION

For the foregoing reasons, Florida Blue respectfully asks that the Court dismiss Oscar's Complaint.  Florida Blue further requests oral argument on its motion to dismiss, with 30 minutes allocated to each side.

February 1, 2019

HOLLAND & KNIGHT LLP,

by

*/s/ Timothy Conner*
_____

Timothy Conner, Esq.
Florida Bar No. 767580
Jerome W. Hoffman, Esq.
Florida Bar No. 258830

50 North Laura Street, Suite 3900
Jacksonville, FL 32202
(908) 798-7362
timothy.conner@hklaw.com
jerome.hoffman@hklaw.com

CRAVATH, SWAINE & MOORE LLP,

by

*/s/ Karin A. DeMasi*
_____

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren Roberta Kennedy

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of February, 2019, a true and

correct copy of the foregoing Motion was electronically filed using the ECF/CM portal

system, which will serve as such filing on all counsel of record.


_/s/ Karin A. DeMasi_
Karin A. DeMasi