**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

OSCAR INSURANCE COMPANY OF
FLORIDA,

        Plaintiff,

v.                                                  Case No:   6:18-cv-1944-Orl-40TBS

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., FLORIDA HEALTH
CARE PLAN INC. and HEALTH
OPTIONS INC.,

        Defendants.
_____/

## ORDER

This cause is before the Court with oral argument on the following:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 11 (the "**Motion**")) and accompanying declarations, filed November 19, 2018;

2. Plaintiff's Supplemental Declaration of Nicholas Gossen (Doc. 56), filed December 21, 2018;

3. Plaintiff's Supplemental Declaration of Dr. Mark A. Israel, Ph.D. (Doc. 57), filed December 21, 2018; and

4. Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 62 (the "**Response**")) and accompanying declarations, filed January 18, 2019.

A six-hour evidentiary hearing, with opening and closing arguments by both sides, took place before the Court on January 23, 2019. Upon due consideration of the pleadings, and with the benefit of oral argument, Plaintiff's Motion is due to be denied.

I.  **BACKGROUND**

The issue in this case deals with Defendants', Blue Cross and Blue Shield of Florida, Inc.'s, Health Options Inc.'s, and Florida Health Care Plan Inc.'s (collectively, "**Florida Blue**"), use of an exclusivity policy preventing their agents from selling individual health insurance plans from any provider other than Florida Blue. (Doc. 1, ¶ 14). Plaintiff, Oscar Insurance Company of Florida ("**Oscar**"), seeks to enjoin Florida Blue from enforcing the exclusivity policy, claiming it constitutes anticompetitive behavior. (Doc. 11, p. 3). Oscar asserts that Florida Blue has monopolized, or attempted to monopolize, the relevant markets for the sale of individual plans in the Orlando area, in violation of Sherman Act § 2, and has unlawfully restrained trade in these markets, in violation of Sherman Act § 1. (*Id.*).

Oscar is a technology-driven health care company formed in the wake of the Affordable Care Act ("**ACA**"). (Doc. 1, ¶¶ 4, 25, 41–44). In 2018, Oscar entered the Orlando health insurance market, selling individual health insurance plans for the first time in Lake County, Orange County, Osceola County, and Seminole County. (*Id.* ¶¶ 4, 15). Oscar offered "Bronze," "Silver," and "Gold" plans—the most popular plan categories available to Florida residents on the ACA exchange. (*Id.* ¶ 48). Individuals in Orlando could purchase these plans from Oscar—or its competitors—during the open-enrollment period running from November 1, 2018, to December 15, 2018, with coverage starting January 1, 2019. (*Id.* ¶ 28).

As a new entrant of the Orlando health insurance market, Oscar engaged in substantial advance work to become a viable competitor in the offering of individual plans. (*Id.* ¶ 10). Oscar prepared financial analysis regarding entry into the market, negotiated

2

rates with hospitals and physicians to build provider networks, gained approval from state regulators, and attracted local brokers to sell its plans. (*Id.* ¶¶ 10, 49). This action arises from Oscar's efforts at appointing local brokers.

Brokers play an important role in the sale of health insurance plans as they provide individualized advice and information to consumers choosing from diverse options. (*Id.* ¶ 31). Brokers must be licensed by the state to sell health insurance, only qualifying for licensure after completing sixty hours of coursework and passing a written exam. (*Id.* ¶ 30). Health insurance companies then "appoint" these brokers, meaning they are legally permitted to sell policies for the insurer in exchange for a commission and/or a fee. (*Id.* ¶ 31).

In anticipation of the 2018 open-enrollment period, Oscar appointed many Orlando brokers to sell its individual plans, including some brokers who also sell individual plans for Florida Blue. (Doc. 56, ¶ 16). On October 24, one week before the open-enrollment period began, a Florida Blue representative sent an email to its brokers, writing: "You . . . will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us." (Doc. 11, p. 7; Doc. 11-3, ¶¶ 9–14). Florida Blue then updated its exclusivity policy, requiring brokers to sign an agreement acknowledging that "[a]ny agent or agency that violates the exclusivity arrangement with Florida Blue will be permanently terminated for cause." (Doc. 11, p. 7; Doc. 11-4, ¶ 8). Subsequently, 235 brokers rescinded their appointments with Oscar. (Doc. 56, ¶ 16).

Currently, there are 146,114 brokers and agents[1] licensed to sell health insurance plans within the state of Florida, and 19,275 of those work in the Orlando area. (Doc. 62-3, p. 132). Florida Blue has exclusive relationships with 9,360 of the brokers in Florida and 1,724 of the brokers in Orlando. (*Id.*).[2] After accounting for the termination of the Florida Blue appointments, Oscar successfully appointed 1,887 brokers in Florida—with less than forty percent actually selling Oscar plans during the 2018 open-enrollment period. (Doc. 56, ¶ 16).

Oscar claims that due to the exclusivity policy, it was unable to enroll the projected number of individuals despite having "high-quality provider networks, but with lower premium rates, compared to Florida Blue." (Doc. 11, p. 5). The week before open enrollment, Oscar projected that it would obtain 63,000 lives in Orlando. (Doc. 56, ¶ 10).[3] However, by the close of open enrollment, Oscar enrolled only 33,251 individuals, with

---

[1]   The parties dispute the proper characterization of agents versus brokers. It is unnecessary for the Court to resolve the dispute at this juncture of the litigation.

[2]   Florida Blue engages 6% of the brokers in Florida and 9% of those residing in Orlando.

[3]   This projection was based off Oscar's knowledge of comparative pricing as of October 26, 2018, the date that rates for Oscar and its competitors were publicly released. (Doc. 56, ¶ 10). "Oscar learned it had a 9 percent rate advantage for Bronze plans and a 3 percent rate advantage for Silver plans relative to its competition." (*Id.*). The projection factored in the difficulty Oscar would face in obtaining appointments due to Florida Blue's exclusivity policy. (*Id.*). In June 2018, Oscar projected it would enroll 36,000 members. (Doc. 62-3, ¶ 228 (citing Florida Blue Presentation, "2019 U65 Competitive Outlook Oscar Entry Baseline Findings," June 29, 2018, Slide 8)). However, the June 2018 projection was made before the October 26, 2018, public release of 2018 open-enrollment rates. (Doc. 56, ¶ 10).

an estimated enrollment effectuation of 29,648 individuals. (*Id.* ¶ 3). This accounts for a 13 percent share of individual ACA enrollments in the Orlando area. (*Id.*).[4]

Conversely, in 2018, Florida Blue accounted for a 70 percent market share of on-exchange individual insurance lives in Florida and a 91 percent market share in Orlando. (Doc. 62-3, p. 131; Doc. 11-2, p. 12). Citing this data, Oscar claims that Florida Blue has monopolized, or attempted to monopolize, the relevant markets for the sale of individual plans in the Orlando area and has unlawfully restrained trade in these markets. (Doc. 11, p. 2). Oscar asserts six Counts against Florida Blue: (1) Sherman Act § 2 Claim for Monopolization; (2) Sherman Act § 2 Claim for Attempted Monopolization; (3) Sherman Act § 1 Claim; (4) Florida Antitrust Act Restraint of Trade § 542.18 Claim for Monopolization and Attempted Monopolization; (5) Florida Antitrust Act Restraint of Trade § 542.18 Claim Based on Florida Blue's Exclusive Agreements with Brokers; and (6) Tortious Interference with a Business Relationship. (Doc. 1, ¶¶ 95–135).

On November 19, 2018, Oscar filed the Motion for a preliminary injunction against Florida Blue. (Doc. 11).[5,6] Oscar seeks to enjoin Florida Blue from enforcing its exclusivity policy, arguing that the policy has substantially foreclosed Oscar from accessing brokers,

---

[4] Seventy-five percent of Oscar's enrollments were obtained through brokers. (Doc. 56, ¶ 14).

[5] The Motion includes declarations from: (1) Nicholas Gossen, Oscar's Director of Sales Strategy and Operations (Doc. 11-1); (2) Dr. Mark A. Israel, Ph.D. (Doc. 11-2); (3) Will Johnson, Oscar Sales Leader (Doc. 11-3); and (4) William Sparks, agent of health insurance plans for the Morse Insurance Agency in the Orlando area (Doc. 11-4).

[6] The Court benefited from briefing from both sides on the following topics: market definitions, market power, barriers to entry, monopoly power, switching, foreclosure, pro-competitive justifications, antitrust damage, harm to competition and consumers, and harm to Oscar and Florida Blue with and without injunctive relief.

and therefore from competing in the Orlando individual-plan market. (Doc. 11, p. 14). Absent injunctive relief, Oscar claims it will continue to suffer irreparable harm in the form of lost market share and goodwill. (*Id.* at p. 3). Furthermore, Oscar contends that an injunction will serve the public interest through added competition to the health insurance industry, which will lead to lower costs, higher-quality options, and more information for consumers. (*Id.* at p. 24).

On December 6, 2018, the Court held a hearing on Oscar's Motion for Expedited Briefing and Discovery (Doc. 13), at which point the Court denied the request for expedited discovery. (Doc. 48). On December 21, 2018, Oscar filed supplemental declarations to account for its performance during the 2018 open-enrollment season. (Docs. 56, 57).[7] On January 18, 2019, Florida Blue filed its Response to the Motion. (Doc. 62).[8]

On January 23, 2019, the Court held a six-hour evidentiary hearing on the Motion. Dr. Mark A. Israel, Ph.D., and Dr. Laurence Baker, Ph.D., testified as expert witnesses for Oscar and Florida Blue, respectively. Oscar and Florida Blue each presented opening and closing arguments.

## II.   STANDARD OF REVIEW

To obtain a preliminary injunction, Oscar must establish: (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable harm in the absence of

---

[7] Oscar submitted supplemental declarations from Mr. Gossen (Doc. 56) and Dr. Israel (Doc. 57).

[8] The Response includes declarations from: (1) Nicholas Tant, Florida Blue's Senior Director of the Individual Consumer Market Segment (Doc. 62-1) and (2) Dr. Laurence Baker, Ph.D. (Doc. 62-3).

an injunction; (3) that the harm suffered by Oscar in the absence of an injunction would exceed the harm suffered by Florida Blue if the injunction was issued; and (4) that an injunction would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)) ("Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion.").

Furthermore, the Court notes that Oscar seeks a mandatory injunction, because if granted, the injunction would affirmatively alter the status quo with regard to Florida Blue's relationship with its agents. *See Antoine v. Sch. Bd. of Collier Cty.*, 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018). "Mandatory preliminary relief, which goes beyond simply maintaining the status quo[,] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corrs.*, 691 F. App'x 581, 583 (11th Cir. 2017) (per curiam) (quoting *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).[9] Accordingly, Oscar faces a heightened burden. *See Antoine*, 301 F. Supp. 3d at 1203.

### III. DISCUSSION

---

[9] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

### A. Failure to Establish Irreparable Harm

The Court first addresses Oscar's ability to prove irreparable harm in the absence of an injunction. As set forth below, Oscar fails to satisfy its burden of proving irreparable harm.

Irreparable harm is the "*sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contracts v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Even where the movant satisfies all the remaining factors necessary to obtain injunctive relief, the failure to prove irreparable harm renders preliminary injunctive relief improper. *City of Jacksonville*, 896 F.2d at 1285 (reversing injunctive relief based solely on movant's failure to show irreparable harm). Critically, "[a]n injury is 'irreparable' only if it cannot be undone through monetary damages." *Id.* "[I]njuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

#### 1. Loss of Market Share

Florida Blue contends that Oscar has failed to carry its burden of establishing irreparable injury, because any loss of market share due to alleged barriers to entry by Florida Blue can be quantified, for example, by using regression analysis. (Doc. 62, p. 18). On this point, counsel for Oscar engaged in the following colloquy with its retained economist, Dr. Israel:

> Q   Counsel [for Florida Blue] noted in his opening that you hadn't done an economic -- an econometric analysis of harm

> and damages and the whole thing. Did you have data from Florida Blue?
>
> A   No. And certainly in some cases you do regressions, in some cases you don't. Generally, it's something that happens post-discovery and with a lot of data. I would say that in this case, honestly, even without having full discovery, we have an ordinary course benchmark right before sales happen, we have another state, we have different ways of coming at the question we get similar answers, it's pretty solid for this point in the case.

(Official Tr. 59:9–17).[10]

During cross-examination of Dr. Israel, Florida Blue introduced an excerpt from a book containing a chapter authored by Dr. Israel in which he expounds upon econometrics and regression analysis. (Def. Ex. 34; Official Tr. 107:23–110:12).[11] In Chapter 6, Dr. Israel writes:

> Econometrics refers to a set of statistical methods or tools that economists use to assess antitrust damages. Regression analysis is the most common tool of econometrics. It enables one to uncover the relationship between a dependent variable (the outcome being modeled, such as prices) and one or more explanatory variables (the potential influences on the dependent variable, such as anticompetitive conduct, supply factors including costs or capacity, and demand factors). Regressions can prove useful in answering the basic "counterfactual" question: What would market outcomes (e.g., prices) have been in the absence of the anticompetitive act?

(Def. Ex. 34, p. 2). Dr. Israel provides examples of how "[e]conometric techniques can be applied in a variety of ways to estimate the impact of the alleged anticompetitive conduct on certain economic outcomes, such as estimating lost sales or price changes due to the

---

[10] Citations to the evidentiary hearing are to the official transcript, denoted "Official Tr." (Doc. 67).

[11] Defense Exhibit 34 is a copy of a chapter Dr. Israel wrote in *Proving Antitrust Damages: Legal and Economic Issues* (3d ed. 2017).

9

alleged conduct." (*Id.* at 70). On cross-examination, counsel for Florida Blue explored whether regression analysis could have been utilized by Dr. Israel to quantify the monetary damages caused by Florida Blue's alleged anticompetitive behavior:

> Q  And with respect to the . . . loss of customers as a basis for injury, you agree with me that regression analyses have met the requirements of the evidentiary rules many times in litigation for a wide range of issues, including the estimation of antitrust damages?
>
> A  Certainly have many times and other times have not. That sounds like it comes from my chapter on econometric analysis, much about when you should or shouldn't use regression.
>
> Q  This is a chapter you wrote in American Bar Association publication, correct?
>
> A  Correct. It's a chapter on the use and misuse of regression analysis in estimating damages.
>
> Q  And, in fact, when you made that statement in the ABA publication, you cited a couple of cases in support of the use of [regression] analyses to estimate damages in antitrust cases, didn't you?
>
> A  I mean, certainly cited the cases that have used regression analysis. There's no doubt there are many such cases.

(Official Tr. 107:23–108:17).

Contrary to Oscar's contention that loss of market share constitutes irreparable harm which cannot be adequately compensated by an award of monetary damages, Dr. Israel—an authority on econometrics and regression analysis—possesses the requisite expertise to calculate the economic impact of Florida Blue's alleged anticompetitive behavior. (*See id.*). Dr. Israel's testimony indicates that he did not attempt to conduct regression analysis because "it's something that happens post-discovery and with a lot of data." (*Id.* 59:11–12). That is, monetary damages can be calculated, just not at this early

10

stage in the litigation. Somewhat surprisingly, in response to a question by counsel for Oscar, Dr. Israel offers that, even absent the data sets required for regression analysis, here "we have an ordinary course benchmark right before sales happen, we have another state, we have different ways of coming at the question we get similar answers, it's pretty solid for this point in the case." (*Id.* 59:14–17). Dr. Israel could look at Oscar's sales in Orlando, compare those sales to other markets he contends are statistically similar, and calculate monetary damages. However, he did not engage in this exercise, and the failure to do so does not give rise to irreparable harm. *See Sampson*, 415 U.S. at 90. ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

To support its assertion that fewer subscribers were achieved in Orlando than had been projected and that this shortfall is the product of Florida Blue's exclusivity policy, Oscar submits a comparison of its market share upon entry into the Orlando market and its market share upon entry into markets without exclusivity policies. (Doc. 11-2, p. 27; Doc. 57, ¶¶ 12–15). Oscar offers data from Decision Resources Group to contrast its market share upon entry in San Antonio, Texas (28%) and Austin, Texas (38%) to Orlando (13%) as evidence that Florida Blue's exclusivity policy constitutes a barrier to entry and is anticompetitive. (Doc. 11-2, p. 27, Table 7).[12]

Several key pieces of data are missing from this analysis. First, Oscar offers little information concerning the types of plans purchased in San Antonio or Austin, fails to specify the rate policyholders switched from those plans in the first year, and does not

---

[12] Table 7 is included at Appendix A.

11

compare key characteristics between Oscar plans and Florida Blue plans. For instance, Florida Blue offers 77 On-Exchange Plans to Oscar's 8; Florida Blue offers plans with no deductible, Oscar does not; Florida Blue has 407 In-Network Primary Care Physicians to Oscar's 122; and Florida Blue has 998 In-Network Specialists to Oscar's 492. (Def. Ex. 29, Slide 8).[13] Second, Oscar fails to mention that they had entered the Dallas-Fort Worth and New Jersey markets but withdrew from both even though no incumbent providers who used exclusive agency agreements were alleged to have existed. (Doc. 62-3, Ex. 7; Def. Ex. 36–38; Official Tr. 111:5–113:21).

As to the first point, Oscar's lower-than-expected performance in Orlando may be due to the differences in available products as opposed to Florida Blue's exclusivity policy. (*See* Def. Ex. 29, Slide 8). The Court is reluctant to speculate, based on the record before it, that San Antonio and Austin are comparable markets such that Oscar's less successful performance in Orlando is due to Florida Blue's alleged anticompetitive conduct.

As to the second point, Oscar has withdrawn from other markets where it presumably anticipated success without facing an incumbent provider who used exclusive agency agreements. (Doc. 62-3, Ex. 7; Def. Ex. 36–38; Official Tr. 111:5–113:21). In fact, Oscar captured under 13 percent market share in five other markets it entered in 2018. (Appendix A). Therefore, the Court is unconvinced by Oscar's argument that performance in Orlando should only be compared to its successful performance in Texas when assessing whether Florida Blue's exclusivity policy is the reason for Oscar's current market share. Furthermore, Florida Blue points out that other competitors who recently

---

[13] Citing Tant Declaration ¶ 3; Baker Declaration ¶¶ 176, 179; Central Florida Network Comparison.xlsx; Federally Facilitated Marketplace, Qualified Health Plan Data.

entered the Orlando market[14] started with unimpressive numbers that improved over time. (Doc. 62, p. 10). For example, in 2014, Centene had 8,365 individuals enrolled in 3 counties, and by 2018 enrollment grew to 371,243 individuals covering 22 counties. (Doc. 62-3, ¶¶ 95–100; Def. Ex. 29, Slide 6).

Accordingly, the Court is unpersuaded by Oscar's argument that Florida Blue's exclusivity policy is responsible for the market share obtained in Orlando in the first year of competition. Even if the Court were persuaded, Oscar has failed to demonstrate that monetary damages cannot be calculated; that is, they fail to carry their burden of demonstrating irreparable injury on their lost-market-share theory.

### 2. Loss of Good Will

The Court is similarly unpersuaded by Oscar's contention that it has suffered and will continue to suffer the loss of good will as a result of Florida Blue's exclusivity policy. Dr. Israel's analysis on this point is unsupported by any empirical data. (Doc. 11-2, ¶ 59). Even though surveys are customarily employed to measure a consumer's view of the plaintiff's reputation and any negative impact caused by the defendant's conduct, Dr. Israel acknowledges that he was not directed to perform such a survey for this case. (Official Tr. 106:12–107:22). Florida Blue's expert, Dr. Baker, observes that Oscar failed to present "an analysis of whether the conduct at issue today would have persistent effects on Oscar's ability to compete in Florida's individual health insurance marketplaces. . . . For example, [Dr. Israel] has not assessed and therefore has not shown that any

---

[14] The Court's reference to the Orlando market should not be construed as acceptance that Orlando is the relevant market. The Court does not reach that issue since it is not outcome determinative at present.

customers who chose not to purchase Oscar plans in one year could not be attracted to Oscar in the following year." (Doc. 62-3, pp. 114–115). Therefore, Oscar failed to adduce evidence that Florida Blue's use of exclusive agents has caused Orlando consumers to develop an indelible, less favorable view of Oscar's brand or its individual plans. (*Id.*). While Dr. Israel is indeed an impressive economist, the loss of good will cannot rest upon the expert's unsupported opinion.

### B. Substantial Likelihood of Success on the Merits

The Court has already expounded upon the difficulty in comparing on this record the relative success Oscar experienced in San Antonio and Austin to Orlando in arriving at the conclusion that Florida Blue's exclusivity policy is to blame for Oscar's perceived underperformance. Another comparison merits discussion. Oscar cites *McWane, Inc. v. Federal Trade Commission* for the proposition that "[f]oreclosure occurs when 'the opportunities for other traders to enter into or remain in [the] market [are] significantly limited' by the exclusive dealing arrangements." 783 F.3d 814, 837 (11th Cir. 2015); (Doc. 11, p. 14). In evaluating potential foreclosure, Oscar asks the Court to define the pool of available brokers as those with an active appointment from Florida Blue, Centene, Health First, Molina, or Oscar—thereby limiting the pool to 2,259 active brokers selling health insurance in Orlando. (Pl. Ex. 2, Slides 5–6; Official Tr. 44:10–45:8, 191:25–196:13). By limiting the pool of available brokers to 2,259, Oscar submits that Florida Blue controls 77 percent of brokers and has foreclosed these brokers from working with Oscar. (*Id.*).

Florida Blue disputes this characterization of available brokers, noting that approximately 146,000 brokers are registered and licensed to sell health insurance in the state of Florida. (Doc. 62, p. 11; Doc. 62-3, ¶ 155 n.248; Def. Ex. 29, Slide 4; Official Tr.

14

146:25–150:7). Based upon this number, Florida Blue has exclusivity agreements with 6 percent of the brokers in Florida, and 9 percent of those residing in Orlando. (Doc. 62-3, ¶ 155; Def. Ex. 29, Slide 4; Official Tr. 149:4–11). Oscar actively recruits brokers on its website and has already secured 1,887 brokers during its short time in the Orlando market. (Doc. 62-3, ¶¶ 156–58; Def. Ex. 7; Official Tr. 67:23–70:3). There is nothing to prevent Oscar from recruiting more brokers than are currently engaged by Florida Blue. Accordingly, the Court declines to limit the pool of available brokers to those with an active appointment with one of the several Orlando insurers. By considering all available brokers, and not just those currently engaged, Florida Blue's exclusivity agreements occupy a tiny fraction of the available pool of brokers. This conclusion weighs against a finding of foreclosure.

Furthermore, Florida Blue has presented ample evidence showing that numerous insurers have entered the Orlando market since 2014. (Doc. 62, p. 10; Doc. 62-3, ¶¶ 84, 96–98, 148, 168–71; Def. Ex. 29, Slide 9). Some have remained and have grown, such as Centene, and others have decided to leave—as Oscar did in Dallas-Fort Worth and New Jersey. (Doc. 62-3, ¶¶ 96–98, 148, Ex. 7; Official Tr. 111:5–113:21). Moreover, the health insurance market in Orlando is vibrant with 25 percent of customers switching plans and carriers, 40 percent renewing, and 35 percent entering as new enrollees. (Doc. 62-3, Ex. 2A, 2B; Def. Ex. 29, Slide 10). Oscar, as a recent provider, captured nearly 13 percent of those shopping for health insurance in its first attempt. (Doc. 56, ¶ 3). These facts suggest that the opportunities for other insurers to enter into or remain in the market are not "significantly limited by the exclusive dealing arrangements." *See McWane*, 783 F.3d at 837.

Finally, the Court notes that brokers (or agents) are not the sole means of capturing consumers of these products, i.e. enrollees of the various individuals plans. A competitor can employ advertising, deploy a properly optimized or indexed website, engage in community outreach, and rely on healthcare.gov, which provides a ready-made portal allowing customers to comparison shop. (*See* Official Tr. 77:22–80:13). This multi-channel method of sale presents significant obstacles to Oscar's chances of success on the merits, even without reaching the questions of whether exclusive agency agreements result in pro-competitive benefits, or whether Orlando is the appropriate market definition. *Cf. United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 184 (3d Cir. 2005).

Given these concerns, Oscar has failed to meet its burden of proving a substantial likelihood of success on the merits of its underlying case. *See 1-800 Contacts, Inc.*, 299 F.3d at 1246–47. The Court is mindful that decisions concerning the issuance of a preliminary injunction are predicated upon the record as it exists prior to the completion of discovery. Therefore, the Court's observations concerning the likelihood of success on the merits is limited to this unique procedural setting.

IV. **CONCLUSION**

Since the Court has determined that Oscar failed to carry its burden of proving irreparable harm and a substantial likelihood of success on the merits, the Court declines to address the remaining prongs at this juncture of the litigation. *See Siegel*, 234 F.3d at 1176. Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction (Doc. 11) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on February 5, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

APPENDIX A

**Table 7**
**Oscar Market Share of Individual Health Insurance**
**Lives In Non-Florida Markets**
**January 2018**

| State | MSA (Oscar-Serviced Counties Only) | January 2018 Share | Entry Year |
|---|---|---|---|
| California | Los Angeles-Long Beach-Anaheim CA | 4.7% | 2016 |
|  | San Francisco-Oakland-Hayward CA | 1.6% | 2017 |
| New Jersey | Allentown-Bethlehem-Easton PA-NJ | 5.0% | 2018 |
|  | NYC - New Jersey Counties | 5.0% | 2018 |
|  | Trenton NJ | 5.0% | 2018 |
| New York | NYC - New York Counties | 11.4% | 2014 |
| Ohio | Akron OH | 0.4% | 2018 |
|  | Cleveland-Elyria OH | 6.3% | 2018 |
| Tennessee | Clarksville TN-KY | 39.4% | 2018 |
|  | Nashville-Davidson--Murfreesboro--Franklin TN | 31.9% | 2018 |
| Texas | Austin-Round Rock TX | 13.4% | 2016 |
|  | San Antonio-New Braunfels TX | 16.5% | 2018 |

Source: Decision Resources Group, Managed Market Surveyor.