**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

OSCAR INSURANCE COMPANY
OF FLORIDA,

                                CASE NO.:  6:18-cv-1944

                Plaintiff,

vs.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., d/b/a Florida Blue; HEALTH
OPTIONS INC., d/b/a Florida Blue HMO; and
FLORIDA HEALTH CARE PLAN INC., d/b/a
Florida Health Care Plans,

                Defendants.

_____/

**<u>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

**<u>(INJUNCTIVE RELIEF SOUGHT)</u>**

        Plaintiff Oscar Insurance Company of Florida ("Oscar" or "Plaintiff") brings

this civil action for injunctive relief and damages under the antitrust laws of the United States

and the State of Florida against Defendants Blue Cross and Blue Shield of Florida, Inc., d/b/a

Florida Blue; Health Options Inc., d/b/a Florida Blue HMO; and Florida Health Care Plan

Inc. (collectively, "Florida Blue" or "Defendants").  Plaintiff alleges based upon personal

knowledge as to facts pertaining to itself, and upon information and belief as to all other

matters as follows:

## NATURE OF THE ACTION

1.     This action arises out of the improper, unlawful and anticompetitive conduct by Florida Blue to stifle competition in Florida for the sale of individual health insurance plans and products in compliance with the Patient Protection and Affordable Care Act of 2010 ("ACA"), a key cornerstone of extending health care to all Americans, regardless of health status.

2.     Florida Blue, the entrenched monopolist in Florida, holds approximately a 75 percent share of individual ACA insurance plans sold statewide and a significantly higher share in portions of the state, including the four counties comprising the Orlando metro area, where prior to the current enrollment period Florida Blue faced only a single competitor in any single county.  Since 2015, major insurers, including Aetna, Humana, Cigna and UnitedHealthcare, have left the ACA exchange in Florida, leaving Florida consumers little choice but to pay Florida Blue's steadily increasing rates.  Oscar is poised to change that.

3.     Oscar, one of the country's fastest growing health insurance companies, uses technology and a customer-first approach to make health care affordable and accessible to its more than 230,000 members.  Oscar has had significant success bringing down health insurance prices and providing consumers with a superior experience in the health care system in the states outside Florida it has entered.

4.     Beginning with the annual enrollment period that ran from November 1, 2018 through December 15, 2018, Oscar sells ACA plans in the four counties that comprise the Orlando metro area and offers innovative plans at lower prices than Florida Blue.  For example, in Orange County, Oscar offers plans in the most popular plan categories with

2

premiums that are $16-36 less expensive per month, or roughly $190-430 less per year, than the comparable Florida Blue plans.  Oscar's plans also offer richer features than its competitors', like free 24/7 telemedicine and dedicated concierge teams.  And Oscar's entry into the Orlando metro area is just the beginning—Oscar has in motion plans to begin selling insurance in other Florida markets as soon as next fall.

5.      Faced with a major threat to its monopoly profits, Florida Blue responded by implementing a blatant scheme targeted at Oscar to keep it out of the state, thereby causing Florida consumers to continue to pay more for health insurance coverage.  First and foremost, the scheme involves denying Oscar access to insurance brokers upon whom consumers rely to advise them of their insurance options.  Florida Blue has a company policy—brazenly displayed on its website—that no broker may sell Florida Blue's individual plans unless that broker agrees to sell *only* Florida Blue's individual plans.  Florida Blue wrongfully uses its monopoly power to compel brokers to sell only its plans when industry standards require independent brokers to find the best options for consumers' needs.  Second, Florida Blue aggressively and selectively enforced this exclusivity policy against Oscar by systematically contacting brokers who had signed contracts with and been appointed as brokers by Oscar to threaten them with permanent termination.  In one email to brokers in October 2018, during the very same week in which Florida Blue learned Oscar's plans are lower-priced than its own, Florida Blue said "**[you] will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

6.     Florida Blue's monopoly power in Florida makes its scheme devastating to a new entrant like Oscar, as well as deeply injurious to Florida consumers.  If appointed by Oscar, brokers face losing the right to sell Florida Blue plans in *all product lines* throughout *the entire State of Florida* if they decide to sell Oscar plans in *a single county in the state*. This anticompetitive leverage is greatest for the most successful brokers in the state, those with the largest client bases and those who operate in the regions, like the counties comprising Orlando, where Florida Blue has an especially dominant market position today. Several brokers have explained they have no choice but to stay with Florida Blue:

- "**I just got word that any Florida Blue agents who will be contracting with Oscar will be terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here.  Losing our Blue Contract would be a financial disaster.**"

- "**Unfortunately I need to rescind my request, as Florida Blue has informed me that they will cancel my contract if they see new appointments for any products in any area of Florida.  This would be highly detrimental as they would be keeping most of my book of business.**"

- "**This is a request to terminate my Oscar contract as I am also appointed with FL blue and they can only allow captive agents to work with them.**"

7.     Florida Blue's coercion of brokers not to deal with new entrants like Oscar stymies those entrants' ability to compete.  Brokers are a critical sales channel in health insurance markets for new entrants in all states, and this is especially so in Florida where consumers purchasing individual ACA plans rely on brokers to a greater extent than in many other regions of the country.  Given Florida Blue's dominant share in Florida (and even larger shares in the counties comprising Orlando), brokers with the largest existing client bases have an overwhelming incentive to sell Florida Blue's plans and cannot afford *not* to sell Florida Blue's plans.  Consequently, Florida Blue's insistence that brokers sell *only*

4

Florida Blue plans necessarily forecloses Oscar from access to brokers responsible for selling

the vast majority of ACA plans serving the counties comprising Orlando.  Oscar will suffer

the same fate in other Florida metro areas it intends to enter, where Florida Blue holds

similar exclusionary power as a result of its high share of plan sales.

8.      The pool of brokers with access to the vast majority of covered lives in

Orlando is highly limited.  A license to sell health insurance is not enough; many brokers

licensed to sell health insurance are not actively doing so and even fewer have the experience

and relationships to be successful.  Thus, active brokers, who have developed good will and a

broad customer base through their own efforts, are a critical path to consumers, especially for

a new entrant like Oscar.  And it is precisely these brokers that Florida Blue's exclusivity

policy has foreclosed to competitors, particularly Oscar.

9.      Beyond the harm to competition derived from seeking to exclude a new,

innovative competitor with lower-priced products from the marketplace, Florida Blue's

scheme undermines a key function of the ACA health insurance marketplace.  One of the

principal purposes of the ACA is to provide consumers with more choices.  Independent

brokers serve a valuable public purpose in explaining options and helping consumers

navigate health insurance exchanges so that they make informed, educated choices about

which plan is best for them and their families.  But Florida Blue is attempting to force all

independent brokers in Florida to become captive agents beholden to Florida Blue.  In doing

so, Florida Blue has eliminated the independence of the largest brokers (and the valuable

services they provide) in the Orlando metro market, such that consumers no longer have

access to objective advice about the full range of their insurance options.  Brokers will not

review the options of insurers with consumers, but instead will merely help them renew or
steer them towards Florida Blue plans each year.

10.     The consequences for Oscar already have been severe.  Under pressure from
Florida Blue, at least 235 brokers backed out of agreements to sell Oscar's plans once they
were threatened with termination by Florida Blue.  Because the bulk of this coercive pressure
was applied only one week before the beginning of the open enrollment period—the only six
weeks during which health insurers selling individual ACA plans can sign up customers for
the entire following year—Oscar had limited opportunity to respond to this blatantly
anticompetitive tactic.  Even before cancellations started mounting, other major brokers,
including many of the largest and most successful brokers servicing the Orlando area, refused
even to discuss dealing with Oscar out of fear of losing Florida Blue's business.  In total,
only about twenty percent of the local brokers in the Orlando metro area, and very few of the
brokers with the type of large client bases necessary for success, have been appointed by
Oscar, which is far fewer appointed than in other markets Oscar has entered.  Based on the
success it has experienced with the limited number of brokers it has appointed in Orlando,
Oscar has every reason to believe that Florida Blue's exclusivity policy is depriving it of the
means to compete for a substantial majority of the ACA business in Orlando.  In fact, Oscar
sold only a fraction of the plans in Orlando that it expected to sell based on its experience in
other markets, even as its performance was quite positive with the limited universe of brokers
who agreed to offer its plans.

11.     While Florida Blue's scheme is causing harm in the Orlando markets right
now, its ramifications extend throughout Florida.  Oscar currently hopes to enter several

other Florida metropolitan areas in the fall of 2019.  Entering new insurance markets requires substantial advance work—beginning over a year before the open enrollment period—that includes contracting with hospitals, physicians and specialists to build provider networks, as well as attracting local brokers, and filing rate, plan, and network information for approval by state regulators.  Oscar's ability to negotiate favorable rates with providers and attract brokers are both directly impacted by how many insureds it has in Florida and its track record of success in entering new markets in the state, as is its ability to recover the significant fixed costs of building new provider networks and marketing itself to consumers.  At the moment, all major providers and brokers in Florida are dependent on Florida Blue.  Florida Blue's scheme is designed to maintain its monopoly by ensuring Oscar and other potential new entrants cannot obtain the volume of business necessary to achieve a minimum efficient scale that will allow them to become viable competitors.

12.     The effects of Florida Blue's scheme are designed to and will have the effect of keeping Oscar out of the Orlando metro area and other major metro areas, and preserving the high prices and monopoly profits that Florida Blue now reaps.  The lack of scale will prevent Oscar from negotiating reasonable provider contracts in the Orlando metro area and other markets for 2020 and beyond that are necessary to provide low-cost alternatives to consumers.

13.     Florida Blue's actions are those of a monopolist that believes it can get away with this type of anticompetitive conduct because it is too powerful to be told no.  As a result of Florida Blue's anticompetitive conduct, Oscar's sales are substantially lower than they would have been but for Florida Blue's misconduct.  Moreover, unless Florida Blue's

7

anticompetitive conduct is enjoined, Oscar will suffer irreparable harm for which it has no adequate remedy at law, including lost goodwill, lost opportunities and potentially its very viability in Florida, not only in the Orlando metro area, but in additional metro areas in Florida it plans to enter in the future.

14.     In turn, Florida Blue's actions have harmed competition throughout insurance markets in Florida by deterring and preventing new insurers, like Oscar, from entering those markets.  Florida Blue's anticompetitive conduct offends the public interest because it deprives consumers of the benefits of a free and competitive market, which would otherwise include new and innovative insurance plans, more choices, lower premiums and better services.

## THE PARTIES

### I.     Plaintiff

15.     Plaintiff Oscar Insurance Company of Florida is a Florida corporation with its principal place of business at 295 Lafayette Street, New York, NY 10012.  Oscar's affiliates are currently accepting health insurance customers for the 2019 plan year in New York, New Jersey, California, Texas, Ohio, Tennessee, Arizona, and Michigan.  Oscar also now offers for the first time health insurance plans in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area, with a starting coverage date of January 1, 2019.

### II.    Defendants

16.     Blue Cross Blue Shield of Florida, Inc. is a Florida corporation with its principal place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.

Blue Cross Blue Shield of Florida, Inc. is an independent licensee of the Blue Cross and Blue Shield Association.  Blue Cross Blue Shield of Florida, Inc. sells health insurance plans across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

17.     Health Options Inc. is a Florida corporation with its principal place of business at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  Health Options Inc. is an independent licensee of the Blue Cross and Blue Shield Association.  Health Options Inc. sells health insurance plans, specifically Health Maintenance Organization ("HMO") plans, across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

18.     Florida Health Care Plan Inc. is a Florida corporation with its principal place of business at 1340 Ridgewood Avenue, Holly Hill, FL 32117.  Florida Health Care Plan Inc. is an independent licensee of the Blue Cross and Blue Shield Association.  Florida Health Care Plan Inc. sells health insurance plans across Florida, including in Lake County, Orange County, Osceola County and Seminole County, in the Orlando, Florida metro area.

19.     Defendants' actions described in this Amended Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered and/or done by Defendants' various officers, agents, employees or other representatives while actively engaged in the management of Defendants' affairs, within the course and scope of their duties and employment, and/or with the actual, apparent and/or ostensible authority of each Defendant.

## JURISDICTION AND VENUE

20.     This court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 for the claims in this action filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) for damages and to secure injunctive relief against Florida Blue for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), as alleged herein.

21.     This court has supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claims as those claims arise out of the same matters and transactions that give rise to the federal law claims over which this Court has federal question jurisdiction.

22.     Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391.  Defendants' principal places of business are within this district, and Defendants have engaged in anticompetitive behavior in this district, as alleged herein.

23.     Defendants' actions described in this Amended Complaint are within the flow of and substantially affect interstate commerce.  Defendants' activities foreseeably restrained interstate commerce by foreclosing out-of-state health insurance plan providers from competing in Florida.

## INDUSTRY BACKGROUND

### I.     Individual ACA Insurance Plans in Florida

24.     Health care is a significant concern for many Americans.  A recent Kaiser Family Foundation survey found that a majority of Floridians view health care as "very important" and 26 percent of Floridians rank it as the "most important issue," a higher percentage than any other issue.  In particular, the cost of health care continues to be an

important issue for Floridians.  The same Kaiser Family Foundation survey found that, when asked to explain why health care is the most important issue, consumers most frequently identified costs as the concern.

25.     Enacted on March 23, 2010, the central goal of the ACA is "to create a more transparent, competitive marketplace that gives consumers more information about their health insurance options and ensures better value for their premium dollars." *Health Plan Finder Data*, Centers for Medicare & Medicaid Services, The Center for Consumer Information & Insurance Oversight.  The ACA governs the sale of, and in some cases subsidizes consumers' purchase of, individual insurance plans, which are health insurance plans that a person buys on his or her own as opposed to through an employer or association.  As the U.S. Department of Health and Human Services ("HHS") has explained, the paramount goal of the federal exchange is "to foster issuer competition, facilitate consumers' comparison shopping, and ensure affordability through financial assistance," *Health Insurance Marketplace Premiums After Shopping, Switching, and Premium Tax Credits, 2015-2016*, Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (April 12, 2016), and to "foster competitive environments in which consumers can choose from a number of affordable and high quality health plans." *Issue Brief*, Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (July 30, 2015).  That is why HHS proposed to spend roughly $1.7 billion in 2018 to operate the federal exchange (covering 34 states, including Florida) to "allow individuals . . . to compare health plan options, see if financial assistance with premiums and cost sharing is available,

11

and purchase coverage." *Justification of Estimates for Appropriations Committee*, Health and Human Services, Centers for Medicare & Medicaid Services, Fiscal Year 2018.

26.     Individuals and families who buy individual ACA insurance plans have no reasonable alternatives, because generally they cannot secure health insurance through other means, e.g., employer-sponsored coverage, Medicare or Medicaid.  Consumers who already have health insurance through employers or a federal program do not purchase individual ACA insurance plans.

27.     In plan year 2018, roughly 1.75 million Floridians purchased individual ACA insurance plans, the highest number of any state in the country.  Florida Blue's public filings indicate that it sold 1.3 million individual ACA plans in 2018, which corresponds to a statewide share of 75 percent.  Approximately 10-12 percent of all individual ACA insurance plan enrollees nationwide are Floridians.  A similar number was expected to enroll for plan year 2019.

28.     Enrollees selected a plan for 2019 coverage during the open enrollment period, which ran between November 1, 2018 and December 15, 2018.  Coverage for plans purchased during this open enrollment period started on January 1, 2019.  In the lead up to and during this and other enrollment periods, health insurance companies devote significant resources and money to attracting enrollees, including recruiting brokers, because their performance during this six-week period determines their total revenues for the entire following year.

II.       **The Importance of Pricing in the Sale of Individual ACA Insurance Plans**

29.      Plans available to Florida residents on the federal ACA exchange are divided into "metal" tiers that correspond to a specific percentage level of cost sharing between the insurer and the insured, with "Bronze," "Silver" and "Gold" plans being the most popular plan categories.  Gold plans typically require higher monthly premiums than Bronze and Silver plans, but cover a higher percentage of the insured's medical bills.  To be eligible for sale in a specific metal tier, a plan must meet federally mandated requirements, based on actuarial values, regarding how costs of care are split between the insurer and a typical consumer.  For instance, as explained on Healthcare.gov, Silver plans must be split on average 70/30, with the insurer paying 70 percent of costs and the typical consumer paying 30 percent.

30.      As explained on Healthcare.gov, all plans on the exchange "must cover the same set of essential health benefits," including emergency services, hospitalization, pregnancy, mental health and prescription drugs.  To appeal to consumers and for regulatory reasons, plans must have a minimally sufficient provider network, which typically includes a major hospital network, and offer a choice of other providers, such as primary care physicians and specialists.  But once an individual plan meets this provider network threshold, the far more important factor to consumer choice is the amount of a plan's premium, rather than any incremental increase in the breadth of the provider networks.

31.      Because of the manner in which the federal government subsidizes ACA insurance plans, offering Silver plans with the lowest premiums, as Oscar did in three of the four Orlando counties, is the most critical factor to attracting enrollees.  The federal

government provides subsidies called Advance Premium Tax Credits (APTCs), which are reductions in monthly premiums, to Floridians with incomes between 100 percent and 400 percent of the federal poverty line.  APTCs are calculated for each eligible individual using a formula that is based on the monthly premium of the second-lowest cost Silver plan offered in a consumer's county.  Specifically, the APTC to which a consumer is entitled is the price of the second-lowest cost Silver plan minus the amount the consumer is deemed able to pay based on his income.  For example, if the second-lowest cost Silver plan available to the consumer costs $500 per month, and the consumer is deemed able to pay $25 per month, the federal government will provide a subsidy of $475 per month.  The consumer can use the APTC to purchase any individual ACA plan that he or she chooses, but must cover any costs above $475 per month.  Moreover, if the consumer chooses a plan that is less expensive than the APTC—for example, a Bronze metal tier plan—the government keeps the difference between the cost of the plan and the APTC.

32.     In addition, the federal government also requires ACA insurers to provide Cost-Sharing Reduction (CSR) subsidies—which reduce out-of-pocket costs for medical care, such as doctor visits and prescription co-pays—to Floridians with incomes less than 250 percent of the federal poverty line.  Only those consumers who purchase a Silver plan are eligible for CSR subsidies, a fact that further drives business toward Silver plans.

33.     For these reasons, most consumers purchase one of the two least expensive Silver plans because they offer lower out-of-pocket costs than more expensive plans and better coverage at no additional cost to the consumer above less expensive Bronze plans.  In 2017, Silver plans accounted for 80 percent of all individual on-exchange ACA enrollments

in Florida, the vast majority of which were subsidized.  In 2017, 90 percent of all on-exchange individual ACA plans purchased in Orange County were subsidized with APTCs, and 79 percent were subsidized with CSRs.

34.     Both Oscar and Florida Blue offer plans in all three metal tiers in each county in the Orlando metro area.  At the Bronze and Silver tiers, Oscar's monthly premiums are regularly significantly lower than comparable Florida Blue plan premiums.  Thus, an individual purchasing an Oscar plan could save many hundreds of dollars a year.

## III.     The Role and Importance of Brokers and Contracted General Agents

35.     Brokers play a crucial role in driving policy sales in Florida, more so than in other states, where brokers play a less prominent role.  In the counties comprising the Orlando metro area, even with Florida Blue's exclusionary conduct, 75 percent of Oscar's policy sales came through brokers compared to 40 percent nationally.

36.     Brokers must be licensed by the state to sell insurance.  To become licensed, brokers must complete 60 hours of insurance and ethics education coursework and pass a written examination.  *See* Fl. Stat. Ann. §§ 626.241, 626.221, 626.8311.  Brokers receive income either through customer fees or through commissions received from an insurance company.  Though the amount and structure of payments varies from insurer to insurer, compensation from insurance companies typically is tied to the number of plans brokers sell.

37.     According to the National Association of Health Underwriters, a trade association representing over 100,000 insurance brokers and agents nationwide, brokers "help millions of consumers by guiding them through the complexities of health insurance

purchasing and enrollment, while ensuring they get the best policy at the most affordable price." Brokers do so by "seek[ing] to understand each personal situation to create recommendations that complement a client's financial and medical security needs." Because consumers rely on brokers as expert personal insurance advisors, Florida law recognizes insurance brokers as fiduciaries of their customers and obligates brokers to provide their clients accurate advice about insurance plans and coverage.

38.     Thus, independent brokers offer consumers valuable services because they provide one-stop shopping and information about multiple insurers' competing plans, as well as expertise and advice as to which plan is best suited for a particular customer. This is especially true in Florida, where the broker sales channel is particularly large and an unusually high percentage of all individual insurance plans are sold through brokers (as compared to other regions in the country). The broker channel is even more important for new entrants because it offers an efficient and cost effective way to gain brand awareness. It is easier to educate brokers about Oscar's cost position, service quality and network quality who can then, in turn, share their expertise with their customers. Conversely, marketing directly to consumers, such as through billboards and advertisements, is expensive and it can take much longer to build broad awareness of the existence and quality of our product with consumers.

39.     While individual ACA insurance plans are sold by different types of brokers, including brokers working at call centers and at online health businesses, local brokers, i.e., those with a physical presence in the relevant sales area, play a critical role in the marketplace because consumers' decisions are often relationship-driven. Oscar's

experience in Orlando demonstrates that local brokers have a far greater ability to guide the decisions of local residents than out-of-state or out-of-area brokers. In other words, many consumers strongly prefer the advice of local brokers whom they interact with in person, rather than brokers who communicate with them solely from a call center or through the Internet. Insurance plan sales are also driven heavily by consumer referrals, and local brokers create more referrals. Of the individual ACA insurance policies sold by brokers for Oscar in Orlando during the 2019 enrollment period, 75 percent came from brokers with operations in that area, even though those brokers represent only approximately 25 percent of Oscar's brokers appointed to sell ACA plans in Florida.

40. Certain brokers, often called general agents or contracted general agents ("CGAs"), play a particularly important role in insurance plan sales. In addition to selling insurance plans through their own employees, CGAs contract with and provide administrative services and support to local brokers. These CGAs thus account for and are the primary avenue for reaching a large volume of the covered lives in the Orlando metro area either through their own policy sales or the sales of the brokers to which they provide services.

41. According to the Florida Department of Financial Services website, there are approximately 2,200 brokers operating in Orlando with a valid appointment to sell plans for an insurer that offers individual health insurance in Florida. This group of appointed brokers that are actively selling individual insurance plans is the pool of brokers with access to the vast majority of covered lives in Orlando, and therefore the pool that insurers seek to appoint (and must if they wish to effectively compete).

42.     While there may be other brokers licensed to sell health insurance plans in Orlando (either exclusively or as part of a joint license to sell life insurance), they are largely irrelevant to competition in the sale of individual insurance plans.  First, many individuals— roughly a third—that hold a license that permits them to sell health insurance are not appointed by any insurer to sell any form of insurance, indicating that they are not active brokers.  Further, many brokers that could sell health insurance are appointed with *life* insurers, indicating that they are not actively selling health insurance.  In either case, brokers who are merely licensed but not actively selling health insurance plans lack infrastructure, experience and, most importantly, a client base, and therefore are not viable substitutes for active brokers who have books of business.  Active brokers, including the brokers with the most covered lives, have invested time and capital building the good will, relationships and business operations that make them successful.  These active brokers become and remain successful through their own independent efforts, not merely because of their affiliation with, or even support from, a particular insurer.  Thus, for insurers, finding effective brokers is not a simple matter of recruiting anyone with a license.  It is not feasible to compete solely by appointing and attempting to train new brokers with no client base, especially given the effects of Florida Blue's exclusionary conduct.  Instead, to become and remain viable, insurers, especially in Florida, must have access to active, established brokers—the very same brokers that Florida Blue has foreclosed to competitors.

43.     When planning to enter Orlando, Oscar made a concerted effort to identify and reach out to prominent agencies in Florida, including CGAs, within the relevant pool of brokers.  In other states that Oscar has entered, CGAs work with multiple insurers, including

18

Oscar.  Oscar identified these agencies based on publicly available information, including via the database on the Federally Facilitated Marketplace ("FFM") website.  Brokers listed in this database are typically more active in enrolling lives because registering for the FFM requires additional training beyond standard licensing requirements.  But because of Florida Blue's exclusivity policy, many of these brokers would not even speak with Oscar, let alone work with Oscar.  Florida is the only state Oscar has entered where CGAs have refused to work with it due to exclusivity agreements with another insurer.

## IV.    Oscar's Entry

44.    Oscar's founding mission has been to build a technology-driven health care experience that makes accessing health care and navigating the complex health care system easy, seamless and more affordable for consumers.  Oscar's decision to enter the counties comprising the Orlando metro area comes in its sixth year serving enrollees in states across the country and stems from its goal of bringing Oscar's uniquely engaging member experience and superior technology to more consumers.

45.    To deliver a better health care experience, Oscar has developed tools and resources that simplify the bureaucracy around health insurance that is often associated with traditional insurers.  Oscar is one of the first health insurers to integrate telemedicine directly into its plans, offering 24/7 access to telemedicine to enrollees at no additional cost.  In 2017, 25 percent of Oscar enrollees used its telemedicine feature, eight times the national average for other large group, employer-sponsored health insurers.  Oscar also pioneered a concierge team model in the health care industry, which gives each enrollee a dedicated team of care guides and nurses who holistically support enrollees to find conveniently

19

located, high-quality doctors, book appointments, understand and process claims, and answer any general questions related to their care.  In 2017, 70 percent of Oscar members contacted and engaged with their concierge team.

46.     Oscar's member experience is distinguished from traditional insurers because of its intuitively designed mobile and web application that allow enrollees to manage their health care seamlessly, including searching for in-network doctors, booking appointments (in certain states) and accessing their health records.  In fact, 43 percent of members' first visits to the doctor are routed through Oscar's technology and customer service teams.  The ability to route enrollees to the right care at the right time is made even more seamless because Oscar does not require referrals for enrollees to see specialist doctors.

47.     Because of its superior technology services and integrated benefits, Oscar has the most engaged health insurance plan members in the industry, with the highest number of online accounts and active online users (mobile and otherwise).  High member engagement translates to cost savings and member satisfaction, which is why Oscar's member satisfaction rate is three times the industry average.

48.     Altogether, these features make it easier and more efficient for enrollees to manage their health care, reducing the amount of time and stress consumers usually spend managing their care and leaving more time for work or family.  Since 2014, Oscar and its affiliates have successfully brought its innovative business model to individual ACA plan consumers in 14 metro areas in 9 states.

49.     As will be the case in Florida, the entry of Oscar and its affiliates has benefited consumers in those states by providing them more choices, lower premiums and

services not offered by other insurers.  By focusing on technology and service, Oscar can keep plan members' costs low.  As a result, Oscar is usually less expensive than traditional insurers, including Florida Blue, while providing comparable coverage and a high quality of care.

50.     Nearly all of Oscar's individual ACA insurance plans in each Orlando metro area county have lower premiums than alternatives offered by Florida Blue's plans.  Oscar's plans are often the lowest-priced plans available, while many of Florida Blue's plans are among the most expensive.

51.     These benefits already are available to consumers in the Orlando metro area with Oscar's entry this year.  Oscar currently hopes to enter several other Florida metropolitan areas in the fall of 2019 and has taken significant affirmative steps to doing so, including:  (1) conducting market research; (2) negotiating with health care providers to build a competitive network of hospitals, physician groups and other ancillary care facilities; and (3) preparing financial analysis regarding the viability and profitability of entry.  Oscar has invested, and continues to invest, significant money and resources on these efforts. Oscar's deadline for entering these markets is fast approaching.  Oscar would need to execute agreements with health care providers, and file for approval of its insurance plan offerings and expansion proposal with federal and state agencies by May 2019, well before which all of the above efforts must be completed.  Thus, time is short.

## FLORIDA BLUE'S UNLAWFUL SCHEME TO EXCLUDE OSCAR

**I.     Coercion of Brokers Into Refusing to Deal With Oscar**

52.     Florida Blue is well aware that Oscar is a threat to upend the traditional insurance model and undercut Florida Blue's dominance.  Upon learning that Oscar planned to enter the Orlando market, Florida Blue recognized Oscar as a major threat to its monopoly, and turned its focus on how best to respond to Oscar's entry.  Florida Blue responded by launching a targeted campaign to prevent Oscar's successful entry in Orlando specifically and Florida more generally through unlawful exclusionary conduct.

53.     Florida Blue makes no secret of its exclusivity policy with respect to brokers that sell individual insurance plans.  Its website states "**Our appointment to sell individual products is an exclusive contract . . . .**"  Thus, if a broker wants to sell individual plans for Florida Blue, it must agree to sell *only* Florida Blue's individual plans.

54.     Florida Blue obtained and enforced these exclusive dealing agreements through coercion and intimidation, including threatening to exclude brokers from a significant portion of the market for individual ACA insurance plans.  Because Florida Blue accounts for approximately 75 percent of these plans sold statewide and even higher shares in Orlando and other metro areas, brokers who already do significant business with Florida Blue cannot afford to refuse them.  In turn, Florida Blue has foreclosed competitors, including Oscar, from the vast majority of potentially independent brokers in the Orlando metro area by forcing these brokers to become exclusive "agents" for Florida Blue.  Without the ability to enter and attract consumers through brokers, Florida Blue's competitors cannot

achieve sufficient scale to negotiate favorable provider contracts and bring real, sustained competition to the state.

55.     After Oscar's planned entry into Orlando became public in the summer of 2018, Florida Blue, on its own and through the CGAs upon which it has forced exclusivity, initiated a concerted effort to intimidate brokers into refusing to work with Oscar.

56.     During a conference attended by approximately 400 brokers on or about August 29, 2018 at an Embassy Suites in Lake Buena Vista, Florida, a Florida Blue representative stated that any brokers with any other company listed on their licenses or selling other plans would be found in violation of the exclusivity policy, permanently terminated and have their commission payments withheld.

57.     At a meeting attended by brokers on or about September 25, 2018 at Florida Blue's offices in Lake Mary, Florida, Beau Shiflet, the Central Florida Area Manager for Florida Blue, stated that he had attended an Oscar informational meeting held in Kissimmee, Florida, and had observed that there were agents appointed by Florida Blue in attendance. As a result, Mr. Shiflet went on to threaten the brokers that attended the meeting at Florida Blue's offices that their Florida Blue contracts would be canceled if they were found to be working with Oscar.  Oscar was the only competitor that Mr. Shiflet mentioned in reference to Florida Blue's exclusivity policy.

58.     Two days later, on September 27, 2018, an employee of Rogers Benefit Group, a CGA, sent an email to insurance agencies, copying Frank Merlino, Southern Area Manager of Individual Sales for Florida Blue, regarding Florida Blue's exclusivity policy. The email stated that some agencies seeking to appoint Florida Blue agents had been "using

23

an outdated exclusivity form." The email purported to attach the most up-to-date form and requested that agencies "**send this exclusivity form to ALL YOUR AGENTS and have them sign it, along with an email reminding them of the exclusivity requirements.**" The email further stated that "**if an agent does not sign this form and submit it to us, Frank will terminate them.**"

59.     On or around October 10, 2018, Florida Blue terminated the appointment of another broker who hosts a local radio show and simply had an Oscar representative as a guest on his show. When that broker asked why his appointment with Florida Blue was terminated, Mr. Shiflet replied, "**We saw and heard your radio program with Oscar leadership promoting them in the Orlando market and the recruiting of agents. This is not what we are looking for in our business partners**."

60.     Florida Blue's intimidation efforts intensified as the 2019 ACA open enrollment approached. In the week before the start of the open enrollment period, the very week that Oscar's competitive pricing for 2019 plans became public, Florida Blue systematically contacted brokers appointed by Oscar, using appointment information that is publicly available on the Florida Department of Financial Services website. These communications threatened to permanently deny Oscar-appointed brokers business from Florida Blue, not only in the Orlando metro area, but throughout Florida, if they continued to do business with Oscar. Florida Blue's behavior occurred only a week before the commencement of the open enrollment period on November 1, 2018 in which health insurance providers sign up all their business for the following year.

61.     For example, on October 24, 2018, Mr. Shiflet sent an email to brokers threatening, "**You . . . will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

62.     In an email received by Oscar that same day, October 24, 2018, one broker wrote to Oscar, "**This is a request to terminate my Oscar contract as I am also appointed with FL Blue and they can only allow captive agents to work with them.**"

63.     Similarly, on October 29, 2018, another broker explained to Oscar, "**I just got word that any Florida Blue agents who will be contracting with Oscar will be terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here.  Losing our Blue Contract would be a financial disaster.**"

64.     On October 25, 2018, Florida Blue again updated its exclusivity policy.  The new form added questions that Florida Blue required appointed agents to answer, including "**Do you understand the exclusivity clause and agree to not sell any other carriers for over and under 65 policies . . . ?**"  The exclusivity policy states "**You must sell and solicit Florida Blue Over 65 Products exclusively at all times.  There is not any circumstance where you may sell an O65 competitor medical product**" and "**You must sell and solicit Florida Blue U65 medical products exclusively at all times.  There are not any circumstances where you can sell an Under 65 medical product.**"  According to the policy, "**Any agent or agency that violates the exclusivity arrangement with Florida Blue will be permanently terminated for cause.**"

65.     Florida Blue's intimidation tactics are particularly effective because it works in concert with the CGAs to propagate its threats to other brokers.  Florida Blue's CGAs wield significant control over commission payments to brokers.  Florida Blue pays CGAs a lump sum from which CGAs are responsible for distributing broker commission payments based on broker performance.  CGAs have considerable leeway in distributing commission payments, and they can withhold commissions or even terminate a broker if that broker violates the terms of Florida Blue's exclusivity policy.

66.     As a result, Florida Blue's CGAs exert considerable control over the many brokers they recruit for Florida Blue.  And through its CGAs, Florida Blue has more help policing and enforcing exclusivity.  Florida Blue requires exclusivity not just from its CGAs, but also the many brokers that contract with CGAs, who often market themselves as independent brokers.  In turn, Oscar and other potential new entrants are foreclosed from access not just to direct customers of CGAs, but also to the customers of the brokers with whom the CGAs contract.

67.     While directly employing some brokers is not unusual, what is highly unusual and anticompetitive is Florida Blue, a monopolist health insurance provider, using its market power to coerce CGAs and in turn independent brokers, into signing exclusivity agreements.

## II.     The Lack of Procompetitive Justifications for Florida Blue's Conduct

68.     Florida Blue has selectively enforced its exclusivity policy.  Florida Blue has aggressively threatened to terminate—and has terminated—its appointment of any broker who obtains and does not cancel an appointment with Oscar.  Yet, many brokers who have cancelled their appointments with Oscar due to threats from Florida Blue are still appointed

with both Florida Blue and other major insurance companies, according to the Florida Department of Financial Services website.  For example, Rizwana Khan, whose signature block identifies her as an independent broker, emailed Oscar terminating her appointment on October 24, 2018 after receiving Mr. Shiflet's email.  But in addition to Florida Blue, Ms. Khan maintains active appointments with Sunshine State Health, a subsidiary of Centene Corporation ("Centene"), and Molina Healthcare of Florida, Inc. ("Molina"), each of which competes with Florida Blue in the sale of individual ACA plans.

69.     Likewise, 51 of 72 brokers from CR Insurance Group that terminated their appointments with Oscar following Mr. Shiflet's October 24, 2018 email still hold active appointments with Florida Blue and other major insurers.  For example, Maria Debes terminated her Oscar appointment on October 25, 2018, but still holds an active appointment with Celtic Insurance Company ("Celtic"), a subsidiary of Centene, in addition to Florida Blue.  Similarly, Joseph Fonte terminated his Oscar appointment on October 25, 2018, but still holds active appointments with Celtic and Molina, in addition to Florida Blue.  Both Ms. Debes and Mr. Fonte received their Celtic appointments in September 2018, only one month before obtaining their Oscar appointments.  This selective enforcement explains why other ACA insurers, such as Centene and Molina, have been able to survive (so far) despite the existence of Florida Blue's exclusivity policy.  The fact that they have not exited the market provides no assurance that Oscar will be able to survive when it is the target of Florida Blue's enforcement efforts.

70.     Florida Blue also permits "grandfathering" of appointments—brokers that are appointed with Florida Blue are permitted to maintain previous appointments with other

27

health insurance carriers and continue to sell their plans.  Indeed, data from the Florida Department of Financial Services indicates that of the nearly 1,700 Orlando area brokers that are appointed by Florida Blue, roughly 240, or 14 percent, have appointments with other insurers that offer individual health insurance, while nearly 650, or 38 percent, have appointments with other insurers that offer Medicare Advantage policies.  Even though they are not exclusive, brokers with grandfathered appointments receive the same benefits from Florida Blue as its other exclusive brokers or "agents."  Florida Blue's exclusivity policy is thus calculated not to protect Florida Blue's investments or to prevent "free riding," but rather to thwart new entry, preserving its monopoly position.

71.     Indeed, while Florida Blue claims that its exclusive agents present themselves as its dedicated representatives, and use Florida Blue branding and marks in selling insurance policies, the overwhelming majority of brokers appointed with Florida Blue also are appointed with other insurance companies, including life insurance, property insurance and casualty insurance providers.  On average, brokers appointed with Florida Blue hold 15 appointments from different insurance companies, indicating that, contrary to Florida Blue's assertions, its exclusive agents are not actually exclusive—except where Oscar is concerned.

72.     There is no material difference in the sales materials (which Florida Blue calls "training" materials) that Florida Blue provides to its brokers than those offered by other insurance companies, including Oscar, that do not require exclusivity.  For example, Oscar hosts in-person and web-based seminars, provides extensive broker marketing materials, and has an entire business team dedicated to providing broker support.  Exclusivity is thus not a prerequisite to offering the type of benefits Florida Blue offers.

73.    Moreover, Florida Blue's sales and promotional efforts with its agents are brand-specific, directly aimed at building Florida Blue's brand and expanding Florida Blue's sales, not sales of individual health insurance policies more generally.  For example, Florida Blue's agents can participate in its "Blue Rewards Program," which provides marketing funding to advertise Florida Blue and its plans.  Similarly, much of the "training" material Florida Blue offers to its agents is nothing more than sales pitches about marketing the right Florida Blue plans relative to the competition.  Because these efforts are highly brand-specific, Oscar and other competitors cannot free ride on them.

74.    In other areas of the country where Oscar has entered (such as Texas), insurance carriers, including Blue Cross Blue Shield entities, do not demand broker exclusivity as Florida Blue does in Florida, even though they offer brokers similar sales and promotional material.

75.    Each of these facts undermines any purported legitimate justification for Florida Blue's exclusivity policy.

**RELEVANT MARKETS**

**I.    The Relevant Product Market**

76.    There is a relevant product market for individual health insurance plans under the ACA ("Individual Plan Market").  The outer boundaries of the Individual Plan Market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between individual health insurance plans under the ACA and potential substitutes.

77.    From the perspective of insurance customers, there are no reasonable substitutes for individual health insurance plans under the ACA because, *inter alia*, those

29

individuals and families generally cannot secure health insurance through other means, e.g., employer-sponsored coverage, Medicare and Medicaid.  Consumers who already have health insurance through employers or a federal program do not purchase, and often are not eligible to purchase, individual ACA insurance plans.  Thus, the Individual Plan Market is inelastic, and a small but significant increase in price would not result in substitution.

## II.   The Relevant Geographic Markets

78.   Markets for health care services are highly localized, as the vast majority of insureds consume health care services close to where they live and/or work.  The geographic markets for individual health insurance plans under the ACA are determined by the regulatory scheme.  ACA plans are approved for sale to consumers only in defined Rating Areas.  In Florida, Rating Areas are set at the county level.  Thus, consumers cannot purchase individual ACA plans outside the county in which they reside even if they would prefer a plan in a neighboring county due to its price or other characteristics.  Accordingly, there is no substitute for plans available within a purchaser's county of residence, and competition is limited to only those insurance providers who have been approved to provide insurance plans in that county.

79.   As a result, the relevant geographic markets (the "Relevant Geographic Markets") are:

    A.   Each individual county comprising the Orlando metro area, i.e., Orange County, Osceola County, Seminole County and Lake County (collectively, the "Orlando Markets"); and

      B.  Each individual county comprising the other Florida metropolitan areas that Oscar enters in the fall of 2019.[1]

### III.  Florida Blue's Monopoly Power

80.    Florida Blue's monopoly power in the Individual Plan Market in the Relevant Geographic Markets is evidenced directly by its abilities to:  (1) charge higher prices than its competitors without losing share; and (2) exclude competitors and, therefore, restrict output.

81.    Florida Blue's monopoly power also is evidenced directly by its ability to coerce brokers into exclusive dealing arrangements in the Individual Plan Market in the Relevant Geographic Markets.

82.    Florida Blue's monopoly power is evidenced indirectly by its dominant market shares in the Individual Plan Market in the Relevant Geographic Markets.  In 2018, Florida Blue's share of the Individual Plan Market in the Orlando Markets was as follows:

|         | County   | Florida Blue Market Share |
|---------|----------|---------------------------|
| Orlando | Lake     | 100%                      |
|         | Orange   | 93.8%                     |
|         | Seminole | 84.5%                     |
|         | Osceola  | 82.4%                     |

---

[1]  The identity of which specific markets Oscar is currently planning to enter is competitively sensitive.

83.    Florida Blue's internal documents calculate shares at the county level and reflect similar shares in the Orlando Markets:[2]



84.    Florida Blue's monopoly position is not the result of any superior product, business acumen or historical accident, but rather its seizure and maintenance of monopoly power through exclusionary conduct.  Competition in the sale of individual ACA insurance plans throughout Florida has diminished as the number of insurers selling those plans has declined.  Major insurers like Aetna, Humana, Cigna and UnitedHealthcare stopped selling individual ACA plans in the Orlando Markets between 2015 and 2017.

85.    As the number of competitors dwindled, Florida Blue recognized that it could leverage its growing share to effectively put a stranglehold on new entry or expansion through the use of its statewide exclusivity policy, thereby entrenching its monopoly

---

[2]  Florida Blue, 2019 U65 Competitive Outlook Oscar Entry Baseline Findings (June 29, 2018).

position.  Brokers that previously sold plans for other major insurers were left with little

choice but to agree to Florida Blue's exclusivity policy even though they are independent

businesses, market themselves as independent brokers, and maintain appointments with

other insurers.

86.     As a result of its exclusionary conduct, Florida Blue steadily gained share, far

eclipsing any other competitor.  By 2018, Florida Blue sold 75 percent of all individual

ACA plans in Florida.  As the shares above indicate, its sales were even higher in certain

counties, including in the counties comprising the Orlando metro area.

87.     Florida Blue now has a 100 percent monopoly position in forty (40) counties

in Florida.  Therefore, brokers who desire to sell ACA plans in any of those counties have

no choice but to agree to exclusively sell Florida Blue plans statewide.

88.     As a result of its market power and stranglehold on brokers, Florida Blue is

able to charge supracompetitive premiums for its individual ACA insurance plans in the

counties comprising the Orlando metro area.  With less competition, consumers are left with

fewer choices and higher prices.

## IV.     Barriers to Entry and Expansion

89.     There are high barriers to entry and expansion in the Individual Plan Market in

the Relevant Geographic Markets.

90.     As an initial matter, Florida Blue's coercive exclusive dealing arrangements

function as both a barrier to entry and expansion because they deter potential competitors

from even attempting to enter the Individual Plan Market in the Relevant Geographic

Markets and prevent new entrants from expanding to achieve sufficient scale to effectively compete with Florida Blue.

91.     Insurers must meet both federal (HHS) and Florida licensing requirements (Florida Office of Insurance Regulation ("FLOIR")) to offer individual ACA insurance plans in Florida.  Certain health insurance plan types also require the approval of the Florida Agency for Health Care Administration.  The process to obtain such approvals must generally begin more than ten months before plan open enrollment periods for the following year begin.

92.     An insurer seeking to enter the Individual Plan Market must plan for months or years in advance and make significant capital investment (often millions of dollars) before entering.  Insurers must reach agreements with providers—hospitals, physicians, specialists and others—sufficient to provide care for the insurer's enrollees.  Given that federal regulations require insurers to include a wide range of services in health insurance plans, and state regulations require the availability of a wide range of health care providers, insurers must make arrangements with a large number of different providers.  With an uncertain number of future enrollees, entrants have less negotiating leverage with doctors and hospitals, meaning they are likely to pay higher prices for care, thus jeopardizing their long-term viability by making it more difficult for them to offer lower premiums and attract customers.  Insurers must also establish relationships with, *inter alia*, pharmacies, laboratories, testing facilities and numerous brokers.  Negotiating all of these arrangements can take months or years of protracted negotiation.

93.     Scale is important.  A new insurer must attract a substantial number of new enrollees in order to have a sustainable business model.  And health insurers face substantial fixed costs in the form of IT, employees and office space, which can only be efficiently recouped with economies of scale.  Consequently, a new health insurer will only seek to enter a new market if it is confident in its ability to attract a sufficiently large number of enrollees.  Medical service providers will only enter into contracts for the provision of services at reasonable rates if the plan has or is anticipated to have a sufficiently large number of enrollees.  This fact is critical for Oscar's success not only in the Orlando Markets but also in other markets it enters in Florida.

94.     High barriers to entry have contributed to consolidation in health insurance markets, as companies have found it easier to simply buy another health insurer rather than enter a new geographic market on their own, and new entry is deterred.

95.     In recent years, insurers that entered the Individual Plan Market in Florida markets have exited shortly afterward because the insurers find them unprofitable.  Oscar's entry is only possible because of its innovative approach to insurance, which other insurers do not share and could not quickly replicate.

## ANTICOMPETITIVE EFFECTS OF FLORIDA BLUE'S CONDUCT

**I.     Antitrust Injury to Oscar**

96.     As a direct result of Florida Blue's exclusionary conduct, Oscar has suffered—and will continue to suffer—damage.  In order to offer health insurance products in a particular market, an entity must:  (1) obtain a certificate of authority from the state regulator; (2) negotiate contracts with health care provider systems to build a network of

35

hospitals, physician groups and other ancillary care facilities; (3) submit insurance products and rates for regulator review and approval; (4) fund the insurance entity with enough capital in reserves to meet regulatory requirements; and (5) educate the market of licensed insurance brokers on the company and its insurance products to enlist their support in helping their clients enroll in the products.  Oscar invested significant time and millions of dollars to complete these steps in preparation for its entry into Florida, which is now being inhibited and jeopardized by Florida Blue's anticompetitive actions.

A.   **Oscar Has Been Substantially Foreclosed From Brokers in Orlando**

97.    Florida Blue's efforts to deny Oscar access to brokers have been highly effective and have substantially foreclosed Oscar from brokers in Orlando.  To date, as a result of Florida Blue's exclusionary scheme, at least 235 brokers have backed out of agreements to sell Oscar's insurance plans.  Of those, 133 terminated their appointments within the 48 hours immediately following Mr. Shiftlet's October 24, 2018 email.  To put that number in perspective and highlight Florida Blue's market power, this year Oscar's affiliates have had only 14 broker terminations *nationally* outside of Florida.

98.    Of the approximately 2,200 relevant brokers in Orlando, roughly 76 percent have appointments with Florida Blue and are foreclosed to Oscar and other competitors.  Only 21 percent have appointments with Oscar.  In stark contrast, in other markets Oscar has entered where no insurer employs an exclusivity policy similar to Florida Blue's policy, Oscar has appointed approximately 60 percent of the active brokers.

99.    This foreclosure has resulted even though Oscar offered higher commissions on a per policy basis than Florida Blue during the 2019 open enrollment period.  Oscar is

offering commissions of $22 per month while a policy is in force.  In contrast, brokers have indicated to Oscar that Florida Blue is offering commissions of only $200 per life for new policies and $110 per life for renewal business.  For policies that are in force for the full year, a broker would earn $264 in commissions from Oscar, $64 more than he or she would earn from new Florida Blue business and $154 more than he or she would earn on renewal business.

100.    The sheer percentage of brokers from which Oscar is foreclosed is significant, as it denies Oscar the ability to compete for at least half the covered lives in Orlando. Florida Blue forecloses 76 percent of the brokers and brokers in Florida account for sales of 65 percent of individual ACA plans, including in Orlando.  And this estimate likely understates the foreclosure story because Florida Blue's CGAs likely account for an even higher percentage of the covered lives and plans sold.  As Oscar's open enrollment results confirm, certain brokers are more effective than others at reaching consumers.  Less than 5 percent of Oscar-appointed brokers were responsible for approximately 73 percent of Oscar's broker-channel sales.

101.    Oscar has been particularly unsuccessful in engaging CGAs because they cannot risk termination by Florida Blue across the entire state.  Because of their large size and Florida Blue's monopoly position in the counties in the Orlando Markets, these CGAs necessarily have a large number of customers insured with Florida Blue.  They generally also have offices in other areas of Florida and multiple product lines, all of which they stand to lose if terminated by Florida Blue.

102.     Forcing CGAs to be "captive" to a particular insurer is not standard in the industry.  CGAs that work with Oscar in other states have refused to work with Oscar in Florida out of fear of losing Florida Blue's business.  For example, Fiorella Insurance Agency is a large contracted general agent with offices in multiple states.  Oscar has successfully worked with Fiorella in Texas.  When Oscar reached out to Fiorella's office in Florida in connection with its launch in Orlando, Fiorella informed Oscar that it could not sell Oscar's policies in Florida because of Florida Blue's exclusivity policy.

**B.     Underperformance Due To Foreclosure**

103.     The preliminary results of the open enrollment period illustrate that, as a result of its foreclosure from brokers due to Florida Blue's exclusivity policy, Oscar sold significantly fewer plans than it otherwise would have.

104.     In total, Oscar enrolled 33,251 individuals in the four-county Orlando metro area.  Based on an estimated enrollment effectuation of 29,648 individuals (i.e., customers who pay their premiums following sign up, which typically occurs at a rate of 89 percent in Florida) Oscar estimates that it obtained a 13 percent share of individual ACA plan sales in the Orlando metro area.

105.     Oscar enrolled the following numbers of individuals across the four counties comprising the Orlando metro area:  20,405 in Orange County; 8,372 in Osceola County; 3,755 in Seminole County; and 719 in Lake County.  Based on estimated enrollment effectuation, Oscar estimates that it obtained the following shares of individual ACA plan sales in those counties:  13 percent in Orange County; 18 percent in Osceola County; 10 percent in Seminole County; and 3 percent in Lake County.

106.    As a result of Florida Blue's exclusivity policy, these enrollment figures are well below what Oscar would have obtained given its low-cost pricing position.  In Orange, Osceola and Seminole Counties, which account for about 90 percent of all Orlando-area effectuations, Oscar offered the lowest-cost and second-lowest cost Silver tier plans.  In Lake County, which only accounts for approximately 10 percent of Orlando-area effectuations, Oscar offered the second- and third-lowest cost Silver tier plans.

107.    Because Oscar offered both the lowest- and second-lowest cost Silver plans in all but one of the four Orlando-area counties, it had a significant pricing advantage.  In order to purchase a plan from Florida Blue, many low-income consumers would have to spend significantly more than they would to purchase an Oscar plan.  For example, in Orange County, Oscar offered three plans in the Bronze metal tier, all of which are less expensive than all other competitors' offerings.  The lowest price Florida Blue plan for a 40-year-old individual in the Bronze metal tier cost approximately 10 percent, or $36, more per month, and roughly $430 more per year, in premiums alone.  In the most popular Silver metal tier, Oscar offered two plans that were less expensive than all other competitors' offerings.  The most affordable Florida Blue plan in the Silver metal tier cost approximately $16 more per month, or roughly $192 more per year, for a 40-year-old male non-smoker.  And in the Gold metal tier, Oscar's plan was priced lower than all four Florida Blue plans.  Some of Florida Blue's plans in Orange County cost several hundred dollars per month more than other competitors' plans.

108.    Much was the same in Osceola, Seminole and Lake Counties, and Oscar would aim for the same in other markets it enters.  Oscar plans are usually among the

lowest-priced plans in a particular local market and considerably less expensive than those of local incumbents like Florida Blue.

109.    In addition to its price advantage (which is far and away the most important consideration for customers), Oscar offers a strong provider network in Orlando that includes Florida Hospital, by far the largest hospital system in the Orlando area, among other providers.  Oscar's plans offer more than 4,000 providers, including primary care physicians and specialists, which is more than sufficient to satisfy consumers.

110.    Despite Oscar's low-cost plans, it fell short of its enrollment estimates.  In June 2018, before insurer plan rates were finalized and made public, Oscar estimated in connection with its initial rate submission to the FLOIR that it would obtain 35,000 enrollments in Orlando during the 2019 open enrollment period.  Subsequently, based on insurer initial rate submissions, independent and experienced Florida actuaries from FLOIR informally advised Oscar that, based on its price advantage, it should obtain approximately 70,000 enrollments.  On October 26, 2018, the rates for Oscar and other insurance carriers were publicly released, and Oscar learned that it had significant price advantages for Bronze and Silver plans relative to its competition.  Based on that advantage, in the week before the start of the enrollment period, Oscar estimated that it would obtain 63,000 enrollments. While Oscar was aware at that time of Florida Blue's damaging exclusionary conduct, it did not have any prior experience with such conduct to allow it to assign a precise quantity to this factor, so it simply made an effort to be conservative where possible in developing its overall estimate.  Oscar's actual enrollments during the 2019 open enrollment period fell

short of all of these estimates and amounted to approximately half of its best and most informed estimate of 63,000 enrollments.

111.    In other areas outside of Florida where Oscar has achieved a similar pricing advantage as in Orlando but was not foreclosed from brokers, Oscar's entry has been more successful.  In 2018, Oscar began offering individual ACA plans in Austin, where—like Orlando—a Blue Cross Blue Shield entity had a significant presence.  As when it entered Orlando this year, Oscar offered the lowest- and second-lowest cost Silver tier plans when it entered Austin.  Oscar also offered a similarly strong provider network, similar plans and faced similar competition.  Unlike Orlando, however, Oscar was able to appoint approximately 60 percent of the local brokers in Austin because no insurance carrier, including the Blue Cross Blue Shield entity operating there, imposed exclusivity on brokers like Florida Blue has done in Florida.  With its cost advantage and access to brokers, Oscar obtained a nearly 38 percent share of individual ACA enrollees in Austin in its first year in that area.

112.    Similarly, in 2016, Oscar began offering individual ACA plans in San Antonio.  Oscar offered the lowest- and second-lowest cost Silver tier plans when it entered San Antonio, and it had access to brokers because unlike in Orlando, the Blue Cross Blue Shield entity operating in San Antonio did not impose exclusivity on brokers like Florida Blue does.  In comparison to Orlando, Oscar offered a similarly strong provider network, offered similar plans and faced similar competition.  With its cost advantage and access to brokers, Oscar obtained a 28 percent share of individual ACA enrollees in San Antonio in its first year in that area.  In 2017, Oscar again offered the lowest- and second-lowest cost

41

on-exchange Silver plans in San Antonio and obtained a 65 percent share of individual ACA enrollees in the area.  These results indicate that if Oscar had the same access to brokers in Orlando as it did in Austin and San Antonio, Oscar would have achieved similar—or even better—results in Orlando.

113.    Conversely, the instances in which Oscar has struggled or been less successful are limited to those markets in which Oscar did not have a low-cost price position.

114.    Oscar stands to underperform and lose sales in 2020 and beyond in the Orlando Markets, and its very future in those markets is jeopardized by Florida Blue's conduct.  Likewise, in other Florida regions, Oscar is likely to suffer the same harm if and when it enters in 2020, as intended.  Florida Blue holds a monopoly position in a number of these markets, and undoubtedly will engage in the same exclusionary conduct rather than compete with Oscar on the merits.  In light of this risk, unless Florida Blue is enjoined, Oscar may be forced to abandon its plans to enter additional markets in Florida, resulting in a loss of profits in those markets and a loss of the significant investment Oscar has expended as part of those entry plans to date.

## II.    Oscar Is Suffering Irreparable Harm

115.    Oscar is suffering irreparable harm because of Florida Blue's conduct. Specifically, Oscar's ability to compete in the Orlando Markets has been inhibited because brokers have terminated—and likely will continue to terminate—their relationships with Oscar.  As a result, Oscar has significantly underperformed its sales projections, selling significantly fewer individual ACA insurance plans than it expected and otherwise would have during the 2019 open enrollment period.

116.    This harm is irreparable.  If Oscar continues to underperform its sales projections, it is likely that it will not achieve the minimum efficient scale necessary for it to become a viable long-term competitor in the Orlando Markets.  Oscar's underperformance this year likely will have major repercussions on its competitiveness in future years.  The fewer insureds it has this year, the less leverage it will have to negotiate favorable terms with providers, which will impact the premiums it can afford to charge.  And any negative impact on the quality or pricing of its insurance plans—or even the impression thereof—will impact its reputation and ability to attract brokers and consumers.  The cascading effects could ultimately impact Oscar's viability in the Orlando Markets.

117.    In addition, Oscar continued underperformance in the Orlando Markets will threaten its plans to enter other markets.  Underperformance will negatively impact Oscar's ability to negotiate desirable provider networks in other areas, its ability to attract brokers in other areas, and ultimately its ability to attract consumers in other areas.

118.    Finally, Oscar continues to expand its services to localities in other states across the country.  Its continued underperformance in, or forced exit from, Florida could cause providers and brokers in other states to question whether they should do business with Oscar and will hinder Oscar's ability to successfully bring its innovative products and services to consumers in other states.

## III.    Harm to Competition

119.    Florida Blue is acting with the purpose and effect of unreasonably restraining and injuring competition in the Individual Plan Market in the Relevant Geographic Markets by attempting to thwart Oscar's entry.  Florida Blue's scheme to foreclose Oscar from

43

access to brokers, which are an indispensable path to insurance customers, prevents Oscar and other new insurers from offering innovative and lower-cost insurance plans to Floridians. Additionally, Florida Blue is reducing output and limiting consumer choice, while also reducing quality by impeding innovation, thereby harming competition and the public interest.

120.    As other major insurers have exited the sale of individual ACA insurance plans, Florida Blue has been shielded from the price competition that characterizes a robust health insurance market. Studies have shown that there is an inverse correlation between the number of insurers in a market and premium growth in the market (i.e., the fewer the number of insurers the greater the premium growth), which is reflected in the fact that Florida Blue has steadily raised its prices without much, if any, competitive restraint in recent years. Studies have also shown that, unsurprisingly, many consumers prefer less expensive plans. On average, 65 percent of plans selected are one of the two lowest-cost plans available in a tier.

121.    The primary anticompetitive effect of Florida Blue's scheme to foreclose Oscar from brokers is that consumers will pay more for health insurance. In the Orlando Markets, Oscar offered a number of plans that are less expensive than Florida Blue alternatives. Consumers will suffer by not having access to the better service and innovative products that Oscar provides and that would be unlocked by real competition.

122.    By forcing brokers to become captive agents who may market and sell only Florida Blue plans, Florida Blue's exclusive dealing arrangements with brokers prevent consumers from learning about Oscar's lower premiums or the numerous innovations in

Oscar's insurance plans.  This undermines the very purposes of the ACA and the federal exchange created thereunder—transparency and reduction of cost.  Many consumers, if they were to learn of Oscar's lower prices, would select an Oscar plan over a Florida Blue plan.

123.    Oscar has entered other markets in the United States with low-cost plans and achieved large enrollment numbers, despite being less established than traditional insurers, in large part due to its lower prices and innovation.  Beyond Oscar and Orlando, Florida Blue's scheme will likely have the effect of deterring entry by other disruptive competitors in many markets across Florida.

124.    But for the exclusionary conduct described above:  (1) Florida Blue's market power in the Relevant Geographic Markets would be lessened; (2) Florida Blue would be unable to coerce brokers into the exclusive dealing arrangements described above; (3) there would be increased competition in the sale of individual insurance plans; (4) consumers would have access to, and knowledge of, more choices when selecting an individual ACA insurance plan; and (5) prices would be lower and the quality of care would be higher for consumers.

## FLORIDA BLUE'S CONDUCT IS NOT EXEMPT FROM ANTITRUST SCRUTINY

125.    Florida Blue's activities as alleged herein are not exempted under the McCarran-Ferguson Act because they (1) do not constitute the "business of insurance," (2) are not regulated by state law, and (3) involve acts of "boycott, coercion or intimidation."

126.    Florida Blue's activities do not satisfy any of the factors relevant to whether a practice constitutes the business of insurance.  First, requiring broker exclusivity has nothing to do with transferring or spreading policyholder risk.  *See Ray v. United Family Life Ins.*

*Co.*, 430 F. Supp. 1353, 1357 (W.D.N.C. 1977) ("Refusals to deal with agents in furtherance of an attempt to monopolize" are not "within the 'business of insurance.'").  Second, Florida Blue's exclusive contracts are not an integral part of the policy relationship between an insurer and insured.  Florida Blue is the only ACA insurer in the State of Florida, if not the country, that requires exclusivity.  Further, the exclusive contracts have no impact on policy terms; insureds can purchase the exact same policy without using a broker.  Third, exclusive contracts are not a practice limited to the insurance industry.  To the contrary, exclusive dealing relationships exist across a wide array of industries.

127.    Florida Blue's exclusivity requirement is also not exempt because it is not regulated by state law.  In response to an inquiry in connection with the termination of a Florida Blue agent for violating the exclusivity policy, the Florida Department of Financial Services, Division of Insurance Agent and Agency Services responded that "[v]iolation of an agent's contract with an insurer to maintain exclusivity is a civil contractual issue between the parties to the contract involved.  There is no law in the Florida Insurance Code that could be applied to this civil employment issue."  (Dec. 12, 2017 email from Jimmy Patronis to Lasandra Henderson.)

128.    Florida Blue's activities are also not exempt because Florida Blue enforces its exclusive agreements with agents through coercion and intimidation within the meaning of the McCarran-Ferguson Act.  Florida Blue has threatened agents with permanent termination and refusals to pay commission if they deal with Oscar or other competitors.  The threats are coercive in both intent and effect because of the power that Florida Blue has throughout the State of Florida.  Florida Blue threatens to terminate agents throughout the

State of Florida if they sell any Oscar plans just in the Orlando area.  Florida Blue's coercive

enforcement of its exclusivity requirement involves "concerted action" between it and its

CGAs.  Florida Blue requires that its CGAs impose and enforce its exclusivity policy upon

the brokers with whom they contract.  Indeed, both the forms requiring exclusivity and the

actual threats of termination often are sent by the CGAs at the direction of Florida Blue.

## CAUSES OF ACTION

### COUNT I
### Sherman Act § 2 Claim for Monopolization

129.    Oscar incorporates by reference the allegations in Paragraphs 1-14 and 27-124.

130.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits the willful

monopolization of any part of the trade and commerce among the States.

131.    Florida Blue possesses monopoly power in the Individual Plan Market in the

Relevant Geographic Markets and is maintaining this power through exclusionary conduct

designed to exclude Oscar from competition.  (*See supra* ¶¶ 52-67, 76-88.)  This conduct

includes coercing brokers into exclusive agreements.  (*See supra* ¶¶ 43, 52-67, 97-102.)

132.    Florida Blue's willful and wrongful maintenance and/or extension of its

monopoly power is not the result of growth and development as a result of innovation,

business acumen or by virtue of offering a superior product.  Rather, it is a direct

consequence of Florida Blue's exclusionary conduct.  (*See supra* ¶¶ 52-67, 80-95.)

133.    There is no efficiency enhancing, procompetitive justification for Florida

Blue's conduct.  (*See supra* ¶¶ 68-75.)

134.    Florida Blue's conduct has substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant Geographic Markets.  (*See supra* ¶¶ 119-24.)  But for Florida Blue's conduct, Oscar would have more successfully entered the Orlando Markets and would successfully enter other markets in Florida, which it has taken affirmative steps toward and is prepared to do.  (*See supra* ¶¶ 103-14.)  As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

135.    Florida Blue's unlawful monopolization of the Individual Plan Market in the Relevant Geographic Markets is and will, unless enjoined, continue to be the proximate cause of injury to Oscar, a direct competitor to Florida Blue in the Orlando Markets and a prospective competitor in other Florida markets.

## COUNT II
### Sherman Act § 2 Claim for Attempted Monopolization

136.    Oscar incorporates by reference the allegations in Paragraphs 1-14 and 27-124.

137.    Section 2 of the Sherman Act (15 U.S.C. § 2) also prohibits attempts to monopolize any part of the trade and commerce among the States.

138.    The same allegations relevant to Count I are also relevant to Count II.  If for any reason, Florida Blue is deemed not to have monopoly power in the Individual Plan Market in the Relevant Geographic Markets, there is a dangerous probability that Florida Blue will acquire such power.  (*See supra* ¶¶ 52-67, 76-88.)  Further, it was Florida Blue's conscious objective to acquire monopoly power in the Individual Plan Market in the

Relevant Geographic Markets by and through its exclusionary conduct. (*See supra* ¶¶ 43, 52-67, 97-102.)

139.    Florida Blue's attempt to monopolize is not the result of growth and development as a result of innovation, business acumen or by virtue of offering a superior product. Rather, it is a direct consequence of Florida Blue's exclusionary conduct. (*See supra* ¶¶ 52-67, 80-95.)

140.    There is no efficiency enhancing, procompetitive justification for Florida Blue's conduct. (*See supra* ¶¶ 68-75.)

141.    Florida Blue's conduct has substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant Geographic Markets. (*See supra* ¶¶ 119-24.) But for Florida Blue's conduct, Oscar would have more successfully entered the Orlando Markets and would successfully enter other Florida markets, which it has taken affirmative steps toward and is prepared to do. (*See supra* ¶¶ 103-14.) As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

142.    Florida Blue's attempted monopolization of the Individual Plan Market in the Relevant Geographic Markets is and will, unless enjoined, continue to be the proximate cause of injury to Oscar, a direct competitor to Florida Blue in the Orlando Markets and a prospective competitor in other areas within the State of Florida.

**COUNT III**
**Sherman Act § 1 Claim Based on**
**Florida Blue's Exclusive Agreements with CGAs and Brokers**

143.    Oscar incorporates by reference the allegations in Paragraphs 1-14 and 27-124.

144.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition; and (4) that harms the plaintiff as a result of the anticompetitive aspect of the practice under scrutiny.

145.    The same anticompetitive conduct that violates Section 2 of the Sherman Act (Counts I and II) also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act because Florida Blue's conduct involves concerted action with CGAs and brokers—with which it has entered into exclusive agreements—that have foreclosed Oscar from a substantial share of brokers.  (*See supra* ¶¶ 35-43, 52-67, 96-102.)

146.    These agreements unreasonably restrain trade in the Individual Plan Market in the Relevant Geographic Markets.  (*See supra* ¶¶ 76-88, 97-102.)

147.    Florida Blue has market power in the Individual Plan Market in the Relevant Geographic Markets.  (*See supra* ¶¶ 76-88.)

148.    There is no efficiency enhancing, procompetitive justification for Florida Blue's agreements with CGAs and brokers.  (*See supra* ¶¶ 68-75.)

149.    These agreements have substantially harmed and will continue to substantially harm competition in the Individual Plan Market in the Relevant Geographic Markets.  (*See supra* ¶¶ 119-24.)  But for these agreements, Oscar would have more successfully entered the Orlando Markets and would enter other Florida markets, which it has taken affirmative steps toward and is prepared to do.  (*See supra* ¶¶ 103-14.)  As a result, prices are (and will be) higher, and there will be fewer alternatives for consumers in the Individual Plan Market in the Relevant Geographic Markets.

150.    These agreements are and will, unless enjoined, continue to be the proximate cause of injury to Oscar.

**COUNT IV**
**Florida Antitrust Act Restraint of Trade § 542.19 Claim for Monopolization and Attempted Monopolization**

151.    Oscar incorporates by reference the allegations in Paragraphs 1-14 and 27-124.

152.    Florida Statute § 542.19 makes it unlawful to monopolize, or attempt to monopolize, any part of the trade or commerce in Florida.

153.    Florida Statute § 542.19 is an analogue to Section 2 of the Sherman Act. Florida Statute § 542.16 states that the purpose of the provisions of the Florida Antitrust Act law is to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.

154.    Accordingly, the same allegations relevant to Counts I and II are also relevant to Count IV.  For the same reasons set forth in Paragraphs 131-35 and 138-42, Florida Blue

is violating § 542.19 by maintaining or attempting to acquire monopoly power in the Individual Plan Market in the Relevant Geographic Markets.

155.     Unless enjoined, Florida Blue's conduct will continue to cause injury and damage to Oscar, and competition will continue to decrease in the Individual Plan Market in the Relevant Geographic Markets.

**COUNT V**
**Florida Antitrust Act Restraint of Trade § 542.18 Claim**
**Based on Florida Blue's Exclusive Agreements with CGAs and Brokers**

156.     Oscar incorporates by reference the allegations in Paragraphs 1-14 and 27-124.

157.     Florida Statute § 542.18 states that every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful.

158.     Florida Statute § 542.18 is an analogue to Section 1 of the Sherman Act. Florida Statute § 542.16 states that the purpose of the provisions of the Florida Antitrust Act law is to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition.

159.     Accordingly, the same allegations relevant to Counts III are also relevant to Count V.  For the same reasons set forth in Paragraphs 145-50, Florida Blue is violating § 542.18 by entering into exclusive agreements with CGAs and brokers that foreclose Oscar from access to brokers and thereby restrain trade in the Individual Plan Market in the Relevant Geographic Markets.

160.    Unless enjoined, Florida Blue's conduct will continue to cause injury and damage to Oscar, and competition will continue to decrease in the Individual Plan Market in the Relevant Geographic Markets.

### PRAYER FOR RELIEF

161.    WHEREFORE, Plaintiff respectfully demands a trial by jury on all matters so triable under law, and respectfully requests that, based on the verdict of the jury, that judgment be entered:

A.    Enjoining Defendants from taking, or threatening to take, any retaliatory or deterrent actions against any CGA or broker based on the CGA's or broker's marketing of, or consideration of marketing, non-Florida Blue health insurance plans, including suspending or terminating any broker's appointment with Florida Blue;

B.    Enjoining Defendants from conditioning any CGA's or broker's ability to market their health insurance plans on that CGA or broker refusing to market non-Florida Blue health insurance plans;

C.    Requiring Defendants to remove their exclusive policy from their website and to distribute to each CGA or broker that markets Florida Blue plans revised broker criteria;

D.    Requiring Defendants to inform CGAs and brokers of any injunction or judgment in this matter, including that Defendants will not retaliate against CGAs or brokers for selling non-Florida Blue health insurance plans;

E.    Enjoining Defendants from engaging in any other exclusionary practices that directly or indirectly foreclose Oscar from marketing its health insurance in Florida; and

F.    Awarding Plaintiff treble damages (to the extent the Court finds that such damages may be ascertained), reasonable attorneys' fees, costs, expenses and such further relief as the Court deems just and proper.

Dated:  February 13, 2019                 Respectfully Submitted,

/s/ Steven C. Sunshine
STEVEN C. SUNSHINE (*Admitted Pro Hac
  Vice*)
TARA L. REINHART (*Admitted Pro Hac Vice*)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
1440 New York Avenue, NW
Washington, D.C. 20005
Tel: (202) 371-7000
Facsimile: (202) 393-5760
steve.sunshine@skadden.com
tara.reinhart@skadden.com

PAUL M. ECKLES (*Admitted Pro Hac Vice*)
MICHAEL H. MENITOVE (*Admitted Pro Hac
  Vice*)
MATTHEW LISAGAR (*Admitted Pro Hac
  Vice*)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
4 Times Square
New York, NY 10036
Tel: (212) 735-3000
Fax: (212) 735-2000
paul.eckles@skadden.com
michael.menitove@skadden.com
matthew.lisagar@skadden.com

FRANCIS M. MCDONALD, JR., ESQ.
Florida Bar No. 0327093
SARAH A. LONG, ESQ.
Florida Bar No. 0080543
**MCDONALD TOOLE WIGGINS, P.A.**
111 N. Magnolia Avenue, Suite 1200
Orlando, FL 32801
Telephone: (407) 246-1800
Facsimile:  (407) 246-1895
fmcdonald@mtwlegal.com
slong@mtwlegal.com
OscarHealthCorpvBCBS@mtwlegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of February, 2019, a true and correct copy of

the foregoing document was filed electronically via the Court's CM/ECF Filing System.


/s/ Steven C. Sunshine

Steven C. Sunshine
*Counsel for Plaintiff*
*Oscar Insurance Company of Florida*