UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

OSCAR INSURANCE COMPANY
OF FLORIDA,

     Plaintiff,

v.                                     Case No. 6:18-cv-1944-PGB-TBS

BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC, d/b/a Florida Blue,
HEALTH OPTIONS INC., d/b/a Florida Blue
HMO, and FLORIDA HEALTH CARE PLAN
INC., d/b/a Florida Health Care Plans,

     Defendants.

_____/

**<u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA</u>**

I.      INTEREST OF THE UNITED STATES

The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court.  The United States is principally responsible for enforcing the federal antitrust laws, *United States v. Borden Co.*, 347 U.S. 514, 518 (1954); 15 U.S.C. §§ 4, 25, and has a strong interest in their correct application.  In particular, the United States seeks to ensure that antitrust exemptions, including the McCarran-Ferguson Act, are not interpreted any more broadly than necessary to carry out their purposes, given that antitrust law "is a central safeguard for the Nation's free market structures." *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S.Ct. 1101, 1109 (2015).[1]  Even when interpreted narrowly, the McCarran-Ferguson exemption has been criticized as unnecessary to advance its principal purpose.  Antitrust Modernization Commission, *Report and Recommendation* 351 (2007), *available at* https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf (questioning the need for the McCarran-Ferguson Act, as interpreted).

---

[1] The need for narrow construction of antitrust exemptions is a widely shared view. Indeed, the bipartisan Antitrust Modernization Commission unanimously recommended that exemptions from the antitrust laws "should be disfavored" and only employed where "a particular societal goal trumps the goal of consumer welfare, which is achieved through competition."  Antitrust Modernization Commission, *supra*, at 335-36.

## II.     SUMMARY OF ARGUMENT

The McCarran-Ferguson Act creates "only a limited exemption" from federal antitrust law for the business of insurance. *Group Life & Health Ins. Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 218 n.18 (1979). In arguing that their exclusivity policy comes within the exemption, the defendants (together, Florida Blue) disregard the Supreme Court's instruction that the exemption "must be construed narrowly," *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982), and ignore the Court's analysis of the restrictive conditions that must be met for the exemption to apply. Properly interpreted, the Act does not provide a basis for dismissing Oscar Insurance Company of Florida's (Oscar's) Sherman Act claims.[2] As alleged, Florida Blue's exclusivity policy is far removed from the transfer of risk and the policy relationship between insurer and insured, and does not constitute "the business of insurance." Moreover, as alleged, Florida Blue implemented the exclusivity policy through "coercion."

## III.    BACKGROUND

### A.     Overview of the McCarran-Ferguson Act

Congress passed the McCarran-Ferguson Act in response to *United States v. South-Eastern Underwriters Association*, 322 U.S. 533 (1944), which held that insurers engage in interstate commerce and that Congress did not exempt the insurance industry from the Sherman Act. "The decision provoked widespread concern that the States would no longer be able to engage in effective taxation and regulation of the insurance industry,"

---

[2] The United States takes no position on other issues raised in Florida Blue's motion.

3

and "Congress moved quickly," passing the Act within a year.  *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 539 (1978).

Congress's "primary concern" was to enact "legislation that would ensure that the States would continue to have the ability to tax and regulate the business of insurance." *Royal Drug*, 440 U.S. at 217-18.  "A secondary concern was the applicability of the antitrust laws to the insurance industry." *Id.* at 218.  In crafting the antitrust exemption, Congress's "primary concern . . . was that cooperative ratemaking efforts be exempt from the antitrust laws" given "the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation." *Id.* at 221.

Consistent with this history, the Supreme Court has instructed that the Act "must be construed narrowly." *Pireno*, 458 U.S. at 126.  The Act embodies "a legislative rejection of the concept that the insurance industry is outside the scope of the antitrust laws," *Royal Drug*, 440 U.S. at 220, providing "only a narrow exemption," *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 505 (1993).

Ratemaking ("the paradigmatic example of the conduct Congress intended to protect") and the performance of an insurance contract are the "business of insurance." *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1331 (11th Cir. 2004).  Both "are fundamental to the business of insurance because they focus on the relationship between the insurance company and its policyholders." *Id.*  The "center" of legislative concern is protecting "intra-industry cooperation in the underwriting of risks," not immunizing arrangements as to other aspects of the business.  *Pireno*, 458 U.S. at 133

(internal quotation omitted); *see also* Antitrust Modernization Commission, *supra*, at 351 (Act serves "to allow insurers, among other things, to collect, aggregate, and review data on losses . . . so they can better set their rates to cover their likely costs").

### B.      Oscar's Allegations[3]

Oscar challenges Florida Blue's exclusivity policy, which prohibits a broker[4] selling certain Blue Cross plans from selling plans offered by competing insurers.  Am. Compl. ¶ 5 (ECF No. 75).  According to Oscar's allegations, given its dominant market share, Florida Blue's exclusivity policy forecloses its competitors from brokers responsible for selling the vast majority of individual health plans in the Orlando area. *Id.* ¶ 7.  Oscar alleges, among other things, that Florida Blue's conduct has caused consumers to pay more for health insurance, limited consumer choice, and impeded innovation.  *Id.* ¶¶ 119, 121.  Oscar claims that Florida Blue has violated Sections 1 and 2 of the Sherman Act.

Oscar also alleges that Florida Blue enforces its exclusivity policy through "coercion and intimidation."  *Id.* ¶ 128.  Florida Blue has threatened to terminate permanently any broker appointed by Oscar, meaning "brokers face losing the right to sell Florida Blue plans *in all product lines* throughout *the entire State of Florida* if they decide to sell Oscar plans in *a single county in the state*."  *Id.* ¶ 6 (emphasis in original).  After

---

[3] In this Statement of Interest, the United States accepts as true the facts alleged in Oscar's complaint.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); Mot. Dismiss at 3 n.2 (ECF No. 81) ("In this motion to dismiss, Florida Blue takes as true the facts alleged in Oscar's Amended Complaint.").

[4] The parties' dispute about the proper characterization of agents versus brokers, *see* Order at 4 n.1 (ECF 72), does not impact the analysis presented in this statement.

Oscar entered the Orlando market, Florida Blue updated its exclusivity policy, directing its brokers to sign new exclusivity forms. *Id.* ¶¶ 58, 64.

According to Oscar's allegations, Florida Blue has selectively enforced its exclusivity policy against brokers contracting with Oscar. *Id.* ¶ 68. Florida Blue also allegedly has threatened to withhold commission payments from brokers who violate the exclusivity policy. *Id.* ¶ 56.

## IV.   ARGUMENT

Florida Blue's exclusivity policy is far removed from the collective ratemaking at the core of the McCarran-Ferguson exemption. The Act exempts from the Sherman Act activities that (1) constitute "the business of insurance," (2) are "regulated by State law," and (3) do not amount to "boycott, coercion, or intimidation." 15 U.S.C. §§ 1012(b), 1013(b). Per Oscar's allegations, Florida Blue's exclusivity policy (1) is not the business of insurance and (2) involves coercion, either of which defeats Blue Cross's claim that the exclusivity policy is exempt from the Sherman Act.[5]

### A.   The Exclusivity Requirement Is Not the "Business of Insurance."

The Supreme Court has stressed that the exemption "is for the 'business of insurance,' not the 'business of insurers.'" *Royal Drug*, 440 U.S. at 211. Accordingly, "it

---

[5] The United States takes no position as to whether Florida Blue's exclusivity policy is regulated by state law. However, the United States notes that, under the plain language of the statute, the exemption does not apply unless the state regulates the particular practice at issue. 15 U.S.C. § 1012(b) (antitrust laws remain applicable "*to the extent*" that the business "is not regulated by State law" (emphasis added)).

does not follow that because an agreement is necessary to provide insurance, it is also the 'business of insurance.'" *Id.* at 213-14 n.9.

In a pair of opinions, *Royal Drug* (1979) and *Pireno* (1982), the Court has "identified three criteria relevant in determining whether a particular practice is part of the 'business of insurance' exempted from the antitrust laws": (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship between insurer and insured"; and (3) "whether the practice is limited to entities within the insurance industry." *Pireno*, 458 U.S. at 129. "None of these criteria is necessarily determinative in itself." *Id.*

In applying these criteria, the Court has noted that the Sherman Act expresses "a longstanding congressional commitment to the policy of free markets and open competition," and thus has construed the criteria narrowly. *Id.* at 126 (internal quotation omitted). Similarly, the Court has looked to the exemption's history, considering whether the practice at issue implicated the core congressional concern of permitting cooperative ratemaking and statistical analysis. *Royal Drug*, 440 U.S. at 224.

Evaluated in light of *Pireno* and *Royal Drug*, Florida Blue's exclusivity policy does not transfer risk or figure as an integral part of the policy relationship between the insurer and the insured. Failing to meet two of the three criteria, Florida Blue is incorrect that its exclusivity policy falls within the business of insurance.

### 1. The exclusivity requirement does not transfer or spread risk.

The Supreme Court has recognized that "underwriting or spreading of risk" is "an indispensable characteristic of insurance." *Id.* at 212. "The transfer of risk from

insured to insurer is effected by means of the contract between the parties—the insurance policy—and the transfer is complete at the time that the contract is entered." *Pireno*, 458 U.S. at 130.  It was the underwriting of risk—and the need for intra-industry cooperation to underwrite in an informed and responsible way—that distinguished the business of insurance from other commercial conduct and justified a limited antitrust exemption. *Royal Drug*, 440 U.S. at 220-24.  Thus, an arrangement that is "logically and temporally unconnected to the transfer of risk accomplished by [the insurance policy]" does not meet this criterion.  *Pireno*, 458 U.S. at 130.

Florida Blue's exclusivity policy is logically and temporally unconnected to the transfer of risk from any policyholder to Florida Blue.  Florida Blue imposes exclusivity separate from the issuing of policies (and the concurrent transfer of risk), when entering into an agreement with an agent.  *See, e.g.*, Am. Compl. ¶ 53.[6]  When Florida Blue asked its existing agents to execute a new exclusivity form, those negotiations also did not involve policyholders.  *Id.* ¶ 58.  Likewise, the threats of termination and to withhold commissions are entirely separate from the transfer of risk through the writing of specific policies.  *See, e.g.*, *id.* ¶ 56.

Ignoring the Supreme Court's analysis, and the rule of narrow construction, Florida Blue posits the overly broad standard that a practice "spreads risk" if it "affects [an insurer's] ability to attract customers."  Mot. Dismiss at 8 (ECF No. 81).  This

---

[6] *Cf. Ray v. United Family Life Ins. Co., Inc.*, 430 F. Supp. 1353, 1357 (W.D.N.C. 1977) (suit arising from the termination of an agent who refused to discontinue his relationship with a competitor "involves the relationship of agent and company, not the relationship of policyholder and company").

cannot be the standard because numerous practices that in no way serve to "spread risk"

enable an insurer to prevent its competitors from "siphon[ing] off" customers. *Id.* For

example, an insurer could prevent a competitor from "siphoning off" customers by

acquiring that insurer. *See Royal Drug*, 440 U.S. at 215 n.13 (stating in a discussion of

risk spreading that a merger of two insurance companies is not the "business of

insurance"). Similarly, an insurer could "attract" customers by acquiring a "must-have"

hospital and refusing to allow that hospital to be in its competitors' networks, or by

sabotaging the IT infrastructure or the operations of a competitor. *Cf. id.* at 215 (stating

in a discussion of risk spreading that an insurer's acquisition of a chain of drug stores is

not "the business of insurance").[7] These practices—like Florida Blue's exclusivity

policy—"can hardly be said to lie at the center of [] legislative concern." *Pireno*, 458

U.S. at 133.

The Fifth Circuit's decision applying the exemption in *Sanger Insurance Agency v.*

*HUB International, Ltd.*, 802 F.3d 732 (5th Cir. 2015), does not support Florida Blue's

overly broad standard because the conduct in that case did more than merely "attract"

additional customers to an insurer. In *Sanger*, the defendant served as broker for an

insurance program offered by a veterinary association. Specifically, the program was "a

risk purchasing group" that offered insurance to all association members under "one

---

[7] The Supreme Court did not "intimate" in *Royal Drug* that agreements between insurers and agents transfer risk, as Florida Blue argues. Mot. Dismiss at 7. To the contrary, the Court simply observed that competing inferences could be drawn from the legislative history as to whether the fixing of agent commissions by insurers constitutes the "business of insurance." 440 U.S. at 224 n.32 ("whatever may be the status of agreements between an insurer and its agents").

master policy," negotiated by the defendant broker.  The court held that exclusive-dealing arrangements, which prevented insurers in the program from writing veterinary insurance through brokers other than the defendant, spread risk by "[k]eeping a large, geographically and professionally diverse pool of veterinarians in the Program."  *Id.* at 743.

The fact that *Sanger* involved a form of exclusive dealing, therefore, is inapposite.  The arrangement in *Sanger* was enforced by the broker, not, as here, by the insurer, and it affected the nature and the scope of risks insured under a single policy for a single customer (the risk purchasing group).  Though the arrangement in *Sanger* may be logically and temporally connected to the transfer of risk, *Pireno*, 458 U.S. at 130, Florida Blue's exclusivity policy, which does not change the risk covered by any policy, is not.  Florida Blue's overly expansive reading of *Sanger* is at odds with *Royal Drug* and *Pireno.*

### 2.    The exclusivity requirement is not integral to the policy relationship.

The Supreme Court has recognized that "[a]nother commonly understood aspect of the business of insurance relates to the contract between the insurer and the insured." *Royal Drug*, 440 U.S. at 215.  This criterion reflects congressional concern with "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement."  *Id.* at 215-16 (quoting *SEC v. Nat'l Secs., Inc.*, 393 U.S. 453, 460 (1969)).  Thus, the "focus" is "on the relationship between the

insurance company and the policyholder," not "separate contractual arrangements." *Royal Drug*, 440 U.S. at 216 (quoting *Nat'l Secs.*, 393 U.S. at 460).

Florida Blue wrongly maintains that "the test in this Circuit" is whether the restrictions "concern the agent's insurance dealings as such." Mot. Dismiss at 9. It relies on *Thompson v. New York Life Insurance Co.*, 644 F.2d 439 (5th Cir. 1981), which involved the termination of an agent for, among other things, engaging in outside employment while working as an agent. With minimal analysis, the court concluded that the restriction was the business of insurance, reasoning that it "did not force [the agent] to engage in activities unrelated to insurance," but instead incentivized the agent to focus all of his entrepreneurial skills solely on selling insurance." *Id.* at 444.

*Thompson* does not survive *Pireno*. The *Thompson* court did not discuss any of the factors, distilled subsequently in *Pireno*, bearing on whether a practice is an integral part of the policy relationship (for example, "the relationship between insurer and insured" and a policy's "reliability, interpretation, and enforcement"). *Pireno*, 458 U.S. at 128 (internal quotation omitted). Indeed, in its analysis, the court ignored the policy and the policyholder and instead focuses entirely on the practice's effect on the agent.[8]

Applying the correct standard in light of the *Pireno* factors, Florida Blue's exclusivity policy is not an integral part of the policy relationship. To the contrary, Florida Blue's agreements with its brokers are "obviously distinct from [its] contracts

---

[8] Nor does *Thompson* support any broader argument that insurer/broker exclusive dealing constitutes the business of insurance. The court failed not only to explain how the restrictions at issue were integral to the policy relationship, but also to explain how they transfer risk.

with its policyholders." *Id.* at 131.  The exclusivity policy does not impact the

"reliability, interpretation, and enforcement" of a policy.  *Royal Drug*, 440 U.S. at 215-

16.[9]  Additionally, the exclusivity policy is not integral to Florida Blue's relationships

with its policyholders given that it selectively enforces its policy, that many insureds

obtain coverage without the assistance of a broker, and that the exclusivity policy is not

unique to the insurance industry.  Am. Compl. ¶¶ 35, 68, 126.  Finally, the threat to

withhold commissions has nothing to do with the relationship between the insurer and

the insured.

      **B.**     **Oscar Has Alleged "Coercion."**

      Even if Florida Blue's exclusivity policy could constitute the business of

insurance, the Sherman Act remains applicable if the policy involves an "act of boycott,

coercion, or intimidation."  15 U.S.C. § 1013(b).  Congress did not define "coercion" or

"intimidation," and instead "employed terminology that evokes a tradition of meaning,

as elaborated in the body of decisions interpreting the Sherman Act."  *St. Paul Fire*, 438

U.S. at 541.  It used "broad and unqualified" language, which, the Supreme Court has

indicated, should be given its full meaning.  *Id.* at 550.

---

[9] It is too much to say that the exclusivity policy enhances the reliability of its insurance
by enabling Florida Blue to earn more business and thereby build greater reserves.
Under that reasoning, any practice that increases Florida Blue's bottom line is integral to
its relationships with its policyholders.  *See Royal Drug*, 440 U.S. at 216-17 (cost savings
alone do not bring a practice within the "business of insurance" because "every business
decision made by an insurance company has some impact on its reliability, its
ratemaking, and its status as a reliable insurer").

### 1. Florida Blue's allegedly anticompetitive conduct involves coercion.

Oscar alleges that Florida Blue leveraged its monopoly power to force brokers to do something they did not want to do, namely, not to do business with Oscar.  In particular, Florida Blue has conditioned a broker's ability to write any line of business (in any part of Florida) on her agreement to write only Florida Blue individual business, and selectively threatened to terminate agreements (if a broker wrote competing individual business in the Orlando area) and withhold commissions.  Am. Compl. ¶¶ 6, 68-69, 128.  This course of conduct falls squarely within the plain meaning of coercion. *See, e.g.*, *Black's Law Dictionary* 275 (10th ed. 2014) (coercion is "[c]onduct that constitutes the improper use of economic power to compel another to the wishes of one who wields it"); *Webster's Second New International Dictionary* 519 (1934) ("the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done").  In fact, one court already has held that a threat to terminate an agent (if he continued to deal with the insurer's competitor) and deprive the agent of commissions and other business constituted coercion.  *Ray*, 430 F. Supp. at 1358.

Florida Blue points to *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993), Mot. Dismiss at 15, but that case actually supports Oscar's allegation of coercion.  In that case, the Supreme Court stated (in dicta) that "a concerted agreement to terms" does not constitute coercion or intimidation.  *Id.* at 808 n.6.  It distinguished an "expansion of the refusal to deal beyond the targeted transaction," where "unrelated transactions are used as leverage to achieve the terms desired."  *Id.* at 803.  The Court

concluded that the plaintiffs had pled more than "a concerted agreement to terms" by alleging that a group of reinsurers refused to write risks not just on forms containing an objectionable term, but also on forms not containing that term. *Id.* at 810.

Likewise, Oscar alleges more than "a concerted agreement to terms." According to the amended complaint, Florida Blue is using "unrelated transactions"—for example, the authority to write other lines of business and the authority to write individual business in parts of Florida other than the Orlando area—as "leverage" to obtain and enforce its exclusivity policy and maintain a monopoly. *Hartford Fire*, 509 U.S. at 803; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-13 (1984) ("By conditioning the sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment." (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953)). In short, the allegations of coercion make the exemption inapplicable.

### 2. "Coercion" does not require concerted action.

Contrary to Florida Blue's argument, the statutory text makes clear that coercion does not require concerted action.[10] By its plain meaning, and in antitrust parlance, the term contemplates unilateral action. *See, e.g.*, *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 17 (1964) ("*a supplier* may not use *coercion* on its retail outlets to achieve resale price maintenance" (emphasis added)); *Black's Law Dictionary* 315 (10th ed. 2014) (defining coercion as "[c]onduct that constitutes the improper use of economic power to compel

---

[10] The United States takes no position on whether Oscar has alleged concerted action.

another to the wishes of *one* who wields it" (emphasis added)); *Black's Law Dictionary* 345 (3d ed. 1933) ("where the relation of the parties is such that one is under subjection to the other"). Moreover, the statute speaks separately of an "act of boycott, coercion, or intimidation" or "any *agreement* to boycott, coerce, intimidate" (emphasis added), indicating that the statute encompasses both unilateral and concerted coercion.

Finally, the statute provides that the "Sherman Act" applies in full force to coercion. The Sherman Act comprises prohibitions on both certain concerted action and certain unilateral conduct,[11] including prohibiting a firm from using anticompetitive conduct to acquire or maintain a monopoly. *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001). Reading the statutory text as Florida Blue does, to require concerted action in addition to coercion, would render this important component of the Sherman Act inapplicable in this context, without any indication that such a limitation was intended.

None of the authorities cited by Florida Blue allow it to escape the statute's plain meaning. *Sanger* expressly reserves the issue. 802 F.3d at 747 n.12. *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 933 (9th Cir. 1983), addresses a separate issue, whether the existence of monopoly power alone—without the additional element of anticompetitive conduct—can constitute a boycott or coercion.[12] Finally, the capsule

---

[11] Section 2 proscribes monopolization, attempted monopolization, and combinations or conspiracies to monopolize. 15 U.S.C. § 2.

[12] In fact, *Feinstein* indicates that concerted action is not required, suggesting that a violation of Section 2 of the Sherman Act plus an act of coercion or intimidation satisfies Section 3(b) of the McCarran-Ferguson Act. 714 F.2d at 934.

15

summary of the charged conduct in *South-Eastern Underwriters*, 322 U.S. at 535-36, is

"certainly not dispositive," 1A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law*

¶ 220a (4th ed. 2014).   Even if that case involved acts of coercion and intimidation done

collectively, its particular facts do not indicate that Congress intended the terms to have

a specialized, limited meaning.   *St. Paul Fire*, 438 U.S. at 546-50 (declining to limit

"boycotts" to actions directed at competitors even though the boycott in *South-Eastern*

*Underwriters* was directed at competitors).

## V.   CONCLUSION

The Court should not dismiss Oscar's Sherman Act claims on the basis of Florida

Blue's flawed interpretation of the McCarran-Ferguson Act's antitrust exemption.

Dated: April 24, 2019

Respectfully submitted,

/s/ Patrick M. Kuhlmann

MAKAN DELRAHIM
*Assistant Attorney General*

ANDREW C. FINCH
*Principal Deputy Assistant Attorney*
  *General*

MICHAEL F. MURRAY
*Deputy Assistant Attorney General*

TAYLOR M. OWINGS
*Counsel to the Assistant Attorney General*

KRISTEN C. LIMARZI
PATRICK M. KUHLMANN
*Attorneys*

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Suite 3224
Washington, DC  20530
Telephone: (202) 305-4639
Email: Patrick.Kuhlmann@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 24, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will service the filing on all counsel of record.

/s/ Patrick M. Kuhlmann
Patrick M. Kuhlmann