UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

OSCAR INSURANCE COMPANY
OF FLORIDA,

     Plaintiff,

vs.                                Case No.: 6:18-cv-01944-ORL-40-TBS

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., d/b/a Florida Blue; HEALTH
OPTIONS INC., d/b/a Florida Blue HMO; and
FLORIDA HEALTH CARE PLAN INC., d/b/a
Florida Health Care Plans,

     Defendants.

_____/

## DEFENDANTS' RESPONSE TO THE STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States of America (the "Government") submitted a Statement of Interest ("Statement") in the above-captioned action, for the limited purpose of addressing Defendants Blue Cross and Blue Shield of Florida, Inc., Health Options Inc. and Florida Health Care Plan, Inc.'s (collectively, "Florida Blue's") reliance on the McCarran-Ferguson Act to dismiss portions of Oscar Health Insurance Company of Florida's Amended Complaint ("Amended Complaint"). Florida Blue now submits this response, pursuant to the Court's April 26 Order, to address the arguments set forth in the Government's Statement. In short, nothing in the Government's submission alters the conclusion that Oscar's Amended Complaint should be dismissed with prejudice.

*First*, the McCarran-Ferguson Act is not an antitrust statute, and the doctrine invoked by Florida Blue is purely jurisdictional. Accordingly, the Government's views of

McCarran-Ferguson are not entitled to any special weight.  *See infra* Section I.

*Second*, the Government's view that the McCarran-Ferguson Act does not apply here is wrong as a matter of law.  As an initial matter, the Government incorrectly concludes that Florida Blue's exclusivity arrangements do not constitute the "business of insurance" because they (i) do not involve the transfer of risk, and (ii) are not integral to the policyholder relationship.  To reach this mistaken conclusion, the Government describes the law it wishes for—rather than the law that exists—in this Circuit.  *See infra* Section II.A.

Next, the Government argues that unilateral conduct can constitute "coercion" sufficient to trigger the narrow exception to McCarran-Ferguson immunity.  That position is inconsistent with Supreme Court case law and other relevant authorities.  *See infra* Section II.B.

## MEMORANDUM OF LAW

## I.      The Court Need Not Accord the Government's Submission Any Special Weight

The Government claims a "strong interest" in this case because the "United States is principally responsible for enforcing the federal antitrust laws" and ensuring "their correct application."  (Statement at 2.)  But that stated interest has nothing to do with the narrow issue addressed in the Government's submission:  the McCarran Ferguson Act.  Contrary to the Government's suggestion, the McCarran-Ferguson Act is not an antitrust statute.  It is a statute—wholly separate from the Sherman Act and Clayton Act—that broadly protects the States' right "to tax and regulate the business of insurance."  *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 218 (1979).

Moreover, unlike the substantive antitrust laws that the Government is tasked with enforcing, McCarran-Ferguson immunity is a jurisdictional doctrine.  *See Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1330, 1335 (11th Cir. 2004) (dismissing federal antitrust claims for lack of subject-matter jurisdiction because McCarran-Ferguson immunity applied).  The Government thus has no special interest in interpreting or construing this Act, even to the extent that it intersects with the antitrust laws.  Instead, courts are "quite capable of addressing issues involving their own jurisdiction" without external intervention.  *See Mar. Tug & Barge, Inc. v. Royal Indem. Co.*, 228 F. App'x 914, 915 (11th Cir. 2007).

Finally, it is not even clear that the Government is entitled to submit a view on this matter at all.  The Government has justified its "Statement of Interest" by citing 28 U.S.C. § 517.  (*See* Statement at 2.)  At least one court in this district has found that § 517 does not create the right asserted by the Government.  *See United States v. Salus Rehab.*, No. 8:11-CV-1303-T-23TBM, 2017 WL 1495862, at *1 (M.D. Fla. Apr. 26, 2017) ("Nothing about Section 517 supports an intent to create in the [Government] the right to appear and submit argument in any case in which the United States articulates a generic interest in the 'development' and the 'correct application' of the law.")  There is thus no basis to afford the Government's views on this topic any special weight.[1]

**II.     The Government's Views Are Wrong As a Matter of Law**

The Government's submission also misapplies governing law.  Although it

---

[1] It bears noting that the Government's stake in this issue is not neutral.  In advocating a narrow interpretation of the McCarran-Ferguson Act, the Government is necessarily seeking to expand its enforcement authority.  Such a vested interest does not warrant significant deference—at least not when presented through a Statement of Interest in a private dispute.  *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988).

correctly observes that McCarran-Ferguson immunity applies to conduct that (i) "is part of the 'business of insurance,'" (ii) "is regulated by state law," and (iii) "does not constitute a boycott of unrelated transactions," *Gilchrist*, 390 F.3d at 1330 (*see also* Statement at 6), the Government is wrong that the first and third elements are not satisfied here.[2]  In fact, all three elements of McCarran-Ferguson immunity are present.

A.      **Florida Blue's Use of Exclusive Agents Is the "Business of Insurance"**

An activity is "part of the business of insurance if it has 'the effect of transferring or spreading a policyholder's risk,' is 'an integral part of the policy relationship between the insurer and the insured,' and is limited to entities within the insurance industry." *Id.* at 1331 (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)).  The Government contends that Florida Blue's exclusive agency arrangements fail the first two elements of that test.  (*See* Statement at 7.)  The Government is wrong on both counts.[3]

i.      **The Exclusivity Policy Transfers or Spreads Risk**

The Government claims that the conduct at issue is not "the business of insurance" because Florida Blue's exclusive agency relationships are "logically and temporally unconnected to the transfer of risk from any policyholder to Florida Blue." (Statement at 8.)  In particular, the Government argues that exclusivity is "separate from the issuing of policies" and does "not involve policyholders."  (*Id.*)  The Government is mistaken on both the law and the alleged facts.

---

[2] The Government "takes no position as to whether Florida Blue's exclusivity policy is regulated by state law."  (Statement at 6 n.5.)

[3] The Government does not dispute that the third element of the "business of insurance" test is satisfied: that "the practice is limited to entities within the insurance industry."  (*See* Statement at 7.)

The Government derives its "logical and temporal" test from the Supreme Court's decision in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982). (*See* Statement at 8.)  In that case, the Supreme Court held that an insurance company's use of a peer review committee to assess the necessity of medical treatments and the reasonableness of charges prior to reimbursement was not part of the "business of insurance" because the committee "play[ed] no part in the 'spreading and underwriting of a policyholder's risk.'"  *Pireno*, 458 U.S. at 130 (quoting *Royal Drug*, 440 U.S. at 211).  The Court noted that "the challenged peer review arrangement is logically and temporarily unconnected to the transfer of risk accomplished by [the insurance company's] insurance policies.  The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered."  *Id.*  Accordingly, the peer review committee did not take part in the transfer of risk, which was already completed before it was ever asked to opine on the risks that had previously been transferred.  *See id.*

The same is not true of Florida Blue's exclusive agents, who play a critical role in entering insurance policies and thus the transfer of risk.   (*See, e.g.*, Am. Compl. ¶¶ 7, 54, 122 (alleging that Florida Blue's exclusivity arrangements drive enrollees to its plans); *see also* Mot. to Dismiss at 7–9.)  Indeed, this is precisely why the Fifth Circuit held that exclusivity arrangements "inevitably involve[] the transferring or spreading of risk":  such agreements prevent competitors from "siphon[ing] off" customers and "alter[ing] the composition of the policyholders" in a plan, which would affect the plan's "ability to spread risk."  *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 744 (5th Cir. 2015).

The Government attempts to distinguish *Sanger* by arguing that the exclusivity arrangement in that case implicated the spreading of risk only because it (i) was enforced by the broker rather than the insurer; and (ii) "affected the nature and scope of risks insured under a single policy for a single customer." (Statement at 10.) Nothing in *Sanger* supports such a restrictive read. To the contrary, the Court spoke broadly about the need to enable brokers "to funnel a broad risk pool to particular insurers." 802 F.2d at 744.[4]

The Government also insists that Florida Blue's reading of *Sanger* is incorrect because "numerous practices that in no way serve to 'spread risk' enable an insurer to prevent its competitors from 'siphoning off' customers." (Statement at 9.) The Government offers a list of hypotheticals, including mergers, acquisitions and IT infrastructure sabotage. (*Id.* at 8–9.) This is a red herring. Like the review committee in *Pireno*, these business dealings are divorced from the execution of an insurance contract and thus the spreading of risk among insureds. The same is not true of "routine dealings between insurers and brokers or agents," which "most courts have held . . . constitute the business of insurance." *Sanger*, 802 F.3d at 744; *see also Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 68 (1st Cir. 2005); *Owens v. Aetna Life & Cas. Co.*, 654 F.2d 218, 226 (3d Cir. 1981).[5]

---

[4] Such reasoning applies with equal force here, even taking into account the Affordable Care Act's ("ACA") risk-adjustment payments. Although such payments reallocate funds from plans with lower-risk enrollees to plans with higher-risk enrollees, 42 U.S.C. § 18063, each insurer's enrollments still implicate the spreading and transfer of risk. Indeed, Aetna cited the imbalanced risk pool and "inadequate risk adjustment mechanism" as a key reason for ceasing its sales of ACA plans in several states, including Florida. Press Release, Aetna, Aetna to Narrow Individual Public Exchange Participation (Aug. 15, 2016) http://investor.aetna.com/phoenix.zhtml?c=110617&p=irol-newsArticle&ID=2195571 (last accessed May 7, 2019); *see also* Nathan Bomey, *Aetna's Exit Deals Blow to Obamacare, Patients*, USA Today, Aug. 16, 2016, https://www.usatoday.com/story/money/2016/08/16/aetna-obamacare-affordable-care-act-exchanges/88825798/.

[5] The Government ignores these cases, and instead cites the same Western District of North Carolina case trumpeted by Oscar in its opposition papers. (*See* Statement at 8 n.6; Opp'n at 5–6.) That case—*Ray v. United*

### ii.     Exclusivity Is an Integral Part of the Policyholder Relationship

The Government disputes the second element of the "business of insurance" test—whether the challenged conduct is an integral part of the policyholder relationship— only by wishing away the established law of this Circuit.  As set forth in Florida Blue's Motion to Dismiss, the Fifth Circuit (pre-split) has held that "[a]n important factor" in assessing whether an exclusive agency arrangement constitutes the business of insurance is whether the exclusivity requirement "concern[s] the agent's insurance dealings as such." *Thompson v. New York Life Ins. Co.*, 644 F.2d 439, 444 (5th Cir. 1981).  If the restriction does not "force [the agent] to engage in activities unrelated to insurance," but instead offers an agent "various incentives" so that the agent will "agree to focus all his entrepreneurial skills solely on selling insurance," then the element is satisfied.  *Id.*  Florida Blue's exclusivity arrangements plainly meet this standard.  (*See* Mot. To Dismiss at 9–10.)

The Government does not dispute *Thompson*'s holding, nor does it dispute that Florida Blue's use of exclusive agents satisfies the *Thompson* test.  Rather, the Government asserts that *Thompson* does not survive the Supreme Court's *Pireno* decision. (Statement at 11.)  The Fifth Circuit plainly disagrees, as it has relied on *Thompson* as recently as 2015 for the very proposition that the Government now declares defunct. *See Sanger*, 802 F.3d at 744–45.  The Government thus invites this Court to "transgress[] the fundamental rule that courts of this circuit are bound by the precedent of this circuit." *In re*

---

*Family Life Ins. Co.*, 430 F. Supp. 1353 (W.D.N.C. 1977)—predates *Royal Drug* and *Pireno*, and runs counter to even contemporaneous judicial thinking on the issue.  *See, e.g.*, *Black v. Nationwide Mut. Ins. Co.*, 429 F. Supp. 458 (W.D. Pa. 1977), *aff'd*, 571 F.2d 571 (3d Cir. 1978).  At bottom, a lone citation to a decades-old, out-of-circuit case—which, unsurprisingly, has never been cited favorably by a federal appeals court—cannot save Oscar's Sherman Act claims.

*Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015).

In any event, the Fifth Circuit's decision in *Thompson* is consistent with the Supreme Court's analysis in *Pireno*.  The "*Pireno* factors" that the Government identifies as missing from *Thompson*—such as "the relationship between insurer and insured" and a policy's "reliability, interpretation, and enforcement" (Statement at 11)—actually derive from a pre-*Thompson* Supreme Court decision called *SEC v. National Securities, Inc.*, 393 U.S. 453 (1969).  Those factors (and that case) were in fact central to the *Thompson* court's analysis.  For instance, the *Thompson* court made clear that "the proper focus of [the] inquiry should be upon the impact of the challenged activity or restriction on the insurer/insured relationship."  644 F.2d at 443.  And the *Thompson* court's test—"whether 'the participation of the agent in the alleged scheme concerned the agent's insurance dealings as such'"—was thought to provide "a strong indication" as to whether the alleged conduct "has a bearing on the core relationship between insurer and insured."  *Id.* at 444.  The Government is thus incorrect that the *Thompson* "court ignored the policy and the policyholder," or that its decision is otherwise inconsistent with binding Supreme Court precedent.  (Statement at 11.)

Applying the correct legal standard, Florida Blue's exclusive agency relationships are plainly part of the business of insurance.  (Mot. to Dismiss at 7–11.)

**B.  The Narrow Exception to McCarran-Ferguson Does Not Apply**

The Government next argues that, "[e]ven if Florida Blue's exclusivity policy could constitute the business of insurance," the McCarran-Ferguson Act does not apply because of the narrow exception for instances of "boycott, coercion or intimidation."  (Statement at 12.)  That is wrong for the reasons explained in Florida Blue's Motion to

Dismiss—namely, that exception applies only where there is "concerted action," and Oscar's attempt to allege concerted action fails as a matter of law.  (Mot. to Dismiss at 13–14.)

The Government argues that the exception includes both unilateral and bilateral conduct because "the statute speaks separately of an 'act of boycott, coercion, or intimidation' or 'any *agreement* to boycott, coerce, or intimidate.'"  (Statement at 15.)  But the Supreme Court has already held that "conduct by individual actors falling short of concerted activity is simply not a 'boycott'" under the McCarran-Ferguson Act, *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 555 (1978), even though the Act mentions both an "act of boycott" and an "agreement to boycott."  The Government's argument is therefore at odds with this binding precedent.

The Government's remaining arguments are equally unpersuasive.  For instance, the Government complains that requiring concerted action would render Sherman Act prohibitions on "certain unilateral conduct . . . inapplicable in this context, without any indication that such a limitation was intended."  (Statement at 15.)  But, of course, there is an indication that such a limitation was intended:  the legislative history of the Act "distinguished between monopolistic practices on the one hand and boycott, coercion or intimidation on the other," suggesting that misbehavior by a monopolist does not fall within the exception to the Act.  *See Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 934 (9th Cir. 1983).  It is thus unsurprising that "the leading treatise concludes that concerted activity is likely required to establish coercion or intimidation," *Sanger*, 802 F.3d at 747 n.12, or that the Government was unable to identify a single case with a contrary holding.

*Second*, even if unilateral action could be deemed to be coercion, Oscar has

still failed to allege coercion within the meaning of the McCarran-Ferguson Act.[6]  As the

Supreme Court explained in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993),

coercion requires the "expansion of the refusal to deal beyond the targeted transaction," such

that "unrelated transactions are used as leverage to achieve the terms desired."  *Id.* at 803.

The Government cites Florida Blue's alleged willingness to prohibit agents who violate their

exclusivity agreements from selling other forms of health insurance in other regions as

evidence of such impermissible leveraging.[7]  This argument misunderstands the appointment

process in Florida.  An agent receives one appointment from a health insurer to sell that

insurer's entire line of business.  Fl. Stat. § 626.311.  Termination of an appointment thus

applies across all lines of business by virtue of statute—not by virtue of any impermissible

leveraging on the part of Florida Blue.[8]

### CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendants'

Dispositive Motion to Dismiss for Failure to State a Claim, Florida Blue respectfully requests

that the Court dismiss Oscar's Amended Complaint in its entirety with prejudice.

---

[6] In the event concerted action is not required—which it plainly is, (*see* Mot. to Dismiss at 13–14)—the Government "takes no position on whether Oscar has alleged concerted action."  (Statement at 14 n.10.)

[7] The Government also suggests that Florida Blue leverages its purported monopoly power by withholding commissions.  (Statement at 13.)  In actuality, Oscar alleged that "Florida Blue pays CGAs a lump sum from which CGAs are responsible for distributing broker commission payments," and "CGAs have considerable leeway in distributing commission payments, and they can withhold commissions . . . if [a] broker violates the terms of Florida Blue's exclusivity policy."  (Am. Compl. ¶ 65.)  In light of these allegations, there is no basis for suggesting that Florida Blue *itself* could threaten to withhold commissions from agents.  Any contradictory allegations in Oscar's complaint are not entitled to a presumption of truth.  *See McMahon v. City of Riviera Beach*, No. 08-80499-CIV, 2008 WL 4108051, at *3 (S.D. Fla. Aug. 28, 2008).

[8] Furthermore, there is nothing coercive about terminating an agent for violating exclusivity requirements in one set of transactions.  Indeed, this may explain why at least two other circuits have held that termination of an agent's appointment for violation of exclusivity does not constitute boycott, coercion or intimidation under McCarran-Ferguson.  *See Card v. Nat'l Life Ins. Co.*, 603 F.2d 828, 832 (10th Cir. 1979); *Black v. Nationwide Mut. Ins. Co.*, 571 F.2d 571 (3d Cir. 1978) (affirming *Black*, 429 F. Supp. 458).

May 8, 2019

HOLLAND & KNIGHT LLP,

by

_/s/ Timothy Conner_

Timothy Conner, Esq.
Florida Bar No. 767580
Jerome W. Hoffman, Esq.
Florida Bar No. 258830

50 North Laura Street, Suite 3900
Jacksonville, FL 32202
(908) 798-7362
timothy.conner@hklaw.com
jerome.hoffman@hklaw.com

CRAVATH, SWAINE & MOORE LLP,

by

_/s/ Karin A. DeMasi_

Evan R. Chesler
Karin A. DeMasi
Lauren Roberta Kennedy

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com

_Attorneys for Defendants_

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 8th day of May, 2019, a true and correct

copy of the foregoing Motion was electronically filed using the ECF/CM portal system,

which will serve as such filing on all counsel of record.

*/s/ Karin A. DeMasi*
Karin A. DeMasi

-