1

1        UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
2            ORLANDO DIVISION

3

4   . . . . . . . . . . . . . . . .
                                  :
5   OSCAR INSURANCE COMPANY        :
    OF FLORIDA,                    :
6                                  :
                Plaintiff,         :
7                                  :  Case Number
    vs.                            :  6:18-CV-1944-ORL-40EJK
8                                  :
    BLUE CROSS AND BLUE SHIELD     :
9   OF FLORIDA, INC., ET AL.       :
                                   :
10              Defendants.        :
    . . . . . . . . . . . . . . . .:
11

12

         FRIDAY, AUGUST 16, 2019; 9:34 A.M.
13              MOTION HEARING
    BEFORE THE HONORABLE PAUL G. BYRON
14      UNITED STATES DISTRICT JUDGE

15

16  APPEARANCE OF COUNSEL:

17  FOR PLAINTIFF:
     Francis McDonald, Jr.
18   Steven Sunshine
     Tara Reinhart
19
    FOR DEFENSE:
20   Evan Chesler
     Karin DeMasi
21   Rebecca Schindel
     Timothy Conner
22
     FOR DEPARTMENT OF JUSTICE:
23   Jeffrey Negrette

24  _____
    Proceedings recorded by mechanical stenography.
25  Transcript produced by computer.

1       P R O C E E D I N G S

2           THE COURTROOM DEPUTY:  Oscar Insurance Company of

3   Florida versus Blue Cross and Blue Shield of Florida, Inc.,

4   et al, Case Number 6:18-CV-1944.

5           Counsel, please state your appearances for the

6   record.

7           MR. McDONALD:  Good morning, Your Honor.  For the

8   plaintiff, Oscar Insurance Company, I'm Frank McDonald, along

9   with Steve Sunshine and Tara Reinhart.

10          THE COURT:  Thank you.  Good morning.

11          MR. SUNSHINE:  Good morning, Your Honor.

12          MS. REINHART:  Good morning.

13          MR. CHESLER:  Good morning, Your Honor.

14   Evan Chesler for the defendant.

15          THE COURT:  Thank you.  Good morning.

16          MS. DeMASI:  Good morning, Your Honor.  Karen DeMasi

17   for the defendants.

18          MS. SCHINDEL:  Hi.  Rebecca Schindel, Your Honor,

19   representing the defendants.

20          THE COURT:  Good morning.

21          MR. CONNER:  Good morning, Your Honor.  Tim Conner

22   for the defendants as well.  Thank you.

23          THE COURT:  Good morning.

24          MR. NEGRETTE:  Good morning, Your Honor.

25   Jeff Negrette for the United States.

1    THE COURT:  Thank you.  Good morning.

2    All right.  Thank you.

3    Ladies and gentlemen, we're here on the defendant's

4  motion to dismiss the complaint.

5    And who will be speaking for Florida Blue?

6    MR. CHESLER:  Your Honor, with your permission,

7  Ms. DeMasi and I planned on dividing it.

8    I would address the McCarran issues, and Ms. DeMasi

9  would address the Sherman Act issues.

10    THE COURT:  That's absolutely fine.  Thank you very

11  much.

12    MR. CHESLER:  Thank you.  May we begin, Your Honor?

13    THE COURT:  Yes, sir.

14    Before we begin, I should just mention for the

15  record I have, of course, read the motion, the response, the

16  Department of Justice pleading, the response to it by the

17  defense, and the response, of course, by the plaintiff, as

18  well as every case cited by every party in every pleading.

19  So proceed with the knowledge that I have read these.  I have

20  summarized them.  I think I have digested them.  So the

21  background, you can skip through a little bit if you feel

22  comfortable doing so.

23    MR. CHESLER:  Thank you very much, Your Honor.

24  That's very helpful.

25    Your Honor, the principle question that I would like

1   to address is whether Florida Blue's use of exclusive agents

2   as one of its routes to acquiring and servicing its health

3   insurance clients is immune from antitrust scrutiny under

4   McCarran-Ferguson.

5          As I'm sure Your Honor knows, McCarran-Ferguson

6   immunizes certain activities if they meet three requirements:

7   First, that they are within the business of insurance; second,

8   that they're regulated by state law; and, third, that they do

9   not constitute agreements or acts of boycott, coercion, or

10   intimidation.

11          Let me turn first to the business of insurance.

12   And before I mention any of the cases or the criteria that

13   the cases establish, I just want to say, Your Honor, by way of

14   foundation or introduction, it's frankly hard to imagine that

15   the use of exclusive agents by an insurance company to obtain

16   and service insured clients is not the business of insurance.

17   That's what insurance companies do.  They sell insurance, and

18   then they provide service to the customers who buy the

19   insurance.  And Florida Blue does that through a number of

20   routes, one of which is the agency route that is the issue

21   here.  So I would suggest, Your Honor, that if that activity

22   is not the business of insurance, it's frankly hard to imagine

23   what is the business of insurance.

24          The Thompson case, which we cite in our papers, as

25   Your Honor knows, involved an agreement between an agent and

1    insurance company in which the court pointed out that the

2    agent received incentive benefits for selling insurance in

3    exchange for exclusivity.  And that is, in fact, what the

4    plaintiff alleges here, that the agents are incentivized by

5    Florida Blue to sell insurance.  It's exactly what the court

6    in Thompson said.

7            And I think I could actually stop there on this

8    point and say I can't imagine that there is a serious rebuttal

9    to that.  But in the interest of completeness and in case

10   Your Honor has questions about it, I want to turn for a few

11   moments to the case law on this particular issue, this first

12   element.  There are, under the cases, several criteria that

13   the cases establish for whether something is or is not within

14   the business of insurance.

15           The first one -- and according to the cases the most

16   important one -- is whether there is a spreading of risk.  And

17   I would submit, Your Honor, that the building and maintaining

18   of a customer pool for an insurance company is, in fact, the

19   way that insurance companies spread their risk.  The more

20   people, the larger the demographic, the greater age range,

21   conditions of health, et cetera, that is the way health

22   insurance companies spread the risk.  And that is, according

23   to the case law, the most important criterion for determining

24   whether something is within the business of insurance.

25           In the Sanger case, which the Fifth Circuit decided

1   in 2015, Your Honor will recall, that was a program of

2   insurance products to members of the American Veterinary

3   Medical Association, which was done through an exclusive

4   broker that had a relationship with the insurers, a broker

5   called HUB.

6           And what the court said there -- and I'm quoting --

7   is, the scheme alleged by Sanger inevitably involves the

8   transferring or spreading of risk, because HUB's role as a

9   broker is to funnel a broad risk pool to particular

10  insurance -- insurers.  And that, again, is what all insurance

11  companies do.  It's certainly what Florida Blue does, and it's

12  certainly what they use their agents to do.

13          THE COURT:  Won't Oscar suggest, as I think they

14  have elsewhere in their pleadings or perhaps during the

15  preliminary injunction hearing that we had, that spreading of

16  the risk may not be applicable in the particular context of

17  the Affordable Care Act, because the government levels that

18  risk by -- I may not be completely familiar with the

19  mechanism, but it appears that if one company has a portfolio

20  of high-risk clients and one has low-risk clients or some

21  combination of those, that the government somehow in their

22  payment or reimbursement levels that field so that the

23  brokers, by collecting the pool, are not necessarily spreading

24  the risk, but the government is spreading the risk in a way

25  that has not previously been commonplace?

7

1    MR. CHESLER:  Right.  And, Your Honor, I have two

2    answers to that.  First, it doesn't eliminate the risk.  It

3    softens the level of risk through the subsidies that the

4    Affordable Care Act provides.

5    And the second answer, Your Honor, is, I think

6    Oscar's argument proves too much.  Because since Affordable

7    Care Act is the law of the land, what that would say is that

8    the business of insurance is no longer in the business of

9    insurance, because all insurance companies participate in the

10   program, and they no longer have a risk-spreading function.

11   That would put a lot of people over at Florida Blue out of

12   business who think they're in the business of spreading risk

13   and analyzing risk, but it would literally wipe out the entire

14   exemption, which makes no sense.  It proves too much.  And

15   that's true of several of the arguments that Oscar makes, and

16   I'll come to several of those in due course as well.

17   So, I'd like to turn to the second of the elements

18   for the business of insurance, which is whether the conduct is

19   integral to the policy relationship.  And, again, the issue

20   here is, does it impact the conduct -- does it impact the

21   relationship, I should say, between the insurer and the

22   insured?

23   And, of course, providing insured people with

24   exclusive agents to whom they can go for questions, for

25   service, to purchase policies, to purchase addended policies,

1    et cetera, that, again, is obviously right at the core of the

2    relationship between the insurance company and the insured.

3    Those agents are the face of the insurance company to those

4    customers.  They are the interface between them.  So it's

5    hard, frankly, to imagine that this element of impacting that

6    relationship is not amply satisfied by the agency

7    relationship.

8            And, again, I mentioned before, this is where the

9    Thompson case mentioned specifically incentivizing agents to

10   sell the insurance.  And paragraph 7 of the amended complaint,

11   which I alluded to before, says that the exclusive agents --

12   the exclusive arrangements give the agents, quote, an

13   overwhelming incentive to sell Florida Blue's plans.  I mean,

14   the complaint uses the exact same word as the case law does.

15           Now, Oscar relies on the Ray case from the Western

16   District of North Carolina, which has never been cited by a

17   Court of Appeals, was cited four years before the Thompson

18   case, and it was, Your Honor -- unlike this case, which is a

19   challenge to our exclusive agency relationships, Ray was a

20   case involving the termination of an agent.  It was an

21   employment issue, whether the agent had been wrongfully

22   terminated or not.  This is not a wrongful termination case,

23   Your Honor.  It's a case about our business model.  And so

24   they're not the same thing.

25           And I would point out that in the same year, in any

1   event, in the same year that the Ray case was decided in North

2   Carolina, the Black v. Nationwide case was decided in the

3   Western District of Pennsylvania, in Pittsburgh, which, unlike

4   Ray, went up to the Court of Appeals and was affirmed by the

5   Third Circuit.  And in that case, even though it involved the

6   termination of an agent, the court in that case held that it

7   was the business of insurance.

8           So at best, you have one case in North Carolina

9   going one way, another case in the same year in Pennsylvania

10  going the other way, which -- and the latter case affirmed by

11  the Court of Appeals, which Ray never was.

12          The third element with respect to the business of

13  insurance is whether the conduct is limited to entities within

14  the insurance industry.

15          Now, here, I think Oscar, frankly, mischaracterizes

16  what this issue means.  Their argument seems to be, can you

17  find the same conduct in other industries?  So let me give

18  Your Honor an example, if I may.

19          Suppose this case were about an insurance company

20  refusing to pay refunds or rebates if you cancel your policy

21  before its term is over.  According to Oscar, the issue would

22  be, can you find other industries in which companies don't

23  give you a refund if you cancel your contract early?

24          Well, that happens in virtually every industry.

25  That, again, proves too much.  It would wipe out the

1   exemption.

2          In fact, what this element means is whether the

3   conduct as practiced is practiced in such a way as it, in

4   fact, only affects entities within the insurance industry.

5   And I don't think, again, there's any question that Florida

6   Blue's use of exclusive agents to sell its health insurance

7   policies only affects entities within the insurance industry.

8   They're only selling insurance to people who want insurance.

9          Now, Oscar also cites a couple of other cases.  They

10  cite the IAB case that says it's not the business of

11  insurance, but that was the sale of trade association

12  memberships.  So it wasn't, in fact, the sale of insurance.

13         And the American Family Life case was a fight

14  between two companies about poaching agents from one another,

15  the kind of thing that goes on in stock brokerage business.

16  It goes on in the technology businesses.  It wasn't about the

17  business of insurance.  It was about a personnel fight for

18  resources.  So I don't think any of those cases, with respect,

19  is apposite here.

20         THE COURT:  What do you make of Pireno where the

21  Supreme Court was dealing with chiropractors who challenged

22  the peer-review process, and the holding essentially turns on

23  the fact that the peer-review process is not limited to the

24  business of insurance?

25         Now, Justices Rehnquist and O'Connor dissented.

1   They found that that was, in fact, part of the claims

2   adjustment process and integral.

3          MR. CHESLER:  Right.  Right.

4          THE COURT:  So is there an analogy to be drawn

5   between the claims adjusting process, that is, the peer review

6   that we saw in Pireno, and the role of brokers, where

7   plaintiff may argue that brokers are used in a variety of

8   settings not unique to insurance?

9          MR. CHESLER:  Yeah.  I don't think so, Your Honor.

10          First of all, these brokers are not used in any --

11   these particular brokers in any context other than insurance.

12          Second, I believe what the Supreme Court said in

13   that case was that it also had to do with the spreading of

14   risk, and that policy didn't affect the spreading of risk.

15   Whatever risk was assumed by the company was there by virtue

16   of which clients it had signed insurance policies with.  So it

17   was an issue that didn't go to the first and what the cases

18   say is the most important element of the business of

19   insurance.  So I just don't think it bears on the issue that's

20   before us here.

21          If I may, Your Honor, I'd like, then, to turn to the

22   second element of McCarran, immunity, which is whether this

23   activity is regulated by the state.  And again, for a moment,

24   before I talk about what the cases say, I want to start with

25   the common sense of it, if I may, which is everybody

1   understands that the insurance industry is regulated.  It's

2   not regulated by the federal government.  So by deductive

3   reasoning, the question is, if the federal government is not

4   regulating insurance and it's regulated, which everybody knows

5   it is, who is regulating it?  Well, of course, the answer is,

6   obviously, the states are regulating it.

7          And it's hard to imagine that anyone could conclude,

8   frankly, that Florida Blue's business in Florida is not

9   regulated by the State of Florida.  The Florida Insurance

10  Commission has broad power to regulate, to investigate issues

11  within the industry.

12         The statute, 626.112, deals specifically with the

13  requirements with respect to licensing of agents.  So the

14  state regulates the licensing of agents.  I'm sure Your Honor

15  will remember at the preliminary injunction hearing, we had a

16  big stack of all the people who had licenses in the State of

17  Florida to sell insurance.

18         The Gilchrist case, which we cite, talks

19  specifically about the fact that states regulate both the

20  business of insurance and, in that case, the particular aspect

21  of it that was involved.  Here, it's agency.  And the state

22  regulates agency.

23         And, Your Honor, there's a couple, again, of basic

24  points here.  Oscar has, as I'm sure Your Honor knows, sued us

25  in this case for saying that this exclusive agency model

1   violates Florida state law.  It's hard for me to imagine how

2   they can then say the State of Florida doesn't regulate this

3   activity if they purport to have a cause of action arising

4   under the law of this state for this activity.

5          They also say -- in the section of the argument that

6   Ms. DeMasi will address, they say that state regulation is a

7   barrier to entry in their discussion of market power.  But in

8   this section, they say that there is no state regulation and,

9   therefore, we're not entitled to McCarran immunity.  And I

10  would submit they can't have it both ways.  It's pretty clear

11  it is regulated.  It's heavily regulated.

12         Now, they point to an exchange of e-mails which they

13  rely upon, which is referenced in the complaint, so it's not

14  extraneous matter.  And when you look at those e-mails,

15  Your Honor, what they involve is what was involved in the Ray

16  case, a termination of an agent, not the question of whether

17  agencies are lawful or exclusive agencies violate the

18  antitrust laws or state law.  It was a question of whether it

19  was the state's role to interject itself into the termination

20  of an employee who didn't want an exclusive arrangement and

21  was terminated.

22         That's a personnel matter.  Of course, it was

23  reasonable for the state to say, leave that to yourselves.

24  It's a private matter.  It's not a public law matter.  That's

25  not what this case is about, just as Ray is not what this case

1    is about.

2          Now, with respect to the case law, just briefly,

3    Your Honor, I mentioned the Thompson case, which, by the way,

4    I think is a binding case on this Court, because it was

5    decided by the Fifth Circuit before the split off of the

6    Eleventh Circuit.  And it, of course, just says flat out that

7    exclusive agency relationships are within the business of

8    insurance.  And that case could not have been decided that way

9    if the court believed that there was no state regulation of

10   exclusive agencies because it would have failed the second

11   element of the three-element test.

12         So, I think the existence of the Thompson case is

13   itself pretty compelling support for the proposition that the

14   regulation by the state element of the test is satisfied.

15   As I mentioned before, Gilchrist is to the same effect.

16         Now, Ray cites -- excuse me -- Oscar cites the Ohio

17   Medical Indemnity case from the Southern District of Ohio back

18   in the '70s.  And that case, interestingly, says, quote -- I'm

19   quoting from the opinion -- There are no reported cases

20   holding that a particular state does not regulate the business

21   of insurance.

22         And the court went on to say, the question really is

23   whether the State of Ohio has preempted the regulation of the

24   business of insurance by its statutory scheme.  The Court

25   holds that the state has done so, albeit by a system of

1    non-regulation.

2              So even in that case where Ohio did not purport to

3    regulate a particular activity, the court said the question

4    was, nevertheless, whether it preempted the field.  It had.

5    And whether a particular activity was or was not addressed by

6    the state regulatory scheme was irrelevant, according to the

7    case which Oscar has cited.

8              And then we turn, Your Honor, to the Feinstein case

9    in the Ninth Circuit, which I'm to going to come back to under

10   the third element, the coercion element.  But in the Feinstein

11   case, the court said on this issue of state regulation -- and

12   I'm quoting -- It is not necessary to point to a state statute

13   which gives approval to a particular practice, rather it is

14   sufficient that a state regulatory scheme possess jurisdiction

15   over the challenged practice.

16             And, again, I would be interested to hear how it

17   could be that the State of Florida has no jurisdiction over

18   this practice when Oscar has sued us for violating Florida's

19   state law with respect to this practice.

20             Now, if they're going to concede that there is no

21   jurisdiction for their state law claim, that would be welcome,

22   but I don't believe they're going to say that.  And it's

23   inconsistent with their position that there is no state

24   regulation here for that prong of the test, which leads me,

25   Your Honor, to the third and final element of the McCarran

1    immunity, which is whether or not there is a -- an agreement

2    or an act of boycott, coercion, or intimidation which would

3    carve it out from under the McCarran exemption, if it existed.

4    And, of course, the issue that the parties are debating there

5    is primarily whether there is a requirement of concerted

6    action or not with respect to that activity.

7              We believe there is.  And --

8              THE COURT:  When you say "that activity," are you

9    referring to boycott, coercion, or intimidation?  Clearly,

10   boycott case law requires concerted action.  I'm fairly

11   confident I read at least one case indicating directly that

12   concerted action is not necessary for coercion or

13   intimidation.

14             MR. CHESLER:  Yes.  And there are -- yes.  And we're

15   talking about coercion and intimidation, right, because I

16   don't believe there is a boycott allegation here.  So let me

17   turn to that, Your Honor.  And why do we say that coercion and

18   intimidation do require concerted action?  Well, I think we

19   have to begin by looking at the origin of the statute -- of

20   the McCarran-Ferguson statute.

21             In the Royal Drug case, the Supreme Court explained

22   to us that the statute arose in the wake of the Southeastern

23   Underwriters opinion the Supreme Court issued back in 1944.

24   Now, what did that case involve?  It involved a criminal

25   price-fixing conspiracy by insurance companies and those

1   insurance companies coercing others who had not joined the

2   conspiracy to come into the conspiracy.

3           And the question in the case was whether the

4   commerce clause of the Constitution granted the Congress the

5   power to regulate interstate insurance transactions.  Before

6   that decision, the presumption was that it didn't.  And what

7   the Supreme Court said was, insurance is no different from any

8   other business.  If it affects interstate commerce, the

9   Congress has the ability to regulate it.

10          And here's a critical passage, Your Honor, from the

11  Southeastern case, which I'd like to quote and I hope the

12  Court will focus on.  The court said -- it was referring to

13  the absence of federal legislation at the time which regulated

14  insurance.  And the court said that that absence, quote, does

15  not even remotely suggest that any Congress has held the view

16  that insurance alone should be permitted to enter into

17  combinations -- combinations for the purpose of destroying

18  competition by coercive or intimidatory practices.  So what

19  the Supreme Court was specifically focused on -- and said so

20  -- was the issue that the Congress plainly had authority to

21  address combinations that involved intimidation or coercion.

22          And as the Supreme Court then says in Royal Drug in

23  the 1970s, Congress then enacts a statute which is intended to

24  provide a limited exemption for insurance from federal

25  antitrust regulation -- not an entire exemption, but a limited

1    exemption -- and to leave, subject to antitrust scrutiny,

2    the conduct which was involved in the Southeastern case which

3    provoked the legislation.  And the conduct, again, by the

4    court's own description, was combinations that are used for

5    the purpose of coercion or intimidation.

6              Now, we turn to the major antitrust treatise we all

7    became familiar with in law school, the Areeda treatise, and

8    there are two paragraphs in paragraph 220(a) -- in

9    Section 220(a) of the treatise.  Interestingly, Oscar points

10   to the first paragraph, but not the second paragraph.

11             And what the second paragraph of Section 220(a)

12   says -- and I'm quoting -- is, quote, Since the St. Paul

13   decision -- which is a 1978 Supreme Court case, St. Paul

14   against Barry.  Since St. Paul, the lower courts have divided

15   on the question.  And Your Honor indicated you saw at least

16   one case that said it doesn't require.

17             And Areeda goes on to say, Helpful, but certainly

18   not dispositive, is that Section 3(b) was drafted by taking

19   language out of the Southeastern Underwriters case, which

20   refers to a conspiracy to boycott, coerce, or intimidate, thus

21   suggesting that concerted action was contemplated by all

22   three.  The most persuasive discussion is contained in the

23   Ninth Circuit's Feinstein decision, which also concluded that

24   all elements of Section 3(b) exception required concerted

25   action.

1        And the Areeda treatise goes on to point in support

2   of that statement to the legislative history of the McCarran

3   statute.  And I think, Your Honor, it's worth pausing on that

4   legislative history just for a moment.

5        Senator Ferguson, the co-sponsor of the

6   McCarran-Ferguson statute, in the legislative history

7   distinguishes between what he calls monopolistic practices on

8   the one hand, which were exempted from antitrust liability,

9   assuming that they were the business of insurance and they

10  were regulated by the state, and boycott, coercion, and

11  intimidation, on the other hand, which were not exempted.

12  That's exactly consistent with what the Southeastern case did,

13  focusing on combinations.  Senator Ferguson draws exactly the

14  same distinction.

15       And I'll get to some other legislative history in a

16  moment which makes it even more explicit.  But it appears,

17  Your Honor, that what's going on here is that the senator was

18  focused on exactly the distinction between Sections 2 and

19  Section 1 of the Sherman Act.

20       Section 2, as Your Honor knows, deals with monopoly

21  practices, monopolization, unilateral conduct by a single

22  entity that monopolizes a defined market, and engages in

23  conduct by itself which has the effect of monopolizing that

24  industry.  Whereas Section 1, it deals with combinations or

25  agreements in restraint of trade.

1        What Senator Ferguson was plainly doing was saying,

2   look, if we're talking about a Section 2 situation, if we're

3   talking about monopolistic practices, somebody who is engaged

4   in conduct that is, in fact, monopolizing a defined market,

5   that's going to be subject to antitrust scrutiny if it meets

6   the other criteria -- if it doesn't meet the other criteria.

7   Whereas combinations -- I'm sorry -- is going to be exempt

8   from antitrust scrutiny if it meets the other criteria of the

9   exemption.  Whereas combinations in restraint of trade are,

10  in fact -- if they involve coercion, intimidation, or boycotts

11  are, in fact, going to continue to be regulated, which is

12  exactly what the case law said in Southeastern.  It's what

13  Hovenkamp and Areeda observed, and it's what Senator Ferguson

14  said.

15        And if you think about it, Your Honor, I think it

16  makes pretty good sense.  Because if you think about what the

17  Sherman Act, Section 2, involves, monopolies, they are

18  inherently coercive.  By definition, you are forced to deal

19  with the monopolist, because they're the only game in town.

20  And so, the conduct that the monopolist engages in to either

21  acquire or maintain that monopoly is inherently coercive.

22        If Senator Ferguson was drawing a distinction,

23  therefore, between monopolistic practices, which is his

24  phrase, and other unilateral conduct, there is no distinction.

25  He'd be referring to exactly the kind of conduct that is a

1    monopolistic practice.

2         The only basis for a logical distinction between

3    referring to monopolistic practices, on the one hand, and

4    boycott, intimidation, and coercion, on the other hand, is if

5    there is a distinction of who is participating because,

6    otherwise, the second falls into the category of the first.

7    There is no distinction.  And if there's any doubt about that,

8    Your Honor, the statement by Senator O'Mahoney in the same

9    legislative history, it seems to me, nails that down clearly.

10   Here's what Senator O'Mahoney said.

11        Quote:  My judgment is that every effective

12   combination or agreement to carry out a program against the

13   public interest of which I have had any knowledge in this

14   whole industry would be prohibited by Section 3(b).

15        He didn't say any conduct, any unilateral conduct,

16   any coercive conduct, any intimidating conduct.  He said

17   any -- every effective combination or agreement that has the

18   effect of coercing or intimidating.  So the stat- -- the

19   senators who addressed this when the statute was enacted

20   plainly were drawing a distinction between unilateral and

21   collective action.

22        And, Your Honor, as we all know, you can't conspire

23   with yourself.  And these are our agents.  They have exclusive

24   relationships with us.  And when you look at what Oscar has

25   pled here about these agents -- let me just cite to three

1  paragraphs.

2          Paragraph 65 of the amended complaint says that

3  Florida Blue, quote, works in concert with the contracted

4  general agencies.  Works in concert.

5          Paragraph 66, it says Florida Blue, quote, through

6  its agents, unquote -- and it describes them as, quote, help

7  police and enforce exclusivity.

8          And then in paragraph 128, they say that Florida

9  Blue requires their CGAs to impose exclusivity on agents and

10  that the threats of termination are sent by CGAs, quote, at

11  the direction of Florida Blue.

12          They have, in those paragraphs, Your Honor, plainly

13  pleaded the elements of an agency:  Acknowledgment by the

14  principal that the agent will act for it, the agent's

15  acceptance of that responsibility, and control by the

16  principal over the actions of the agent.  They're all pled in

17  the complaint.  And we can't conspire with our own agents.

18          So, in fact, if, as we believe is absolutely clear

19  from the legislative history, from what the Areeda treatise

20  says, from what the Feinstein case says in the Ninth Circuit,

21  which is cited by Areeda as the most compelling authority on

22  the question, we believe that there is a collective action

23  requirement, that it cannot be met here on the face of the

24  complaint given the nature of the allegations of conspiring

25  with our own agents and, therefore, Your Honor, the exemption

1    applies.

2         Just two other points and then I'll stop,

3    Your Honor, unless you have any questions.

4         Even if -- even if Your Honor finds somehow that we

5    can conspire with our own agents to satisfy the collection

6    [sic] action requirement, this is, as we point out in the

7    papers, nothing more than concerted agreement to terms.

8    It's agreeing on what the terms are under which we will do

9    business.  And that's what the Hartford Fire case involved in

10   1993, the Supreme Court case, where the Supreme Court said

11   that a boycott must involve expansion of refusal to deal

12   beyond the targeted transaction leveraging from some other

13   transaction.  And then it said, concerted agreement to terms

14   is not coercion or intimidation, quote, precisely what is

15   protected by McCarran-Ferguson immunity.  That's at 808 and 06

16   of the U.S. reported decision.

17        So even if there were an ability to conspire with

18   our own agents, Your Honor, it's not intimidation or coercion.

19   It's concerted agreement to the terms.  There is no leveraging

20   here.  The agents get one appointment statewide to sell all of

21   our health insurance policies.  We're not leveraging to some

22   other transaction.  The only way to terminate an agent is to

23   terminate her appointment.  It's a single, unibody

24   appointment, if you will, to sell insurance products in the

25   State of Florida.  There's no leveraging of something else.

1    And, therefore, Your Honor, I think the immunity applies.

2           My last point, Your Honor.  If you agree with us

3    that the immunity applies and, therefore, the federal

4    antitrust claims should be dismissed, then the state antitrust

5    claims should be dismissed as well.

6           The state law clearly in Florida is that the state

7    antitrust law is parallel to federal antitrust laws.  If there

8    is no antitrust claim at the federal level, then there should

9    be no antitrust claim at the state level.

10           And, in fact, there's a state statute, 542.20, which

11   explicitly says that any conduct or activity exempt under

12   Florida statutory or common law or exempt from the provisions

13   of the antitrust laws of the United States is exempt from the

14   provisions of this chapter.  So the exemption would apply at

15   both the federal and state levels.

16           Unless Your Honor has any questions --

17           THE COURT:  No, more of an observation.

18           And you cite -- you and your colleagues cite McWane,

19   Inc. versus FTC from the Eleventh Circuit, 2015, which is, of

20   course, binding and where the court held that exclusive broker

21   arrangements are lawful and gives the caveat that they can run

22   afoul of antitrust if used to maintain monopoly power.

23           So, I just wanted to note that while you were

24   speaking about collective action versus unilateral action --

25   I mean, concerted action versus non-concerted action for

1  purposes of coercion and intimidation and whether they should

2  be viewed the same as the body of law on boycott, and even if

3  I were to find it could be unilateral, I assume it's your

4  position that the activity is protected under McWane and other

5  case law saying -- or holding that exclusive brokerage

6  agreements and arrangements are, in fact, lawful.

7          MR. CHESLER:  Yes, Your Honor.

8          THE COURT:  It's the way they're applied that can

9  make them problematic, but not the existence itself.

10          MR. CHESLER:  Exactly, Your Honor.  Exactly.

11          THE COURT:  I think the best way to proceed is to

12  have response on this issue, then we'll go to the second phase

13  so it doesn't become --

14          MR. CHESLER:  However you wish.  Thank you.

15          THE COURT:  Thank you.

16          Mr. Sunshine, I don't want to preempt your argument,

17  but Thompson from the Fifth Circuit, which is binding on me,

18  and is affirmed again in Sanger, which is not binding but

19  which refers, of course, to Thompson versus New York Life,

20  1981 Fifth Circuit case at 644 F.2d 439, unambiguously holds

21  that the relationship between a broker and the insurer is the

22  business of insurance.  Why is that not good law?

23          MR. SUNSHINE:  Your Honor, I think that's it --

24  it's a statement of general law.  I will go through the

25  Supreme Court cases.  I'll go through Gilchrist.  I'll go

1    through Thompson.

2            But just to answer your question precisely, on

3    page 44 -- sorry -- page 444 of the Thompson decision, the

4    Thompson decision specifically notes -- let me just find my

5    reference to it.  But that decision specifically notes -- and

6    I'm quoting -- Clearly not all provisions that could be placed

7    in an agency contract are all dealings are exempt.  And it

8    cites the Zelson case.  And it says it needs to look at the

9    insurer's scheme.

10           And I think right here is a key point here.  We're

11   not saying that an exclusive agency contract is illegal.  You

12   know, the Court pointed to McWane.  We're not saying that

13   under proper, kind of narrow scrutiny that an exclusive agency

14   contract can be covered by McCarran-Ferguson.  But what the --

15           THE COURT:  Thompson -- I'm sorry to interrupt, but

16   Thompson on page 444 goes on one paragraph down and adds this

17   language to what you just read.

18           "Instead, this optional contract --" since as we

19   know, there were two types of contracts for brokers in

20   Thompson, one with incentives and one without.  So one that

21   was exclusive and one that was not.

22           "Instead, this optional contract --" the exclusive

23   one -- "offered appellant various incentives beyond the usual

24   agency relationship so that appellant would agree to focus all

25   his entrepreneurial skill solely on selling insurance.

1   This distinction is significant and, on the facts of this

2   situation, dispositive.  Such activity, whatever its merit, is

3   within the business of insurance."

4           MR. SUNSHINE:  And I thank Your Honor for that.

5   And, again, this will become much clearer when we talk about

6   Pireno and when we talk about Royal Drug.

7           The court was specifically saying, "in this

8   instance."  In this instance, basically what the insurance

9   company said is, we -- agent, we will give you additional

10  commissions, additional compensation at your option if you

11  agree to focus on insurance.  There's nothing unreasonable or

12  wrong with that contract.  The court was very clear to say,

13  in this instance.  That's fine.  But the language that I just

14  read Your Honor was also clear that the court was not saying

15  this is a blanket exemption, and it specifically referred to

16  looking at the overall scheme.

17          And our argument here -- how ever it gets

18  characterized by Florida Blue, our argument is not that an

19  exclusive agency agreement is illegal.  Our argument is a

20  pervasive scheme by an entrenched and established monopolist

21  to tie up all or most of the brokers is a scheme that falls

22  outside of McCarran-Ferguson and obviously is in that

23  situation in McWane, Your Honor, where it's run afoul of it.

24          And, Your Honor, I can go through Pireno, Royal

25  Drug, Gilchrist, Sanger, which is also binding on this Court

1   and which actually supports our point, and then go back to

2   Thompson to show you how this all fits together and how the

3   arguments here are really at a very superficial level.  And

4   looking at exactly what's being done, what McCarran-Ferguson

5   was targeted at makes sense.  And I think we can show why the

6   Thompson case is a special situation and what controls is

7   Gilchrist.

8          THE COURT:  If I'm not mistaken, Sanger is Fifth

9   Circuit, 2015?  If so, then it's persuasive.  But I take your

10  point, because they're referring to Thompson.

11         MR. SUNSHINE:  Yeah.  And I'm sorry.  I was putting

12  emphasis on Sanger, because the -- Florida Blue put such

13  emphasis on --

14         THE COURT:  Does the timing of when Florida Blue

15  acquired its exclusive brokers matter?  So, for example,

16  you're framing it as the use of exclusive broker relationships

17  to maintain monopoly power, and that's addressed in a number

18  of cases.  But -- and, in fact, you cite -- I believe it's

19  your side that cited anti-competitive exclusion raising

20  rivals' cost to achieve power over price from the Yale Law

21  Journal, 96 -- page 2009, 1986 publication.  But that article

22  is premised upon the use of exclusive agents and brokers to

23  shore up monopoly share after another company comes into the

24  market and is the young aggressive rival, as they put it in

25  the article.

1          In this case, weren't the broker relationships

2    created at the inception of Florida Blue's entry into the

3    market or thereabouts?  And if so, does the timing matter?

4    Because introducing that to maintain monopoly power can run

5    afoul of antitrust.  See McWane, which I mentioned, but having

6    it previously is just the way that they marketed.  And framing

7    it differently doesn't necessarily change that dynamic, or

8    does that matter?

9          MR. SUNSHINE:  No.  I think, actually, it does

10   matter, Your Honor, and there's a complicated set of points

11   that come out, but let me try and address it quickly.

12         The timing matters both for the Section 2, the

13   monopoly claims.  And Dentsply will address this correctly --

14   will address this, and I'll get to it.  It says you can

15   lawfully gain monopoly power, but continued use of these

16   exclusive dealing contracts can violate -- and, in fact, the

17   court found in that situation does violate Section 2.  So they

18   can be legal in the past, but the use of them today...

19         Second point is, the complaint alleges that all of

20   these exclusivity contracts were renewed and re-upped after

21   Oscar's entry.  So to say that the exclusivity contracts were

22   in existence is not consistent with the facts pled in the

23   complaint.  The new versions of the exclusivity agreements

24   were signed up in August.  Third, the most --

25         THE COURT:  But I'm just curious if that matters,

1  though, because I'm not aware of any cases indicating that a

2  company in a market -- in a given market who has exclusive

3  brokerage contracts and renews them in the due course --

4  ordinary course of business must abandon that practice for

5  purposes of the issue we're with now, which is

6  McCarran-Ferguson, whether it's the business of insurance.

7  Because what you're talking about is, if the exemption doesn't

8  apply, is there an unlawful maintaining of monopoly power,

9  assuming we get past market share that gets a presumption of

10  monopoly power.

11        MR. SUNSHINE:  Right.

12        THE COURT:  So we don't get there until we get past

13  the exemption.  So does it matter that they renew the

14  contracts for purposes of whether it's in the business of

15  insurance, not for purposes of whether it creates a dominant

16  force or maintains a dominant force?

17        MR. SUNSHINE:  Your Honor, Dentsply absolutely

18  addresses this issue.  If you'll recall from your reading of

19  the Dentsply case, Dentsply didn't even have contracts.

20  Dentsply was all dealings at will, but an under- -- a de facto

21  understanding that it was exclusive.

22        So in Dentsply, the conduct continued all along, and

23  the court found this conduct that was taking place today

24  violated the antitrust law.  And there's even a provision in

25  the opinion itself which says Dentsply may have lawfully

1    gained monopoly power at its time, but its continued

2    maintenance is what now violates the antitrust law.  And that

3    goes back to Grinnell, Your Honor, the old established Supreme

4    Court case that says you can acquire monopoly power through

5    skill, you know, whatever, but it's the continued practices.

6              And here, Your Honor, again, I think it's wrong to

7    focus on the signing up of an exclusive agent.  What's illegal

8    is a pervasive practice to tie up the entire market.  That's

9    the difference between exclusive agency.

10             But there's also an important time connection with

11   respect to McCarran-Ferguson, Your Honor, and that is that

12   there is a time discontinuance between the relationship

13   between the insurer and the insured.  That is done at a

14   completely different time than these exclusive agency's

15   contracts are signed up, and that's fatal to McCarran-Ferguson

16   immunity in this case.

17             And, Your Honor, I'd like to kind of re-visit those

18   -- those basic points to be able to demonstrate to you why

19   actually on all three elements the McCarran-Ferguson immunity

20   just doesn't apply here.  And just to kind of put it in

21   context and to try to make sense of the arguments that we've

22   heard from Florida Blue, I want to start off with what the

23   complaint actually alleges and then the contradictions in what

24   Florida Blue is trying to say.

25             What the complaint actually says is that there's a

```
 1   set of persuasive contracts with brokers across the entire
 2   State of Florida and that this whole scheme qualifies for
 3   antitrust immunity even though the brokers' contracts are not
 4   part of the contract between the insurer, Florida Blue, and
 5   the insured.
 6            Now, that flies squarely in the face of what are
 7   axiomatic principles in every one of the cases we're talking
 8   about, Pireno, Royal Drug, Gilchrist.  All of those cases say,
 9   first of all, that McCarran-Ferguson is extremely limited.
10   It's a narrow exemption.  It's intended to protect just
11   cooperative ratemaking and the performance of insurance
12   contracts, neither one of which covers arrangements with
13   exclusive agents.
14            If we take the arguments that we have just heard --
15   in fact, we heard it doesn't even apply to monopolists --
16   there is -- the extent of that argument is that there is a
17   broad antitrust exemption for the insurance industry.  That
18   was plainly rejected in Congress in 1945.  It's been plainly
19   rejected by every Supreme Court case that's looked at it.
20   It's been rejected by Gilchrist here in the Eleventh Circuit.
21            The real question is defining into, is it the
22   business of insurance, is it regulated by state law, and is
23   there a coercion?  The regulated by state law, again, the
24   arguments that Florida Blue make basically say every state
25   regulates insurance in some way.  That would turn this into a
```

1    total exemption for the insurance industry.

2         And, in fact, the regulation here -- and I heard

3    Florida Blue argue this both ways.  They cite four provisions

4    of the statute.  Two are on licensing and appointment of

5    agents, which are extremely limited.  The other two are the

6    antitrust provisions, which then Florida Blue then says, but

7    you can't sue under the two antitrust -- the two Florida

8    provisions because of -- because of the exemption.

9         THE COURT:  In Sanger, the Court, though, held at

10   page 745 that regulated by state law is not a high bar for

11   antitrust defendants to clear.  If the state's insurance

12   industry is regulated by state law, then antitrust law does

13   not apply.  Now, you don't get there until you first cross

14   business of insurance.  So the fact that the states fairly

15   broadly regulate the business of insurance is not dispositive.

16   It doesn't -- it doesn't broaden the exemption because you

17   still have those two other prongs that you have to meet,

18   business of insurance and then, of course, the last prong, no

19   coercion, boycott, or intimidation.

20        MR. SUNSHINE:  Yeah.  I mean, I think -- and there

21   is -- there's a mix of law on that provision.

22        But I think that here, where all Florida does is say

23   that an agent has to be licensed and in order to sell an

24   insurance policy, it has to have an appointment for the

25   insurance company, and then we have a letter cited in

1    paragraph 127 of the complaint that says Florida law doesn't

2    cover exclusivity at all.  That turns McCarran-Ferguson into a

3    blanket exemption -- or, I should say, that turns the second

4    prong into a meaningless prong, because every state has some

5    insurance law.

6            So here, you would leave Florida with the Florida

7    regulators saying, this is not within our purview.  This is

8    not something we do.  And Florida Blue saying, well, you can't

9    sue under the antitrust law.

10           THE COURT:  Has the Supreme Court or the Eleventh

11   Circuit defined what regulated by state law means any more

12   clearly than what I just said?

13           MR. SUNSHINE:  I don't believe so, Your Honor.

14   I don't believe so.  So, I think that's unclear.  But,

15   Your Honor, I do think that by going through the business of

16   insurance, we can easily dispose of this claim.  I think we

17   can also do it by coercion.

18           And let's go right to the business of insurance,

19   because the whole purpose -- and I appreciate the reading of

20   the legislative history of the Act, but the whole purpose was

21   to protect cooperative ratemaking.

22           The Southeastern case was a criminal case against

23   insurers who were cooperating to try to put ratemaking.  And

24   the court was very -- the Congress was very clear to say, what

25   we're trying to do is to protect cooperative ratemaking.

1          THE COURT:  And the Supreme Court defines that as

2    transferring and spreading policyholder risk, right?  I mean,

3    that's the way that ratemaking -- cooperative ratemaking can

4    be protected is by allowing the parties to communicate so they

5    understand the risk they're dealing with.  But then the

6    Supreme Court states in Royal Drug that the business of

7    insurance is the transfer or spreading of policyholders' risk.

8          MR. SUNSHINE:  That's correct, Your Honor.  But it's

9    the transfer of risk between the insurer and the insured.

10          THE COURT:  Right.

11          MR. SUNSHINE:  And then what both Pireno and Royal

12    Drug do is engage in line drawing about what defines the

13    business of insurance.

14          THE COURT:  Yes, in the context of those unique

15    cases, chiropractor and the prescription drug reimbursement

16    deal between the insurer and the pharmacies that undertook

17    that business.

18          MR. SUNSHINE:  And then, Your Honor, Gilchrist does

19    the same thing.

20          THE COURT:  Every case does that.  They're drawing

21    the line.

22          MR. SUNSHINE:  And I think if we go through those

23    three cases, Your Honor, and compare it to the facts in this

24    case, you'll see why we are comfortably on the side of this

25    is -- of the -- of this pervasive scheme of agents do not fall

1   within the -- into the spreading of risk.

2          THE COURT:  Before you do and just to make -- I

3   don't want to keep interrupting you, which is why I'll do this

4   now so I can stop interrupting you.  You mentioned at one

5   point a moment ago about the brokerage -- exclusive brokerage

6   agreements are not part of the contract between the insured

7   and the insurer.  Do you feel that that is required, that the

8   brokerage agreement would have to be incorporated into the

9   contract?  Because I can't imagine that ever happens.

10          MR. SUNSHINE:  Well, I think that, Your Honor, that

11   is one of the elements that are fatal to -- to this claim that

12   these contracts are covered by McCarran-Ferguson.  It's the

13   Pireno court itself that talks about the temporal connection

14   between the contract between the insured and the insurer.

15   The fact that -- and I -- so that the fact that these occur at

16   different times and occur at different places show that they

17   are not part of the transferring of risk.

18          I think the other place where this gets, I think,

19   described very nicely is in Gilchrist on page 1333.  And what

20   Gilchrist does is it looks at the policy that was in front of

21   the court, which was having to do with -- it had to address

22   the question of class certification, and it actually dismissed

23   the case, because it decided sua sponte they didn't have

24   jurisdiction, but it looks at the use of OEM parts to repair

25   cars.  It compares it to Royal Drug, which was pharmacy

1   agreements.  And it compares it to Pireno, which was the

2   contractor's review.  And what each of those cases do is they

3   look at the underlying contact.

4          In each of those cases, the court says, we

5   understand that there's going to be some effect on premiums,

6   but to say that anything that affects premiums is affecting

7   the risk is just -- is going way too far.  And it says that

8   that would essentially insulate every business decision of the

9   insurer.  And that would fly right into the face of one of the

10  axioms that the antitrust -- that McCarran-Ferguson is to

11  protect the business of insurance, not the business of

12  insurers.

13         And just a couple of what I think, you know,

14  really -- and this is on page 128 and 129 of the Pireno

15  decision.  Every business decision in some sense has some

16  impact.  This argument proves too much.  It's plainly contrary

17  to the statutory language.  The statute protects the business

18  of insurance, not the business of review -- of insurers.

19         THE COURT:  Don't those cases usually turn on

20  whether the insured is getting the benefit of their bargain

21  regardless of the side deal?

22         So, for example, with Royal Drug, the court

23  concluded that the policyholder only cares about their co-pay.

24  They don't care about the deal negotiated between the insurer

25  and the pharmacies.  Therefore, not in the business of

1    insurance.  It doesn't go -- it's not integral to the policy

2    relationship.

3              MR. SUNSHINE:  Correct.

4              THE COURT:  Same thing with Pireno, that it's not

5    necessary because the after-the-fact claims adjustment doesn't

6    affect whether the party pays or not.

7              MR. SUNSHINE:  Right.  Same thing is true in this

8    case, Your Honor.  The policyholder here doesn't care what

9    commission the agent gets, doesn't care whether the agent is

10   exclusive.  The person who buys the policy directly over

11   the -- over the Internet gets exactly the same policy that

12   somebody bought it through the agent.

13             Those facts, Your Honor, fall flatly and precisely

14   into exactly the distinction you're making.  That's why it's

15   also logically and temporally unconnected to the spreading of

16   the risk.

17             I think there's a good notation in Gilchrist where

18   this argument once had the same kind of thing of, does this

19   affect the contract?  And the question was, you know, do the

20   claims go to the heart of the reliability, the interpretation,

21   and the enforcement of the policy?

22             Here, Your Honor, the agency contracts have nothing

23   to do with reliability.  They have nothing to do with

24   interpretation.  They have nothing to do with enforcement.

25   And in the words of Royal Drug -- Royal Drug was about the

1   drugstore.  But here on page -- again, this is on Gilchrist,

2   quoting Royal Drug on 1333:  Blue Shield policyholders are

3   basically unconcerned with the contract between the insurers

4   and the pharmacies.

5         Same thing here, Your Honor.  If you or I were to

6   buy an insurance contract from Florida Blue through the agent,

7   we couldn't care less how much commission the agent got.  We

8   couldn't care less whether it was exclusive or non-exclusive.

9         THE COURT:  Those cases, however, deal with

10  cost-saving agreements that the policyholder is not a party to

11  and doesn't care about, because it does not affect their

12  bottom line.  The other cases cited by your colleague involve

13  the specific role of a broker in spreading risk, a different

14  variety, if you will, of this analysis.

15        So, for example, in Feinstein, talking about that

16  temporal relationship, the Ninth Circuit is looking at the

17  agreement between the Medical Association for Los Angeles

18  County and the insurance company using sole and exclusive

19  agents to represent the Los Angeles County Medical

20  Association.

21        And there, the court found that it didn't matter

22  that the Los Angeles County Medical Association negotiated the

23  contract, which would be temporally different in time than the

24  policy sold, because the law generally views the intermediary

25  who negotiates the contract as an agent, either of the insured

1    or the insurer, and not as a party pursuing its own objective.

2          So why aren't brokers also agents of Florida Blue,

3    and the temporal disconnect between hiring the agent or

4    renewing the contract and selling the policy would fall under

5    the Feinstein analysis of being not dispositive?

6          MR. SUNSHINE:  Well, Your Honor -- and that's

7    exactly the reasoning in Sanger as well.  And I think where

8    both those cases are just completely opposite here is that in

9    Sanger, the broker was HUB.  In Feinstein, the broker was --

10   they were acting as the exclusive broker for a pool of

11   insureds.  They weren't acting as the broker for the insurance

12   companies.  And what they were trying to do -- Sanger is the

13   best example.  It's the case that Florida Blue relies most

14   heavily on.

15         There's a group of insureds, veterinarians, a

16   relatively small group with very specific set of risks who

17   pooled their risk, and they hired an exclusive broker as part

18   of pooling their risk to go out and get collective ratemaking

19   from a number of insurance companies.

20         And, Your Honor, at core, that is exactly the

21   activity that McCarran-Ferguson is trying to protect.  A pool

22   of insureds collect their risk.  A pool of multiple insurers

23   get together and say, let's figure out how we can most cheaply

24   cover that risk, and they did it through an agent.

25         Again, Your Honor, we're not saying that every

1   exclusive agent's contract is covered.  But what's so

2   different about this case -- let's go back to first

3   principles.  It's not cooperative ratemaking.  That's

4   conceded.  There's one insurance company here.  It's a

5   monopolist.  It doesn't need anybody else.  It's not spreading

6   risk.  And then, Your Honor, the other point that you made is

7   the ACA itself spreads that risk.  The ACA is effectively

8   acting as the veterinarian association for Los Angeles County.

9   So there is no -- the risk pooling has been done on the

10  insured's side already, and there's no cooperative ratemaking

11  here.  In fact, very much to the contrary, the whole point of

12  the scheme is to avoid other insurers coming in.

13          And, you know, I thought it was rich to see the

14  quote about siphoning off customers.  One, I think you can

15  disregard that on the Pireno and the Royal Drug about, you

16  know, affecting premiums.  But I also, you know, can't ignore

17  the McWane/Dentsply side of the equation where somehow we

18  should be worried about the dominant entrenched monopolist

19  losing a few brokers when Oscar can go out and find uninsured

20  patients and train up new brokers at the same time.  And the

21  contradiction is just -- just speaks volumes between the two.

22          And I think when you take that back to the business

23  of insurance, which -- does it spread risk, is it integral to

24  the policy relationship between the insurer and the insured --

25          THE COURT:  Don't you concede that point, though,

1    when you argue that their exclusive brokerage relationships

2    hurts Oscar, because it's cutting off a way to get additional

3    people to sign up?  In other words, it must be integral if it

4    hurts you.

5            MR. SUNSHINE:  No, Your Honor.  Because I think that

6    what that goes to is really this question about cost

7    reduction.  I mean, basically what Florida Blue is saying is,

8    is our cost would be a little bit lower.  We could offer lower

9    premiums if we had, you know, a bigger market share.

10           I think, you know, kind of the corollary of that

11   point is, we should just allow Florida Blue to have a

12   hundred percent of every market that they're in, all right,

13   which clearly the McCarran-Ferguson is not out sanctioning

14   monopolies.  And the whole purpose of the ACA is to spur

15   competition.  The whole purpose of the ACA was to put common

16   products together to pool the risk and allow different

17   insurance companies to come in and compete for that business.

18           THE COURT:  But I can't really get there.  And there

19   are a number of cases that make this observation where the

20   court states that they're not passing judgment on whether they

21   approve or disapprove of the practice.  They look at the

22   exemption and they look at the criteria for the exemption, and

23   that's where the analysis stops.  Only when you get past there

24   do you then look at market share, harm, foreclosure, whether

25   it's substantial, and all the other factors.

1        MR. SUNSHINE:  Right.

2        THE COURT:  So it's not for me to pre- -- you know,

3   to pass judgment on whether I approve of the way market share

4   is acquired or maintained.  It's whether the exemption

5   applies.  And that's a three-step analysis with the subparts

6   that we've already talked about.

7        MR. SUNSHINE:  That's right, Your Honor.  And I'll

8   put that -- put the whole McWane/Dentsply piece aside.

9        I do think, going back to the three key elements on

10  the business of insurance, right, which is just kind of prong

11  one, it's, does it spread the risk?  And I think we've already

12  talked about the risk is being spread through the ACA.  To say

13  that --

14       THE COURT:  Although the counter argument is it

15  softens the risk.  It doesn't delete it.  Otherwise -- the

16  business of insurance is, as we all know, about spreading

17  risk, taking in money and hopefully paying out less than you

18  take in, and also allowing people to pay a smaller amount to

19  avoid a catastrophic financial exposure that may or may not

20  arise in their life.  So that's what we're all about with

21  insurance, more or less.

22       But what your colleague is saying is that the ACA

23  doesn't eliminate that.  It just softens it by leveling to

24  some extent.  You first have to have bodies in the program

25  before you have risk to spread.  You have to have people with

1   high risk and low risk, pre-existing conditions, no

2   pre-existing conditions.  That whole universe of potential

3   insureds that are covered by the ACA, that group has to be

4   collected so the risk can then be spread between those who are

5   willing to enter into that market, because some have left, as

6   we learned from the last hearing, and some have stayed.  Some

7   have grown.  Some have withered by whatever -- for whatever

8   reason, their own choice or competition.

9         MR. SUNSHINE:  Right.  But I think that argument

10  goes too far in the sense of anything that could arguably come

11  back and say that has -- has increased, spread the risk, is,

12  therefore, covered under this policy.  And I think that's why

13  the other two prongs really matter:  Is it integral to the

14  relationship between the policy and the policyholder?  And is

15  it limited to practices in the insurance industry?

16        And let me speak to those 'cause I -- I think on the

17  first one, I think it goes way too far.  It doesn't really

18  spread the risk.  It's not the cooperative kind of ratemaking,

19  right?  That's what Congress was trying to do, was to protect

20  cooperative ratemaking.  There's nothing about Florida Blue's

21  program that's cooperative ratemaking.  It's all about

22  protecting itself.

23        And that's why it's so far afield from what the

24  purpose of McCarran-Ferguson is, what the Supreme Court said

25  in Pireno, Royal Drug.  And to say, oh, this -- you know, we

1    can figure out a way in which this actually somewhat reduces

2    our risk, even though that risk is reduced by the ACA, just

3    turns what, you know, what other -- which is clearly a narrow

4    exemption into a more limited one.  But more importantly, I

5    think it fails the other prongs of, is it integral to the

6    policy relationship between the insurer and the insured.  It

7    has nothing to do with the policy relationship between the

8    insured and the insurer.

9         Whoever buys a policy gets the exact same policy

10   from whoever -- from whoever buys it.  It does not affect,

11   under Gilchrist, the reliability, interpretation, or

12   enforcement.  And in Gilchrist, it kind of said, yeah, if you

13   can save some money, that arguably affects reliability, but

14   that's way too far and reads way too much into it.

15        And then lastly, the limited to entities in the

16   insurance industry, there's not a lot of case law on this one

17   way or the other.  But what the -- remember, that's a prong to

18   try to understand, is this the business of insurance?

19        And so the question, I think, that's being asked

20   under limited to entities inside the insurance industry is, is

21   this a unique device that is used in the insurance industry to

22   spread risk?  Is it a unique device that's used to perform

23   contracts?  And that's why the question that, one, these

24   practices of using schemes of exclusive agents outside the

25   antitrust laws exist.

1       But I think it's also relevant, as Oscar has alleged

2   and really hasn't been disputed, that nowhere else in the

3   country is this scheme used.  So it can't be necessary or

4   important to the spreading of risk in the insurance industry

5   if it's unique to just this particular situation.

6       THE COURT:  Doesn't the Eleventh Circuit seem to

7   acknowledge that the use of exclusive brokers in insurance is

8   an industry practice in McWane when they say that it's not

9   unlawful to have an exclusive brokerage relationship?  It's

10  only when you misuse it to maintain monopoly power that it

11  becomes a problem.

12      MR. SUNSHINE:  That's exactly my point, Your Honor,

13  that, you know, the practice of having an exclusive agency is

14  done all the time in all kinds of places.  It's the practice

15  of having a pervasive scheme that runs afoul of the antitrust

16  law.  It's also that practice that has not occurred -- to our

17  knowledge and has never been disputed by anybody else -- that

18  practice hasn't occurred anywhere else in the country.

19      My point for the Court this morning is that shows

20  that that's not a practice that's common in the -- inside the

21  insurance industry and is one that is, therefore, useful for

22  getting at, is this the business of insurance?  Does this have

23  to do with cooperative rate setting?

24      It doesn't, Your Honor.  It's a scheme to protect

25  monopoly power.  It's not what Congress was trying to get at

1   when it passed the exemption.  It's not what the Supreme Court

2   has said when it's focused on it.  It's not the way the

3   Eleventh Circuit deals with it.

4        I mean, Gilchrist, page -- right at the very

5   beginning acknowledges that ratemaking and performance of

6   insurance-based contracts are at the core of

7   McCarran-Ferguson.  That's really -- you know, and that,

8   again, as I had said, is going to the heart of reliability,

9   interpretation, and enforcement.

10       And I think, again, the cite out of Pireno and Royal

11  Drug that the challenge practice was largely a matter of

12  indifference to the policyholders, that's such a compelling

13  point for us, Your Honor, such a compelling point.  You know,

14  as I said, you or I or whoever purchases here in Orlando, who

15  gets a contract, gets the same contract regardless of who they

16  buy it from, whether they buy it direct, whether their agent

17  gets a commission, whether their agent's exclusive or not

18  exclusive, and they fail that prong as well.

19       I do also -- unless Your Honor has more questions on

20  the business of insurance, I do want to go to the coercion

21  point.  And I'm not really sure exactly what Florida Blue's

22  arguing at this point.

23       I guess I would start with the plain language of the

24  statute.  The statute says, an agreement to boycott, coerce,

25  or intimidate, or acts of boycott, coercion, or intimidation.

1   I don't think the statute could be any clearer.

2           I appreciate Florida Blue read you a lot of

3   legislative history of the Act, but I think it's pretty clear

4   what was actually passed, and then also clearly been

5   interpreted by the courts.

6           I recognize that there's one case that says boycott

7   has to be concerted, but that case does not deal with whether

8   there can be an act of coercion or an act of intimidation.

9   The idea on coercion, to say that this is all one transaction,

10  just misses the point.  I mean, the transaction is the selling

11  of ACA plans here in the Orlando area.

12          What Florida Blue, as a monopolist, has done has

13  chosen to bundle all of the transactions of all the different

14  products statewide.  And so it's a number of products, and

15  it's the entire state.  They've chosen to bundle it into one

16  contract.  That's how monopolists coerce.  That's precisely

17  the coercion that was in McWane.  That's precisely the burden

18  that was in Dentsply.

19          The bundling of it all into one place is the

20  economic coercion.  You see it in the brokers that we cite in

21  our complaint in the paragraphs in the 50s and 60s.  All these

22  brokers say, I have no choice but to resign my appointment

23  because of all the business I have elsewhere.  That is, by

24  definition, economic coercion.

25          THE COURT:  What do you make of McWane, then, where

1  the court held having an exclusive brokerage arrangement is

2  lawful?

3          So here, for example -- and we've seen this in some

4  other cases where there are exclusive arrangements.  We spoke

5  about one a moment ago where you have the two different types

6  of policy, one that had the exclusivity and the higher

7  commissions and one where you were a free agent.  You were an

8  independent contractor.

9          MR. SUNSHINE:  Right.

10         THE COURT:  So in this case, if we start with the

11 premise that exclusive business arrangements between insurers

12 and brokers is lawful, then what is coercive about saying to

13 somebody, look, you've entered into this contract of your own

14 free will, and you have to abide by the terms?

15         It's like a non-compete.  Every person who enters a

16 business -- and you could have the same argument.  They have

17 to enter the business because they have to pay their bills.

18 They need a job.  They have to have money.  So they enter.

19 They sign an agreement that says you won't compete and that if

20 you leave and compete, you get sued to enforce the agreement.

21         How is that coercive to simply enforce an agreement

22 that you entered into by a party who could say no?  There's a

23 whole lot of brokers in the State of Florida who don't work

24 for Florida Blue.

25         MR. SUNSHINE:  Your Honor, McWane is binding

1   precedent on this Court, and McWane totally sides with our

2   view.  And it's not that one exclusive agency contract is

3   illegal.  That's not what McWane says.

4          What McWane says, if you, the monopolist, enter into

5   so many exclusive agent contracts that you foreclose in large

6   part or if you foreclose people through a series of contracts,

7   McWane says you violated the law.

8          When I'm saying coercion, what's understood under

9   the antitrust laws -- it's certainly in McWane.  It's

10  certainly in Dentsply -- is economic coercion.

11         And so if you're a broker -- say, Your Honor, I'm a

12  broker.  I have had relationships with insureds all over the

13  state.  When I sign up for Oscar and Florida Blue says, you're

14  going to be terminated and lose all your business in all these

15  other places no matter how good of a deal Oscar gives you.

16  And I look at my business and say, I can't afford to lose all

17  of those others, I have to resign my commission, that, under

18  the law, is economic coercion by a monopolist.  That's what

19  McWane finds.  That's what Dentsply finds.  That is the

20  coercion that we talk about with antitrust violations.

21         But I think the coercion in this case goes beyond

22  just enforcing the contract.  Your Honor, we cite in -- I

23  think it's paragraph 59.  I'll have to go back and look.  But

24  we cite a broker who was terminated for going on a radio show.

25  He didn't violate the terms of his contract.

1          His contract was he couldn't sell -- he couldn't

2    sell Oscar insurance policies.  He went on a radio show, and

3    he got terminated.  That's coercion.  That's intimidation.

4          And moreover, Your Honor, it's really worse than

5    that, because what the complaint clearly alleges -- and I

6    think what we showed at the preliminary injunction hearing as

7    well -- is there's selective enforcement.  This is not --

8          THE COURT:  How pervasive does the -- let's assume

9    for the sake of argument that firing a person who goes on a

10   radio show is coercion.  Let's just assume that.  Dealing with

11   that one example, how pervasive must that be for the exemption

12   not to apply?  Can it be one out of 2,000 people?  Can it

13   be -- is there some number?

14         Most of the cases involve a broker suing the insurer

15   saying, I want -- you know, you've precluded me, because

16   you've left New Jersey and you're no longer in that market

17   under an agreement you have with other insurers to not compete

18   in certain markets, or something of that kind.

19         MR. SUNSHINE:  Well, Your Honor, we know there were

20   235 brokers who signed up.  We don't -- and had to terminate

21   their appointments as a result of communication.  We also know

22   that there are many brokers who refuse to talk to us, but this

23   is exactly what discovery is for.  So we're not talking one.

24   And I think the complaint amply pleads all of those facts.

25         We talk about meetings that happened in August of

1   2018, if I'm keeping my years right, where there was clear

2   statements to the market.  Call it intimidation.  Call them

3   threats.  There was letter writing.  There was the termination

4   of this guy.  And we lost at least 235 agents.  So we're not

5   talking about a single instance of coercion.  And so this

6   coercion is all a part of the scheme.

7           And again, Your Honor, just -- I keep coming back

8   to first principals.  This coercion has nothing to do with

9   cooperative ratemaking.  It has nothing to do with what the

10  McCarran-Ferguson Act has attempted to cover.  To say that

11  this is covered by the McCarran-Ferguson Act is to give a

12  complete pass to the insurance industry.  Nobody's done that.

13  Congress didn't do that.  The Supreme Court didn't do that.

14  That's all I have for now, Your Honor, on -- oh, I'm sorry.

15  I do have one more -- one more point, just to go back just

16  briefly to the regulated by state law.

17          And, you know, again, Florida Blue says there's four

18  provisions of state law that apply and regulate this industry.

19  They say that there are two provisions.  I think it's 626.11,

20  and then the other one is -- is, I think, 633.  Both of those

21  deal with licensing and appointment only.

22          In Florida, you have to have a license.  And in

23  Florida, you have to be appointed by an insurance company

24  before you sell it.  Period.  End of story.

25          They then cite the two antitrust statutes to also

1    say that Florida regulates it.  But you heard Florida Blue at

2    the end of the argument say, oh, well, those statutes, there's

3    actually an exemption from that statute, so those statutes

4    don't even apply.

5          So we have two statutes that deal with licensing and

6    appointment.  We have a letter from the Florida regulator that

7    says that the matters that have to do with exclusive agency

8    are a matter of civil contract.  They are not regulated by the

9    Florida Insurance Code.  So here in Florida, what Florida Blue

10   would have you believe, again, is that there's a total

11   exemption from the antitrust laws on the basis of the fact

12   that people have to be licensed and appointment.

13         Again, Your Honor, it just boggles the mind that

14   given the nature of the statute and given the case law that

15   that could be the case.  And as we talked about earlier, every

16   state has some insurance law of some extent.  And so this

17   would render this prong of the analysis to be completely

18   meaningless.  We may as well make it a two-part test and not a

19   three-part test.

20         THE COURT:  Very good.  Thank you very much.

21         MR. SUNSHINE:  Thank you.

22         THE COURT:  Let's take a short break so my court

23   reporter can have a quick reprieve.

24         We'll come back at -- in about ten minutes.

25       (Recess from 10:47 a.m. to 11:02 a.m.)

1      MR. CHESLER:  Your Honor, may I respond very, very

2  briefly?

3      THE COURT:  Yes, you may.

4      MR. NEGRETTE:  And, Your Honor, I'm sorry.  This is

5  Jeff Negrette for the United States.  I just wanted to make

6  myself available, if you do have any questions about the

7  government's perspective on this before the --

8      THE COURT:  I may have a question for you about

9  Thompson and your view on whether it's binding or not and why

10  not.  So we'll -- I'm going to come back to you after I talk

11  to these two gentlemen.

12      MR. NEGRETTE:  Fair enough.  Thanks.

13      MR. CHESLER:  Thank you, Your Honor.

14      THE COURT:  Mr. Chesler, I do have a couple of

15  questions before you go into your response.

16      MR. CHESLER:  Yes, of course.

17      THE COURT:  They deal with state regulation and the

18  coercive component.

19      There is a policy of guidance on what constitutes

20  state regulation for purposes of the exemption, and I'm a bit

21  concerned that any state regulation whatsoever is adequate.

22      So let's assume for the sake of argument that the

23  relationship between an insurer and a broker is clearly

24  business of insurance.  Let's just assume that's good sense

25  for a lot of reasons.

1          We next then turn to whether there's state

2     regulation.  If the -- and here's where my concern lies.

3     An argument you made is that if there is an exemption under

4     the McCarran-Ferguson Act, there is also an exemption to the

5     state antitrust rules under Florida Statute 542.20, I think

6     you said.  That would mean there's no antitrust law applicable

7     to the conduct, and you're left with only whatever the state

8     is regulating.  And if the state is not regulating anything

9     but licensure and a few other things, then conduct which might

10    theoretically be monopolistic cannot be addressed, meaning

11    they're not going to -- the state regulators, I assume, would

12    not pull licenses from brokers who themselves personally are

13    doing nothing wrong.  So what level of state regulation is

14    necessary for congressional intent to be met?

15          So, I see this probably as a Tenth Amendment sort of

16    analysis on their part, that they're looking at the state

17    should regulate this conduct.  We'll exempt it because

18    insurance is highly scrutinized.  It's highly regulated.

19    You have your own tools to deal with it.  We'll exempt it from

20    antitrust, if all the prongs are met.  But if the state's

21    regulation is thin, is that adequate?

22          I mean, it may be a matter that the state

23    legislature simply needs to go back to the drawing board and

24    do better.  But if it's not a complex web of regulation, then

25    what is enough to constitute, quote, state regulation.

1          And then on coercion, we have a motion to dismiss,

2     so their allegations are pled.  In the complaint, I initially

3     focused on paragraphs 5, 6, 51, 52, which really deal with

4     coercion and intimidation.  But as Mr. Sunshine points out,

5     there are other paragraphs referring to meetings and

6     statements and things.  So at this level of review, why

7     wouldn't that be enough to carry at least that prong for the

8     plaintiff, that is, to defeat a motion to dismiss?

9          So whatever else you wanted to respond to, please

10    feel free.  But Mr. Sunshine's comments gave me those

11    thoughts, and I wanted to give you an opportunity to respond

12    to them.

13          MR. CHESLER:  I appreciate that, Your Honor.

14          First, with respect to the state regulation, the

15    state statute does certainly say that if there is an exemption

16    from federal antitrust law, that exemption applies to state

17    antitrust law as well.  That was a decision made by the state

18    legislature.  They didn't need to say that, but they chose to

19    say it.

20          And it would seem to me, Your Honor, that what that

21    leaves, in answer to your question is, it leaves a very

22    well-endowed state insurance commission that can -- that is

23    empowered to investigate whatever they believe is, in fact,

24    inconsistent with the best interests of the population of

25    Florida vis-a-vis insurance, a broad investigative authority,

1    broad enforcement authority.

2          And as Your Honor correctly points out, the

3    legislature has obviously the authority to enact whatever laws

4    they wish to regulate insurance within the State of Florida.

5    The question here is -- is not whether there would be a

6    mechanism, I would submit, for the state to address the

7    question of regulation, if it wanted to.  The question is

8    whether the insurance business involved here is sufficiently

9    regulated by the state so as to satisfy that prong of the

10   federal antitrust immunity.

11         There are other states, including the one in which I

12   live and primarily practice law, which do not have an

13   automatic exemption from state antitrust law if you're exempt

14   from federal antitrust law.  That happens to be the law in the

15   State of Florida, however.

16         So I wouldn't -- with all respect to what counsel

17   pointed out, I think counsel's misconstrued what we've said

18   about the state antitrust claim.  What we've said is,

19   particularly in Florida, those exemptions -- am I doing

20   something wrong with the microphone?

21         THE COURT:  I think a little quick.

22         MR. CHESLER:  I'm sorry.

23         THE COURTROOM DEPUTY:  Too close.

24         THE COURT:  Oh, close.  Sorry.  Too close.

25         MR. CHESLER:  I'm often criticized for speaking too

1    quick.  I'm sorry.

2          It happens that this state has that parallel

3    exemption statute.  Many states do not.  But this state also

4    has state regulatory authority.

5          And as Your Honor pointed out in response to some of

6    the questions from my colleague, it really is a question of

7    whether or not the relationship between the insured and the

8    insurer is a focus of that regulation.  And there isn't any

9    question that that is the case in Florida.

10          So, I don't think there is a hole.  The hole is

11    filled by the legislature, the legislature's empowerment of

12    the state insurance commission, and the ability of the

13    legislature to enact additional laws as it sees fit to

14    regulate insurance.

15          The question, as one of the cases I quoted from

16    before asks is -- I guess it was the Ohio Indemnity case that

17    they cited -- has the area been preempted by the state?  And

18    if it has, the question of whether there is any particular

19    statute or rule that addresses a particular issue is

20    irrelevant.  Has it been preempted?  And as far as I can tell,

21    it has been preempted in the State of Florida.

22          Florida is the only regulatory authority for

23    insurance in the State of Florida, and it has broad authority

24    to assert its jurisdiction over the insurance business and to

25    enact statutes and promulgate rules that regulate the

1   practice.

2          So I think in this instance, whatever the bar is

3   that one must cross, it's been crossed for being regulated by

4   the state.  It is certainly possible that there is a state

5   that essentially has nothing on the books for regulating

6   insurance.  It's a blank slate that hasn't evidenced an intent

7   to preempt the field, that hasn't exerted any influence.  And

8   there, I think, there'd be a serious question.  I just don't

9   think there's a serious question here, Your Honor.

10          THE COURT:  And the coercion issue --

11          MR. CHESLER:  Yes.

12          THE COURT:  -- on whether or not there's enough pled

13   in the complaint?  Whether that holds up on summary

14   judgement's another issue, but --

15          MR. CHESLER:  Right.  And I think, Your Honor, the

16   answer is, there is not.  If you look at what the complaint

17   says, all of these conversations and statements that are made,

18   they are all in service to enforcing a lawful contractual

19   obligation.

20          The implications of Oscar's argument are, if you

21   have an agreement that is lawful, you will only promote my

22   product and not her product.  And you then transgress on that

23   obligation.  If I write you a letter and say, I'm warning you,

24   you've stepped over the line.  I intend to enforce my

25   contractual rights.  If I call you up and say, stop it, as

1   opposed to simply sending you a termination letter of one

2   sentence that says, you're terminated pursuant to paragraph X

3   of our agreement, I've moved from enforcing contractual rights

4   into coercion.  There's nothing in this complaint that is

5   untethered to the enforcement -- on this issue that is

6   untethered to the enforcement of that contractual right by

7   Florida Blue with respect to the agents who have signed up for

8   that right.

9           As Your Honor pointed out, there's no requirement

10  that they work for Florida Blue at all.  There are thousands

11  of licensed agents in this state who don't work for Florida

12  Blue.  But there -- as our concerted action to enforce rights

13  argument points out, there were terms to that retention, there

14  are terms to that appointment, and one of those terms is

15  exclusivity.

16          And all of the allegations that counsel pointed to

17  in the complaint relate to discussions between or statements

18  made by our client, my client, to the people who are subject

19  to that contractual obligation basically saying, you better

20  live by what you promised to do or else.  That's enforcement

21  of a lawful contract.

22          And calling it a pervasive scheme or calling it

23  intimidation doesn't change the facts that they've pled and

24  that the facts that they've pled are enforcement of a lawful

25  contractual provision.  And that can't be coercion, it can't

1   be intimidation, or else it would turn several hundred years

2   of contract law on its head.

3              Several other points, Your Honor, if I may quickly,

4   unless you have any further questions.

5              THE COURT:  No, I don't.  Thank you.

6              MR. CHESLER:  McWane.  McWane was mentioned several

7   times in the argument.  McWane is a situation where the

8   incumbent company instituted a specific new plan in response

9   to the entry of a competitor.  It's not our situation.

10             Oscar's argument amounts to an argument that says

11  that if a company is doing business in a particular way for

12  20 years that's perfectly lawful and then a competitor enters

13  and they continue to do what they've been doing, it becomes

14  unlawful.  Somehow it becomes maintenance of monopoly power to

15  do what you were been doing before.

16             I've been trying antitrust cases for 40 years.  I've

17  never heard that interpretation.  It would disrupt businesses

18  in incredible ways.  I wake up one day and I find out that

19  Oscar has entered my state and is doing business and I have to

20  now say, guess what, guys, all those exclusive arrangements

21  we've had since 1982, they're done.  Because if I dare to

22  continue exclusivity or I renew your agreement next year,

23  they're going to say that I'm maintaining monopoly power.

24             THE COURT:  And if you spend more money on marketing

25  or television or any number of other activities that improve

1    your product.

2            MR. CHESLER:  Exactly.  Exactly.  Which is plainly

3    pro-competitive, Your Honor, and I don't think that argument

4    holds water.

5            A further point.  Counsel said -- I counted, I made

6    little tick marks -- I think it's 12 times that the

7    McCarran-Ferguson exemption only applies to cooperative

8    ratemaking.  He kept saying, let's go back to basic

9    principles, only cooperative ratemaking.  Well, Your Honor,

10   the Thompson case doesn't involve cooperative ratemaking.

11   The Thompson case involves an exclusive agency arrangement.

12           And I submit to you that Oscar can't have it both

13   ways.  They can't, on the one hand, say, well, Thompson says

14   maybe in some cases it's lawful, in other cases it's unlawful,

15   but it admittedly says that the exclusivity there was lawful.

16   And then turn around and say that the exemption only relates

17   to cooperative ratemaking, when Thompson plainly didn't, and

18   Thompson is controlling authority.

19           So obviously the argument, that this exemption is

20   limited only to cooperative ratemaking can't be right unless

21   the Fifth Circuit got the Thompson case dead wrong.

22           THE COURT:  I think Card versus National Life

23   Insurance from the Tenth Circuit in 1979 came to the same

24   conclusion.

25           MR. CHESLER:  Exactly did, Your Honor.  It also

1  said, you can't conspire with your own agents, in the Card

2  case.

3           Last point, Your Honor.  Counsel made a big point

4  about the insureds being indifferent to the terms of the

5  agreement between the insurance company and the agents, trying

6  to put these facts into the bucket of some cases, as

7  Your Honor pointed out, that deal with relationships that are

8  entirely between the insurance company's agents that are

9  opaque and non-visible and have no consequence to the insured.

10          What counsel didn't say and can't say is that the

11 insureds are indifferent to the rates they pay, to what it

12 costs them to acquire insurance.  And what it costs them to

13 acquire this insurance is a function of the risk that Florida

14 Blue faces in the pool of insureds that it has.  The higher

15 the risk that it faces, the more they spread the cost of that

16 risk across their insured base.

17          The pool that they have which, in turn, determines

18 the level of risk, is recruited in large part -- not entirely,

19 because there are all these other routes into the insurance

20 policies that they offer.  But it is certainly contributed to

21 in significant measure by the agents who are working on their

22 behalf.

23          There's no way to cut off that proximate

24 relationship between the agency relationship and the spreading

25 of risk which affects the cost to the insured, which is at the

1   heart of what they care about with respect to their insurance

2   coverage.  And they also care about the service they receive,

3   Your Honor.

4           And as Your Honor said in your preliminary

5   injunction decision in this case -- I'm quoting from page 3 --

6   Brokers play an important role in the sale of health insurance

7   plans as they provide individualized advice and information to

8   consumers choosing from diverse options, quoting paragraph 31

9   of the pleading.

10          Obviously, it's service and price.  Both of those go

11  to the relationship.  Both of those, therefore, satisfy the

12  standard that this is, in fact, integral to that relationship

13  and is the business of insurance.

14          THE COURT:  Thank you.

15          MR. CHESLER:  Thank you, Your Honor.

16          THE COURT:  Mr. Sunshine --

17          MR. SUNSHINE:  Your Honor, may I have two minutes?

18          THE COURT:  -- you're not happy with the rebuttal?

19          MR. SUNSHINE:  No, Your Honor, I'm not.  I just want

20  to make a couple quick points --

21          THE COURT:  Sure.

22          MR. SUNSHINE:  -- based on what Mr. Chesler just

23  said.

24          Your Honor's question about what's the line on

25  regulation --

1          THE COURT:  Yes, sir.

2          MR. SUNSHINE:  -- the answer is not whether it could

3     be regulated or whether Florida could choose to regulate.

4     The prong in the test is, is it regulated.  And I think the

5     preemption analysis that Your Honor mentions bears directly on

6     that question, did the state mean to preempt all other kinds

7     of litigation.  And, again, I would go back to the intent is

8     for a narrow interpretation, not a broad interpretation.

9          But I'd also cite Your Honor back to Gilchrist,

10    because in Gilchrist, which is dealing with OEM parts, the

11    court said the industry is regulated in general, but it also

12    said, and in particular, the use of OEM parts is regulated.

13    So the Eleventh Circuit said not just generally, but the

14    particular aspect that was under challenge was being

15    regulated.

16         On coercion, Your Honor, this question about whether

17    it was lawful or unlawful to enforce the contract for the

18    purpose of McCarran-Ferguson, I would submit, Your Honor, is a

19    red herring.  Obviously, we believe that the coercion applied

20    here is part of an unlawful scheme, but it doesn't really

21    matter.  The question is, is there coercion?  And in the

22    business world, the way you provide coercion is through

23    economics.  I'm not saying there aren't cases where other more

24    nefarious and criminal ways of applying coercion don't happen,

25    but coercion is done economically.

1        And that's what's in McWane.  That's what's done in

2   Dentsply.  That's what's alleged, is that all of these brokers

3   had no choice as a matter of keeping their business to go.

4   That's coercion.

5        THE COURT:  Isn't that the nature, though, of

6   exclusive broker arrangements, that you have no choice; you

7   will be exclusive, or you won't work for me?  That's the

8   nature.  If they're always coercive, then all exclusive broker

9   relationships are unlawful, which the Eleventh Circuit says is

10  not the case.

11       MR. SUNSHINE:  Your Honor, I would respectfully

12  disagree in this sense.  And I would compare Thompson, which

13  is a case which I have pointed out to Your Honor talks about

14  that you have to look at it in context.

15       In Thompson, it was optional.  The broker said, I

16  could take this contract.  I could do something else.  It's at

17  my option.  In the standard world, if you sign up for an

18  exclusive, you think it's in your benefit to get that

19  exclusive relationship.  The situation we're talking about,

20  it's not optional.  It's not optional.  I can't -- if I'm the

21  broker, I can't lose all my Medicare Advantage customers.

22  I can't lose all my customers outside of the Orlando area.

23  It's not optional.

24       And, again, we're not saying you can't use

25  exclusives.  We're not saying you can't provide incentives.

1    But when you package all of these together, it is coercion,

2    and it's an attempt to -- you know, to really change the

3    nature and dynamic of the industry.

4            Your Honor, Florida Blue, during the rebuttal,

5    talked about no other case where conduct that was originally

6    legal subsequently violate the antitrust laws.  Your Honor,

7    there are other cases that hold that.  None of them have been

8    cited in the brief, so I don't want to go there.  But we'd be

9    glad to submit supplemental authority if Your Honor thinks

10   that's an important point, because there are clearly

11   situations, you know, particularly with ventures that grow

12   over time that have rules that once the ventures get to a

13   point where they have market power, monopoly power, the

14   continued enforcement of those rules are problems.  We'd be

15   happy to submit additional authority on that point.

16           And lastly, Mr. Chesler's last argument about this

17   agreement affecting costs, that just goes right to the heart

18   of what Pireno, Royal Drug, and Gilchrist say.  Everything an

19   insurance company does is going to affect its cost.  That's

20   not the test.  That's really not the test at all in this case,

21   and particularly in the case where the ACA already creates the

22   risk-spreading pool that we're talking about.

23           THE COURT:  Thank you.

24           MR. SUNSHINE:  Thank you very much.

25           THE COURT:  I think the government wanted to comment

1    on Thompson.

2         Is it Mr. Negrette who is speaking or Mr. Gentry?

3         MR. NEGRETTE:  I'm sorry?

4         THE COURT:  Mr. Negrette?

5         MR. NEGRETTE:  Negrette, sir.

6    [Pronounces differently.]

7         THE COURT:  Negrette.  Thank you.

8         So as you know, I'm not free to ignore controlling

9    law, nor would I.  So what has -- what has made Thompson no

10   longer binding, since 1981 decisions from the Fifth Circuit

11   are clearly binding?

12        MR. NEGRETTE:  Sure.  So --

13        THE COURT:  Not dealing with the factual

14   distinctions that might be made, but why -- meaning whether or

15   not the facts are the same as the facts in this case, but is

16   there some law or some analysis that you believe indicates

17   that the brokerage relationship was not meant to be protected

18   as is indicated in Thompson?

19        MR. NEGRETTE:  Sure.  So it is the government's

20   position that Thompson has -- does not survive Pireno and for

21   very clear reasons just looking at the surface of Thompson.

22        So, of course, we know in Pireno, three criteria

23   were identified for what constitutes the business of insurance

24   -- the transfer or spread of risk, the degree in which the

25   activity is integral to the relationship between the insurer

1   and the insured, and, of course, entities within the insurance

2   industry.

3           So, Thompson does mention Royal Drug.  Obviously, it

4   doesn't benefit from any of Pireno's guidance given the

5   timing.  But Pireno's guidance really comes from Royal Drug

6   and, unfortunately, Thompson really doesn't give proper credit

7   to Royal Drug.

8           Royal Drug itself identifies risk spreading, for

9   example, as being indispensable, and yet there's no discussion

10  at all in Thompson about risk-spreading activity or transfer.

11  And so that alone suggests it's not good law.

12          Moving on to the relationship --

13          THE COURT:  Don't we assume that the Fifth Circuit

14  was aware of the Supreme Court's pronouncements when they made

15  their findings and if they felt there was no risk spreading

16  achieved by brokers, they would have said so?

17          MR. NEGRETTE:  If I'm understanding your question,

18  is it that you're inferring that there is no risk spreading

19  involved between Thompson?

20          THE COURT:  No.  Just that when the -- when Pireno

21  was written -- and I'm looking for the date of the opinion.

22  I'm sorry.  I don't have it in front of me --

23          MR. NEGRETTE:  I think it was --

24          THE COURT:  -- 1982.  So it actually came out after

25  Thompson.

1          MR. NEGRETTE:  Yes.

2          THE COURT:  All right.  So you're saying that

3    because Thompson does not address specifically risk spreading

4    and Pireno does a year later, that Pireno creates some

5    language that was not considered -- or a test that was not

6    considered by the court in Thompson and, therefore, Thompson

7    is not binding?

8          MR. NEGRETTE:  That's certainly true at a minimum --

9    at a minimum.  I think there are additional arguments beyond

10   that, though, that threaten the credibility of Thompson, which

11   I'm happy to elaborate on if you don't find that argument

12   satisfactory.  And I think we can even look at the

13   integration, which is really the basis for where Thompson

14   comes from as satisfying the requirement to show the business

15   of insurance --

16         THE COURT:  Let me interrupt you just for one second

17   if I can, though.  Sanger is the same court as Thompson.

18   And Sanger is 2015, so many, many years after Pireno.

19         MR. NEGRETTE:  Mm-hmm.

20         THE COURT:  In Sanger, the court noted that the HUB,

21   which was the entity that collected all the insurers to

22   provide coverage for the medical professional liability --

23   the court there held that because HUB allocates or funnels a

24   broad risk pool, it meets the definition of business of

25   insurance.

1         They go on to say this:  Even if the case were

2    viewed more narrowly as just a broker case, more courts have

3    held routine dealings -- pardon me -- most courts have held

4    routine dealings between brokers and insurers constitute the

5    business of insurance even when the relationship may not be

6    distinctly -- distinctively different from ordinary

7    relationships with dealers marketing a product or service,

8    at page 744.  And they cite a few other cases.

9         So that being the case, it appears that Sanger,

10   being well aware of Pireno and Royal Drug, persisted in their

11   view that the business of insurers and agents working together

12   satisfies the test.

13        And you can go forward to Arroyo-Melecio, I think

14   it's pronounced, M-e-l-e-c-i-o versus Puerto Rican American

15   Insurance, First Circuit, 2005.  That's the case involving

16   compulsory motor vehicle insurance in Puerto Rico and the

17   relationship between private insurer and a government entity

18   that provided insurance.

19        And they stated in disposing of that case -- this is

20   dicta, but they did state, Royal Drug left open whether the

21   business of insurance includes fixing a broker's commission,

22   but it read the legislative history of McCarran-Ferguson Act

23   to suggest that the business of insurance may have been

24   intended to include dealings within the insurance industry

25   between insurers and agents.

1        So now we have a few courts, two circuits, that are

2   well aware of Pireno and endorse the notion that the

3   relationship between brokers and insurers is within the

4   business of insurance, integral to that business.

5        So why is Thompson not dispositive --

6        MR. NEGRETTE:  Right.  So --

7        THE COURT:  -- on that point?

8        MR. NEGRETTE:  Certainly.  So there's a lot there to

9   unpack.  I'll just say, starting with Sanger, the analysis is

10  independent.  The reference to Thompson and these older

11  historical cases are -- again, as you say, it's dicta in this

12  characterization, even if this were just a broker case, right?

13  But the analysis that Sanger actually conducts prior to that

14  in establishing that the activities were within the realm of

15  business of insurance is a more proper application of Pireno

16  with a thorough discussion of risk spreading.

17       So where the Court then follows up, it's almost as

18  if to say not only does it make sense in this case, but we do

19  have -- there is a history of this practice occurring, and so

20  the cited cases, as I said, are mostly historical.  Many of

21  them pre-date Royal Drug.  And I think all except for Arroyo

22  pre-date Pireno.

23       And so, it's true that these cases came to those

24  conclusions, but did they properly apply the analysis, I

25  think, is the relevant question.

1          And I think Sanger is even aware that they may not

2    have by this citation to insurance brokerage right before

3    listing those cases, acknowledging that this practice is

4    expected in any industry and, therefore, it's really not

5    obviously the business of insurance.

6          So it does -- it does guide that we go back to

7    Pireno and Royal Drug to figure out, well, does it qualify as

8    risk spreading?  Does it qualify as integral to the

9    relationship?  And, again, going back to Thompson, we know

10   that it just doesn't do that.  And I'll say even on the point

11   of integration between the insurer and insured, it really

12   doesn't even use the right standard, even though that's how

13   the defendants characterize it.  If we look at 444 --

14         THE COURT:  Sanger, though, does.  And you're

15   getting to it on page 44 [sic].  Sanger, in citing Thompson,

16   states that an important factor in the business of insurance

17   is whether participation of the agent in the alleged scheme

18   considered the agent's insurance dealings as such.

19         MR. NEGRETTE:  Correct.

20         THE COURT:  A broker getting clients involves the

21   insurer's dealings as such.  If yes, that's a strong

22   indication that the scheme has a bearing on the core

23   relationship between insurer and insured.

24         So Sanger, in 2015, well aware the Supreme Court

25   found that brokers, in fact, when they are selling the

1  products or whatever it may be, that is in the core

2  relationship between insurer and insured.

3       MR. NEGRETTE:  Right.  But we'll just look at

4  Thompson and compare it to Pireno and see just how different

5  it is.  So --

6       THE COURT:  It may be.  But absent a clear

7  pronouncement that Thompson is a bad law, am I free to ignore

8  it?  I mean, let's assume this was the Eleventh Circuit.

9  I treat the Fifth Circuit prior to the split as being the

10 Eleventh, as I must.  And if the Eleventh Circuit has held

11 without hesitation that this particular relationship is the

12 business of insurance, I'm not free to substitute my view that

13 they are incorrectly deciding it or the Supreme Court somehow,

14 if we tease it out, undermines their analysis, particularly

15 when that same court years later, with the benefit of

16 reflection for almost 20 years, comes to the same conclusion,

17 as does other circuits, the First and I think the Third as

18 well.  The Third is 1981, the same -- the year, the same year

19 as Thompson and comes to the same conclusion as Thompson.

20       So, I would imagine if I was talking to the Eleventh

21 Circuit right now, they'd be -- they'd be chastising me for

22 taking their decisionmaking so lightly.  I don't think I'm

23 free to do that.

24       MR. NEGRETTE:  Well, I can appreciate that.  But,

25 again, the analysis -- the reference to these older cases here

1  in Sanger is -- is not in the context of the analysis of

2  Pireno and Royal Drug.  It's just -- it's just recognizing

3  that this is a practice that the courts have recognized.

4          And so, it's not that you need to -- it's not that

5  Thompson is controlling, and you need to ignore that.  It's

6  that the guidance from the Supreme Court in Pireno is much

7  more explicit on how to handle the relationship between the

8  broker and the insurer.  And to ignore that guidance and to

9  rely on Thompson, I think, would be to, as Thompson did,

10 ignore the binding Supreme Court precedent.

11         And I do just want to point out that the standard

12 Thompson puts out here on the relationship between the insurer

13 and insured is so clearly different than what Pireno

14 identifies that the fact that it's acknowledged again in these

15 later courts as coming to the same conclusions doesn't make

16 the grounds upon which it got there suitable guidance for this

17 Court.

18         And so, again, I'm just reading on page 444 and it

19 says, for one, whether it concerns the agents' insurance

20 dealings as such.  So when I read that, to me, that's really

21 no different than the term business of insurance, right?

22 There's really zero guidance on insurance dealings as such.

23 That's an extremely broad characterization and clearly doesn't

24 go into things like Pireno does talking about the enforcement,

25 the interpretation, the reliability of the policy.

1        But then it goes on to say that since the --

2        THE COURT:  Isn't the business of insurance selling

3  insurance?  And Thompson states specifically that they agree

4  that -- and that an agreement that forces the broker to focus

5  all of his entrepreneurial skills solely on selling the

6  insurance is a distinction that is dispositive, meaning that

7  is the business of insurance.  There's no point in having

8  insurance if you can't sell it.  And that's what brokers do.

9        So how is that not part of the business of

10  insurance?  And if you are selling it, you are then getting a

11  pool of people, and that spreads risk.  That's kind of common

12  sense.

13        MR. NEGRETTE:  Well, I'm not sure that it is.

14        I think -- I certainly can talk about the

15  relationship here with risk spreading that's involved in this

16  relationship.  But just to finish this last point here on 444

17  where it says, has a strong indication that the scheme has a

18  bearing on the core relationship -- so a bearing on the

19  relationship is quite a bit different than integral to the

20  relationship between the insurer and insured.

21        So even to the extent Thompson tries to get at what

22  Royal Drug is referring to, it's -- it clearly underperforms

23  and specifies a threshold that is lower than what the Supreme

24  Court dictates.  But to go back to your question of -- if I

25  understand it -- about how is sales not the business of

1    insurance?  So, I think the challenge here is trying to

2    appreciate that intuitive observations may not necessarily

3    comply with the criteria that the Supreme Court has identified

4    in Royal Drug and Pireno.

5            And defendants argue, for example, that essentially

6    all risk-spreading activity is -- all activity that affects

7    their core base, as you say, the sales of insurance -- all

8    activity that affects their core base affects their ability to

9    spread risk.  But to infer that all risk-spreading activity is

10   the business of insurance is contrary to Supreme Court

11   precedent and congressional intent.

12           The logical conclusion of defendant's argument here

13   is for a natural monopoly.  The only way to maximally spread

14   risk is to capture the entire market.  But the record shows

15   that Congress explicitly rejected any notion of fostering a

16   monopoly or even anticipating that a monopoly would develop

17   from the Act.

18           Instead, as we've heard, Congress's intent was to

19   foster competition and to do so by enabling cooperative

20   ratemaking, and that's not involved here at all.  Nothing

21   we're seeing here today is related to cooperative ratemaking,

22   even to the extent sales may be affected on behalf of Florida

23   Blue as a result of the --

24           THE COURT:  That only pre-supposes there's a

25   monopoly that's been improperly created and maintained, right?

1          So you're putting the -- you're taking that cart and

2    you're putting it directly in front of the horse by saying

3    because they monopolized, because their monopoly was not

4    through competition and a superior product and staying power

5    and all the other things, that now we can take that

6    presumption that they're monopolistic and we can say that's

7    not what's intended by this exemption.  That's inverting the

8    analysis.  I have to look at the exemption, then look at

9    monopoly.  We don't even get there until that happens.

10         MR. NEGRETTE:  I can appreciate that.  And allow me

11   to clarify.  I'm not making any -- we're not taking any

12   position here as a government about whether there is a

13   monopoly or not or anything with respect to --

14         THE COURT:  Right.  Only in your argument you are,

15   not in your pleadings.

16         MR. NEGRETTE:  Well --

17         THE COURT:  Because that argument is premised upon

18   the fact that what they're doing is inconsistent with

19   legislative intent because it is a monopoly.

20         MR. NEGRETTE:  Okay.  And that's where I just want

21   to clarify what I'm saying.  It's not that I'm saying that

22   they are a monopolist.  What I'm saying is, is that the

23   interpretation that all risk-spreading activity is the

24   business of insurance is to infer that Congress intended to

25   facilitate monopolies, right, because that would be the only

1   way to fully spread risk is to capture the entire market.

2            And, again, I'm not saying Florida Blue's done that.

3   I'm just saying how it's inconsistent to say that all

4   risk-spreading activity is the business of insurance, because

5   otherwise Congress would have just nationalized insurance or

6   otherwise shown some indication that they are -- are promoting

7   or encouraging monopolization.  That's the extent of the

8   point.

9            THE COURT:  All right.  Thank you.

10           Let's move to the second phase, if we can.  We're

11  going to talk about whether there is a monopoly, whether there

12  has been foreclosure on all the other matters.  Ms. DeMasi.

13           MS. DeMASI:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MS. DeMASI:  For this portion of the argument, I'd

16  like to focus on two elements, in particular.  That's monopoly

17  power and substantial foreclosure.

18           For monopoly power, Oscar primarily relies on

19  Florida Blue's high market share.  And I'm not going to stand

20  here before Your Honor and tell you that Florida Blue does not

21  have a high market share.  It does, indeed.  As Oscar has pled

22  in its amended complaint, some of that market share comes from

23  2015 when a number of insurers left the market and Florida

24  Blue stayed put.  But Oscar is wrong as a matter of law that

25  high market share is enough to infer monopoly power.

1       Instead, the case law is clear that even very high

2   market share, even in the range of Florida Blue's, is not the

3   whole story.  Market share does not always lead to monopoly

4   power.

5       Now, Oscar relies primarily on Grinnell, a 1966

6   Supreme Court case where the Supreme Court inferred such power

7   from 87 percent market share where there were no other

8   competitors.  Since that time, however, many courts, including

9   many that are cited by Oscar, have held that in addition to

10  market share, barriers to entry are necessary and relevant to

11  look at in the analysis of market power or monopoly power.

12      And that includes McWane in the Eleventh Circuit,

13  Reazin in the Tenth Circuit, Ball in the Seventh Circuit,

14  Tops Market in the Second Circuit, Broadcom in the Third

15  Circuit, Fin Tech in the Southern District of Florida, Tyntec

16  in the Middle District of Florida, and the Areeda treatise,

17  that prominent antitrust treatise that we talked about

18  earlier.

19      In particular, Your Honor, the Ball case out of the

20  Seventh Circuit explained why it's necessary to look at

21  barriers to entry.  And what the court said there -- and I'm

22  quoting from page 1335 of that decision at 784 F.2d 1335 --

23  the court said that in some cases, quote, a firm's share of

24  current sales does not reflect the ability to reduce total

25  output in the market.  If firms are able to enter, expand, or

1   import sufficiently quickly, that may counteract a reduction

2   in output by existing firms.  And if current sales are not

3   based on the ownership of productive assets so that entrants

4   don't need to build a new plant or otherwise take a long time

5   to supply the customer's wants, existing firms may have no

6   power at all to cut back a market's output, end of quote.

7           So in other words, what Ball goes on to say is,

8   today's market share tells you nothing or very little about

9   tomorrow's competition in certain types of markets.  The lower

10  the barriers to entry, the shorter the time to enter, and the

11  less power that existing firms have, because new entrants can

12  enter quickly and can reduce that market share.  And that's

13  exactly, Your Honor, what is going on here.

14          Even taking Oscar's allegations as true, the

15  barriers to entry in this market are extremely low.

16  Competitors like Oscar can enter and expand easily.  Customers

17  are not captive.  In fact, they can switch easily.  And under

18  the ACA, consumers have the opportunity to switch insurers

19  every single year during open enrollment.

20          All it takes to enter is license and money, both of

21  which are easy to obtain and readily accessible.  There are no

22  plants or factories or other large investments that would take

23  years to build, as some of the cases -- in some of the cases

24  that Oscar cites.  For example, the pipefitting foundry that

25  was at -- in McWane, totally different from what is necessary

1    here.

2           Here, the barriers to entry are all the lower,

3    because the ACA itself creates a federal exchange, which Oscar

4    cites and discusses in its complaint, which is a dedicated

5    forum operated by the United States government to foster

6    competition and to create a platform where any insurer that

7    wants can come, compete, and have its product listed.

8           In fact, Oscar itself is the best example of how low

9    the barriers to entry are.  In a single year when Oscar

10   entered last year in Orlando, in its first year, it gained

11   13 percent market share.  It pleads that it plans to enter

12   more markets in Florida this fall.  How many, we don't yet

13   know.  It pleads that it was able to offer significant price

14   advantage to customers in terms of premiums.  And it pleads

15   that it was able to offer -- and I'm quoting now from

16   paragraph 109 of the amended complaint -- a strong provider

17   network in Orlando that includes Florida Hospital, by far the

18   largest hospital in Orlando, among other providers, end of

19   quote.  And it confirms it offers more than 4,000 providers,

20   including primary care physicians, specialists, and other

21   physicians that are more than sufficient to satisfy its

22   consumers.  That's Oscar's allegations about what it has been

23   able to do in just one year of entry.

24          Oscar alleges that its plans -- it's been able to

25   offer more features for less money and, again, that it plans

1    to expand that into other Florida markets.  And finally, in

2    paragraph 48, Oscar pleads that it has entered 14 metro areas

3    in nine states in just the past five years.  If that's not low

4    barriers to entry, I don't know what is.

5            Notably, there is no non-conclusory allegation other

6    than parroting the words themselves of any reduction in

7    output.  In fact, Oscar's complaint at paragraph 27

8    acknowledges that Florida -- the State of Florida has the

9    highest ACA participation of any state in the country, so

10   output here is not being reduced.  Likewise, there's no

11   allegation of super-competitive pricing other than just merely

12   a conclusory one.

13           Nevertheless, Oscar does claim there are high

14   barriers to entry -- this is in paragraphs 89 to 95 of their

15   complaint -- in three different ways.

16           First, Oscar says that Florida Blue's exclusivity

17   contracts themselves are a barrier to entry.  First of all,

18   the exclusivity contracts are lawful, as we've talked about,

19   under McWane.  They didn't deter Oscar from entering.  And the

20   only authority that Oscar has cited for this proposition is

21   McWane itself where, again, there were much more significant

22   entry barriers, including having to build or buy a pipefitting

23   foundry.

24           The second barrier to entry that Oscar cites is

25   state and federal licensing requirements.  Again, these

1    approvals are a requirement.  They're not a barrier.

2    Oscar was easily able to get them and was easily able to come

3    in 2018 and offer -- offer its products on the exchange and

4    through other means.

5           And third and finally, Oscar cites capital

6    investment and provider relationships.  But, again, the

7    capital investment, as was the issue in Ball, is simply money,

8    which is easily accessible.  And the provider relationships,

9    Oscar itself touts its ability to have a substantial and

10   expansive provider network in Orlando.  So that can't possibly

11   be a barrier.  It's certainly not a high barrier.

12          I think we've already talked about Wane [sic].

13   I'm happy to talk about the differences in Wane.  But in Wane,

14   it involved the domestic pipefitting industry.  It was the

15   sole distributor.  It had a hundred percent market share when

16   it entered -- when it began its full support program in the

17   face of an oncoming competitor.  There were significant

18   barriers to entry, and there was a major capital outlay that

19   would have been needed to buy or build a foundry, very

20   different than here.

21          In addition, in McWane, unlike here, there were no

22   other available channels of distribution.  There was no other

23   way to distribute other than the distributors foreclosed by

24   Wane.  And that was a fact the court found very significant,

25   that -- the no alternative channels of distribution.

1        Second, Your Honor, let me just briefly address

2   substantial foreclosure of competitors.  In an exclusive

3   dealing case, Oscar has to also plead substantial foreclosure

4   of competitors from the relevant market.

5        As we've already talked about, exclusive

6   arrangements are typically lawful.  They only become unlawful

7   if they substantially foreclose competitors.  And the test is

8   whether the challenged practice bars a substantial number of

9   rivals or severely restricts their ability to enter the

10  market.

11       Traditionally, to show foreclosure, you need 40 or

12  50 percent of the market foreclosed.  So to meet this

13  threshold, what Oscar does is it gerrymanders the pool of

14  brokers in order to plead substantial foreclosure.  What it

15  does is it says that the relevant -- quote/unquote -- relevant

16  pool of brokers -- and this is in paragraphs 42 and 43 of the

17  amended complaint -- is, quote, active brokers, rather than

18  all available brokers in Orlando or in the State of Florida.

19       As a result, even though the public records, the

20  DFS website that Oscar cites in its own amended complaint,

21  demonstrates that there's over 300,000 brokers in Florida and

22  over 19,000 brokers in Orlando.  Oscar claims that the

23  relevant pool is only 2,200.  And the reason that Oscar does

24  that is because Florida Blue has exclusive relationships with

25  only 1,700.  Oscar never tells us which brokers they are.

1      Oscar never alleges that it can't appoint its own

2  brokers.  Indeed, there is nothing to prevent Oscar from

3  appointing its own brokers.  And, in fact, it does so on its

4  own website.  Oscar's never -- doesn't allege anywhere in the

5  complaint that it is only able to succeed with established

6  brokers or that other competitors rely on this narrowed set.

7  It doesn't allege that it's unable to train or, as I've said,

8  recruit or appoint its own brokers.  And so this active

9  broker, this pool, this gerrymandered pool of 2,200 brokers

10  is, respectfully, Your Honor, not entitled to the presumption

11  of truth on a motion to dismiss.

12      Using the 19,000 brokers, what we know are actually

13  available in Orlando based on the DFS website, Florida Blue's

14  percentage is less than 9 percent.  That's nowhere near

15  foreclosure that is required to show substantial foreclosure.

16      Second and last point, Your Honor.  Even putting

17  aside the broker channel, Oscar's allegations completely

18  ignore what was very important to McWane, whether there are

19  additional distribution channels through which Oscar can sell

20  and is not foreclosed.  And, of course, there are.

21      There's healthcare.gov, which Oscar cites in its

22  complaint.  Never calls it an alternative distribution

23  channel, but healthcare.gov is the website that the federal

24  government sets up in order for Oscar and other competitors to

25  sell their insurance.

1          There is also another distribution channel, direct

2     sales to consumers, which Mr. Sunshine just referenced in his

3     argument earlier today.  Oscar can sell direct through its

4     website.  It can sell direct through its telephone service.

5     It can sell in person, going out, as we saw at the PI

6     hearings, where you set up a van in a parking lot, and it can

7     reach consumers directly.

8          So there's multiple alternative distribution

9     channels.  And there's no allegation that Oscar is foreclosed

10    from any of those distribution channels.  In fact, Oscar's

11    complaint acknowledges that a sizable portion come from

12    distribution channels other than brokers.  It just doesn't

13    identify what they are.

14         THE COURT:  I think they pled that over half -- a

15    little over half of their sales were by local brokers.

16         MS. DeMASI:  So leaving --

17         THE COURT:  Meaning the balance would be other

18    avenues.

19         MS. DeMASI:  Exactly.  Leaving an enormous

20    percentage, Your Honor, through other distribution channels.

21         And as McWane says, if firms can use other means of

22    distribution or sell directly to consumers, it is less likely

23    that their foreclosure from distributors will cause harm.

24    And that's exactly, Your Honor, what we have here.  We have

25    minimal foreclosure, and we have lots of distribution

1  channels.

2          THE COURT:  You haven't commented on this, but I

3  know it's in your pleadings --

4          MS. DeMASI:  Sure.

5          THE COURT:  -- the distinction between foreclosing a

6  competitor and foreclosing competition.

7          MS. DeMASI:  Yes.

8          THE COURT:  I've seen allegations in the complaint

9  about harm to competition, for example, paragraphs 88, 90, 97,

10  101, and they tend to be focusing only on the unreasonable

11  restraint thwarting Oscar's entry.  That's paragraph 88.  90,

12  the primary anti-competitive effect of Florida Blue's scheme

13  is to foreclose Oscar from the market.  And that's repeated

14  again in paragraph 97 and 101.

15          MS. DeMASI:  Yes.

16          THE COURT:  So do you want -- I don't want to

17  foreclose you from speaking about it and it may not be

18  necessary, but any comment concerning competition versus a

19  competitor?

20          MS. DeMASI:  No.  Sure, Your Honor.

21          So, you know, our view as set forth in our papers is

22  that Oscar primarily alleges harm to Oscar, that its ability

23  to compete has been a inhibited.  But the antitrust laws

24  protect against harm to competition, and that is generally in

25  two -- the harm to competition that the antitrust laws look at

1   are increased price and decreased output, and neither is

2   properly alleged here.  Oscar's allegations are focused on

3   harm to itself.  The cases that it cites for this proposition

4   are distinguishable.  As we've already talked about, McWane is

5   distinguishable.  And Le Page, which is the other cite -- the

6   other case that Oscar focused on for this purpose, the court

7   explained that foreclosure of even one significant competitor

8   could lead to higher prices, could lead to reduced output.

9   But, again, there's no allegation in this case that it has

10  other than the conclusory allegation parroting the words, you

11  know, of the cases.  So, we don't believe that Oscar has

12  plausibly alleged harm to competition, but rather has focused

13  harm solely to Oscar, which is insufficient to survive a

14  motion to dismiss.

15          THE COURT:  All right.  Thank you very much.

16          MS. DeMASI:  Thank you, Your Honor.

17          THE COURT:  Mr. Sunshine.

18          MR. SUNSHINE:  Thank you, Your Honor.

19          In reviewing Florida Blue's arguments here, it's

20  just plain that they ignore the controlling law in this

21  circuit, McWane, and it's clear, Your Honor, that all they're

22  doing is arguing facts back to you and clearly arguing facts

23  that are very specifically alleged in the complaint.

24          Let me be clear exactly what I mean.  And I'll go

25  through the monopoly power, the foreclosure issue, and then

1   the harm to competition issue, and show why that's true in

2   each one.

3           McWane is an Eleventh Circuit case.  It's the

4   leading case in this circuit.  On the question of monopoly

5   power, McWane was reviewing an FTC order under the FTC

6   statute.  When the FTC as a commission issues a decision, the

7   order can be appealed to any circuit.  It was appealed to the

8   Eleventh Circuit.

9           Standard of review for that order is the Eleventh

10  Circuit has to take findings of fact if there's substantial

11  evidence to support it and can review de novo.  One of the

12  findings that the Commission made -- the Federal Trade

13  Commission made was that McWane was a monopolist, and it noted

14  that McWane had between 90 and 100 percent of the market.

15          The Eleventh Circuit in McWane looks at those

16  allegations and it cites Eastman Kodak for the proposition

17  that standing alone, an 80 to 95 percent share of the market

18  is sufficient.  It cites Grinnell, the U.S. Supreme Court,

19  saying 87 percent is sufficient.  It cites Dentsply for saying

20  75 to 80 percent is sufficient standing alone.

21          And then, I quote, Your Honor, on the carryover from

22  830 to 831, McWane says, Standing alone -- and alone being

23  this allegation of market share -- this would seem to be

24  sufficient evidence to support the Commission's conclusion

25  that McWane had monopoly power in the domestic fittings

1   market.

2        Your Honor, I submit that's a higher standard, the

3   substantial evidence standard, than we are here at a motion to

4   dismiss with the Eleventh Circuit saying, standing alone, a

5   share of that magnitude is sufficient to support it.

6        And on the monopoly power, I could sit down at this

7   part.  Of course I won't, because we allege a heck of a lot

8   more than just monopoly power.

9        THE COURT:  Now, that's sufficient -- that

10  percentage of market share is sufficient for a prima facie

11  case that then transfers the burden to show pro-competitive

12  justification.

13       MR. SUNSHINE:  Correct, Your Honor.  And those

14  pro-competitive justifications clearly are a fact dispute

15  amongst the parties.  So I think this question of monopoly

16  power -- I think we get past it just on this quote.  But

17  having said that, the allegations in Oscar's complaint did not

18  stop there.

19       THE COURT:  And what did you plead was the monopoly

20  or the market share -- pardon me -- the market share for

21  Florida Blue?

22       MR. SUNSHINE:  We pled that there are four different

23  counties in Orlando, each of which counties has a separate

24  market share, the lowest of which was 82 percent, the highest

25  of which was 100 percent.  So -- and I think there was one

1   that was in the 90s as -- another one that was in the 90s as

2   well.  So clearly market share levels in a couple of the

3   markets, the same as in McWane.

4           THE COURT:  Now, what do you make of your

5   colleague's contention that there is also an additional

6   requirement of barriers to entry -- not just market share,

7   that there has to be barriers to entry?

8           And McWane was different.  It's a factory.  So it's

9   perhaps a different case factually that having 85 to 90

10  percent of that type of business may be different than a soft

11  business like this where barriers are more easily penetrated.

12          MR. SUNSHINE:  So two points on that, Your Honor.

13  I'll do the second one first.  We do allege all those other

14  barriers, and they're there and we can go through them and I

15  think we'd be arguing facts.

16          But just to be clear on it, the way that monopoly

17  law works is that most circuits -- the rules are a little bit

18  different between each -- will have a minimum threshold.

19  It's 50 in a lot of circuits.  It's 60 in others.  And in

20  those circuits, it typically says if you're at that level,

21  then clearly you need to have proof of entry barriers.

22  You need to have direct evidence of monopoly power.

23          What these cases and I think what the Eleventh

24  Circuit was saying in McWane is once the market share gets so

25  high, 90 to 100 percent, standing alone, that share of market

1    is certainly sufficient on a motion to dismiss stage to say --

2    I mean, obviously in the Eleventh Circuit, it was a more

3    complicated procedural context.  So I wouldn't say it's a

4    sliding scale, but depending on what the market share is, it

5    puts more pressure on those other areas.

6            The fact that Oscar entered the market isn't proof

7    of easy entry.  There was an entrant in McWane.  There was an

8    entrant in Dentsply.  That's not the relevant inquiry.  And we

9    go through chapter and verse in the complaint about all the

10   entry barriers that exist with, you know, literally the dozens

11   of contracts that have to be entered into, the regulatory

12   process, the ability to go out and attract enrollees, the

13   ability to achieve scale.  It's not about, can you enter the

14   market.  It's can you be an effective entrant.  And all of

15   these things are barriers to really being an effective

16   entrant.  But those facts are all alleged in detail.  And with

17   respect, Your Honor, the arguments about the barriers are all

18   fact-bound.  There's chapter and verse in the complaint about

19   why these are all plausible entry barriers.

20           THE COURT:  What about harm to competition versus

21   Oscar?  Because when I went through the complaint -- and I may

22   not have gone through it quite as thoroughly as certainly you.

23   You wrote it.  But when I went through it -- and I'll be

24   candid.  I sort of word-searched it, because it's pretty

25   dense.  And for purposes of today, I wanted to see how often

1    competition came up.  And the paragraphs I found, the focus is

2    on Oscar.  And there may be some generalized additional

3    language that if it's bad for Oscar, it's bad for everyone.

4              MR. SUNSHINE:  Mm-hmm.  Well, Your Honor --

5              THE COURT:  So what has been pled that competition

6    is harmed as opposed to one competitor, particularly since we

7    do know there are other people in the market?

8              MR. SUNSHINE:  Your Honor, sure.  And these track

9    through in a number of complaints to come to it, but I will

10   talk about just today -- I shouldn't say today.

11             For the 2019 enrollment period, there were two

12   effects on the market.  One, consumers paid higher prices than

13   they otherwise would.  And I'll explain that.  And the second

14   competitive effect is that consumers were denied choice

15   between programs.

16             THE COURT:  Is that pled in the complaint?

17             MR. SUNSHINE:  It is, Your Honor.

18             THE COURT:  All right.  I'll go back and look for

19   it.  You don't have to find it.

20             MR. SUNSHINE:  It is.  I think it kind of -- but

21   it's pled at the end.  It's pled in a more conclusory fashion,

22   but it's the guts of the whole story all throughout, right?

23   The idea that the price -- the allegation is that prices set

24   under the ACA is set by the lowest -- the second lowest silver

25   tier plan.

1          In a couple of the counties, Oscar had both the

2     first and the second lowest-priced silver plan.  Any customer

3     that was denied the ability to -- to be able to sign up for

4     that plan paid a higher price for their plan than they would

5     have paid if they had had the choice.  And all of the

6     customers that Oscar didn't get -- as we allege, there's at

7     least 30,000, that number is actually higher, as I'll talk to

8     in a minute -- all of those customers paid higher prices than

9     they would have paid.

10          There is also the quality competition, and the

11    customers were denied the choice.  The exclusive contracts

12    with the agents meant that the agents could only show the

13    Florida Blue plan.

14          THE COURT:  This may have come up a bit in the

15    injunction hearing, but from the complaint -- I certainly

16    appreciate the standard of review for the complaint and I'm

17    going to take the allegations as favorable to you and truthful

18    and so forth, but there's also the countervailing that it

19    can't just be -- you know, it has to be plausible as well as--

20          MR. SUNSHINE:  Right.

21          THE COURT:  -- as well-pled.

22          Where have you pled -- and, again, you don't need to

23    cite it.  We'll go back and look for it.  But did you plead

24    facts sufficient to show that the plan you're selling and the

25    plan that Florida Blue is selling -- yours is less, but it's

1   the same, as opposed to -- it's not helpful to say we have

2   cheaper options if the options aren't they same.  You can buy

3   a car without accessories.  It costs less, but it may not be

4   the one you want.  So has that been pled?

5           MR. SUNSHINE:  It has, Your Honor.  I would point

6   you to paragraph 30 through 34 of the complaint, and it talks

7   about the ACA has been driven by tiers with comparable

8   quality, and the main determinant for consumers is price.

9           THE COURT:  All right.  So you're saying that it's

10  required under the ACA to have comparable quality for the

11  certain tiers, and then price is determined based on the

12  provider and a number of factors?

13          MR. SUNSHINE:  Right.  And we're not saying the

14  plans are identical.  But certainly what we're alleging is

15  because the ACA frames those gold, bronze, silver, it provides

16  comparable levels of quality.  And what we clearly allege is

17  that because of that, price is the most important determinant.

18  And it makes sense, too, with the idea that the government

19  subsidies are tiered off the second lowest-tiered silver plan.

20  It assumes comparability across the board.  And also the idea

21  of the ACA is to create a level playing field so consumers can

22  choose.  So I think there is that harm.

23          There is also alleged in the complaint, there's a

24  harm to brokers.  What's alleged in the complaint is that

25  Oscar offered higher commissions to brokers than Florida Blue

1    did.  Those brokers were denied the opportunity to get more

2    money for their services by this arrangement.  So that's

3    another --

4           THE COURT:  That's an interesting point, because

5    I've been looking at it from the filter of harm to the

6    consumer, not considering the broker as being part of that

7    analysis.

8           MR. SUNSHINE:  Well -- and I think, Your Honor,

9    that's what's so pernicious about this practice.  And really

10   ultimately where the harm is, is it's a disruption of the

11   competitive process.  I mean, Oscar is the most intended

12   victim of it, but what has happened here is the competitive

13   process has been distorted by a company that certainly, under

14   the facts of the complaint, is an undisputed monopolist.

15          And so in that process, certain consumers ended up

16   paying more for their plans than they would have, brokers

17   ended up getting less commissions than they would have, and

18   then we have kind of the future effects of what it does to

19   deter entry, what it does to deter other competition, how it's

20   going to affect Oscar getting provider contracts in following

21   years.  All of those elements ultimately were down to the

22   consumer.

23          THE COURT:  Not to get into a fact-based discussion,

24   but to deal with plausibility of brokers who are denied a

25   higher commission because Oscar would pay more, can't they

1  just leave Florida Blue?  They have an exclusivity agreement.

2  They can just leave and go to someone else.  Now, Florida Blue

3  may pay less but have a higher volume of work, and that may be

4  a net increase in your income.

5          MR. SUNSHINE:  And, Your Honor, that's where

6  economic coercion comes in.  Because as we allege in the

7  complaint in those paragraphs, in 60 and on, brokers could not

8  leave.  And so -- they could not leave because they're selling

9  Medicare Advantage.  They could not leave because they're

10 selling in other parts of the state.  They simply had to

11 forego those commissions.  So that harm is to the commission.

12          That harm is also to those brokers' customers,

13 because those customers were denied the opportunity to pick

14 Oscar.  There may have been a customer who said, I really like

15 the application that Oscar puts on my mobile phone.  It's

16 probably not a real quality difference, but that customer

17 might have wanted that.  That customer was denied that choice.

18 He or she can't get Oscar because of this contract, and that's

19 really disruption of the process.

20          I mean, Oscar is not here saying, Your Honor, we

21 really would like you to order Florida Blue to give us some of

22 their agents.  That's not what we're about at all.  What we're

23 saying is, we want to compete for it.  We want to get out

24 there.  We want to go to brokers.  We want to say, we have a

25 better product.  We'll pay you more commissions.

1          We'll get out there.  You keep doing, you know, what

2    you're doing.  You do what's in the best interest of your

3    patients.  We're not trying to steal anybody.  We're just

4    trying to compete.  And what these contracts do is they

5    prevent any kind of competition, which gets to the heart of

6    the antitrust laws, because it denies all the fruits of

7    competition.  The whole reason why the antitrust laws promote

8    competition is to be able to get these price effects, to be

9    able to get these quality effects, to be able to get

10   innovation.  These things come from having a competitive

11   process.  These contracts inhibit the competitive process.

12          And, Your Honor, let me deal with how exactly these

13   contracts hit the competitive process by talking about

14   foreclosure.  And in talking about foreclosure, McWane is the

15   controlling case in this circuit, but I'm going to start with

16   Dentsply.  I don't think there's any question that a reader of

17   McWane could ever have that the Eleventh Circuit approvingly

18   followed Dentsply.  By my count, McWane cites Dentsply at

19   least 16 times during the complaint.  So let's just compare

20   what -- what happened in Dentsply with what happens here.

21          First of all, first fact, Dentsply sold a large

22   bundle of products to dealers.  There's an allegation on

23   page 185 that it sold over $400 million of products to dealers

24   while the profit from artificial teeth was just 16 to

25   22 million.  So, I don't have the exact sales.  I couldn't get

1    it out of the opinion, but clearly it's going to be a small

2    portion of that 400 million.  So there was a bundle of

3    products outside of artificial teeth, a predominant bundle of

4    products, that Dentsply had with respect to economic coercion.

5    Here, Florida Blue sells multiple insurance products, and it

6    sells them statewide.  And as we talked about, that's the

7    source of the economic coercion.  So that's bundling.

8            Second -- and I find this part really instructive.

9    According to the opinion, Dentsply locked up 23 key dealers.

10   But, Your Honor, in that case, the Third Circuit noted that

11   there are literally hundreds of dealers.  This was on page 185

12   of the opinion.  So literally hundreds of dealers.

13           Ms. DeMasi quoted that Florida Blue only has

14   9 percent of the dealers, when the Third Circuit said Dentsply

15   has hundreds of dealers.  We don't know what that hundreds is,

16   but it's clearly more than 200 or it wouldn't have said

17   hundreds.  Already, we're down at that 90 percent.  But it's

18   those 23 key dealers.  And on page 190, the Court said the

19   reality in this case is that the firm that ties up the key

20   dealers rules the market.  That's what Oscar's alleging.

21   The key dealers have been tied up here.

22           Now, how do we get to those numbers?  And I think

23   these facts are certainly plausibly alleged.  I actually think

24   these facts are correct, but certainly for this stage, they're

25   plausibly alleged.

1            We've got 2,200 brokers.  Those are 2,200 brokers

2    who are in Florida, they're licensed, and they have an

3    appointment to sell health insurance.

4            As we discussed in the first half of the argument,

5    Florida requires a broker to have a license and an appointment

6    to sell the product.  So by definition, anybody not in the

7    2,200 is currently not selling any product.

8            And we allege, quite plausibly -- and I will say, as

9    an aside, correctly -- that brokers that aren't selling any

10   health insurance for -- the vast majority of them have no

11   relationships to which to sell insurance.  So they're not key

12   dealers.  And the fact that there's 19,000 people who have a

13   license, Your Honor, frankly, doesn't really mean anything.

14   Those people could be retired.  They could have decided,

15   selling insurance is not my thing.  I'm going to do something

16   else.  They may have moved out of the area.  They may be just

17   selling life insurance.  And, again, that's just not

18   plausible.

19           And if I take that 1,700 that Florida Blue has

20   locked up and I divide it into 2,200, that's 77 percent.

21           THE COURT:  But why 2,200?  You've heard your

22   colleague's response.  I know you've pled that, but it has to

23   be plausible.  There is a significant greater -- significantly

24   greater number of brokers available who could sell this

25   product line if they wanted to.  So why hone it down to 2,200?

1        Tell me how the math works.

2        MR. SUNSHINE:  Yeah.  The 2,200, Your Honor, are

3   brokers who have a license and an active appointment to sell

4   health insurance in Orlando.  Those are people who are

5   currently selling life insurance.  If you go beyond anybody in

6   that 2,200 -- health insurance, if I said life.  Those are

7   people who are currently selling health insurance in Atlanta

8   [sic].

9        If you go beyond anybody in that 2,200, you're

10  talking about somebody who either carries no appointments at

11  all, not practicing at all, and doesn't carry any health

12  insurance appointments.  The idea that those are -- again, the

13  cases instruct us to look at the significant commercial

14  realities.  The fact that these companies -- that these

15  brokers are not selling anything makes it completely

16  implausible that they're a source of any significant amount of

17  business.  And, again, the cases say commercial reality, not

18  theoretical possibility.  And we've alleged that, Your Honor.

19  We've alleged that.

20       But it's worse than that, Your Honor, because of the

21  1,700 brokers that Florida Blue has, we've alleged that they

22  have the key ones.  They have the big ones.  Now, we don't

23  know exactly who all of them are.  We know who some of them

24  are, and that's what discovery will reveal.  But each broker

25  is not equal to each other broker.  They have the large ones.

1           We've talked about contracted general agents.

2    So they have -- that 77 percent of brokers understates the

3    commercial significance of those brokers.

4           And, Your Honor, I know my colleagues will clearly

5    dispute this and we'll have discovery and a trial about it,

6    but those allegations are so far beyond any kind of

7    plausibility scale.  They're sensible.  They're there, done in

8    detail.

9           THE COURT:  What are the allegations of the

10   maintenance of monopoly power?

11          Let's assume I'm with you that there is certainly a

12   prima facie case based on market share, if we look at McWane,

13   which also -- notwithstanding the market share in that case,

14   they did look at entries to barrier at page 829.

15          MR. SUNSHINE:  Right.

16          THE COURT:  And they then say, of course, the next

17   step is to look at whether the defendant willfully maintained

18   the market power.  Speaking about the use of brokers, it was

19   in the context at page 832, I believe, of going into this

20   exclusivity arrangement after a rival appears, not before.

21          So that was their context, that if you -- if you

22   have a dominant firm, the issue then becomes not did they

23   become dominant, but are they willfully maintaining their

24   dominant position through some means that's inappropriate,

25   such as then acquiring exclusive brokers; whereas here,

1    Florida Blue apparently had exclusive brokers before Oscar

2    showed up since Oscar's a recent entrant.

3            MR. SUNSHINE:  Your Honor, several things.  I mean,

4    first, we do think new exclusivity was introduced.  And we

5    have alleged that with the fact that new agreements were

6    signed up, new and tougher agreements maybe that Florida Blue

7    felt that the old ones were inadequate.  But clearly, there

8    were new agreements that were put into place directly as a

9    result of Oscar's entry.  We allege that for the -- in August,

10   late August, after Florida Blue understood that Oscar had

11   lower prices, that this new round of exclusivity contracts

12   were in place.

13           But to your point, monopoly maintenance is something

14   that -- it goes on over time.  In Dentsply, which cites this

15   directly.  And pardon me, Your Honor, I'm just going to need a

16   second to find the cite.  Dentsply goes and says very clearly

17   that -- the court in Dentsply said, Dentsply very well may

18   have obtained their monopoly properly, but the continued

19   enforcement of these provisions can run afoul of the antitrust

20   laws and can be illegal.  And that's exactly -- even if you --

21   you know, putting aside the allegations of the new records,

22   that's exactly what -- what happened here.

23           And in Dentsply, there was a -- it was a de facto

24   exclusivity.  All right.  It made it known that it didn't want

25   people -- it didn't want its dealers selling other people's

1    teeth, but that continued to happen over time.

2          The cite I was looking for, Your Honor, is on

3    page 196 of Dentsply, and it's just before the end of the

4    section:  While we may assume that Dentsply won its preeminent

5    position by fair competition, that fact does not permit

6    maintenance of its monopoly by unfair practices.  And that's

7    essentially what happened in both cases.

8          Your Honor, I referred to in the earlier half kind

9    of supplemental authority where antitrust cases come in, and

10   there's other cases that support that which we will provide to

11   the Court.

12         I wanted also to -- just to draw one other

13   comparison to Dentsply, because the argument is made we ignore

14   other lines -- other channels to the consumer.  But the fact

15   of the matter is, Your Honor, in Dentsply, there were other

16   channels to the consumer as well.  The consumer in that case

17   was actually the laboratories that were manufacturing the

18   teeth.

19         And the court noted that those other lines of

20   business were available, but were not sufficient to provide

21   the minimum efficient scale that the competitive process

22   really demanded.  And that's precisely what the -- that's

23   precisely what's going on here as well.  There's just not

24   enough business to support the minimum efficient scale.

25         And the Dentsply decision stresses focusing on

1   practical commercial realities.  And, in fact, the district

2   court below held that -- that because there wasn't total

3   foreclosure, the practice didn't violate the antitrust laws.

4       The Eleventh Circuit overruled that finding and

5   criticized the district court.  And, again, these words are

6   from page 196:  The district court erred when it minimized the

7   stat situation and focused on a theoretical feasibility of

8   success through direct access to dental labs.

9       That, Your Honor, is what I think Florida Blue is

10  trying to urge this Court to do.

11      Let me just make sure, Your Honor, that I've picked

12  up the points I wanted to make.

13      THE COURT:  If you'd like to confer with your

14  colleagues, feel free to do so.

15    (Pause in proceedings.)

16      MR. SUNSHINE:  Your Honor, I think my colleagues are

17  telling me to sit down.

18      THE COURT:  All right.  Thank you very much.

19      MR. SUNSHINE:  Thank you.

20      THE COURT:  Thank you.

21      Ms. DeMasi, any brief reply you would like to make?

22      MS. DeMASI:  Just a couple points, Your Honor.

23      Just a few points, Your Honor.  Let me first address

24  McWane.  And Mr. Sunshine read from page 831 about McWane for

25  the point of showing that market share, in fact, is sufficient

1    to presumptively infer monopoly power.  Just a couple points

2    on that.  First, if it were just market share that mattered,

3    McWane wouldn't have gone on for pages to discuss barriers to

4    entry, which is, in fact, precisely what it did on pages 830

5    through to page 833.

6            In fact, in a section that Mr. Sunshine didn't read,

7    the court is evaluating the import of barriers to entry and

8    makes clear that case law from other circuits support McWane's

9    position that the court needs to look at barriers to entry in

10   addition to market share and cites Tops Market, the Second

11   Circuit case I referenced before that says, quote, We cannot

12   be blinded by market share figures and ignore marketplace

13   realities, such as the relative ease of competitive entry.

14   A competitor's successful entry refutes any inference of the

15   existence of monopoly power that might be drawn from the

16   defendant's market share.

17           With respect to Dentsply, Your Honor, Dentsply

18   really distinguishes itself.  And I encourage Your Honor -- it

19   sounds like you've done a lot of reading of these cases, and I

20   encourage you to read Dentsply.

21           Dentsply is a case about the artificial tooth

22   industry.  It was a stagnant market with minuscule

23   competitors.  The competitors had single-digit percentages,

24   some less than one percent, and those are included.  And it

25   was important to the court's analysis that there really was no

1   substantial entry by any other competitor, and that's on page

2   185 of the decision.

3            There was no other viable distribution path, which

4   I'll get to in a moment.  Mr. Sunshine mentioned there was a

5   possible distribution channel, but the court held it wasn't a

6   viable one.  And there was no easy place to access end users.

7   It was completely different than the market here.

8            And, indeed, what the Dentsply court says in

9   distinguishing itself at the end of the case is -- this is on

10  page 196 of the decision -- it says, This case does not

11  involve a dynamic volatile market -- and it analogizes it to

12  the Microsoft case, but it would be easily able to analogize

13  it here -- and does not involve a proven alternative

14  distribution channel.  The economic impact of an exclusive

15  dealing arrangement is amplified in this stagnate, no-growth

16  context of the artificial tooth field.

17           And so, Dentsply really, like I said, distinguishes

18  itself.  It's quite different from this situation here.  And

19  as I've said -- and if Your Honor looks, there's a section,

20  again, that -- on page 194 that Mr. Sunshine didn't turn to

21  that talks about a possible alternative distribution channel

22  but says, quote, We are convinced that it's viable only in a

23  sense that it's possible, not that it is practicable or

24  feasible in the market as it exists and functions.

25           And held at the end that there was actually no

1   viable alternative distribution channel, again, unlike here.

2          Mr. Sunshine mentioned some allegations about price.

3   And, again, we think if Your Honor goes back to the

4   allegations in the complaint, there is no well-pled allegation

5   of super competitive prices.  When Mr. Sunshine talks about

6   price and the allegations he pointed Your Honor to, he's

7   talking only about premium.  He's not talking about overall

8   cost to the consumer that includes co-pays and non-covered

9   costs.  They don't plead that the overall price to the

10  consumer is higher, that Florida Blue has super competitive

11  prices in the sense of overall cost.  They're only talking

12  about premium.  And indeed, Oscar uses its ability to offer

13  low premiums as one of the ways in which it is a successful

14  competitor in the marketplace.  So that actually goes to low

15  barriers to entry, the ability to offer low prices.

16         Just two more points, Your Honor.  On harm to

17  brokers, which came up during your discussion with

18  Mr. Sunshine, we don't think the harm to brokers is a harm

19  that is a harm to competition.  If the brokers want the

20  benefit of increased commissions, brokers can go and are free

21  to go, leave Florida Blue and go work for Oscar.  So there's

22  no harm to brokers that is pled.

23         And then finally, Your Honor, with respect to the

24  2,200 brokers, it sounds like it's Oscar's argument that the

25  relevant set of brokers are Florida Blue's brokers, that

1   somehow the market should be defined and the relevant pool of

2   brokers to look at -- for purposes of foreclosure should be

3   defined by Oscar's ability to free ride off of Florida Blue's

4   or other insurer's brokers that are appointed.

5          Again, there's no -- there's no allegation that

6   Oscar can't appoint its own brokers.  And the idea that the

7   relevant pool of brokers should be defined by the ability to

8   free ride respectfully turns the antitrust laws on their head.

9   And, again, we think the pool of relevant brokers is much

10  bigger, as set forth in the materials that we've submitted,

11  and that the Court can properly take judicial notice of on

12  this motion to dismiss.

13         THE COURT:  This question I have may be weighing

14  into the facts too much so, but an argument made by

15  Mr. Sunshine is that the ACA has tiers of coverage, so

16  silver -- whatever the nomenclature is.  But there are tiers

17  that are analogous.

18         And you just made an argument that there is no

19  allegation well-pled in the complaint that the net price to

20  consumers is higher with Florida Blue, because you have to

21  look at a number of things besides what you're paying.

22  You have to look at co-pay and a number of other factors.

23         So in the tier approach that the ACA has created,

24  does it cover things such as co-pays and those sorts of

25  things, or is it -- how analogous are these tiers?

1    Because I'm having trouble with how to compare what

2 Oscar offers versus what Florida Blue offers in terms of what

3 the complaint has alleged.

4    MS. DeMASI:  Sure.  Well, again, in terms of what

5 the complaint has alleged, it's alleged that there are

6 different tiers in terms of premiums.  Mr. Sunshine mentioned

7 quality.  The ACA doesn't actually look at quality.  It looks

8 at what's quoted in paragraph 30, essential health benefits.

9 So it doesn't get to the total cost, but rather it's different

10 premiums for different services that are set forth in the

11 different tiers.  And that's in paragraphs 29 and 30 of the

12 amended complaint.

13    THE COURT:  Thank you.  Is there anything else?

14    MS. DeMASI:  Thank you, Your Honor.

15    THE COURT:  Thank you.

16    Anything further by either side before we conclude

17 for the day?

18    There being no takers, then thank you all very much.

19 I do appreciate your argument.  I very rarely have argument on

20 a motion to dismiss, but it has been very helpful.  And I will

21 go back and re-read a number of the points that you all have

22 made and resolve this issue promptly, meaning within the next

23 probably two weeks.

24    I don't think I can do it any quicker than that, but

25 I really do want to re-read these issues, go back through the

1    complaint more thoroughly, and then come up hopefully with a

2    well-reasoned result that someone's going to be unhappy with,

3    one side or the other.

4              Thank you all very much.  It's been a pleasure, as

5    always.

6              COUNSEL:  Thank you, Your Honor.

7         (Adjourned at 12:23 p.m.)

8                         *  *  *  *  *  *

9                   Certificate of Official Reporter

10   I certify that the foregoing is a correct transcript of

11   the record of proceedings held in the above-entitled matter.

12

     s/Koretta Stanford_____
13   Official Court Reporter
     United States District Court
14   Middle District of Florida      Date:  9/17/19

15

16

17

18

19

20

21

22

23

24

25