# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

OSCAR INSURANCE COMPANY OF
FLORIDA,

        Plaintiff,

v.                                         Case No:  6:18-cv-1944-Orl-40EJK

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., FLORIDA HEALTH
CARE PLAN INC. and HEALTH
OPTIONS INC.,

        Defendants.

_____/

## ORDER

This cause is before the Court on the following pleadings:

1.    Defendants Blue Cross and Blue Shield of Florida, Inc., Florida Health Care Plan Inc., and Health Options Inc.'s (collectively, "**Florida Blue**") Motion to Dismiss (Doc. 81 (the "**Motion**"));

2.    Plaintiff Oscar Insurance Company of Florida's ("**Oscar**") Response in Opposition to Defendants' Motion to Dismiss (Doc. 86);

3.    Statement of Interest of the United States of America (Doc. 89)[1];

---

[1]   28 U.S.C. § 517 does not create a right for the Government to appear and submit argument in any case in which the United States articulates an interest in the development and correct application of the law. *United States v. Salus Rehab.*, No. 8:11-cv-1303, 2017 WL 1495862 (M.D. Fla. Apr. 26, 2017). *Cf.* 28 U.S.C. § 2403(a) (empowering the Government to intervene in a federal court action that questions the constitutionality of an Act of Congress affecting the public interest). The Government's briefing and participation at oral argument, while siding with Oscar, was unhelpful to the resolution of the issues at bar.

4.      Defendants' Response to the Statement of Interest of the United States of America (Doc. 92); and

5.      Plaintiff's Reply to Defendants' Response to the Statement of Interest of the United States of America (Doc. 95).

At the parties' request, the Court held oral argument on August 16, 2019. (Doc. 105). With briefing complete, the Motion is ripe. Upon consideration, the Motion is due to be granted and the case dismissed with prejudice.[2]

## I.      BACKGROUND[3]

Oscar contends Florida Blue is engaged in improper, unlawful, and anticompetitive conduct designed to stifle competition in Florida for the sale of individual health insurance plans and products via the Affordable Care Act of 2010 ("**ACA**"). (Doc. 75, ¶ 1). Oscar describes itself as one of the country's fastest-growing health insurance companies, utilizing technology and a customer-first approach to make health care affordable and accessible to its members. (*Id.* ¶ 3). Oscar accuses Florida Blue of implementing a "blatant scheme targeted at Oscar to keep it out of the state" by "denying Oscar access to insurance brokers upon whom consumers rely to advise them of their insurance options." (*Id.* ¶ 5). In support of this contention, Oscar notes that Florida Blue entered into exclusivity agreements with its brokers under which brokers agree to sell only Florida

---

[2]    The Court finds the complained-of conduct is immune from antitrust scrutiny under the McCarran-Ferguson Act and will not reach the merits of whether Plaintiff has adequately pled claims under the Sherman Act and the Florida Antitrust Act.

[3]    This account of the facts comes from Plaintiff's Amended Complaint. (Doc. 75). The Court accepts these factual allegations as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

Blue's individual ACA plans. (*Id.*). Oscar asserts that Florida Blue employs illegal coercion by "aggressively and selectively enforc[ing] this exclusivity policy against Oscar by systematically contacting brokers who had signed contracts with . . . Oscar to threaten them with permanent termination." (*Id.*).

Florida Blue moves to dismiss the Amended Complaint on two grounds: first, the Sherman Act Claims (Counts I–III) are barred by the McCarren-Ferguson Act, which immunizes insurers from federal suits involving the "business of insurance"[4]; and second, the Amended Complaint fails to state a claim for monopolization or attempted monopolization under § 2 of the Sherman Act and Florida law, and fails to state a claim for unreasonable restraint of trade pursuant to § 1 of the Sherman Act and Florida law. (Doc. 81, p. 3).

## II.   STANDARD OF REVIEW

To survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions and recitation of a claim's elements are properly disregarded, and courts are "not bound to accept as true a

---

[4]   Pursuant to Fla. Stat. § 542.20, "[a]ny activity or conduct . . . exempt from the provisions of the antitrust laws of the Untied States is exempt from the provisions of this chapter [542]." Accordingly, if the McCarran-Ferguson Act exemption applies, Fla. Stat. § 540.20 requires dismissal of the state law antitrust claims. *In re Jet 1 Ctr., Inc.*, 322 B.R. 182, 197 (M.D. Fla. 2005); *see also Golta, Inc. v. Greater Orlando Aviation Auth.*, 761 F. Supp. 778 (M.D. Fla. 1991).

legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam). In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 67.

## III.   DISCUSSION

### A.   The McCarran-Ferguson Act

In 1945, Congress passed the McCarran-Ferguson Act. 15 U.S.C. §§ 1011–1015. Congress passed the Act "to allow insurers to share information relating to risk underwriting and loss experience without exposure to federal antitrust liability and to preserve for the states the power to regulate the insurance industry." *Gilchrist v. State Farm Mut. Auto. Ins.*, 390 F.3d 1327, 1330 (11th Cir. 2004) (citing *Union Labor Life Ins. v. Pireno*, 458 U.S. 119, 133 (1982)).[5] The Act provides, in pertinent part:

> **(a) State regulation**
>
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> **(b) Federal regulation**
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee

---

[5] "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

> or tax upon such business, unless such Act specifically relates
> to the business of insurance . . . .

15 U.S.C. § 1012.

The exemption from antitrust liability is not without limitation:

> **(b)** Nothing contained in this chapter shall render the said
> Sherman Act inapplicable to any agreement to boycott,
> coerce, or intimidate, or act of boycott, coercion, or
> intimidation.

*Id.* § 1013. The Act, therefore, exempts the activities of insurance companies from antitrust liability when the following three elements are met: "(1) the challenged activity is part of the 'business of insurance'; (2) the challenged activity is regulated by state law[6]; and (3) the challenged activity does not constitute a boycott of unrelated transactions." *Gilchrist*, 390 F.3d at 1330. It is well settled that exemptions from the antitrust laws are narrowly construed. *Grp. Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979).

### 1.    The Business of Insurance

The first requirement for determining whether an insurer's conduct falls within the scope of the McCarran-Ferguson exemption is that the activity is part of the "business of insurance."[7] The Act does not exempt all activities undertaken by insurance companies;

---

[6] "The legislative history of the proviso clause indicates that Congress never intended state insurance department regulation of *some* insurance company activities to be enough to completely oust the federal antitrust laws for *all* activities. Otherwise a gap would exist where neither federal nor state law applied, and the public would be left wholly unprotected." Charles D. Weller, *The McCarran-Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy*, 1978 DUKE L.J. 587, 607 (1978).

[7] "The issue is difficult to resolve because the Act does not define 'business of insurance,' and the legislative history is ambiguous." Alan M. Anderson, *Insurance and Antitrust Law: The McCarran–Ferguson Act and Beyond*, 25 WILLIAM & MARY L.R. 81, 89–90 (1983) (citing 91 CONG. REC. 480 (1945) (remarks of Sen. Murdock) (suggesting that the 'business of insurance' is synonymous with 'insurance companies')).

that is, the Act exempts the "business of insurance," not the "business of insurers." *Royal Drug,* 440 U.S. at 211. In *Royal Drug*, the Court observed that "[t]he relationship between the insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'" *Id.* at 215–16. Included within this definition are activities that "relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." *Id.* at 216 (citing *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460 (1969)).[8]

The Supreme Court in *Royal Drug* articulated a three-prong test for determining whether an insurer's activity is within the business of insurance: first, whether the practice has "the effect of transferring or spreading a policyholder's risk"; second, whether the practice is "an integral part of the policy relationship between the insurer and the insured"; and third, whether the practice is "limited to entities within the insurance industry." *Gilchrist*, 390 F.3d at 1331 (quoting *Pireno*, 458 U.S. at 129).

a.      *Transferring or Spreading Risk*

At issue is whether Florida Blue's exclusivity agreements with its brokers constitute the business of insurance. In applying the test to a given relationship or transaction, the Court relies "on [Plaintiff's] characterization of its claim, as it is supported by the allegations in the complaint . . . because we must accept the plaintiff's theory of the case in conducting the McCarran-Ferguson inquiry." *Sanger Ins. Agency v. HUB Intern., Ltd.*,

---

[8]    "The process of deciding what is and is not the 'business of insurance' is inherently a case-by-case problem." *Royal Drug*, 440 U.S. at 252.

802 F.3d 732, 743 (5th Cir. 2015). Oscar describes Florida Blue's exclusivity agreement

with its brokers, as follows:

> . . . First and foremost, the scheme involves denying Oscar access to insurance brokers upon whom consumers rely to advise them of their insurance options . . . .

> (Doc. 75, ¶ 5)

> Brokers play a crucial role in driving policy sales in Florida, more so than in other states, where brokers play a less prominent role. In the counties comprising the Orlando metro area, even with Florida Blue's exclusionary conduct, 75 percent of Oscar's policy sales came through brokers compared to 40 percent nationally.

> (*Id.* ¶ 35)

> Brokers must be licensed by the state to sell insurance. To become licensed, brokers must complete 60 hours of insurance and ethics education coursework and pass a written examination. *See* Fl. Stat. Ann. §§ 626.241, 626.221, 626.8311.

> (*Id.* ¶ 36)

> According to the National Association of Health Underwriters, a trade association representing over 100,000 insurance brokers and agents nationwide, brokers 'help millions of consumers by guiding them through the complexities of health insurance purchasing and enrollment, while ensuring they get the best policy at the most affordable price.' Brokers do so by 'seek[ing] to understand each personal situation to create recommendations that complement a client's financial and medical security needs.' Because consumers rely on brokers as expert personal insurance advisors, Florida law recognizes insurance brokers as fiduciaries of their customers and obligates brokers to provide their clients accurate advice about insurance plans and coverage.

> (*Id.* ¶ 37)

> . . . Oscar's experience in Orlando demonstrates that local brokers have a far greater ability to guide the decisions of local residents than out-of-state or out-of-area brokers. In other

words, many consumers strongly prefer the advice of local brokers whom they interact with in person, rather than brokers who communicate with them solely from a call center or through the Internet. Insurance plan sales are also driven heavily by consumer referrals, and local brokers create more referrals. Of the individual ACA insurance policies sold by brokers for Oscar in Orlando during the 2019 enrollment period, 75 percent came from brokers with operations in that area, even though those brokers represent only approximately 25 percent of Oscar's brokers appointed to sell ACA plans in Florida.

(*Id.* at ¶ 39).

The Supreme Court instructs the trial court to focus on the relationship between the insurance company and the policyholder. Here, Oscar concedes that Florida Blue's brokers help consumers by guiding them through the complexities of health insurance purchasing and enrollment. (*See id.* ¶ 37). Florida Blue's brokers ensure consumers get the best policy at the most affordable price, and they seek to understand each personal situation and create recommendations that complement the client's financial and medical security needs. (*See id.*). In short, consumers rely on Florida Blue's brokers as expert personal insurance advisors, and indeed Florida law recognizes the brokers as the client's fiduciary. Florida Blue's brokers increase the number of policyholders, therefore spreading the risk. It is hard to imagine a relationship more squarely at the core of the business of insurance than the one described by Oscar as existing between Florida Blue's brokers and ACA consumers.

In *Thompson v. New York Life Insurance*, 644 F.2d 439, 440 (5th Cir. 1981),[9] appellant entered into a Soliciting Agents Contract with New York Life Insurance

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981). *Thompson* was decided May 4, 1981, and is therefore binding precedent.

Company, authorizing appellant to solicit insurance applications subject to approval by the appellee. The Agreement precluded appellant from engaging in any other business or occupation for remuneration or profit during the contract year absent the written consent of New York Life. *Id.* Appellant was terminated when he failed to procure $50,000 of new insurance as required by the Agreement. *Id.* at 441. Appellant sued New York Life for violating § 1 of the Sherman Act. *Id.* Appellee argued the exclusive agency contract was exempt from antitrust scrutiny under the McCarran-Ferguson Act because it constituted the business of insurance. *Id.*

The Fifth Circuit considered the relationship between New York Life's exclusive broker and the consumer, and observed:

> The trial court correctly recognized that the proper focus of its inquiry should be upon the impact of the challenged activity or restriction on the insurer/insured relationship. The trial court concluded, without lengthy analysis, that at the center of this relationship was the agent, a middle-man in the truest sense, and that therefore, the terms and conditions of the agency contract were, a fortiori, within the business of insurance.

*Id.* at 443. The Fifth Circuit noted that the Supreme Court in *Royal Drug* did not address the validity of agency restrictions and left open whether transactions between an insurer and its agents is the business of insurance. However, the Fifth Circuit went on to hold that that "exclusive agency clauses have been deemed exempt from anti-trust scrutiny as part of the business of insurance." *Id.* (citations omitted).[10]

---

[10]   The court cited to *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453 (1969), for the proposition that "the fixing of rates is part of [the] business [of insurance]" and "[t]he selling and advertising of policies and the licensing of companies and their agents are also within the scope of the statute." *Thompson*, 644 F.2d at 442–43 (citations omitted). Oscar concedes Florida Blue's brokers are instrumental in selling policies of insurance.

Twenty-four years after *Thompson*, the Fifth Circuit had the opportunity to expound upon the McCarran-Ferguson Act in *Sanger Insurance Agency v. HUB Intern., Ltd.*, 802 F.3d at 732. Appellant Sanger claimed it was forced to abandon prospective business due to HUB's anticompetitive practices. *Id.* at 734. HUB was the Broker of Record and Administrator of an insurance program issued through the American Veterinary Medical Association Professional Liability Insurance Trust. *Id.* The program offered various forms of insurance to members of the American Veterinary Medical Association. *Id.* Sanger claimed the program accounted for 90% of the market for veterinary professional liability insurance. *Id.* at 735. The alleged anticompetitive behavior consisted of HUB having entered into exclusive dealing arrangements with its insurers to prevent them from writing veterinary insurance through other brokers. *Id.*

Sanger alleged that after it approached the Texas Equine Veterinary Association and Continental, HUB contacted its insurers to find out if they were underwriting coverage for Sanger. *Id.* at 735–36. HUB also objected to its insurers raising program premiums because doing so might have driven customers to Sanger. *Id.* at 736. Accordingly, Continental, Zurich, The Harford, and Travelers told Sanger they had an exclusive arrangement with HUB and could not do business with Sanger. *Id.* Sanger sued HUB for violations of Sections 1 and 2 of the Sherman Act and related state law claims. *Id.* [11] The

---

[11]  Sanger's complaint alleged that "HUB violated federal and state antitrust law when, by entering into exclusive arrangements with the companies willing to underwrite these policies, it prevented competitors from brokering veterinary insurance policies." *Sanger*, 802 F.3d at 736.

trial court granted HUB's motion to dismiss, holding the McCarran-Ferguson Act exempted HUB's alleged anticompetitive activity from federal antitrust law. *Id.*[12]

The Fifth Circuit applied the test announced in *Pireno* to answer the question whether "HUB's alleged exclusive dealing arrangements with insurers constitute[d] the 'business of insurance.'" *Id.* at 743. Sanger, like Oscar in the instant case, relied on *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010). *Id.* However, in that decision, the court confronted an agreement between insurer-partners not to compete for incumbent business; that is, accounts up for renewal. *Id.* (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 340, 356). Thus, the agreement did not involve the extent to which a prospective consumer would spread its risk to an insurer; rather, it concerned merely to which insurer that risk would be transferred. *Id.* (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 357). The Fifth Circuit noted that HUB's exclusive dealing arrangement, unlike the agreement in *In re Insurance Brokerage Antitrust Litigation*, results in "[k]eeping a large, geographically and professionally diverse pool of veterinarians in the [p]rogram—including significant numbers of small-animal, large-animal, mixed, and equine veterinarians—[and] spreads risk." *Id.*

Instead, the Fifth Circuit found HUB's conduct to be closer to *Feinstein v. Nettleship Co. of L.A.*, 714 F.2d 928, 932 (9th Cir. 1983).[13] There, the Ninth Circuit held

---

[12] Unlike Florida, Texas antitrust law does not incorporate the McCarran-Ferguson exemption. *See* Tex. Bus. & Comm. Code § 15.05(g) ("[T]he McCarran-Ferguson Act does not serve to exempt activities under this Act." (citation omitted)). Therefore, the Fifth Circuit held that "[w]hether HUB is entitled to the exemption thus has no effect on Sanger's state antitrust claims." *Sanger*, 802 F.3d at 742.

[13] The Ninth Circuit distinguished this case from the agreement providing peer review of chiropractors' fees in *Pireno* and the agreement between the insurer and pharmacists to offer low cost drugs in *Royal Drug*, holding that those practices are aimed solely at

the agreement between the medical association and insurers to offer malpractice insurance only to members of the Los Angeles County Medical Association was "demonstrably related to the allocation and spreading of risk," because "it defines the pool of insureds over which risk is spread." *Id.* (citing *Feinstein*, 714 F.2d at 932). Because it had the effect of spreading the risk, the exclusivity agreement in *Feinstein* was determined to constitute the business of insurance. *Id.* (citing *Feinstein*, 714 F.2d at 932).

The Fifth Circuit further held that Sanger's attempt to siphon off HUB's veterinarians by offering group plans through HUB's insurers would alter the composition of policyholders in the program and likely impact the program's ability to spread risk. *Id.* at 744. The same is true here. Florida Blue's exclusive brokers work to create a broad risk pool, thereby spreading the risk. Allowing Oscar to have access to Florida Blue's exclusive brokers would result in Oscar siphoning off ACA consumers and altering the composition of policyholders, impacting Florida Blue's ability to spread risk. Finally, the Fifth Circuit, being well aware of the Supreme Court's holding in *Pireno*, stated that "even if viewed more narrowly as just a 'broker' case, most courts have held that routine dealings between insurers and brokers or agents do constitute the business of insurance even if that relationship may not be 'distinctively different from ordinary relationships with dealers marketing a product or service.'" *Id.*[14]

---

cutting insurers' costs—the business of insurers—and had nothing to do with the allocation of risk—the business of insurance. *Feinstein*, 714 F.2d at 932.

[14] The Department of Justice argues that *Thompson* does not survive *Pireno*. (Doc. 89, p. 11). The Department also contends that *Thompson* did not discuss *Pireno*'s factors on whether a practice is an integral part of the policy relationship. (*Id.*). However, *Gilchrist* and *Sanger* were decided in 2004 and 2015, respectively, long after *Pireno*, and neither criticize the reasoning in *Thompson*. Similarly, the First Circuit decided *Arroyo-Melecio v. Puerto Rican American Insurance*, 398 F.3d 56, 68 (1st Cir. 2005),

Oscar contends that "a broader pool of insureds under the ACA does not spread policyholder risk because each individual ACA plan customer is risk-neutral for insurers." (Doc. 86, p. 4). Oscar explains that "[f]ederal regulation requires insurers to charge all ACA plan customers the same rates regardless of health status, and then funds are reallocated from plans with lower-risk enrollees to plans with higher-risk enrollees to compensate." (*Id.* (citing 42 U.S.C. § 18063)).

First, the Amended Complaint does not allege that under the ACA an insurer need no longer worry about spreading the risk, and the Court must limit its factual review to the allegations contained in the Amended Complaint. Second, even if the Court were permitted to stray outside the Amended Complaint, Oscar's argument that § 18063 defeats the first prong of the "business of insurance" test announced in *Pireno* and reiterated in *Gilchrist* is not quite as simple as Oscar's suggests. Notably, Oscar does not cite any precedent or a single government study discussing whether the risk allocation envisioned by § 18063 works, and the United States Department of Justice did not advance this argument in its Statement of Interest. (Doc. 89).

The Risk Adjustment statute states:

**(a) In general**

**(1) Low actuarial risk plans**

Using the criteria and methods developed under subsection (b), each State shall assess a charge on health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans

---

after *Pireno* and *Royal Drug*, and observed that *Royal Drug* left open the question of whether the business of insurance includes dealings within the insurance industry between insurers and agents. The Department of Justice is too quick to dismiss binding precedent, and this Court declines to follow suit.

or coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

**(2) High actuarial risk plans**

Using the criteria and methods developed under subsection (b), each State shall provide a payment to health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

**(b) Criteria and methods**

The Secretary, in consultation with States, shall establish criteria and methods to be used in carrying out the risk adjustment activities under this section. The Secretary may utilize criteria and methods similar to the criteria and methods utilized under part C or D of title XVIII of the Social Security Act. Such criteria and methods shall be included in the standards and requirements the Secretary prescribes under section 18041 of this title.

**(c) Scope**

A health plan or a health insurance issuer is described in this subsection if such health plan or health insurance issuer provides coverage in the individual or small group market within the State. This subsection shall not apply to a grandfathered health plan or the issuer of a grandfathered health plan with respect to that plan.

42 U.S.C. § 18063. The statute merely provides that the Secretary, in consultation with

States, shall establish criteria and methods to carry out the task of risk assessment. The

statute envisions that first, the actuarial risk of enrollees must be calculated, after which

the Secretary and the States attempt to agree upon criteria and methods for carrying out

risk adjustment. While Florida Blue conceded at oral argument that § 18063 "softens" the

risk for providers of ACA coverage, the plain wording of § 18063 does not convince the Court that spreading risk is no longer a concern for insurers selling ACA coverage.[15]

The relationship between the insurer and its brokers is at the core of the business of insurance—that is, spreading risk. Furthermore, as Oscar concedes in their Amended Complaint, this relationship is fundamental to the type of policy which could be issued, its reliability, interpretation, and enforcement. (Doc. 75, ¶ 35–39); *see also Royal Drug,* 440 U.S. at 215–16. As Oscar aptly noted, Florida Blue's brokers are fiduciaries to the ACA customer under Florida law. (*Id.* ¶ 37). The services provided by Florida Blue's brokers go directly to the allocation and spreading of risk. The argument advanced by Plaintiff and the Department of Justice that Florida Blue's brokers, who are bound to work exclusively for Florida Blue, are not engaged in the transfer of risk and are not an integral part of the policy relationship between the insurer and the insured ignores the allegations set forth in the Amended Complaint and disregards the holdings in *Thompson* and *Sanger*.

It is worth noting that during oral argument, Plaintiff at times framed Florida Blue's exclusive agreement with its brokers as an impediment to market entry by Oscar. This argument places the cart before the horse. Whether a dominant firm uses exclusivity agreements with its brokers to maintain its monopoly power is relevant only if the

---

[15] *See Insights on the ACA Risk Adjustment Program*, AM. ACAD. OF ACTUARIES (Apr. 2016), https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/RA-March-31-White-Paper-032416.pdf; *see also March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting*, CTR. FOR MEDICARE & MEDICAID SERVS. (Mar. 24, 2016), https://www.actuary.org/sites/default/files/files/imce/Insights_on_the_ACA_Risk_Adjustment_Program.pdf.

exemption from federal antitrust law does not apply. *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015). For purposes of the McCarran-Ferguson Act, the Court's inquiry is limited to whether Florida Blue's use of exclusive brokers is part of the relationship between the policyholder and the insurer, along with the other factors expressed in *Royal Drug, Pireno,* and *Gilchrist*. The legality and propriety of exclusivity agreements are beyond dispute.

*b.*        *Integral Part of the Policyholder Relationship*

This prong of the "business of insurance" analysis requires little discussion. As discussed in the preceding section, the brokers employed by Florida Blue provide invaluable services to customers trying to navigate the complex world of health insurance coverage. The services provided by Florida Blue's brokers are neither logically nor temporally unconnected to the transfer of risk accomplished by procuring a diverse pool of insureds. Additionally, the Fifth Circuit announced in *Thompson* that "[a]n important factor in assessing whether an exclusive agency arrangement constitutes the business of insurance is whether the exclusivity requirement 'concern[s] the agent's insurance dealings as such.'" *Thompson*, 644 F.2d at 444. As in *Thompson*, Florida Blue did not force its brokers to engage in activities unrelated to insurance. Rather, their brokers received incentives beyond the usual agency relationship—access to all of Florida Blue's lines of insurance—in exchange for which the brokers agreed to focus all their entrepreneurial skills on selling only Florida Blue's insurance products. *See id.*; (Doc. 75, ¶ 60). It is up to the State of Florida to decide whether such restrictive covenants are a good policy.

c.       *Limited to Entities within the Insurance Industry*

The Court next considers whether Florida Blue's activities are limited to entities within the insurance industry. *Gilchrist*, 390 F.3d at 1331; *see also Pireno*, 458 U.S. at 132. The Supreme Court in *SEC v. National Securities, Inc.*, held "'the business of insurance' pertained to those activities peculiar to the insurance industry. Business activities of insurance companies not peculiar to the insurance industry were found to be subject to federal regulatory laws." *Am. Family Life Assurance Co. of Columbus v. Planned Mktg. Assocs., Inc.*, 389 F. Supp. 1141, 1145 (E.D. Va. 1974) (citing *Nat'l Sec., Inc.*, 393 U.S. at 459–60). The court in *Sanger* summarized several opinions addressing this concept and concluded that "most courts have held that routine dealings between insurers and brokers or agents do constitute the business of insurance even if that relationship may not be 'distinctively different from ordinary relationships with dealers marketing a product or service.'" *Sanger Ins. Agency*, 802 F.3d at 744. For example, "authorizing agents to solicit individual or group policies [and] accepting or rejecting coverages tendered by brokers" are exempt activities. *Id.* (quoting *Owens v. Aetna Life & Cas. Co.*, 654 F.2d 218, 226 (3d Cir. 1981)). And in *Thompson*, the Fifth Circuit held that an insurance company's contract with an agent prohibiting him from engaging in "any other business or occupation for remuneration or profit" and offering "various incentives . . . so that [he] would agree to focus all of his entrepreneurial skills solely on selling insurance" is within the business of insurance. *Thompson*, 644 F.2d at 439.

One could easily argue that exclusive relationships can be found in businesses unrelated to insurance. However, to exclude from the business of insurance any activity that could, hypothetically, also be present in a business unrelated to insurance is too

expansive and would effectively exclude nearly all activity from the McCarran-Ferguson Act. In *Pireno*, the Supreme Court clarified that conduct involving "third parties wholly outside the insurance industry" is not the business of insurance. 458 U.S. at 132. Brokers, such as those employed by Florida Blue, are not parties wholly outside the insurance industry. To the contrary, Oscar concedes the brokers play an instrumental role in the sale of health insurance. For the foregoing reasons, Florida Blue's exclusive broker agreement constitutes the business of insurance.

### 2.    Regulated by State Law

The second element of the McCarran-Ferguson Act is whether the challenged activity is regulated by state law. *Gilchrist*, 390 F.3d at 1330. The Eleventh Circuit previously held "[t]he State of Florida heavily regulates the insurance industry." *Id.* at 1334. Chapters 624 through 651 govern the insurance industry in Florida. For example, Florida Statutes §§ 626.011–711 govern licensing procedures and general requirements for insurance representatives, Florida Statutes §§ 626.826–839 control health insurance agents, and Florida Statutes §§ 627.601–64995 concern health insurance policies. Oscar's argument that the Florida Insurance Code does not specifically regulate exclusive brokerage agreements, thereby taking Florida Blue's exclusive brokerage agreements outside the McCarran-Ferguson Act, is misplaced.[16]

Florida law comprehensively regulates the insurance industry, including the relationship between principles and their agents. In *Gilchrist*, auto insurance policyholders

---

[16]  Oscar cites a portion of a statement by the Florida Department of Financial Services ("**DFS**") in the Amended Complaint. The Court agrees with Florida Blue that the entire text of the communication does not support Oscar's claim that Florida law does not govern the insurer's agency relationship with its brokers. (Doc. 81, p. 12).

sued State Farm Mutual Insurance for using non-original equipment manufactured ("**OEM**") parts when making repairs. *Gilchrist*, 390 F.3d at 1330. In applying the McCarran-Ferguson Act, the Eleventh Circuit held that Florida regulates the insurance industry in general and the use of non-OEM parts in particular. *Id.* at 1334. Here, Florida regulates the insurance industry in general and the relationship between principles and their agents in particular. It is, therefore, unnecessary that the state enact a specific statute regulating insurance/non-OEM parts or insurance/exclusive brokerage agreements. Oscar's construction of the law creates an impossibly high bar where each challenged relationship or activity must be regulated by a single, specific statute. The Fifth Circuit was correct in holding that the second element of the exemption requiring the challenged activities to be regulated by state law "is not a high bar for antitrust defendants to clear." *Sanger*, 802 F.3d at 745. Accordingly, the Court finds the challenged activity is regulated by state law.

The Court's finding that Florida regulates the business of insurance is a catch-22 situation. The McCarran-Ferguson Act specifies that the business of insurance is exempt from the antitrust laws only if regulated by the state. Florida law regulates the insurance industry and restraint of trade. *See* Fla. Stat. §§ 542.18–19. However, Florida's legislature enacted § 542.20 which exempts from Florida's regulation of monopolies and restraint of trade any activity exempt from provisions of the antitrust laws of the United States. Thus, activity exempt under McCarran-Ferguson is exempt from Florida's laws regulating that same conduct. Not every state has enacted this "pass-through" exemption from antitrust scrutiny, but Florida has. A reasonable argument can be made that Florida's pass-through exemption precludes a finding that the activity is regulated by the state. That is, one can

argue that state regulation means *effective* state regulation and that such regulation is defeated by Fla. Stat. § 542.20. Yet, the McCarran-Ferguson Act only requires that the state regulates the activity, which is indeed the case here. Florida is free to enact exemptions from its own antitrust law—the wisdom of which is left to the state legislature to ponder. This Court may not add language to the McCarran-Ferguson Act that is clearly absent. Had Congress intended for the exemption to exist only when state laws both regulate the activity and preclude exemption from the state's scrutiny, it would have said as much.

### 3.    *Boycott, Coercion, or Intimidation*

The third and final element of the Act requires the Court to decide if the challenged activity constitutes a boycott, coercion, or intimidation. 15 U.S.C. § 1013(b).[17] At issue in this case is whether the challenged exclusive broker agreements involve coercion. Oscar's Amended Complaint contains several paragraphs alleging facts which Oscar contends demonstrate coercion by Florida Blue over its brokers. The Amended Complaint also sets forth numerous paragraphs which contain a factual statement surrounded by conclusory allegations and legal assertions. (*See* Appendix A). The Court will focus upon the statements of fact as opposed to the conclusory allegations, formulaic recitations of the elements of a claim, and legal assertions.

Stripped of argument and advocacy, the Amended Complaint alleges that Florida Blue's brokers entered into exclusivity agreements, and Florida Blue enforced those agreements by: 1) reminding the brokers of their legal obligation to sell health insurance

---

[17] "Nothing contained in this chapter shall render the . . . Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation."

only for Florida Blue; and 2) by terminating a broker who promoted a competitor's product and recruited brokers to work for the competition. The issue is whether the enforcement of exclusivity agreements is coercion such that the McCarran-Ferguson exemption is defeated.

The Eleventh Circuit unequivocally held in *McWane, Inc. v. FTC*, that "exclusive dealing arrangements are not per se unlawful, but they can run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly." 783 F.3d at 832. [18] The court in *McWane* was addressing market share and monopoly power or the dangerous probability of achieving it. *Id.* at 829. The court provided the following example to show how a company with a dominant position may run afoul of antitrust scrutiny:

> [S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

*Id.* at 832 (citations omitted). Florida Blue's use of exclusive brokerage agreements predates Oscar's entry into the market. Oscar asks this Court to find that the continued use of exclusivity agreements, and Florida Blue's enforcement of such lawful contractual relationships, constitutes coercion. In so doing, Oscar focuses upon the analysis reserved for assessing the existence and maintenance of a monopoly, not the analysis used when applying the McCarran-Ferguson Act.

---

[18] Exclusivity agreements were also present in *Sanger Insurance Agency*, and insurers declined to do business with Sanger due to their exclusive arrangement with HUB. 802 F.3d at 734. *See also Thompson v. New York Life Ins.*, 644 F.2d at 444; *Arroyo-Melecio*, 398 F.3d at 68.

The Government similarly ignores the Eleventh Circuit's holding in *McWane* approving of exclusive brokerage agreements. The Government disregards the lawful exclusivity agreements entered into between Florida Blue and its brokers and avers that Florida Blue's communications with its brokers designed to enforce the contract is coercive. (Doc. 89, p. 11). The Government relies upon definitions of coercion found in *Black's Law Dictionary* and *Webster's Second New International Dictionary* instead of discussing or distinguishing *McWane, Sanger, Thompson,* and *Arroyo-Melecio*. The Court is not persuaded by the reasoning advanced by Plaintiff or the Government's contribution.

At oral argument, Florida Blue observed that—according to Oscar—once a competitor attempts to enter the market, a company may not enforce a lawful contractual relationship with its brokers because an attempt to enforce the contract is transformed into coercion. Florida Blue's argument is well taken. Oscar focuses upon the strenuous language employed by Florida Blue to impress upon its brokers their obligations under the exclusive agreement, but the tone of the message is irrelevant. If a contractual relationship is lawful, a party may enforce the agreement without those efforts morphing into coercion. Similarly, it is irrelevant to the issue of coercion that brokers who violate the agreement lose all of Florida Blue's business. The brokers agreed to work exclusively for Florida Blue in exchange for access to all of Florida Blue's product lines. The consequences of violating the agreement is the broker's inability to sell insurance for Florida Blue. There is nothing coercive about enforcing the contractual relationship. Obviously, if the McCarran-Ferguson exemption did not apply, the Court would consider the continued use of exclusive brokerage agreements in the context of maintaining

monopoly power. The Court, however, declines to jump forward to considerations of the maintenance of monopoly power when the only issue is whether Florida Blue engaged in coercion vis-à-vis its brokers.[19]

## IV.   CONCLUSION

Florida Blue's brokers provide services that spread the policyholder's risk, and their work in providing guidance to ACA consumers is an integral part of the policy. The brokers act within the business of insurance, and the exclusive broker arrangement is regulated by state law. That is, state law provides comprehensive regulation of the insurance industry and agency relationships. The fact that the Florida Legislature chose to enact a law exempting from state antitrust scrutiny activity exempted under the McCarran-Ferguson Act is not outcome-determinative. The State of Florida has the right to create exemptions from its antitrust laws, and any modification of that law is left to the discretion of the Legislature. Finally, Florida Blue's contract with its brokers requiring them to sell insurance only for Florida Blue at the risk of losing access to all of Florida Blue's product lines is lawful, and Florida Blue has the right to enforce the agreement. Florida Blue's efforts at enforcing a lawful contract are not coercive, regardless of the tone or tenor of the language employed by Florida Blue.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant Florida Blue's Motion to Dismiss (Doc. 81), pursuant to the McCarran-Ferguson Act, is

---

[19]  Oscar and Florida Blue disagree over whether § 1013(b) requires concerted action for coercion, with the Government siding with Oscar. (Doc. 81, pp. 13–15; Doc. 86, pp. 8–11; Doc. 89, pp. 13–16). The Court will not address this dispute, having found that the challenged activity—enforcement of a contractual relationship—does not meet the definition of coercion even assuming concerted action is not required.

**GRANTED**. The Amended Complaint is **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to close the case.

      **DONE AND ORDERED** in Orlando, Florida on September 20, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

## APPENDIX A

¶ 5     Faced with a major threat to its monopoly profits, Florida Blue responded by implementing a blatant scheme targeted at Oscar to keep it out of the state, thereby causing Florida consumers to continue to pay more for health insurance coverage. First and foremost, the scheme involves denying Oscar access to insurance brokers upon whom consumers rely to advise them of their insurance options. Florida Blue has a company policy—brazenly displayed on its website—that no broker may sell Florida Blue's individual plans unless that broker agrees to sell *only* Florida Blue's individual plans. Florida Blue wrongfully uses its monopoly power to compel brokers to sell only its plans when industry standards require independent brokers to find the best options for consumers' needs. Second, Florida Blue aggressively and selectively enforced this exclusivity policy against Oscar by systematically contacting brokers who had signed contracts with and been appointed as brokers by Oscar to threaten them with permanent termination. In one email to brokers in October 2018, during the very same week in which Florida Blue learned Oscar's plans are lower-priced than its own, Florida Blue said "**[you] will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

¶ 6     … If appointed by Oscar, brokers face losing the right to sell Florida Blue plans in *all product lines* throughout *the entire State of Florida* if they decide to sell Oscar plans in *a single county in the state*… Several brokers have explained they have no choice but to stay with Florida Blue:

> • **"I just got word that any Florida Blue agents who will be contracting with Oscar will be terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here. Losing our Blue Contract would be a financial disaster."**

> • **"Unfortunately I need to rescind my request, as Florida Blue has informed me that they will cancel my contract if they see new appointments for any products in any area of Florida. This would be highly detrimental as they would be keeping most of my book of business."**

> • **"This is a request to terminate my Oscar contract as I am also appointed With FL blue and they can only allow captive agents to work with them."**

¶ 7     Florida Blue's coercion of brokers not to deal with new entrants like Oscar stymies those entrants' ability to compete…

¶ 10    The consequences for Oscar already have been severe. Under pressure from Florida Blue, at least 235 brokers backed out of agreements to sell Oscar's plans once they were threatened with termination by Florida Blue. Because the bulk of this coercive pressure was applied only one week before the beginning of the open enrollment period–the only six weeks during which health insurers selling individual ACA plans can sign up customers for the entire following year–Oscar has limited opportunity to respond to this

blatantly anticompetitive tactic. Even before cancellations started mounting, other major brokers, including many of the largest and most successful brokers servicing the Orlando area, refused even to discuss dealing with Oscar out of fear of losing Florida Blue's business…

¶ 53   Florida Blue makes no secret of its exclusivity policy with respect to brokers that sell individual insurance plans. Its website states "**Our appointment to sell individual products is an exclusive contract . . . .**" Thus, if a broker wants to sell individual plans for Florida Blue, it must agree to sell only Florida Blue's individual plans.

¶ 54.   Florida Blue obtained and enforced these exclusive dealing agreements through coercion and intimidation, including threatening to exclude brokers from a significant portion of the market for individual ACA insurance plans. Because Florida Blue accounts for approximately 75 percent of these plans sold statewide and even higher shares in Orlando and other metro areas, brokers who already do significant business with Florida Blue cannot afford to refuse them.

¶ 55.   After Oscar's planned entry into Orlando became public in the summer of 2018, Florida Blue, on its own and through the CGAs upon which it has forced exclusivity, initiated a concerted effort to intimidate brokers into refusing to work with Oscar.

¶ 56.   During a conference attended by approximately 400 brokers on or about August 29, 2018 at an Embassy Suites in Lake Buena Vista, Florida, a Florida Blue representative stated that any brokers with any other company listed on their licenses or selling other plans would be found in violation of the exclusivity policy, permanently terminated and have their commission payments withheld.

¶ 57.   At a meeting attended by brokers on or about September 25, 2018 at Florida Blue's offices in Lake Mary, Florida, Beau Shiflet, the Central Florida Area Manager for Florida Blue, stated that he had attended an Oscar informational meeting held in Kissimmee, Florida, and had observed that there were agents appointed by Florida Blue in attendance. As a result, Mr. Shiflet went on to threaten the brokers that attended the meeting at Florida Blue's offices that their Florida Blue contracts would be canceled if they were found to be working with Oscar. Oscar was the only competitor that Mr. Shiflet mentioned in reference to Florida Blue's exclusivity policy.

¶ 58.   Two days later, on September 27, 2018, an employee of Rogers Benefit Group, a CGA, sent an email to insurance agencies, copying Frank Merlino, Southern Area Manager of Individual Sales for Florida Blue, regarding Florida Blue's exclusivity policy. The email stated that some agencies seeking to appoint Florida Blue agents had been "using an outdated exclusivity form." The email purported to attach the most up-to-date form and requested that agencies "**send this exclusivity form to ALL YOUR AGENTS and have them sign it, along with an email reminding them of the exclusivity requirements." The email further stated that "if an agent does not sign this form and submit it to us, Frank will terminate them**."

¶ 59.   On or around October 10, 2018, Florida Blue terminated the appointment of another broker who hosts a local radio show and simply had an Oscar representative as a guest on his show. When that broker asked why his appointment with Florida Blue was terminated, Mr. Shiflet replied, "**We saw and heard your radio program with Oscar leadership promoting them in the Orlando market and the recruiting of agents. This is not what we are looking for in our business partners**."

¶ 60.   Florida Blue's intimidation efforts intensified as the 2019 ACA open enrollment approached. In the week before the start of the open enrollment period, the very week that Oscar's competitive pricing for 2019 plans became public, Florida Blue systematically contacted brokers appointed by Oscar, using appointment information that is publicly available on the Florida Department of Financial Services website. These communications threatened to permanently deny Oscar-appointed brokers business from Florida Blue, not only in the Orlando metro area, but throughout Florida, if they continued to do business with Oscar. Florida Blue's behavior occurred only a week before the commencement of the open enrollment period on November 1, 2018 in which health insurance providers sign up all their business for the following year.

¶ 61.   For example, on October 24, 2018, Mr. Shiflet sent an email to brokers threatening, "**You . . . will have 48 hours to terminate your Oscar appointment or we will terminate your Florida Blue appointment with no eligibility of reappointment with us.**"

¶ 62.   In an email received by Oscar that same day, October 24, 2018, one broker wrote to Oscar, "**This is a request to terminate my Oscar contract as I am also appointed with FL Blue and they can only allow captive agents to work with them**."

¶ 63.   Similarly, on October 29, 2018, another broker explained to Oscar, "**I just got word that any Florida Blue agents who will be contracting with Oscar will be terminated immediately. . . . I have a very large book with Blue and Oscar is not in my area here. Losing our Blue Contract would be a financial disaster.**"

¶ 64.   On October 25, 2018, Florida Blue again updated its exclusivity policy. The new form added questions that Florida Blue required appointed agents to answer, including "**Do you understand the exclusivity clause and agree to not sell any other carriers for over and under 65 policies . . . ?**" The exclusivity policy states "**You must sell and solicit Florida Blue Over 65 Products exclusively at all times. There is not any circumstance where you may sell an O65 competitor medical product**" and "**You must sell and solicit Florida Blue U65 medical products exclusively at all times. There are not any circumstances where you can sell an Under 65 medical product.**" According to the policy, "**Any agent or agency that violates the exclusivity arrangement with Florida Blue will be permanently terminated for cause**."

¶ 65.   Florida Blue's intimidation tactics are particularly effective because it works in concert with the CGAs to propagate its threats to other brokers. Florida Blue's CGAs

wield significant control over commission payments to brokers. Florida Blue pays CGAs a lump sum from which CGAs are responsible for distributing broker commission payments based on broker performance. CGAs have considerable leeway in distributing commission payments, and they can withhold commissions or even terminate a broker if that broker violates the terms of Florida Blue's exclusivity policy.

¶ 66.   As a result, Florida Blue's CGAs exert considerable control over the many brokers they recruit for Florida Blue. And through its CGAs, Florida Blue has more help policing and enforcing exclusivity. Florida Blue requires exclusivity not just from its CGAs, but also the many brokers that contract with CGAs, who often market themselves as independent brokers. In turn, Oscar and other potential new entrants are foreclosed from access not just to direct customers of CGAs, but also to the customers of the brokers with whom the CGAs contract.